Daniel A. Small (*Pro Hac Vice* forthcoming)
Brent W. Johnson (*Pro Hac Vice* forthcoming)
Jeffrey B. Dubner (*Pro Hac Vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW
Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com
bjohnson@cohenmilstein.com
jdubner@cohenmilstein.com

[Additional Counsel Listed on Signature Page]

*Attorneys for Representative Plaintiff Robert A. Nitsch, Jr. and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

**Robert A. Nitsch, Jr.,**

Plaintiff, and on behalf of all others similarly situated,

vs.

**DreamWorks Animation SKG, Inc.; Pixar; Lucasfilm Ltd., LLC; The Walt Disney Company; Digital Domain 3.0, Inc.; ImageMovers; ImageMovers Digital; Sony Pictures Animation and Sony Pictures Imageworks;**

Defendants.

Case No: ________________

**ANTITRUST CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

Plaintiff Robert A. Nitsch, Jr., individually and on behalf of all others similarly situated, ("Plaintiff") alleges the following:

## I. INTRODUCTION

1. Visual effects and animation companies have conspired to systematically suppress the wages and salaries of those who they claim to prize as their greatest assets—their own workers. In *per se* violations of the antitrust laws, the leaders and most senior executives of Defendants Pixar, Lucasfilm and its division Industrial Light & Magic, DreamWorks Animation, The Walt Disney Company and its division Walt Disney Animation Studios, Digital Domain and others secretly agreed to work together to deprive thousands of their workers of better wages and opportunities to advance their careers at other companies. These workers include animators, digital artists, software engineers and other technical and artistic workers who are the creative genius and dedicated workhorses behind such wonders as Wall-E (Pixar), the Shrek series (DreamWorks Animation), the Harry Potter adaptations (Lucasfilm/ILM) and the Transformers series (Digital Domain), among others. The conspiracy deprived Plaintiff and other class members of millions of dollars which Defendants instead put to their bottom lines. It did so at the same time that the films produced by these workers achieved world renown and generated billions of dollars in revenues in the United States and abroad.

2. The conspiracy was initiated and carried out by some of the most recognizable names in the American entertainment and technology industries. Steve Jobs, an American technology icon and the founder of Apple, and his deputy Ed Catmull, the President of Pixar, initiated the conspiracy with filmmaker George Lucas, the creator of the Star Wars franchise and founder of Lucasfilm and its well-known division Industrial Light & Magic ("ILM"). Jobs purchased Lucasfilm's computer graphics division in 1986 and created a separate new company called "Pixar." With Jobs as its CEO, Pixar agreed with Lucasfilm that (a) they would not cold call each other's employees; (b) they would notify the other company when making an offer to an employee of the other company, if that employee applied for a job notwithstanding the agreement not to cold call; and (c) the company making such an offer would not increase its offer if the company currently employing the employee made a counteroffer. Such an agreement is referred to as a non-solicitation agreement herein.

3. Jobs led Pixar as CEO until 2006, during which time he and Catmull worked to spread the conspiracy and these types of anti-competitive agreements throughout the visual effects and animation industry.

4. By no later than 2004 (and possibly much earlier), Steve Jobs and the CEO of DreamWorks Animation, Jeffrey Katzenberg, had personally discussed and formed similar "no raid" agreements between their companies. As Catmull explicitly acknowledged in an email: "we have an agreement with DreamWorks not to actively pursue each others employees." Catmull acknowledged under oath that Jobs and Katzenberg discussed the subject and that the two companies weren't "going after each other."

5. When The Walt Disney Company purchased Pixar in 2006 (and possibly well before), the non-solicitation agreements spread to Disney's other animation studios, including Walt Disney Feature Animation (now Walt Disney Animation Studios). Indeed, Disney quickly made Catmull—one of the architects and chief drivers of the scheme—the President of both Walt Disney Feature Animation and DisneyToons. Together with Dick Cook, then the Chairman of Walt Disney Studios, Catmull soon formed a non-solicitation agreement with ImageMovers, a company founded by director Robert Zemeckis in 1997.

6. The conspiracy was not limited to bilateral agreements between Pixar and other studios; rather, it included an overarching agreement among all Defendants. As Catmull explained to Cook in 2007, the conspiracy was more comprehensive: "[w]e have avoided wars up here in Norther[n] California because all of the companies up here – Pixar, ILM, Dreamworks, and couple of smaller places [sic] – have conscientiously avoided raiding each other."

7. Catmull and other leaders of the conspiracy policed any violation of the conspiracy, even when it did not directly involve efforts to recruit their own employees. Whenever a studio threatened to disturb the conspiracy's goals of suppressing wages and salaries by recruiting employees and offering better compensation, the leaders of the conspiracy took steps to stop them for the anti-competitive benefit of all conspirators. For example, when ImageMovers began recruiting workers for its digital wing, ImageMovers Digital, in 2007, Catmull intervened to stop them from targeting other conspirators, even though he knew they would not target his company

Pixar. His express purpose in doing so was to keep solicitation efforts from "mess[ing] up the pay structure." At Catmull's request, a Disney senior executive advised ImageMovers to comply with the broad conspiracy.

8. The intent of the conspiracy was to suppress wages throughout the industry. As Catmull later explained under oath, his concern about "mess[ing] up the pay structure" was that it would make it "very high." Lucasfilm's then-President Jim Morris explained the goal even more succinctly in a June 2004 email to Catmull: "I know you are adamant about keeping a lid on rising labor costs." In Catmull's view, the agreements "worked quite well"—to the benefit of Defendants' bottom lines, but at the expense of workers throughout the visual effects and animation industry.

