Daniel A. Small (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
dsmall@cohenmilstein.com

Steve W. Berman (*pro hac vice*)
Ashley A. Bede (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
ashleyb@hbsslaw.com

Marc M. Seltzer (54534)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com

[Additional Counsel on Sig. Page]

*Plaintiffs' Interim Co-Lead Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE ANIMATION WORKERS ANTITRUST LITIGATION | Master Docket No. 14-cv-4062-LHK |
| | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| | DEMAND FOR JURY TRIAL |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

Plaintiffs Robert A. Nitsch, Jr., Georgia Cano, and David Wentworth, on behalf of themselves and all others similarly situated ("Plaintiffs"), allege the following:

## I.    INTRODUCTION

1.    Visual effects and animation companies have conspired to restrain competition in order to suppress compensation of those whom they claim to prize as their greatest assets—their own workers.  In *per se* violations of the antitrust laws, the leaders and most senior executives of Defendants Pixar, Lucasfilm and its division Industrial Light & Magic, DreamWorks Animation, The Walt Disney Company, Sony Pictures Animation, Sony Pictures Imageworks (collectively, the "Sony Defendants"), Blue Sky Studios, ImageMovers LLC, ImageMovers Digital LLC (collectively, the "ImageMovers Defendants") and others secretly agreed to work together to deprive thousands of their workers of better compensation and deny them opportunities to advance their careers at other companies.  These workers include animators, digital artists, software engineers and other technical and artistic workers who are the creative genius and dedicated workhorses behind such wonders as Wall-E (Pixar), the Shrek series (DreamWorks Animation), the Harry Potter adaptations (Lucasfilm/ILM) and the Spiderman series (Sony), among others.  The conspiracy deprived Plaintiffs and other class members of millions of dollars in compensation while the films they produced generated billions of dollars in revenues for Defendants.

2.    To accomplish their anticompetitive goals, Defendants agreed to limit recruiting activities that otherwise would have existed absent Defendants' conspiracy.  For example, Defendants entered into a scheme not to actively recruit employees from each other, referred to as an anti-solicitation scheme herein.  Among the tactics of this anti-solicitation scheme were that (a) Defendants would not cold call each other's employees; (b) they would notify the other company when making an offer to an employee of the other company, if that employee had applied for a job; and (c) the company making such an offer would not increase the compensation offered to the prospective employee in its offer if the company currently employing the employee made a counteroffer.

3.    Pixar and Lucasfilm developed the anti-solicitation scheme in the 1980s, acting through Pixar's Chief Executive Officer Steve Jobs and President Edwin Catmull and Lucasfilm's

1  founder George Lucas.  Over the coming decades, Catmull and his co-conspirators enlisted several

2  additional visual effects and animation studios to join in the conspiracy, including each of the other

3  Defendants.

4         4.       The existence and nature of the anti-solicitation scheme cannot seriously be disputed.

5  Catmull and Lucas themselves, along with other executives and human resources employees of Pixar

6  and Lucasfilm, acknowledged the scheme in sworn testimony, with direct written documentary

7  evidence showing the participation of each of the other Defendants, as well as several other

8  companies, in the scheme.  For example, Catmull testified that Steve Jobs and DreamWorks

9  Animation Chief Executive Officer Jeffrey Katzenberg personally agreed not to "go[] after each

10  other," and wrote in 2007 that Pixar "ha[d] an agreement with DreamWorks not to actively pursue

11  each others employees" and that "all of the companies up here [in Northern California] – Pixar, ILM,

12  Dreamworks, and couple of smaller places [sic] – have consciously avoided raiding each other."

13         5.       Although the anti-solicitation scheme may have started in Northern California, the

14  scheme metastasized beyond that region.  Pixar's Vice President of Human Resources, Lori

15  McAdams, wrote in 2005: "With regard to ILM, Sony, Blue Sky, etc., . . . we have a gentleman's

16  agreement not to directly solicit/poach from their employee pool."

17         6.       The conspiracy was intended to suppress compensation throughout the market by

18  limiting direct solicitation of visual effects and animation workers.  By doing so, Defendants would

19  tamp down bidding wars (i.e., competition) to attract and retain employees.  To that end, when any

20  studio engaged in significant competition (in effect, "cheating") in breach of their agreement,

21  conspirators attempted to squelch it.  For example, in 2007, when ImageMovers head Robert

22  Zemeckis began recruiting workers for its digital wing, ImageMovers Digital, Catmull intervened to

23  stop them from targeting other conspirators, even though he knew they would not target his

24  company, Pixar.

25         7.       The conspiracy's leaders have been equally clear about their shared goals.   Catmull's

26  express purpose in eliminating active recruitment was to keep solicitation efforts from "mess[ing] up

27  the pay structure."  As Catmull later explained under oath, his concern about "mess[ing] up the pay

28  structure" was that it would make it (i.e., compensation) "very high."  Lucasfilm's then-President

1   Jim Morris explained the goal even more succinctly in a June 2004 email to Catmull: "I know you

2   are adamant about keeping a lid on rising labor costs."  Or, as George Lucas stated, Defendants

3   wanted to keep the industry out of a "normal industrial competitive situation" and avoid "a bidding

4   war with other companies."  In Catmull's view, the scheme to restrain competition "worked quite

5   well"—to the benefit of Defendants' bottom lines, but at the expense of workers throughout the

6   visual effects and animation industry.  The conspiracy was thus intended to and did suppress the

7   amount of compensation that would have been paid to Plaintiffs and their fellow class members.

8        8.      Defendants' second method to achieve the goals of their conspiracy was to engage in

9   direct collusive communications concerning competitively sensitive compensation information and

10   agree upon compensation ranges, in order to limit the compensation offered to their respective

11   employees and workers.  Absent the conspiracy, this competitively sensitive information would have

12   been given confidential treatment.

13        9.      Since the mid-1990s, the most senior personnel from the human resources and

14   recruiting departments of the studios have met yearly to discuss an industry compensation survey.

15   From the beginning, Defendants understood that the survey was used by each to "confirm or adjust

16   our salary ranges."  By the early 2000s, Defendants used those meetings and communications

17   connected to them to help fix the compensation of their workers within ranges for the ensuing year.

18   Senior human resources personnel met annually after the survey for "an opportunity for an intimate

19   group of us to get together," which they termed the "Directors meeting."  At least at one studio, the

20   meetings were called the annual "salary council."

21        10.     These collusive discussions facilitated Defendants' goals of suppressing

22   compensation, such that Defendants could thereby compensate their employees at a lower rate.  They

23   also allowed Defendants who paid higher compensation early in the conspiracy period to come into

24   alignment with other studios without fearing that lowering compensation would be used against

25   them competitively.

26        11.     Defendants, both through their top executives and their human resources and

27   recruiting departments, also communicated throughout the year to implement and enforce the

28

conspiracy to suppress compensation while keeping those communications secret from their workers

and others in the industry.

12.     Senior human resources and recruiting personnel also met for lunches, dinners, drinks

and other informal meetings at various times during the year, both as a group and on a one-on-one

basis.  Human resources personnel regularly called counterparts at other studios for salary

information.  Indeed, communications among Defendants' senior human resources personnel were

so pervasive that Pixar's Head of Human Resources wrote to her counterparts at Sony Pictures

Imageworks, ILM, DreamWorks, Disney, and Blue Sky in early 2007 that "[c]hatting with all of you

each day is really becoming a fun habit" and joked that they should "all just have a short conference

call each morning to start our days off right."  Walt Disney Animation Studios' Vice President of

Human Resources echoed this sentiment, noting that she "hear[s] from you all on a daily basis."