9. The conspiracy among the visual effects and animation companies was not limited to the non-solicitation agreements. The most senior personnel from the human resources and recruiting departments of the companies met yearly to discuss job titles to be included an industry compensation survey. They used meetings and events outside the survey meeting to exchange information about wages and salaries and fix the salaries and wages of their workers within narrow ranges for the ensuing year. At least at one defendant, these meetings were called the annual "salary council."

10. Defendants, both through their top executives and their human resources and recruiting departments, also communicated throughout the year to implement and enforce these non-solicitation and wage-fixing agreements while keeping them secret from their workers and others in the industry. Senior human resources and recruiting personnel met for lunches, dinners, drinks and other informal meetings at other times during the year as well. They even communicated directly to ensure that the non-solicitation agreements were not breached and salaries were not raised to competitive levels.

11. The cooperation among Defendants was so systematic and deeply ingrained that in some instances, many conspirators were on the same emails concerning compensation for their workers. For instance, in late 2006, the head of human resources at Pixar sent an email to the heads of human resources at DreamWorks, Sony Pictures Imageworks, Lucasfilm/ILM, Walt Disney

Animation Studios and others to provide Pixar's budget for salary increases in the following year, 2007, and to ask for the other studios' salary increase budgets in return.

12. Defendants engaged in the conspiracy to avoid paying their workers at competitive pay levels. As George Lucas stated, Defendants wanted to "keep the industry out of a "normal industrial competitive situation." He also stated: "I always—the rule we had, or the rule that I put down for everybody," was that "we cannot get into a bidding war with other companies because we don't have the margins for that sort of thing." Ed Catmull has stated: "[e]very time a studio tries to grow rapidly . . . it seriously messes up the pay structure . . . by offering high salaries to grow at the rate [a company] desire[s], people will hear about it and leave."

13. All of the Defendants kept the agreements secret from their employees. Only their top executives and human resources and recruiting personnel involved in the conspiracy communicated about the agreements orally or in emails among themselves, and they almost always insisted that the agreements not be committed to writing.

14. The Antitrust Division of the United States Department of Justice (the "DOJ") investigated Defendants Pixar and Lucasfilm's non-solicitation agreement. The DOJ found that their agreement was "facially anticompetitive" and violated the Sherman Act *per se*. As the DOJ explained, the agreement "eliminated significant forms of competition to attract digital animators and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities." The DOJ concluded that the agreement "disrupted the normal price-setting mechanisms that apply in the labor setting." Defendants Pixar and Lucasfilm signed settlements enjoining them from making such non-solicitation agreements again.

15. These agreements unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*, and constituted unfair competition and unfair practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* Plaintiff Robert A. Nitsch, Jr., on his own behalf and on behalf of the class defined herein, seeks to recover the difference between the wages and salaries that class

members were paid and what class members would have been paid in a competitive market, and to enjoin Defendants from continuing their unlawful agreements.

## II.    PARTIES

16.     Plaintiff Robert A. Nitsch, Jr. was a Senior Character Effects Artist at DreamWorks Animation from 2007 to 2011 in Los Angeles, California and a Cloth/Hair Technical Director at Sony Pictures Imageworks during 2004 in Los Angeles, California.  He is a resident of the state of Massachusetts.

17.     Defendant Digital Domain 3.0, Inc. ("Digital Domain"), formerly known as Digital Domain, Inc., is a Delaware corporation with its principal place of business at 12641 Beatrice Street, Los Angeles, California.

18.     Defendant DreamWorks Animation SKG, Inc. ("DreamWorks") is a Delaware corporation with its principal place of business located at 1000 Flower Street, Glendale, California. It has a studio in Redwood City, California, located in Santa Clara County.

19.     Defendant ImageMovers, LLC is a California corporation with its principal place of business located at 1880 Century Park East, Suite 1600, Los Angeles, California.

20.     Defendant ImageMovers Digital (together with ImageMovers, LLC, the "ImageMovers Defendants") is, upon information and belief, a California corporation located at P.O. Box 10428, San Rafael, CA 94912.  From February 2007 to January 2011, ImageMovers, LLC and Walt Disney Studios participated in an entity called ImageMovers Digital that had its principal place of business at 9 Hamilton Landing, Novato, California.

21.     Defendant Lucasfilm Ltd., LLC ("Lucasfilm") is a California corporation with its principal place of business located at 1110 Gorgas Ave., San Francisco, California.  Industrial Light & Magic ("ILM") is a division of Lucasfilm.  Since 2012, Lucasfilm and ILM have been owned by Defendant The Walt Disney Company.

22.     Defendant Pixar is a California corporation with its principal place of business located at 1200 Park Avenue, Emeryville, California.  Since 2006, it has been owned by Defendant The Walt Disney Company.

23. Defendant Sony Pictures Animation, Inc. is a California corporation with its principal place of business located at 9050 W. Washington Blvd., Culver City, California.

24. Defendant Sony Pictures Imageworks, Inc. (together with Sony Pictures Animation, Inc., the "Sony Defendants") is a California corporation with its principal place of business located at 9050 W. Washington Blvd., Culver City, California.

25. Defendant The Walt Disney Company ("Disney") is a Delaware corporation with its principal place of business located at 500 South Buena Vista Street, Burbank, California. Walt Disney Studios is a division of Disney with its principal place of business located at 500 South Buena Vista Street, Burbank, California. Walt Disney Studios oversees the operations of both Walt Disney Animation Studios and, since 2006, Pixar. Walt Disney Animation Studios is a division of Disney with its principal place of business located at 2100 W. Riverside Drive, Burbank, California. Walt Disney Animation Studios was formerly known as Walt Disney Feature Animation.