13.     As part of these direct communications, Defendants repeatedly collusively discussed

and provided to each other specific pay ranges for individual positions, facilitating their common

goal to suppress their employees' compensation.  In one example, Disney's Vice President of

Human Resources and DreamWorks' Head of Human Resources had lunch on May 10, 2006;

shortly thereafter, Disney's Vice President of Human Resources provided Disney's pay ranges for

two positions that DreamWorks was evaluating.  As illustrated below, many more examples of

collusive conduct exist.

14.     The cooperation among Defendants was so systematic and deeply ingrained that in

some instances, many conspirators were included on the same emails concerning compensation for

their workers.  For instance, in late 2006, the head of human resources at Pixar sent an email to the

heads of human resources at DreamWorks, Sony Pictures Imageworks, Lucasfilm/ILM, Walt Disney

Animation Studios, Blue Sky Studios, and others to provide Pixar's budget for future salary

increases in the following year, 2007, and to ask for the other studios' salary increase budgets in

return.

15.     Defendants took actions to conceal the agreements from their employees.  Top

executives and human resources and recruiting personnel involved in the conspiracy communicated

1   about the agreements orally or in emails among themselves, often insisting on discussing the

2   agreements by phone.

3            16.   The Antitrust Division of the United States Department of Justice (the "DOJ")

4   investigated Defendants Pixar and Lucasfilm's anti-solicitation scheme.  The DOJ found that their

5   agreement was "facially anticompetitive" and was illegal *per se* under Section 1 of the Sherman Act,

6   15 U.S.C § 1.  As the DOJ explained, the scheme "eliminated significant forms of competition to

7   attract digital animators and, overall, substantially diminished competition to the detriment of the

8   affected employees who were likely deprived of competitively important information and access to

9   better job opportunities."   The DOJ concluded that the scheme "disrupted the normal price-setting

10  mechanisms that apply in the labor setting."  Defendants Pixar and Lucasfilm signed settlements

11  enjoining them from entering into such anti-solicitation agreements again.

12           17.   Defendants' conspiracy unreasonably restrained trade and commerce in violation of

13  Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, Cal. Bus. & Prof. Code

14  §§ 16720 *et seq.*, and constituted unfair competition and unfair practices in violation of California's

15  Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*  Plaintiffs, on their own behalf

16  and on behalf of the class defined herein, seek to recover the difference between the compensation

17  that class members were paid and what class members would have been paid absent Defendants'

18  illegal conduct, and to enjoin Defendants from repeating or engaging in their unlawful conduct.

19                              **II.   PARTIES**

20           18.   Plaintiff Robert A. Nitsch, Jr. was a Senior Character Effects Artist at DreamWorks

21  Animation from 2007 to 2011 in Los Angeles, California and a Cloth/Hair Technical Director at

22  Sony Pictures Imageworks during 2004 in Los Angeles, California.  He resides in Massachusetts.

23           19.   Plaintiff Georgia Cano was a Digital Artist at Rhythm & Hues from 1992 to 2004; a

24  Lighting Technical Director at Walt Disney Feature Animation from 2004 to 2005; a Lighting Artist

25  at Rhythm & Hues again from 2007 to 2009; a Lighting Artist at ImageMovers Digital in 2010; and

26  has worked in similar positions for several other visual effects or animation studios from 1992

27  through the present.  She resides in California.

28

CONSOLIDATED AM. CLASS ACTION COMPL.-
No.14-cv-4062 LHK                    - 5 -

20.     Plaintiff David Wentworth worked at ImageMovers Digital as a Production Engineer, Lead Production Engineer, and Associate Computer Graphics Supervisor from 2007 to 2010.  He resides in California.

21.     Defendant Blue Sky Studios, Inc. ("Blue Sky") is a Delaware corporation with its principal place of business located at One American Lane, Greenwich, Connecticut.  It is owned by Twentieth Century Fox Film Corporation, which has its principal place of business in Los Angeles, California.

22.     Defendant DreamWorks Animation SKG, Inc. ("DreamWorks") is a Delaware corporation with its principal place of business located at 1000 Flower Street, Glendale, California. It has a studio in Redwood City, California, located in Santa Clara County.

23.     Defendant ImageMovers LLC is a California corporation with its principal place of business located at 1880 Century Park East, Suite 1600, Los Angeles, California.

24.     Defendant Two Pic MC LLC f/k/a ImageMovers Digital LLC ("ImageMovers Digital"; together with ImageMovers, LLC, the "ImageMovers Defendants") is a Delaware corporation with its principal place of business at 500 S. Buena Vista Street, Burbank, California. ImageMovers Digital is a joint venture of ImageMovers LLC and ABC Inc., a subsidiary of The Walt Disney Company.

25.     Defendant Lucasfilm Ltd., LLC ("Lucasfilm") is a California corporation with its principal place of business located at 1110 Gorgas Ave., San Francisco, California.  Industrial Light & Magic ("ILM") is a division of Lucasfilm.  Since 2012, Lucasfilm and ILM have been owned by Defendant The Walt Disney Company.

26.     Defendant Pixar is a California corporation with its principal place of business located at 1200 Park Avenue, Emeryville, California.  Since 2006, it has been owned by Defendant The Walt Disney Company.

27.     Defendant Sony Pictures Animation, Inc. is a California corporation with its principal place of business located at 9050 W. Washington Blvd., Culver City, California.

1    28.    Defendant Sony Pictures Imageworks, Inc. (together with Sony Pictures Animation,

2    Inc., the "Sony Defendants") is a California corporation with its principal place of business located

3    at 9050 W. Washington Blvd., Culver City, California.

4    29.    Defendant The Walt Disney Company ("Disney") is a Delaware corporation with its

5    principal place of business located at 500 South Buena Vista Street, Burbank, California.  Walt

6    Disney Studios is a division of Disney with its principal place of business located at 500 South

7    Buena Vista Street, Burbank, California.  Walt Disney Studios oversees the operations of both Walt

8    Disney Animation Studios and, since 2006, Pixar.  Walt Disney Animation Studios is a division of

9    Disney with its principal place of business located at 2100 W. Riverside Drive, Burbank, California.

10   Walt Disney Animation Studios was formerly known as Walt Disney Feature Animation.

11   30.    Various persons, partnerships, sole proprietors, firms, corporations and individuals

12   not named as defendants in this lawsuit, including other animation and visual effects studios, have

13   participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and

14   have performed acts and made statements in furtherance of the conspiracy or in furtherance of the

15   anticompetitive conduct.

16   31.    Whenever in this Complaint reference is made to any act, deed or transaction of any

17   corporation or limited liability entity, the allegation means that the corporation or limited liability

18   entity engaged in the act, deed or transaction by or through its officers, directors or employees while

19   they were actively engaged in the management, direction, control or transaction of the corporation's

20   or limited liability entity's business or affairs.

21   ### III.    JURISDICTION AND VENUE

22   32.    This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4

23   and 16 and 28 U.S.C. §§ 1331 and 1337.

24   33.    This Court has personal jurisdiction over Defendants because each resides in or has

25   its principal place of business in the State of California, employed individuals in this state during the

26   Class Period, and/or has had substantial contacts within the state of California in furtherance of the

27   conspiracy.

28

34.     Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this judicial district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and multiple defendants reside in this district.

## IV.     INTRADISTRICT ASSIGNMENT

35.     Pursuant to Civil Local Rule 3.2(c) and (e), assignment of this case to the San Jose Division of the United States District Court for the Northern District of California is proper because a substantial part of the events and omissions giving rise to Plaintiffs' antitrust claims occurred within the San Jose Division.