## III. JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4 and 16 and 28 U.S.C. §§ 1331 and 1337.

27. This Court has personal jurisdiction over Defendants because each resides in or has its principal place of business in the state of California, employed individuals in this state during the Class Period, and has had substantial contacts within the state of California in furtherance of the conspiracy.

28. Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this judicial district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and multiple defendants reside in this district.

## IV. INTRADISTRICT ASSIGNMENT

29. Pursuant to Civil Local Rule 3.2(c) and (e), assignment of this case to the San Jose Division of the United States District Court for the Northern District of California is proper because a substantial part of the events and omissions which give rise to Plaintiff's antitrust claims occurred within the San Jose Division.

## V. NATURE OF WORK IN THE VISUAL EFFECTS AND ANIMATION INDUSTRY

30. Defendants are each in the business of creating visual effects and animation for motion pictures. That business depends on the labor of thousands of skilled animators, graphic artists, software engineers and other technical and artistic workers. Major animated films and films with significant visual effects require hundreds of workers with special training and millions, if not tens of millions, of dollars of investment in the visual effects and animation. Defendants create those effects and animation for movies produced by major motion picture studios such as Warner Bros. Pictures, 20th Century Fox, Universal Pictures, Paramount Pictures or Walt Disney Studios, or sometimes for their own movies.

31. A limited number of studios have the know-how, technological resources and industry experience to handle the visual effects and animation work required by modern motion pictures.

32. Visual effects and animation workers frequently obtain formal specialized schooling and training for their craft and then gain invaluable experience and skills specific to the industry throughout their careers. They develop and use specialized software and other tools unique to the industry.

33. Visual effects and animation workers primarily work for studios as employees or independent contractors[1] paid on an hourly basis, although studios also employ permanent salaried employees. Studios frequently ask their employees to agree to work for them for the length of a particular project, often corresponding to the length of the studio's work on a particular feature or movie. Those periods frequently last between three to nine months, but can be as short as a few weeks. Studios also sometimes ask workers to commit to the studio for one to three years with the caveat that the studio has the option to terminate their employment either at any time or after particular periods of time. During their tenures at the studios, many workers do not receive health care benefits from the studio.

[1] For convenience, this complaint refers to class members as "employees" even though some of them may have worked for Defendants as independent contractors.

34. Working in the industry requires great commitment. Studios frequently ask their employees to work feverishly for months or even years, including days or weeks straight without a day off and into the early hours of morning. Visual effects and animation workers also bear great risk in that the studios regularly terminate them after their project or a particular feature film production ends. They then have to find new employment with another studio or again with the current studio. Most are not paid during periods of unemployment in between projects. Studios sometimes also delay projects or terminate them early and do not pay their workers during those delays or after the early termination. Studios sometimes ask workers to move to other states to work on projects there.

## VI. THE CONSPIRACY

35. Defendants conspired not to actively solicit each other's employees and to fix their employees' wage and salary ranges as part of one overarching conspiracy to suppress the compensation of their employees and other class members.

### A. Defendants Agreed Not to Actively Solicit Each Others' Employees

36. Defendants competed for class members' services, but agreed to severely limit their competition by abandoning one of the most effective ways of recruiting employees. Specifically, each Defendant agreed not to actively solicit employees of other Defendants. Through these agreements, Defendants agreed not to contact their coconspirators' employees to inform them of available positions unless that individual employee had applied for a job opening on his or her own initiative.

37. Such solicitation, often called "cold calling," is a key competitive tool in a properly functioning labor market for skilled labor. Competing studios' employees represent one of the main pools of potential hires with the appropriate skills for an open position, and who may be unresponsive to other forms of recruiting. And compared to unemployed workers or employees actively seeking new employment, employees who are not actively seeking to change employers are more likely to be the highest quality employees. Because they are not looking for other jobs, they are difficult to reach without active solicitation. As Lucasfilm recognized internally, "[p]assive talent [is] difficult to find." A company searching for a new hire can save costs and avoid risks by

poaching that employee from a rival company.  Thus, if Defendants were acting in their independent self-interests, they would actively solicit each other's employees.

38.     Defendants also sought to restrain competition by agreeing to notify each other when an employee of one Defendant applied for a position with another Defendant, and to limit counteroffers in such situations.  Thus, when an employee at one Defendant contacted a second Defendant and the second Defendant decided to make an offer, it would (a) notify the first Defendant, and (b) decline to increase its offer if the current employer outbid it.   Again, if Defendants were acting in their independent self-interests, they would not preemptively tell their competitors that they were offering jobs to the competitor's employees or refuse to bid against their competitors.

**(1)     Pixar and Lucasfilm's Initial Non-Solicitation Agreement**

39.     The roots of the conspiracy reach back to the mid-1980s.  George Lucas, the former Lucasfilm Chairman of the Board and CEO, sold Lucasfilm's "computer division," then a "tech, research and development company," to Steve Jobs, who had recently left the employ of Apple as CEO.  Jobs named his new company Pixar.  Lucas and Jobs's deputy, Pixar's President Ed Catmull, along with other senior executives, subsequently reached an express agreement to restrain their competition for the skilled labor that worked for the two companies.  Pixar drafted the terms of the agreement and communicated those terms to Lucasfilm; both Defendants then communicated the agreement to senior executives and select human resources and recruiting employees.  Lucas has stated in email that Pixar and Lucasfilm "have agreed that we want to avoid bidding wars."  He has also stated that the agreement was that "we wouldn't actively try to raid each other's companies" and that "we agreed not to raid each other" and "I think the part of the agreement is not to solicit each other's employees, is the crux of it."