## V.     NATURE OF WORK IN THE VISUAL EFFECTS AND ANIMATION INDUSTRY

36.     Defendants are each in the business of creating visual effects and animation for motion pictures.  That business depends on the labor of thousands of skilled animators, graphic artists, software engineers and other technical and artistic workers.  Major animated films and films with significant visual effects require hundreds of workers with special training and millions, if not tens of millions, of dollars of investment in the visual effects and animation.  Defendants create those effects and animation for their own movies or movies produced by major motion picture studios such as Warner Bros. Pictures, 20th Century Fox, Universal Pictures, Paramount Pictures or Walt Disney Studios.

37.     A limited number of studios have the know-how, technological resources and industry experience to handle the visual effects and animation work required by modern motion pictures.

38.     Visual effects and animation workers frequently obtain formal specialized schooling and training for their craft and then gain invaluable experience and skills specific to the industry throughout their careers.  They develop and use specialized software and other tools unique to the industry.

39.     Visual effects and animation workers work for studios as employees or independent contractors,[1] paid sometimes on an hourly basis and sometimes as permanent salaried employees. Studios frequently ask their employees to agree to work for them for the length of a particular project, often corresponding to the length of the studio's work on a particular feature or movie. Those periods frequently last between three to nine months, but can be as short as a few weeks. Studios also sometimes ask workers to commit to the studio to work for one to three years with the caveat that the studio has the option to terminate their employment either at any time or after particular periods of time. During their tenures at the studios, many workers did not receive health care benefits from the studio.

40.     Working in the industry requires great commitment. Studios frequently ask their employees to work feverishly for months or even years, including days or weeks straight without a day off and into the early hours of morning. Visual effects and animation workers also bear great risk in that the studios regularly terminate them after their project or a particular feature film production ends. They then have to find new employment with another studio or again with the current studio. Most are not paid during periods of unemployment in between projects. Studios sometimes also delay projects or terminate them early and do not pay their workers during those delays or after the early termination. Studios sometimes ask workers to move to other states to work on projects there.

## VI.     THE CONSPIRACY

41.     Defendants conspired to suppress the compensation paid to their workers and other class members. To accomplish their conspiratorial goals, Defendants entered into a scheme not to actively solicit each other's employees; and Defendants also engaged in collusive discussions concerning competitively sensitive compensation information and agreed upon compensation ranges, in order to limit the compensation offered to current and prospective workers.

---

[1] For convenience, this complaint refers to class members as "employees" even though some of them may have worked for Defendants as independent contractors.

**A.      Defendants' Scheme Not to Actively Solicit Each Others' Employees**

42.      As part of the conspiracy alleged herein, Defendants competed for class members' services, but agreed to severely limit their competition by abandoning one of the most effective ways of recruiting employees.  Specifically, each Defendant agreed not to actively solicit employees of other Defendants.  Defendants agreed not to contact their coconspirators' employees to inform them of available positions unless that individual employee had applied for a job opening on his or her own initiative.

43.      Such solicitation, often called "cold calling," is a key competitive tool in a properly functioning labor market, especially for skilled labor.  Competing studios' employees represent one of the main pools of potential hires with the appropriate skills for an open position, and who may be unresponsive to other forms of recruiting.  And compared to unemployed workers or employees actively seeking new employment, employees who are not actively seeking to change employers are more likely to be among the most sought after employees.  Because they are not looking for other jobs, they are difficult to reach without active solicitation.  As Lucasfilm recognized internally, "[p]assive talent [is] difficult to find."  A company searching for a new hire can save costs and avoid risks by poaching that employee from a rival company.  Thus, if each Defendant was truly acting in its own independent self-interest, it would actively solicit the others' employees.

44.      Defendants' scheme to restrain competition included notifying each other when an employee of one Defendant applied for a position with another Defendant, and agreeing to limit counteroffers in such situations.  In these circumstances, when an employee at one Defendant contacted a second Defendant and the second Defendant decided to make an offer, it would typically (a) notify the first Defendant, and (b) decline to increase its offer if the current employer outbid it. Again, if Defendants were acting in their independent self-interest, they would not preemptively tell their competitors that they were offering jobs to the competitor's employees or refuse to bid against their competitors.

45.      Indeed, Defendants often refrained from hiring other Defendants' employees at all without the permission of the current employer.  Similarly, Defendants sometimes declined to extend

1    offers to applicants if they had an outstanding offer from another Defendant, even if they were not

2    currently employed.

3                    **(1)     Pixar and Lucasfilm's Commencement of the Anti-Solicitation Scheme.**

4            46.     As alleged above, the roots of the conspiracy reach back to the mid-1980s.  George

5    Lucas, the former Lucasfilm Chairman of the Board and CEO, sold Lucasfilm's "computer

6    division," then a "tech, research and development company," to Steve Jobs, who had recently left the

7    employ of Apple as CEO.  Jobs named his new company Pixar.  Lucas and Jobs's deputy, Pixar's

8    President Ed Catmull, along with other senior executives, subsequently reached an agreement to

9    restrain their competition for the skilled labor that worked for the two companies.  Pixar drafted the

10   terms of the agreement and communicated those terms to Lucasfilm; both Defendants then

11   communicated the agreement to senior executives and select human resources and recruiting

12   employees.  Lucas has stated in email that Pixar and Lucasfilm "have agreed that we want to avoid

13   bidding wars."  He has also stated that the agreement was that "we wouldn't actively try to raid each

14   other's companies" and that "we agreed not to raid each other" and "I think the part of the agreement

15   is not to solicit each other's employees, is the crux of it."

16           47.     Catmull agreed with George Lucas that the newly independent Pixar would

17   reciprocate this non-compete "rule" with Lucasfilm.  The companies thus agreed: (1) not to cold call

18   each other's employees; (2) to notify each other when making an offer to an employee of the other

19   company if that employee applied for a job on his or her own initiative; and (3) that any offer by the

20   potential new employer would be "final" and would not be improved in response to a counteroffer

21   by the employee's current employer (whether Pixar or Lucasfilm).

22           48.     Pixar and Lucasfilm were similarly explicit about their agreement not to make

23   counteroffers.  An internal Pixar email sent on January 16, 2006 explained that "we agreed not to

24   counter . . . .  It's a very small industry and neither Lucas or Pixar wants to get into an issue of

25   countering offers back and forth."  Their policy was to "never counter if the candidate comes back to

26   us with a better offer."

27

28

(2)     **Other Defendants Enter into the Anti-Solicitation Scheme.**

49.     Although the conspiracy began with Pixar and Lucasfilm, other companies joined the conspiracy under Catmull's leadership.  Companies later joining the conspiracy include, at least, Disney and its studio Walt Disney Animation Studios, DreamWorks, the ImageMovers Defendants, the Sony Defendants and Blue Sky.

50.     As Pixar's Vice President of Human Resources, Lori McAdams, wrote in 2005: "With regard to ILM, Sony, Blue Sky, etc., we have no contractual obligations, but we have a gentleman's agreement not to directly solicit/poach from their employee pool."  An internal "Competitors List" created by Pixar listed anti-solicitation rules for each of the Defendants, among other visual effects and animation studios.  Blue Sky, DreamWorks, Image Movers Digital, Sony Pictures Imageworks, and Walt Disney Animation Studios were all listed with directions not to "recruit directly" or "solicit or poach employees."