40.     Pixar's President, Edwin Catmull, agreed with George Lucas that the newly independent Pixar would reciprocate this non-compete "rule" with Lucasfilm.  The companies thus agreed: (1) not to cold call each other's employees; (2) to notify each other when making an offer to an employee of the other company if that employee applied for a job on his or her own initiative; and

(3) that any offer by the potential new employer would be "final" and would not be improved in response to a counteroffer by the employee's current employer (whether Pixar or Lucasfilm).

41.    Pixar and Lucasfilm were similarly explicit about declining to make counteroffers. An internal Pixar email sent on January 16, 2006 explained that "we agreed not to counter . . . .  It's a very small industry and neither Lucas or Pixar wants to get into an issue of countering offers back and forth." Their explicit policy was to "never counter if the candidate comes back to us with a better offer."

42.    In the years since the initiation of the conspiracy, Pixar and Lucasfilm implemented their agreements and enforced them.  For instance, in 2007, from its principal place of business in Emeryville, California, Pixar twice contacted Lucasfilm regarding suspected violations of their agreements.  Lucasfilm responded by changing its conduct to conform to its anticompetitive agreements with Pixar.  Through these actions and others, Pixar and Lucasfilm harmed their respective workers, depriving them of the wages and salaries they would have received in a competitive market.

43.    In addition to Lucasfilm/ILM, Pixar eventually formed similar non-solicitation agreements with at least DreamWorks, Walt Disney Animation Studios, the ImageMovers Defendants and the Sony Defendants.  In addition to Pixar, Lucasfilm/ILM eventually formed similar non-solicitation agreements with at least DreamWorks, Walt Disney Animation Studios, the ImageMovers Defendants and Digital Domain.

**(2)    The Conspiracy's Expansion: DreamWorks, Disney and Others Enter Non-Solicitation Agreements**

44.    Although the initial agreement involved only Pixar and Lucasfilm, it grew under Catmull's leadership to include, at a minimum, Disney and its studio Walt Disney Animation Studios, DreamWorks, the ImageMovers Defendants, Digital Domain and the Sony Defendants.  In 2007, Catmull explained that the conspiracy was more comprehensive and included a "couple of smaller places" as well as Pixar, Lucasfilm/ILM and DreamWorks: "[w]e have avoided wars up here in Norther[n] California because all of the companies up here – Pixar, ILM, Dreamworks, and couple of smaller places [sic] – have conscientiously avoided raiding each other."

*a) DreamWorks*

45. DreamWorks has formed non-solicitation agreements with at least Pixar, Lucasfilm/ILM, Walt Disney Animation Studios and Digital Domain.

46. DreamWorks joined the conspiracy no later than February, 2004. Some time prior to February 2004, Steve Jobs and the CEO of DreamWorks, Jeffrey Katzenberg, personally discussed and formed a non-solicitation agreement between their companies. The agreement, Catmull told Jobs in a February 18, 2004 email, "worked quite well." Catmull reiterated this agreement in a January 14, 2007 email to Disney Chairman Cook: "we have an agreement with Dreamworks not to actively pursue each others employees."

47. As Catmull explained, DreamWorks' agreement with Pixar was not merely between the two companies; rather, it was an agreement among "all of the companies up here – Pixar, ILM, DreamWorks, and couple of smaller places [sic]."

*b) Walt Disney Animation Studios*

48. Walt Disney Animation Studios has formed non-solicitation agreements with at least Pixar, DreamWorks, Lucasfilm/ILM, the ImageMovers Defendants and the Sony Defendants. It began enforcing the agreements no later than 2006, when Catmull was given control over the studio.

*c) Sony Pictures Imageworks and Sony Pictures Animation*

49. The Sony Defendants have formed non-solicitation agreements with at least Pixar, Walt Disney Animation Studios and Digital Domain.

50. In 2004 or 2005, Catmull met in person with senior executives at Sony Animation for the express purpose of attempting "to reach some agreement" because Pixar's "people [we]re becom[ing] really desirable and we need to nip this in the bud." Catmull was able to reach a "gentleman's agreement" between Pixar and Sony.

*d) ImageMovers and ImageMovers Digital*

51. The ImageMovers Defendants have formed non-solicitation agreements with at least Pixar, Walt Disney Animation Studios, Lucasfilm/ILM and DreamWorks. The ImageMovers Defendants joined the conspiracy no later than January 2007.

52. Catmull wrote to Dick Cook, Walt Disney Studios' then-chairman, that he knew "Zemeckis' company [ImageMovers] will not target Pixar."

53. However, the ImageMovers Defendants were still recruiting employees from other conspiring studios such as DreamWorks and The Orphanage,[2] "offering higher salaries," in Catmull's words. Even though Pixar's agreement with the ImageMovers Defendants insulated it from their recruitment efforts, it was concerned about the ImageMovers Defendants "raiding other studios." Catmull advised Cook that he would meet with Steve Starkey, one of the founders of ImageMovers. Cook responded: "I agree."

54. Once Walt Disney Studios had formed an entity with ImageMovers, Catmull advised Walt Disney Studios' President Alan Bergman and Senior Vice President of Human Resources Marjorie Randolph to require the ImageMovers Defendants to abide by the terms of the non-solicitation agreement. Catmull specifically asked for the ImageMovers Defendants to stop recruiting from conspiring studios like The Orphanage. Randolph responded that Disney had in fact gotten the ImageMovers Defendants to agree to the "rules" of the non-solicitation agreement.

*e) Digital Domain*

55. Digital Domain subsequently joined the conspiracy as well and has formed non-solicitation agreements with at least DreamWorks, Lucasfilm/ILM and the Sony Defendants.