51.     Similarly, Catmull explained that the conspiracy was more comprehensive and included a "couple of smaller places" as well as Pixar, Lucasfilm/ILM and DreamWorks: "[w]e have avoided wars up here in Norther[n] California because all of the companies up here – Pixar, ILM, Dreamworks, and couple of smaller places [sic] – have conscientiously avoided raiding each other." And although the conspiracy began in Northern California, it came to extend well beyond that region, as shown by the involvement of Blue Sky and the Sony Defendants.

a)     *DreamWorks Joins the Conspiracy.*

52.     Steve Jobs and the CEO of DreamWorks, Jeffrey Katzenberg, personally discussed DreamWorks joining into the conspiracy.  Catmull told Jobs in a February 18, 2004 email, that the companies' mutual understanding "worked quite well."  Catmull reiterated this in a January 14, 2007 email to Disney Chairman Cook: "we have an agreement with Dreamworks not to actively pursue each others employees."

53.     Similarly, when a new contract recruiter at DreamWorks contacted a Pixar employee in March 2007, Catmull wrote him to explain their understanding: "While we do not act to prevent people from moving between studios, we have had an agreement with Dreamworks not to actively pursue each others employees [sic].  I have certainly told our recruiters not to approach any

Dreamwork [sic] employees."  Pixar's Vice President of Human Resources, Lori McAdams, wrote

to Catmull that she "know[s] [Dreamworks'] head of HR Kathy Mandato well, and she's in

agreement with our non-poaching practices, so there shouldn't be any problem."  McAdams checked

with Mandato to make sure there was "no problem with our past practices of not poaching from each

other," to which Mandato replied "Absolutely! You are right . . . (my bad)."

54.   DreamWorks was similarly committed to enforcing the anti-solicitation scheme

against other studios.  For example, Mandato asked Pixar not to solicit DreamWorks employees

when a recruiting email was sent to a DreamWorks employee by mistake.  McAdams' response:

"Argh, it shouldn't have gone to anyone at work or our competitors people [sic].  I'll put a stop to

it!"

55.   As Catmull explained, the scope of the conspiracy was not merely an agreement

between DreamWorks and Pixar; rather, it was an agreement among "all of the companies up here –

Pixar, ILM, DreamWorks, and couple of smaller places [sic]."

b)   *The Walt Disney Company Joins the Conspiracy.*

56.   The Walt Disney Company also joined the conspiracy.  For example, an internal

Pixar email in 2005 confirmed that Pixar would not recruit workers out of Disney or other studios.

Its participation deepened in 2006, when it purchased Pixar and appointed Catmull to run Walt

Disney Animation Studios.  Indeed, Disney Chairman Dick Cook explicitly approved Pixar's and

Disney's participation in the anti-solicitation scheme when informed of the scheme.  Catmull

explained to Cook that "all of the companies up here – Pixar, ILM, Dreamworks, and couple of

smaller places [sic] – have conscientiously avoided raiding each other" and explained that the

concern was that companies offering employees "a substantial salary increase" will "seriously

mess[] up the pay structure."  Cook responded succinctly: "I agree."  He promised to "reaffirm our

position again" with ImageMovers Digital, a joint venture Disney was about to launch with

ImageMovers.

57.   Similarly, Walt Disney Animation Studios' Director of Animation Resources asked

ILM to observe "the Gentlewomen's agreement" concerning the recruiting of digital artists at Disney

in 2006.

1

         *c)*      *Sony Pictures Imageworks and Sony Pictures Animation Join the*

2

                       *Conspiracy.*

3        58.    Prior to 2002, Sony Pictures Imageworks primarily created visual effects for live-

4  action films produced by Sony and other production companies.  In 2002, Sony Pictures Animation

5  was created to develop proprietary animated feature films, and Sony Pictures Imageworks

6  significantly expanded to handle the production of those films.  This expansion was fueled in part by

7  offering higher salaries to lure workers away from other studios.

8        59.    Sony's competition on compensation and recruitment efforts early in the 2000s were

9  met with displeasure by other studios.  As Catmull later wrote, when a studio offers "a substantial

10  salary increase" in an effort "to grow rapidly, whether it is Dreamworks in 2D animation or Sony in

11  3D, it seriously messes up the pay structure."

12        60.    To stop this competition, Catmull decided to "go down and meet [Sony Pictures

13  Animation executives] to reach some agreement . . . to nip this in the bud."  With that objective,

14  Catmull flew to Los Angeles to meet with Sony executives in person in 2004 or 2005 "and asked

15  them to quit calling our employees."

16        61.    Catmull reached a "gentleman's agreement not to directly solicit/poach from their

17  employee pool" with Sony at that time.  Even so, because one Pixar employee left to work at Sony

18  Pictures Imageworks on his own initiative, and a Sony recruiter asked if another employee was "still

19  employed and if she can contact," McAdams spoke to them in person and over the phone to "make

20  sure they're still honoring it as they may have had turnover in their Recruiting team."

21        62.    Sony would soon restrain its relatively higher-wage practices to levels below what

22  otherwise would have existed in a competitive market, and come into the fold with the rest of its

23  conspirators.

24                 *d)*      *Blue Sky Studios Joins the Conspiracy.*

25        63.    Blue Sky similarly entered the conspiracy.  Blue Sky both requested that other studios

26  not recruit from it and refrained from recruiting from others.  For example, in 2005, Blue Sky

27  declined to pursue a DreamWorks candidate who would "be an amazing addition" because they

28  didn't "want to be starting anything with [Katzenberg] over one story guy."

CONSOLIDATED AM. CLASS ACTION COMPL.-
No.14-cv-4062 LHK               - 14 -

64.     Similarly, Blue Sky contacted Pixar to discuss "our sensitive issue of employee retention," in response to which McAdams "spoke[] to Linda Zazza, [Blue Sky's] Director of HR to assure her that we are not making calls to their people or trying to poach them in any way."

> e)     *ImageMovers LLC and ImageMovers Digital Join the Conspiracy.*

65.     The ImageMovers Defendants joined the conspiracy as well. In January 2007, Catmull wrote to Dick Cook, Walt Disney Studios' then-chairman, that he knew "Zemeckis' company [ImageMovers] will not target Pixar."

66.     However, the ImageMovers Defendants were still recruiting employees from other conspiring studios such as DreamWorks and The Orphanage,[2] "offering higher salaries," in Catmull's words.  Pixar recognized that the industry would benefit (by less competition) if they could avoid the ImageMovers Defendants "raiding other studios."  And so Catmull advised Cook that he would meet with Steve Starkey, one of the founders of ImageMovers.  Cook responded: "I agree."

67.     Catmull met with Starkey later that month, who told Catmull that he had "told George [Lucas] that he would not raid ILM."  Catmull impressed upon Starkey "how important it is that we not have a hiring war."

68.     Catmull also advised Walt Disney Studios' President Alan Bergman and Senior Vice President of Human Resources Marjorie Randolph to require the ImageMovers Defendants to abide by the terms of the anti-solicitation scheme.  Catmull specifically asked for the ImageMovers Defendants to stop recruiting from conspiring studios like The Orphanage.  Randolph responded that Disney had in fact gotten the ImageMovers Defendants to agree to the "rules" of the anti-solicitation scheme.

---

[2] The Orphanage was a visual effects studio with offices in San Francisco and Los Angeles.  It went out of business in 2009.

f)    *Digital Domain Joins the Conspiracy.[3]*

69.    Digital Domain subsequently joined the conspiracy as well, evidenced by its anti-solicitation agreement with at least DreamWorks, Lucasfilm/ILM and the Sony Defendants.