56. Beginning in 2007, Digital Domain's Head of Human Resources was Lala Gavgavian, who had previously spent nine years at Lucasfilm's ILM division in senior level roles in talent acquisition for visual effects films and animation. Although Digital Domain's studio and all of its technical and artistic employees were located in the Los Angeles area, Gavgavian worked out of San Rafael in the Bay Area—in the same office building she previously worked at for ILM.

57. Gavgavian and other senior personnel at Digital Domain specifically instructed employees not to cold call or otherwise solicit other Defendants' employees. Indeed, if an employee

[2] The Orphanage was a visual effects studio with offices in San Francisco and Los Angeles. It went out of business in 2009.

of Lucasfilm/ILM, DreamWorks or the Sony Defendants even contacted Digital Domain independently about applying for a job, the contact had to be reported to Gavgavian.

**(3) Further Expansion and Enforcement of the Conspiracy**

58. Defendants repeatedly sought non-solicitation agreements with new animation and visual effects studios. For example, when a small 20-person studio named Lightstream Animation opened in Petaluma, California in 2008, Lucasfilm's President and Executive in Charge of Production both immediately concluded that they should seek a non-solicitation agreement—even though Lucasfilm's Chief Administrative Officer believed the startup was not "going to be a significant impact on our ability to recruit."

59. Defendants implemented and enforced their non-solicitation agreements through direct communications. In 2007, for example, Pixar contacted Lucasfilm twice regarding suspected violations of their agreements, leading Lucasfilm to abandon the recruiting activity Pixar had complained about. In 2007, Disney made it clear to ImageMovers that they needed to abide by the non-solicitation agreement's rules and the ImageMovers Defendants obliged.

**B. Defendants Agreed Upon and Fixed the Wages and Salaries of their Workers**

60. Defendants' conspiracy went beyond their illicit non-solicitation agreements. Defendants directly communicated and met regularly to discuss and agree upon wage and salary ranges and communicated directly on an industrywide basis about their respective internal salary plans.

61. At least once per year, some or all Defendants met in either Northern or Southern California to discuss job positions in common among their studios, in order to set the parameters of a compensation survey called the Croner Animation and Visual Effects Survey. This was a survey of wage and salary ranges for the studios' technical or artistic positions, broken down by position and experience level. However, Defendants used the opportunity presented by the Croner meeting to go further than their matching of job positions across companies; they discussed, agreed upon and set wage and salary ranges during meals, drinks and other social gatherings that they held outside of the official Croner meetings.

62. The overall gathering, referred to in Digital Domain's human resources department as the annual "salary council," was attended by senior human resources and recruiting personnel and other studio executives from DreamWorks, Pixar, Lucasfilm/ILM, Disney, Digital Domain, ImageMovers Digital and the Sony Defendants, among others.

63. During these opportunities to communicate outside the official Croner meetings, Defendants discussed salary changes at other studios and the rates that were being offered. For example, it was at a January 2007 salary council that Pixar learned that ImageMovers Digital was recruiting employees from other studios at a higher salary, leading Catmull to ask Disney's chairman to step in. As Catmull put it: "The HR folks from the CG studios had their annual get together in the bay area last week. At that time, we learned that the company that Zemeckis is setting up in San Rafael has hired several people away from Dreamworks at a substantial salary increase."

64. Defendants' top human resources and recruiting personnel met aside from the opportunities presented by the Croner meetings as well. They often met in social settings at restaurants or elsewhere in Los Angeles and the San Francisco Bay Area as well as at industry events, such as the annual Siggraph conference (also known as the International Conference and Exhibition on Computer Graphics and Interactive Techniques) and FMX, the Conference on Animation, Effects, Games and Transmedia.

65. In addition to their in-person meetings, Defendants also communicated through various other means throughout the year about wages and salaries for their workers in an effort to implement the conspiracy more effectively. For example, on November 17, 2006, Pixar's Vice President of Human Resources, Lori McAdams, emailed the following message to senior human resources personnel at DreamWorks, Sony Pictures Imageworks, Lucasfilm, Walt Disney Animation Studios and others:

> Quick question from me, for those of you who can share the info.
>
> What is your salary increase budget for FY '07? Ours is [REDACTED] but we may manage it to closer to [REDACTED] on average. Are you doing anything close, more, or less?"[3]

[3] A redacted version of this document was obtained from the docket in *In re High-Tech Employee Antitrust Litigation*, No. 11-cv-2509 (N.D. Cal.). Plaintiff does not presently have access

66. In other words, Pixar's top human resources executive emailed six direct competitors with the *future* amount that Pixar would be raising salaries and then requested the same information from the other studios. The tone, context and content of the email reveals that this communication was one made in the regular course of Defendants' communications about the conspiracy.

67. No studio acting in its independent self-interest in the absence of a conspiracy to suppress wages would share this information, let alone with such a large group of competitors. Absent an agreement not to compete on wages and salaries, any studio sharing such information would be handing its competitors specific information about how much they needed to raise their offers to outbid it. Such behavior only makes sense in the context of a conspiracy to suppress wages and salaries. The only possible benefit to Pixar from such an action was the facilitation of industrywide suppression of wages and salaries.

68. Human resources and recruiting executives and personnel of the Defendants also have communicated regularly by telephone and other means. Those communications as well as the meetings and events provide opportunities for them to implement and enforce the conspiracy about workers' wages and salaries and to ensure that workers are not solicited.