70.    Beginning in 2007, Digital Domain's Head of Human Resources was Lala Gavgavian, who had previously spent nine years at Lucasfilm's ILM division in senior roles in talent acquisition for visual effects films and animation—during which time Pixar President Jim Morris explicitly informed her that Pixar and Lucasfilm had agreed not to "actively recruit from one another."  Indeed, although Digital Domain's studio and all of its technical and artistic employees were located in the Los Angeles area, Gavgavian worked out of San Rafael in the Bay Area—in the same office building she previously worked at for ILM.

71.    Gavgavian and other senior personnel at Digital Domain specifically instructed employees not to cold call or otherwise solicit other Defendants' employees.  If an employee of Lucasfilm/ILM, DreamWorks or the Sony Defendants even contacted Digital Domain independently about applying for a job, the contact had to be reported to Gavgavian.

### (3)    Further Expansion and Enforcement of the Conspiracy.

72.    Defendants repeatedly sought to recruit new animation and visual effects studios into the anti-solicitation scheme.  For example, when a small 20-person studio named Lightstream Animation opened in Petaluma, California in 2008, Lucasfilm's President and Executive in Charge of Production both immediately concluded that they should seek an anti-solicitation agreement— even though Lucasfilm's Chief Administrative Officer believed the startup was not "going to be a significant impact on our ability to recruit."

73.    And, as discussed above, Defendants repeatedly implemented and enforced their anti-solicitation scheme through direct communications.  In 2007, for example, Pixar contacted Lucasfilm twice regarding suspected breaches of the terms of the conspiracy, leading Lucasfilm to

---

[3] From 2006 to 2012, Digital Domain was owned by Digital Domain Media Group, which went bankrupt in 2012 and sold its assets that year to Digital Domain 3.0 pursuant to a "free and clear" order of the bankruptcy court of the United States Bankruptcy Court for the District of Delaware. Plaintiffs have dismissed Digital Domain 3.0 without prejudice pursuant to a tolling agreement.

abandon the recruiting activity Pixar had complained about.  In 2007, Disney made it clear to the ImageMovers Defendants that they needed to abide by the conspiracy's rules and the ImageMovers Defendants obliged.

**B.      Defendants Engaged in Direct, Collusive Discussions and Agreed Upon Compensation Ranges to Achieve the Conspiracy's Goal of Suppressing Compensation**

74.      Defendants' methods to successfully achieve the objects of their conspiracy went beyond their illicit anti-solicitation scheme.  Defendants directly communicated and met regularly to discuss and agree upon compensation ranges and communicated directly on an industrywide basis about their respective internal compensation plans.

75.      At least once per year, some or all Defendants meet in either Northern or Southern California to discuss job positions in common among their studios, in order to set the parameters of a compensation survey.  The survey provides wage and salary ranges for the studios' technical or artistic positions, broken down by position and experience level.  For most of the class period, the meeting and survey were conducted by Wayne Dunlap or the Croner Company.  As McAdams explained, the meeting and survey was instituted "so we can each confirm or adjust our salary ranges."

76.      This meeting was attended by senior human resources and recruiting personnel and other studio executives from DreamWorks, Pixar, Lucasfilm/ILM, Disney, ImageMovers Digital, the Sony Defendants,  Twentieth Century Fox Filmed Entertainment (which includes within it Blue Sky Studios), and Digital Domain, among others.

77.      Defendants used the opportunity presented by the Croner meeting to go further than their matching of job positions across companies; they discussed, agreed upon and set wage and salary ranges during meals, drinks and other social gatherings that they held outside of the official Croner meetings.  As DreamWorks Head of Human Resources Mandato said in an email to her counterparts at Disney, Pixar, Blue Sky, and Sony Pictures Imageworks, the survey meeting "presents an opportunity for an intimate group of us to get together."  ILM's Senior Director of Human Resources Sharon Coker (soon to become Director of Human Resources at The Walt Disney Company and ImageMovers Digital) termed this annual side meeting the "Director's meeting."

1   These meetings provided the officials an opportunity to discuss compensation ranges in a private

2   setting.

3          78.    Defendants were successful at using these meetings and other communications to

4   depress compensation throughout the industry.  Defendants used the Director's meeting to discuss

5   salary changes at other studios and the rates that were being offered.  For example, it was at a

6   January 2007 meeting that Pixar learned that ImageMovers Digital was recruiting employees from

7   other studios at a higher salary, leading Catmull to ask Disney's chairman to step in.  As Catmull put

8   it: "The HR folks from the CG studios had their annual get together in the bay area last week.  At

9   that time, we learned that the company that Zemeckis is setting up in San Rafael has hired several

10  people away from Dreamworks at a substantial salary increase."  As alleged above, this disclosure

11  prompted Catmull and Disney to take action to rein in ImageMovers Digital's hiring, telling its

12  founder Starkey "how important it is that we not have a hiring war," as well as a meeting directly

13  between Starkey and George Lucas.

14         79.    Defendants' top human resources and recruiting personnel met aside from the

15  opportunities presented by the Croner meetings as well.  For example, Defendants held a similar

16  "annual HR Directors dinner" in connection with the Siggraph conference, a major visual effects

17  industry conference, which was attended by senior human resources personnel of Blue Sky, Pixar,

18  DreamWorks, Lucasfilm and Sony Pictures Imageworks.  The heads of human resources also met

19  with each other one-on-one on many occasions.

20         80.    Similarly, the senior members of Defendants' human resources departments

21  frequently sought to create new relationships when one of their counterparts was replaced at a co-

22  conspirator to ensure the efficacy of communications about the conspiracy.  As one example, when

23  ILM hired a new head of human resources in 2005, McAdams promptly set up a dinner meeting with

24  her.

25         81.    In addition to their in-person meetings, Defendants also communicated through

26  various other means throughout the year about compensation for their workers to implement and

27  enforce the conspiracy.  Defendants regularly emailed each other with specific salary ranges for

28  individual positions, allowing each Defendant to ensure that it did not pay workers more than it

absolutely needed to.  For example, on May 13, 2005, DreamWorks requested that Disney provide "[a]ny salary information you have" on three positions.  Disney responded the same day with pay ranges for the positions.

82.     DreamWorks made a similar request of Pixar the following spring, requesting Pixar's "range of pay" for various positions and making clear that DreamWorks "will be happy to share ours too."  At the same time, it contacted Disney and made clear it was surveying multiple studios; Disney responded by providing an exact salary range and offered to "get further into the details" over the phone.

83.     Similarly, on September 2, 2009, Blue Sky's Director of Human Resources emailed Pixar with the following request for four positions:

> I was wondering if I could get some salary info from you.  We're trying to find out if we're paying a competitive rate and I have a feeling we're coming in a little low. Please see the titles below and if possible, could you give me a range of what you pay them?

84.     As DreamWorks' Head of Compensation explained in a 2007 email specifically noting collusive discussions with Sony, "We do sometimes share general comp information (ranges, practices) in order to maintain the relationships with other studios and to be able to ask for that kind of information ourselves when we need it."

85.     These collusive efforts to coordinate compensation were not limited to one-off, bilateral discussions; rather, Defendants openly emailed each other in large groups with competitively sensitive confidential current and future compensation information.

86.     For example, on November 17, 2006, Pixar's Vice President of Human Resources, Lori McAdams, emailed the following message to senior human resources personnel at DreamWorks, Sony Pictures Imageworks, Lucasfilm, Walt Disney Animation Studios and others:

> Quick question from me, for those of you who can share the info.
>
> What is your salary increase budget for FY '07? Ours is [REDACTED] but we may manage it to closer to [REDACTED] on average.  Are you doing anything close, more, or less?"