### C. The Department of Justice Investigated Pixar and Lucasfilm and Enjoined Them from Making Non-Solicitation Agreements

69. The Antitrust Division of the United States Department of Justice (the "DOJ") investigated Defendants Pixar and Lucasfilm's misconduct. The DOJ found that their agreement was "facially anticompetitive" and violated the Sherman Act *per se*. As the DOJ explained, the agreement "eliminated significant forms of competition to attract digital animators and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities." The DOJ concluded that the agreement "disrupted the normal price-setting mechanisms that apply in the labor setting." The DOJ also concluded that Defendants' agreements "were not ancillary to any legitimate collaboration."

---

to the redacted information.

70.     The DOJ noted that the agreement "covered all digital animators and other employees and was not limited by geography, job function, product group, or time period," and that "employees did not agree to this restriction."

71.     Following its investigation, the DOJ filed complaints in federal court against Defendants Pixar and Lucasfilm.  The DOJ also filed stipulated proposed final judgments in each case.  In these stipulated proposed final judgments, Pixar and Lucasfilm agreed to be "enjoined from attempting to enter into, entering into, maintaining or enforcing any agreement with any other person to in any way refrain from, requesting that any person in any way refrain from, or pressuring any person in any way to refrain from soliciting, cold calling, recruiting, or otherwise competing for employees of the other person." The District Court for the District of Columbia entered the stipulated proposed final judgments on March 17, 2011 and June 3, 2011.

## VII.     HARM TO COMPETITION AND ANTITRUST INJURY

72.     Defendants' conspiracy suppressed Plaintiff's and the class's compensation and restricted competition in the labor market in which Plaintiff and the other class members sold their services.  It did so through an overarching agreement concerning non-solicitation and the fixing of wage and salary ranges for their workers.

73.     Concerning the non-solicitation agreements, cold calling and other forms of active solicitation have a significant beneficial impact for individual employees' compensation.  Cold calls from rival employers may include offers that exceed an employee's salary, allowing her to receive a higher salary by either changing employers or negotiating increased compensation from her current employer.  Employees receiving cold calls may often inform other employees of the offer they received, spreading information about higher wage and salary levels that can similarly lead to movement or negotiation by those other employees with their current employer or others.

74.     Active solicitation similarly affects compensation practices by employers.  A firm that actively solicits competitors' employees will learn whether their offered compensation is enough to attract their competitors' employees, and may increase the offer to make themselves more competitive.  Similarly, companies losing or at risk of losing employees to cold-calling competitors

may preemptively increase their employees' compensation in order to reduce their competitors' appeal.

75. These information exchanges, through which information about higher salaries and benefits is exchanged between recruiters of one firm and employees of another, naturally would increase employee compensation. The agreement against active recruitment made higher pay opportunities less transparent to workers and thus allowed employers to keep wages and salaries down.

76. The compensation effects of cold calling are not limited to the particular individuals who receive cold calls, or to the particular individuals who would have received cold calls but for the anticompetitive agreements alleged herein. Instead, the effects of cold calling (and the effects of eliminating cold calling, pursuant to agreement) commonly impact all workers and class members at the Defendants.

77. The Defendants themselves have explained the purpose of the conspiracy and in doing so, articulated the harm and injury caused by it to their workers. George Lucas explained under oath that the purpose of the non-solicitation agreement was to suppress wages and keep the visual effects industry out of "a normal industrial competitive situation." The agreement was explicitly intended to avoid "a bidding war with other companies because we don't have the margins for that sort of thing." Internal Lucasfilm emails similarly explained that the two companies had "agreed that we want to avoid bidding wars."

78. Ed Catmull, the longtime Pixar President who now also oversees Walt Disney Animation Studios, was equally clear about the purpose of the conspiracy and the common injury it caused to visual effects and animation workers as well as to competition in the labor market for their services. In a 2007 email, Catmull explained this goal concisely: hiring people away from competitors with "a substantial salary increase . . . seriously messes up the pay structure." Or, as Lucasfilm's then-President Jim Morris said in a June 2004 email to Catmull, "I know you are adamant about keeping a lid on rising labor costs." During his deposition several years later, Catmull made clear that the problem was high salaries: "[I]t messes up the pay structure. It does. *It makes it very high*." (Emphasis added.) Other companies "would bring in people, they would pay

higher salaries, it would be disruptive. . . . [Catmull] was trying to prevent that from happening." Separately, Mr. Catmull described Mr. Jobs as "very adamant about protecting his employee force," meaning depriving them of opportunities to earn higher wages at other companies.

79. When the wage-fixing was coupled with Defendants' agreements to prohibit counteroffers from the potential new employer, Defendants deprived their workers of the opportunity to have Defendants bid to pay higher wages and salaries for that employee's services. Those agreements suppressed not only the compensation of the workers seeking a new job, but also that of other workers by suppressing the wage ranges on which Defendants based all workers' pay.

80. The effects and injuries caused by all of Defendants' agreements commonly impacted all visual effects and animation workers because Defendants valued internal equity, the idea that similarly situated employees should be compensated similarly and that fair pay distinctions should be made across employees at different levels in the organization. Each Defendant established a pay structure to accomplish internal equity. Defendants fixed narrow wage and salary ranges for employees with similar job titles or classifications and similar levels of experience. And Defendants maintained certain wage and salary differentials between different positions within the hierarchy of the organization. For example, Defendants ensured that lead effects animators earned more than assistant effects animators.

81. At Lucasfilm, for example, internal equity was "always one of the considerations" in setting pay, according to its Director of Talent Acquisitions. Lucasfilm regularly reviewed employee salaries to "align the employee more appropriately in their salary range" and their "internal peer group." At Lucasfilm, all new positions and out-of-cycle compensation adjustments presented to its compensation committee for approval were to be accompanied by "Peer Relationship" information regarding how the subject employee's (or candidate's) colleagues inside the company were compensated, and this factored heavily into committee decisions.