87.     In other words, Pixar's top human resources executive emailed six direct competitors with the *future* amount that Pixar would be raising salaries and then requested the same information from the other studios.

88.     Similarly, despite his concern that it was "taboo" to do so, DreamWorks' Head of Production Technology emailed the heads of human resources at Pixar, ILM, Sony Pictures Animation, and Disney in January 2009 to learn how they handled overtime—an issue that was competitively sensitive in an industry where workers are regularly asked to work dozens of hours of overtime a week.  He sought to see if the other companies were "as generous"—an answer that could allow him to reduce compensation without fear of losing a competitive advantage.  A Sony executive called him after emailing him the subject was not "taboo" for her.

89.     No studio acting in its own independent self-interest in the absence of a conspiracy to suppress compensation would share this kind of compensation information, let alone with such a large group of competitors.  Absent an agreement not to compete on compensation, any studio sharing such information would be handing its competitors specific information about how to best compete with them for employees and candidates.  Such behavior only makes sense in the context of a conspiracy to suppress compensation.  The only possible benefit to Defendants from such actions was the facilitation of an agreement to suppress compensation.

90.     Human resources and recruiting executives and personnel of the Defendants also have communicated regularly by telephone and other means.  Defendants' communications were so consistent that Pixar's McAdams wrote to her counterparts at Sony Pictures Imageworks, ILM, DreamWorks, Disney, and Blue Sky in early 2007 that "[c]hatting with all of you each day is really becoming a fun habit.  I'm thinking it'd be a great resolution for 2007 that we all just have a short conference call each morning to start our days off right."  Walt Disney Animation Studios' Vice President of Human Resources responded with a similar comment, saying that "[i]t is fun to hear from you all on a daily basis."

91.     Those communications as well as the meetings and events provided the means and opportunities for Defendants to collude and to implement and enforce the conspiracy to suppress workers' compensation.

C.    **The Department of Justice Investigated Pixar and Lucasfilm and Enjoined Them from Entering Into Anti-Solicitation Agreements**

92.    The Antitrust Division of the United States Department of Justice (the "DOJ") investigated Defendants Pixar and Lucasfilm's misconduct.  The DOJ found that their agreement was "facially anticompetitive" and was *per se* illegal under the Sherman Act.  As the DOJ explained, the agreement "eliminated significant forms of competition to attract digital animators and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities."  The DOJ concluded that the agreement "disrupted the normal price-setting mechanisms that apply in the labor setting."  The DOJ also concluded that Defendants' agreements "were not ancillary to any legitimate collaboration."

93.    The DOJ noted that the agreement "covered all digital animators and other employees and was not limited by geography, job function, product group, or time period," and that "employees did not agree to this restriction."

94.    Following its investigation, the DOJ filed complaints in federal court against Defendants Pixar on September 24, 2010 and Lucasfilm on December 21, 2010.  The DOJ also filed stipulated proposed final judgments in each case.  In these stipulated proposed final judgments, Pixar and Lucasfilm agreed to be "enjoined from attempting to enter into, entering into, maintaining or enforcing any agreement with any other person to in any way refrain from, requesting that any person in any way refrain from, or pressuring any person in any way to refrain from soliciting, cold calling, recruiting, or otherwise competing for employees of the other person." The United States District Court for the District of Columbia entered the stipulated proposed final judgments on March 17, 2011 and June 3, 2011, respectively.

95.    Press reports in 2009 noted that the DOJ was investigating anti-solicitation agreements among high-tech companies. They did not indicate at that time that their investigation included Pixar, Lucasfilm, or any other visual effects or animation company.  No visual effects or animation company was mentioned publicly as part of that investigation, nor were there any press reports about anticompetitive agreements in the visual effects and animation industry, until

September 17, 2010, when a news story for the first time named Pixar as one of the companies under investigation. There was no public disclosure that Pixar had conspired with any other visual effects or animation companies, nor that any of the other Defendants in this case were suspected of any wrongdoing. The first public reports that Pixar had reached anti-solicitation agreements with any entity other than Apple were not published until December 2010, and then implicated only Lucasfilm. Until certain filings in the *High-Tech* docket were unsealed in 2013, there was no public information that any of the other Defendants here had engaged in similar conduct or that a conspiracy existed among the Defendants.

## VII. HARM TO COMPETITION AND ANTITRUST INJURY

96. Defendants' conspiracy suppressed Plaintiffs' and the class's compensation and restricted competition in the labor market in which Plaintiffs and the other class members sold their services. It did so through a scheme to limit soliciting each other's employees, to collusively discuss compensation information and to agree on compensation ranges for their workers.

97. Defendants' conduct intended to and did suppress compensation. Concerning the anti-solicitation scheme, cold calling and other forms of active solicitation have a significant beneficial impact for individual employees' compensation. Cold calls from rival employers may include offers that exceed an employee's salary, allowing her to receive a higher salary by either changing employers or negotiating increased compensation from her current employer. Employees receiving cold calls may often inform other employees of the offer they received, spreading information about higher wage and salary levels that can similarly lead to movement or negotiation by those other employees with their current employer or others.

98. Active solicitation similarly affects compensation practices by employers. A firm that actively solicits competitors' employees will learn whether their offered compensation is enough to attract their competitors' employees, and may increase the offer to make themselves more competitive. Similarly, companies losing or at risk of losing employees to cold-calling competitors may preemptively increase their employees' compensation in order to reduce their competitors' appeal.

99.     Information about higher salaries and benefits provided by recruiters for one firm to employees of another naturally would increase employee compensation.  Restraining active recruitment made higher pay opportunities less transparent to workers and thus allowed employers to keep wages and salaries down.

100.     The compensation effects of cold calling are not limited to the particular individuals who receive cold calls, or to the particular individuals who would have received cold calls but for the anticompetitive conduct alleged herein.  Instead, the effects of cold calling (and the effects of eliminating cold calling, pursuant to agreement) commonly impacted all workers and class members employed by the Defendants.

101.     The Defendants themselves have explained the purpose of the conspiracy and articulated the harm and injury caused by it to their workers.  George Lucas explained under oath that the purpose of the anti-solicitation scheme was to suppress compensation and keep the visual effects industry out of "a normal industrial competitive situation."  The conspiracy was explicitly intended to avoid "a bidding war with other companies because we don't have the margins for that sort of thing."  Internal Lucasfilm emails similarly explained that the two companies had "agreed that we want to avoid bidding wars."

102.     Ed Catmull, the longtime Pixar President who now also oversees Walt Disney Animation Studios, was equally clear about the purpose of the conspiracy and the common injury it caused to visual effects and animation workers as well as to competition in the labor market for their services.  In a 2007 email, Catmull explained this goal concisely: hiring people away from competitors with "a substantial salary increase . . . seriously messes up the pay structure."  Or, as Lucasfilm's then-President Jim Morris said in a June 2004 email to Catmull, "I know you are adamant about keeping a lid on rising labor costs."  During his deposition several years later, Catmull made clear that the problem was high salaries: "[I]t messes up the pay structure.  It does.  *It makes it very high*."  (Emphasis added.)  Other companies "would bring in people, they would pay higher salaries, it would be disruptive. . . . [Catmull] was trying to prevent that from happening."  Separately, Catmull described Jobs as "very adamant about protecting his employee force," meaning depriving them of opportunities to earn higher wages at other companies.