82. Similarly, Pixar recruiters would compare salaries of similar employees to ensure they were not "out of whack." Pixar maintained "a consistent framework for evaluating the expected contribution of software engineers" and to justify adjusting salaries. A Pixar official has stated: "[I]f

someone feels like they're being paid more than someone I know who has more value, it raises a bit of a flag."

83. Digital Domain also utilized a similar pay structure and adhered to its wage and salary ranges strictly. On information and belief, all other Defendants similarly employed a similar pay structure.

84. Defendants' efforts to maintain internal equity ensured that their conspiracy caused the compensation of all their employees to be suppressed.

## VIII. INTERSTATE COMMERCE

85. During the Class Period, Defendants employed Plaintiff and other class members in California, Florida, New Mexico and other states.

86. States compete to attract visual effects and animation studios, leading employment in the industry to cross state lines.

87. Both Defendants and Plaintiff and other class members view labor competition in the industry to be nationwide. Defendants considered each others' wages to be competitively relevant regardless of location, and many class members moved between states to pursue opportunities at studios.

88. Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

## IX. CLASS ALLEGATIONS

89. Plaintiff Robert A. Nitsch, Jr. sues on his own behalf and, pursuant to Federal Rule of Civil Procedure 23(b)(3) and (b)(2), on behalf of the following Class:

> All persons who worked at any time from 2004 to the present in technical, artistic, creative and/or research and development positions for Pixar, Lucasfilm, DreamWorks Animation, Walt Disney Animation Studios, Walt Disney Feature Animation, Digital Domain, ImageMovers Digital, Sony Pictures Animation or Sony Pictures Imageworks in the United States. Excluded from the Class are officers, directors, senior executives and personnel in the human resources and recruiting departments of the Defendants. Also excluded from the Class are the claims against Pixar, Lucasfilm and Disney released in *In re High-Tech Employees Antitrust Litigation*, No. 11-cv-2509 (N.D. Ca.).

90.     The class contains thousands of members, as each Defendant employed hundreds or thousands of class members each year.  The class is so numerous that individual joinder of all members is impracticable.

91.     The class is ascertainable either from Defendants' records or through self-identification in a claims process.

92.     Plaintiff Robert A. Nitsch, Jr.'s claims are typical of the claims of other class members as they arise out of the same course of conduct and the same legal theories, and he challenges Defendants' conduct with respect to the Class as a whole.

93.     Plaintiff Robert A. Nitsch, Jr. has retained able and experienced antitrust and class action litigators as its counsel.  He has no conflicts with other class members and will fairly and adequately protect the interests of the Class.

94.     The case raises common questions of law and fact that are capable of class-wide resolution, including:

a.      whether Defendants agreed not to actively solicit each other's employees, to notify other Defendants of offers made to their employees, and to limit counteroffers;

b.      whether Defendants agreed to fix wage and salary ranges for positions held by class members;

c.      whether such agreements were *per se* violations of the Sherman Act and/or Cartwright Act;

d.      whether Defendants' agreements constituted unlawful or unfair business acts or practices in violation of California Business and Professions Code § 17200;

e.      whether Defendants fraudulently concealed their conduct;

f.      whether and the extent to which Defendants' conduct suppressed wages and salaries below competitive levels;

g.      whether Plaintiff and the other class members suffered injury as a result of Defendants' agreements;

h.      whether any such injury constitutes antitrust injury;

i. the nature and scope of injunctive relief necessary to restore a competitive market; and

j. the measure of damages suffered by Plaintiff and the Class.

95. These common questions predominate over any questions affecting only individual class members.

96. A class action is superior to any other form of resolving this litigation. Separate actions by individual class members would be enormously inefficient and would create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of class members to pursue their claims. There will be no material difficulty in the management of this action as a class action.

97. Injunctive relief is appropriate with respect to the Class as a whole, because Defendants have acted on grounds generally applicable to the Class.

## X. STATUTE OF LIMITATIONS

### A. Continuing Violation

98. Defendants' conspiracy was a continuing violation in which Defendants repeatedly invaded Plaintiff's and class members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreements described herein. Defendants continue to discuss and agree on wage and salary ranges and prohibit active solicitation of other Defendants' employees through the present.

99. Defendants communicated among themselves by phone and email and in in-person meetings in furtherance of the conspiracy as described in the allegations of this Complaint.

### B. Fraudulent Concealment

100. Before September 17, 2010 at the earliest, Plaintiff had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of any conspiracy until at the earliest September 17, 2010 when it was first revealed that an investigation by the DOJ into non-solicitation agreements among high-tech companies included Pixar, a visual effects and animation company. No visual effects or animation company had been mentioned previously as a part of the investigation.

101.   Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy among visual effects and animation companies to restrict competition for class members' services through non-solicitation agreements, and to fix the wages and salaries of class members.   In fact, Defendants had secret discussions about the conspiracy and agreed not to discuss it publicly or in the presence of class members.

102.   Defendants' conspiracy was concealed and carried out in a manner specifically designed to avoid detection.   Outside top executives and certain human resources and recruiting personnel, Defendants concealed and kept secret the illicit non-solicitation and wage-fixing agreements from class members.   Defendants consciously avoided discussing the agreements in written documents that might be disseminated beyond the individuals involved in the conspiracy, to avoid creating evidence that might alert Plaintiff or other class members to the conspiracy's existence.

103.   Defendants provided pretextual, incomplete or materially false and misleading explanations for hiring, recruiting and compensation decisions made pursuant to the conspiracy.   Defendants' explanations for their conduct served only to cover up Defendants' conspiracy.