1    103.    When the collusive discussions concerning compensation was coupled with

2    Defendants' scheme to prohibit counteroffers from the potential new employer, Defendants deprived

3    their workers of the opportunity to have Defendants bid to pay higher compensation for that

4    employee's services.   The illicit conduct suppressed not only the compensation of the workers

5    seeking a new job, but also that of other workers by suppressing the compensation on which

6    Defendants based all workers' pay.

7    104.    The effects and injuries caused by all of Defendants' agreements commonly impacted

8    all visual effects and animation workers because Defendants valued internal equity, the idea that

9    similarly situated employees should be compensated similarly and that fair pay distinctions should

10   be made across employees at different levels in the organization.  Each Defendant established a

11   compensation structure to accomplish internal equity.  Defendants fixed narrow compensation

12   ranges for employees with similar job titles or classifications and similar levels of experience.  And

13   Defendants maintained certain compensation differentials between different positions within the

14   hierarchy of the organization.

15   105.    At Lucasfilm, for example, internal equity was "always one of the considerations" in

16   setting pay, according to its Director of Talent Acquisitions.  Lucasfilm regularly reviewed

17   employee salaries to "align the employee more appropriately in their salary range" and their

18   "internal peer group."  At Lucasfilm, all new positions and out-of-cycle compensation adjustments

19   presented to its compensation committee for approval were to be accompanied by "Peer

20   Relationship" information regarding how the subject employee's (or candidate's) colleagues inside

21   the company were compensated, and this factored heavily into committee decisions.

22   106.    Similarly, Pixar recruiters would compare salaries of similar employees to ensure

23   they were not "out of whack."  Pixar maintained "a consistent framework for evaluating the expected

24   contribution of software engineers" and to justify adjusting salaries.  A Pixar official has stated: "[I]f

25   someone feels like they're being paid more than someone I know who has more value, it raises a bit

26   of a flag."

27   107.    On information and belief, all other Defendants similarly employed a similar pay

28   structure.

108.     Defendants' efforts to maintain internal equity ensured that their conspiracy caused the compensation of all their employees to be suppressed.

## VIII.   INTERSTATE COMMERCE

109.     During the Class Period, Defendants employed Plaintiffs and other class members in California, Connecticut and New Mexico.

110.     States compete to attract visual effects and animation studios, leading employment in the industry to cross state lines.

111.     Both Defendants and Plaintiffs and other class members view labor competition in the industry to be nationwide.  Defendants considered each others' wages to be competitively relevant regardless of location, and many class members moved between states to pursue opportunities at studios.

112.     Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

## IX.     CLASS ALLEGATIONS

113.     Plaintiffs sues on their own behalf and, pursuant to Federal Rule of Civil Procedure 23(b)(3) and (b)(2), on behalf of the following Class:

> All persons who worked at any time from 2004 to the present for Pixar, Lucasfilm, DreamWorks Animation, Walt Disney Animation Studios, Walt Disney Feature Animation, Blue Sky Studios, Digital Domain, ImageMovers Digital, Sony Pictures Animation or Sony Pictures Imageworks in the United States.  Excluded from the Class are officers, directors, senior executives and personnel in the human resources and recruiting departments of the Defendants.

114.     The members of the Settlement Class under the September 20, 2013 Settlement Agreement with Pixar and Lucasfilm in *In re High-Tech Employees Antitrust Litigation*, No. 11-cv-2509 (N.D. Cal.) do not bring in this complaint any claims against Pixar, Lucasfilm, and Disney that were released pursuant to the Settlement Agreement.

115.     The class contains thousands of members, as each Defendant employed hundreds or thousands of class members each year.  The class is so numerous that individual joinder of all members is impracticable.

116.    The class is ascertainable either from Defendants' records or through self-identification in a claims process.

117.    Plaintiffs' claims are typical of the claims of other class members as they arise out of the same course of conduct and the same legal theories, and they challenge Defendants' conduct with respect to the Class as a whole.

118.    Plaintiffs' have retained able and experienced antitrust and class action litigators as its counsel.  They have no conflicts with other class members and will fairly and adequately protect the interests of the Class.

119.    The case raises common questions of law and fact that are capable of class-wide resolution, including:

> a.    whether Defendants agreed not to actively solicit each other's employees;
>
> b.    whether Defendants agreed upon compensation ranges for positions held by class members;
>
> c.    whether such agreements were *per se* violations of the Sherman Act and/or Cartwright Act;
>
> d.    whether Defendants' agreements constituted unlawful or unfair business acts or practices in violation of California Business and Professions Code § 17200;
>
> e.    whether Defendants fraudulently concealed their conduct;
>
> f.    whether and the extent to which Defendants' conduct suppressed compensation below competitive levels;
>
> g.    whether Plaintiffs and the other class members suffered injury as a result of Defendants' agreements;
>
> h.    whether any such injury constitutes antitrust injury;
>
> i.    the nature and scope of injunctive relief necessary to restore a competitive market; and
>
> j.    the measure of damages suffered by Plaintiffs and the Class.

120.    These common questions predominate over any questions affecting only individual class members.

121.    A class action is superior to any other form of resolving this litigation.  Separate actions by individual class members would be enormously inefficient and would create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of class members to pursue their claims. There will be no material difficulty in the management of this action as a class action.

122.    Injunctive relief is appropriate with respect to the Class as a whole, because Defendants have acted on grounds generally applicable to the Class.

## X.    STATUTE OF LIMITATIONS

123.    Defendants' conspiracy was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and class members' interests by adhering to, enforcing and reaffirming the anticompetitive agreements described herein.

124.    Defendants communicated among themselves by phone and email and in in-person meetings in furtherance of the conspiracy as described in the allegations of this Complaint.

125.    During the relevant statute of limitations period, Plaintiffs had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of any conspiracy.

126.    Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy among visual effects and animation companies to restrict competition for class members' services through anti-solicitation agreements, and to fix the compensation ranges of class members.  As discussed above, Defendants' discussions often occurred at small meetings just among the human resources directors, to which class members were not privy.  Defendants intentionally kept the meetings "to principals" only, keeping the most sensitive details of the conspiracy from spreading beyond senior management.

127.    Defendants' conspiracy was concealed and carried out in a manner specifically designed to avoid detection.  Outside top executives and certain human resources and recruiting personnel, Defendants concealed and kept secret the illicit anti-solicitation and wage-fixing agreements from class members.  Defendants largely avoided discussing the agreements in written

documents that might be disseminated beyond the individuals involved in the conspiracy, to avoid unnecessarily creating evidence that might alert Plaintiffs or other class members to the conspiracy's existence.

128.    Similarly, although Defendants occasionally put incriminating exchanges in emails, they often tried to limit the details of their illicit communications to phone calls.

129.    For example, a DreamWorks human resources employee recalled that DreamWorks' heads of recruitment explained the no-poaching agreement to him orally, and that he never saw anything in writing to document it.  One of DreamWorks's head recruiters told him it was unsaid and certainly not in writing.  Nor did DreamWorks make any changes to its practices in the wake of the entrance of the Lucasfilm consent decree in 2011 that might have alerted its workers to the company's prior misconduct.

130.    Defendants provided pretextual, incomplete or materially false and misleading explanations for hiring, recruiting and compensation decisions made pursuant to the conspiracy.  Defendants' explanations for their conduct served only to cover up Defendants' conspiracy.