104.   Defendants have attempted to create the false impression that their decisions are independent and that they were acting in accordance with the antitrust laws.   For example, they and the Croner Company describe the Croner Survey as an "independent third party" survey purportedly falling within the DOJ's safe harbor, but Defendants used the occasion of Croner meetings to discuss and set wage and salary ranges for their employees in secret and in violation of the federal antitrust laws.   Similarly, Defendants concealed the fact that they shared other salary and wage information directly with competitors by phone, email and other secret means.

105.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## CAUSES OF ACTION

## XI. FIRST CAUSE OF ACTION—VIOLATION OF SECTION ONE OF SHERMAN ACT

106. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

107. Defendants, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition for class members' services through non-solicitation agreements and agreements to fix the wage and salary ranges of class members, all with the purpose and effect of suppressing class members' compensation and restraining competition in the market for class members' services.

108. Defendants' conduct injured class members by lowering their compensation and depriving them of free and fair competition in the market for their services.

109. Defendants' agreements are *per se* violations of the Sherman Act.

## XII. SECOND CAUSE OF ACTION—VIOLATION OF THE CARTWRIGHT ACT

110. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

111. Defendants, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of California Business and Professions Code § 16720. Specifically, Defendants agreed to restrict competition for class members' services through non-solicitation agreements and agreements to set and fix the wage and salary ranges of class members, all with the purpose and effect of suppressing class members' compensation and restraining competition in the market for class members' services.

112. Defendants' conduct injured Plaintiff and other class members by lowering their compensation and depriving them of free and fair competition in the market for their services.

113. Plaintiff and other class members are "persons" within the meaning of the Cartwright Act as defined in California Business and Professions Code § 16702.

114. Defendants' agreements are *per se* violations of the Cartwright Act.

## XIII. THIRD CAUSE OF ACTION—UNFAIR COMPETITION

115. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

116. Defendants' efforts to limit competition for and suppress compensation of their employees constituted unfair competition and unlawful and unfair business practices in violation of California Business and Professions Code §§ 17200 *et seq.* Specifically, Defendants agreed to restrict competition for class members' services through non-solicitation agreements and agreements to set and fix the wage and salary ranges of class members, all with the purpose and effect of suppressing class members' compensation and restraining competition in the market for class members' services.

117. Defendants' acts were unfair, unlawful, and/or unconscionable, both in their own right and because they violated the Sherman Act and the Cartwright Act.

118. Defendants' conduct injured Plaintiff and other class members by lowering their compensation and depriving them of free and fair competition in the market for their services, allowing Defendants to unlawfully retain money that otherwise would have been paid to Plaintiff and other class members. Plaintiff and other class members are therefore persons who have suffered injury in fact and lost money or property as a result of the unfair competition under California Business and Professions Code § 17204.

119. Pursuant to California Business and Professions Code § 17203, disgorgement of Defendants' unlawful gains is necessary to prevent the use or employment of Defendants' unfair practices, and restitution to Plaintiff and other class members is necessary to restore to them the money or property unfairly withheld from them.

## XIV. PRAYER FOR RELIEF

120. WHEREFORE, Plaintiff Robert A. Nitsch, Jr., on behalf of himself and a class of all others similarly situated, requests that the Court enter an order or judgment against Defendants including the following:

a. Certification of the class described herein pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.    Appointment of Plaintiff Robert A. Nitsch, Jr. as Class Representative and his counsel of record as Class Counsel;

c.    Compensatory damages in an amount to be proven at trial and trebled thereafter;

d.    Pre-judgment and post-judgment interest as provided for by law or allowed in equity;

e.    A permanent injunction prohibiting Defendants from hereafter agreeing not to solicit other companies' employees, to notify each other of offers extended to potential hires, or not to make counteroffers, or agreeing with other companies about wage and salary ranges or any other terms of employment;

f.    The costs of bringing this suit, including reasonable attorneys' fees and expenses;

g.    An incentive award to compensate Plaintiff Robert A. Nitsch, Jr. for his efforts in pursuit of this litigation;

h.    Disgorgement and/or restitution pursuant to California Business and Professions Code § 17203; and

i.    All other relief to which Plaintiff Robert A. Nitsch, Jr. and the Class may be entitled at law or in equity.

## XV.    JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

121.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: September 8, 2014

Respectfully submitted,

*/s/ Daniel A. Small*_______________
Daniel A. Small (*Pro Hac Vice* forthcoming)
Brent W. Johnson (*Pro Hac Vice* forthcoming)
Jeffrey B. Dubner (*Pro Hac Vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW
Suite 500
Washington, DC 20005
Tel.: (202) 408-4600
Email: kpierson@cohenmilstein.com
bjohnson@cohenmilstein.com
jdubner@cohenmilstein.com

*/s/ Matthew Ruan*_______________
George Farah (*Pro Hac Vice* forthcoming)
Matthew Ruan (State Bar No. 264409)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street
14th Floor
New York, NY 10005
Tel.: (212) 838-7797
Email: gfarah@cohenmilstein.com
mruan@cohenmilstein.com

Bruce Spiva (State Bar No. 164032; application to N.D. Ca. pending)
THE SPIVA LAW FIRM PLLC
1776 Massachusetts Avenue NW
Suite 601
Washington, DC 20036
Tel.: (202) 785-0601
Email: bspiva@spivafirm.com

Richard L. Grossman (State Bar No. 112841)
PILLSBURY & COLEMAN LLP
600 Montgomery Street
Suite 3100
San Francisco, CA 94111
Tel.: (415) 433-8000
Email: rgrossman@pillsburycoleman.com