131.    Defendants have attempted to create the false impression that their decisions are independent and that they were acting in accordance with the antitrust laws.  For example, they and the Croner Company describe the Croner Survey as an "independent third party" survey purportedly falling within the DOJ's safe harbor, but Defendants used the occasion of Croner meetings to discuss and set compensation ranges for their employees in secret and in violation of the federal antitrust laws.  Similarly, Defendants concealed the fact that they shared other compensation information directly with competitors by phone, email and other secret means.

132.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiffs and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## XI.   CLAIMS FOR RELIEF

## XII.   FIRST CLAIM FOR RELIEF—VIOLATION OF SECTION ONE OF THE SHERMAN ACT

133.   Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

134.   Defendants, by and through their officers, directors, employees, or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1.  Specifically, Defendants agreed to restrict competition for class members' services through anti-solicitation agreements and agreements to fix the compensation ranges of class members, all with the purpose and effect of suppressing class members' compensation and restraining competition in the market for class members' services.

135.   Defendants' conduct injured Plaintiffs and other class members by lowering their compensation and depriving them of free and fair competition in the market for their services.

136.   Defendants' agreements are *per se* violations of Section 1 of the Sherman Act.

## XIII.   SECOND CLAIM FOR RELIEF—VIOLATION OF THE CARTWRIGHT ACT

137.   Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

138.   Defendants, by and through their officers, directors, employees, or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of California Business and Professions Code § 16720.  Specifically, Defendants agreed to restrict competition for class members' services through anti-solicitation agreements and agreements to set and fix the compensation ranges of class members, all with the purpose and effect of suppressing class members' compensation and restraining competition in the market for class members' services.

139.   Defendants' conduct injured Plaintiffs and other class members by lowering their compensation and depriving them of free and fair competition in the market for their services.

140.   Plaintiffs and other class members are "persons" within the meaning of the Cartwright Act as defined in California Business and Professions Code § 16702.

141.    Defendants' agreements are *per se* violations of the Cartwright Act.

## XIV.   THIRD CLAIM FOR RELIEF—UNFAIR COMPETITION

142.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

143.    Defendants' efforts to limit competition for and suppress compensation of their employees constituted unfair competition and unlawful and unfair business practices in violation of California Business and Professions Code §§ 17200 *et seq.*  Specifically, Defendants agreed to restrict competition for class members' services through anti-solicitation agreements and agreements to set and fix the compensation ranges of class members, all with the purpose and effect of suppressing class members' compensation and restraining competition in the market for class members' services.

144.    Defendants' acts were unfair, unlawful and/or unconscionable, both in their own right and because they violated the Sherman Act and the Cartwright Act.

145.    Defendants' conduct injured Plaintiffs and other class members by lowering their compensation and depriving them of free and fair competition in the market for their services, allowing Defendants to unlawfully retain money that otherwise would have been paid to Plaintiffs and other class members.  Plaintiffs and other class members are therefore persons who have suffered injury in fact and lost money or property as a result of the unfair competition under California Business and Professions Code § 17204.

146.    Pursuant to California Business and Professions Code § 17203, injunctive relief is appropriate to enjoin Defendants from engaging in their unfair acts and practices.

## XV.    PRAYER FOR RELIEF

147.    WHEREFORE, Plaintiffs Robert A. Nitsch, Jr., Georgia Cano, and David Wentworth, on behalf of themselves and a class of all others similarly situated, requests that the Court enter an order or judgment against Defendants including the following:

       a.    Certification of the class described herein pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.    Appointment of Plaintiffs Robert A. Nitsch, Jr., Georgia Cano, and David Wentworth as Class Representatives and Plaintiffs' Interim Co-Lead Class Counsel as Class Counsel;

c.    Threefold the amount of damages to be proven at trial;

d.    Pre-judgment and post-judgment interest as provided for by law or allowed in equity;

e.    A permanent injunction prohibiting Defendants from hereafter agreeing not to solicit other companies' employees, to notify each other of offers extended to potential hires, or not to make counteroffers, or engaging in unlawful communications regarding compensation and agreeing with other companies about compensation ranges or any other terms of employment;

f.    The costs of bringing this suit, including reasonable attorneys' fees and expenses;

g.    All other relief to which Plaintiffs and the class may be entitled at law or in equity.

## XVI.   JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

148.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: November 26, 2014            Respectfully submitted,

                                    */s/ Daniel A. Small*
                                    Daniel A. Small (*pro hac vice*)
                                    Brent W. Johnson (*pro hac vice*)
                                    Jeffrey B. Dubner (*pro hac vice*)
                                    COHEN MILSTEIN SELLERS & TOLL PLLC
                                    1100 New York Avenue NW, Suite 500
                                    Washington, DC 20005
                                    Tel.: (202) 408-4600
                                    dsmall@cohenmilstein.com
                                    bjohnson@cohenmilstein.com
                                    jdubner@cohenmilstein.com

                                    Jeff D. Friedman (173886)
                                    Shana E. Scarlett (217895)
                                    HAGENS BERMAN SOBOL SHAPIRO LLP
                                    715 Hearst Avenue, Suite 202
                                    Berkeley, CA 94710
                                    Telephone: (510) 725-3000
                                    jefff@hbsslaw.com
                                    shanas@hbsslaw.com

                                    Steve W. Berman (*pro hac vice*)
                                    Ashley A. Bede (*pro hac vice*)
                                    HAGENS BERMAN SOBOL SHAPIRO LLP
                                    1918 Eighth Avenue, Suite 3300
                                    Seattle, WA 98101
                                    Telephone: (206) 623-7292
                                    steve@hbsslaw.com
                                    ashleyb@hbsslaw.com

                                    Marc M. Seltzer  (54534)
                                    Steven G. Sklaver  (237612)
                                    SUSMAN GODFREY L.L.P.
                                    1901 Avenue of the Stars, Suite 950
                                    Los Angeles, CA 90067-6029
                                    Telephone: (310) 789-3100
                                    mseltzer@susmangodfrey.com
                                    ssklaver@susmangodfrey.com

                                    Matthew R. Berry (*pro hac vice*)
                                    SUSMAN GODFREY L.L.P.
                                    1201 Third Avenue, Suite 3800
                                    Seattle, WA 98101
                                    Phone:  (206) 516-3880
                                    mberry@susmangodfrey.com

1

*Interim Co-Lead Class Counsel*

2

Bruce Spiva (*pro hac vice*)

3

THE SPIVA LAW FIRM PLLC
1776 Massachusetts Avenue NW, Suite 601

4

Washington, DC 20036
Tel.: (202) 785-0601

5

bspiva@spivafirm.com

6

Richard L. Grossman (112841)

7

PILLSBURY & COLEMAN LLP
600 Montgomery Street, Suite 3100

8

San Francisco, CA 94111
Tel.: (415) 433-8000

9

rgrossman@pillsburycoleman.com

10

Julian Ari Hammond (268489)

11

HAMMONDLAW, PC
1180 S Beverly Drive, Suite 610

12

Los Angeles, CA 90035
Phone: (310) 601-6766

13

Fax: (310) 295-2385
hammond.julian@gmail.com

14

15

Craig Ackermann (229832)
ACKERMANN & TILAJEF PC

16

1180 S Beverly Drive, Suite 610
Los Angeles, CA 90035

17

Phone: (310) 277-0614
Fax: (310) 277-0635

18

cja@ackermanntilajef.com

19

*Counsel for the Proposed Class*

20

21

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

22

Pursuant to Civil Local Rule No. 5-1(i)(3), I declare that concurrence has been obtained from

23

each of the above signatories to file this document with the Court.

24

25

/s/ Steve W. Berman
STEVE W. BERMAN

26

27

28