EMILY JOHNSON HENN (SBN 269482)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94061
Telephone: 650-632-4700
Facsimile: 650-632-4800
Email: ehenn@cov.com

*Attorneys for Defendants*
The Walt Disney Company, Lucasfilm Ltd.,
LLC, Pixar, ImageMovers, L.L.C., and Two Pic
MC LLC

STEPHEN V. BOMSE (SBN 40686)
DAVID M. GOLDSTEIN (SBN 142334)
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105-2669
Telephone: 415-773-4145
Facsimile: 415-773-5759
Email: sbomse@orrick.com

*Attorneys for Defendants*
Sony Pictures Animation Inc.
Sony Pictures Imageworks Inc.

*Other counsel on signature page*

DANIEL G. SWANSON (SBN 116556)
ROD J. STONE (SBN 145405)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213-229-7256
Facsimile: 213-229-6256
Email: rstone@gibsondunn.com

*Attorneys for Defendant*
DreamWorks Animation SKG, Inc.

JOHN E. SCHMIDTLEIN (SBN 163520)
JONATHAN B. PITT (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: 202-434-5901
Facsimile: 202-434-5029
Email: jschmidtlein@wc.com

*Attorneys for Defendant*
Blue Sky Studios, Inc.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| IN RE ANIMATION WORKERS ANTITRUST LITIGATION <br><br><br> THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | Master Docket No. 14-cv-4062-LHK <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:        March 26, 2015 <br> Time:        1:30 p.m. <br> Courtroom:   8 <br> Judge:       Hon. Lucy H. Koh |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on March 26, 2015, at 1:30 p.m. in the courtroom of the Honorable Lucy H. Koh, United States District Court for the Northern District of California, 280 South 1st Street, Courtroom 8, San Jose, California, Defendants DreamWorks Animation SKG, Inc., The Walt Disney Company, Lucasfilm Ltd., LLC, Pixar, ImageMovers, L.L.C., Two Pic MC LLC (f/k/a ImageMovers Digital ("IMD")), Sony Pictures Animation Inc. and Sony Pictures Imageworks Inc. ("Sony Pictures"), and Blue Sky Studios (collectively, "Defendants") each will, and hereby does, move to dismiss plaintiffs' Consolidated Amended Complaint ("CAC") in its entirety with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and/or 9(b).  In the alternative, each Defendant moves to dismiss and/or strike the claim based on wage-fixing set forth in paragraphs 74-91 of the CAC pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f).  In addition, Blue Sky, Sony Pictures, and ImageMovers, L.L.C. each moves to dismiss and/or strike the claim based on non-solicitation agreements set forth in paragraphs 42-73 of the CAC pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f).[1]

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the documents on file with the Court, Defendants' Joint Request for Judicial Notice, the Declaration of Jonathan B. Pitt, the Declaration of David M. Goldstein, and such further evidence and argument as the Court may permit.

---

[1]    The remaining defendants are not moving to dismiss the allegations of a "no-poaching" conspiracy against them, but vigorously deny that they participated in any alleged agreement not to solicit employees.

1    DATED:   January 9, 2015                    COVINGTON & BURLING LLP

2

3                                                By:  */s/ Emily Johnson Henn*
                                                     Emily Johnson Henn
4                                                    333 Twin Dolphin Drive, Suite 700
                                                     Redwood Shores, CA 94061
5                                                    Telephone: 650-632-4700
                                                     Facsimile: 650-632-4800
6                                                    Email: ehenn@cov.com

7                                                    *Attorneys for Defendants*
                                                     The Walt Disney Company
8                                                    Lucasfilm Ltd., LLC
                                                     Pixar
                                                     ImageMovers, L.L.C.
9                                                    Two Pic MC LLC

10   DATED:  January 9, 2015                     GIBSON, DUNN & CRUTCHER LLP

11

12                                               By:  */s/ Rod J. Stone*
                                                     Rod J. Stone
13                                                   333 South Grand Avenue
                                                     Los Angeles, CA 90071-3197
14                                                   Telephone: 213-229-7256
                                                     Facsimile: 213-229-6256
15                                                   Email: rstone@gibsondunn.com

16                                                   *Attorneys for Defendant*
                                                     DreamWorks Animation SKG, Inc.
17

18   DATED:   January 9, 2015                    ORRICK, HERRINGTON & SUTCLIFFE
                                                 LLP
19
                                                 By:  */s/ Stephen V. Bomse*
20                                                   Stephen V. Bomse
                                                     405 Howard Street
21                                                   San Francisco, CA 94105-2669
                                                     Telephone: 415-773-4145
22                                                   Facsimile: 415-773-5759
                                                     Email: sbomse@orrick.com

23                                                   *Attorneys for Defendants*
                                                     Sony Pictures Animation Inc.
24                                                   Sony Pictures Imageworks Inc.

25

26

27

28

DATED:   January 9, 2015                    WILLIAMS & CONNOLLY LLP

By:  */s/ John E. Schmidtlein*
    John E. Schmidtlein
    725 Twelfth Street, N.W.
    Washington, D.C. 20005
    Telephone: 202-434-5901
    Facsimile: 202-434-5029
    Email: jschmidtlein@wc.com

    William Faulkner (SBN 83385)
    McMANIS FAULKNER
    50 West San Fernando Street, 10th Floor
    San Jose, California 95113
    Telephone: 408-279-8700
    Facsimile: 408-279-3244
    Email: wfaulkner@mcmanislaw.com

    *Attorneys for Defendant*
    Blue Sky Studios, Inc.

## **TABLE OF CONTENTS**

I.  INTRODUCTION AND SUMMARY OF ISSUES TO BE DECIDED ......................... 1

II.  FACTUAL BACKGROUND ....................................................... 2

III. ARGUMENT .................................................................. 3

    A.  Legal Standard ......................................................... 3

    B.  Plaintiffs' Claims Are Clearly Barred By the Statutes of Limitations.................... 4

        1.  The CAC Does Not Adequately Allege Unlawful Conduct or a Continuing Violation Within the Limitations Period................................. 5

            a)  Plaintiffs' Conclusory Allegation of a "Continuing Violation" Lacks the Detail Required by *Twombly*. ...................... 5

            b)  Allegations That a Conspiracy Continued Beyond the DOJ's 2009 Investigation Are Implausible..................................... 7

        2.  Plaintiffs Have Failed To Allege Facts To Support a Plausible Claim That the Limitations Period Should Be Tolled Because of Fraudulent Concealment. ........................................................ 9

            a)  Plaintiffs Have Not Alleged Affirmative Acts of Concealment. .................................................... 10

            b)  Plaintiffs Have Not Alleged Diligence In Investigating Their Claims................................................ 14

            c)  Plaintiffs' Allegation That They Did Not Have Knowledge of Their Claims Before the Limitations Period Is Irrelevant. ....... 15

        3.  The "Discovery Rule" Does Not Apply To Antitrust Claims.................. 16

    C.  Plaintiffs Fail To State a *Per Se* Antitrust Claim Based on Wage-Fixing Agreements. ...................................................... 18

        1.  Plaintiffs Fail To Allege Facts Sufficient To Show That Defendants Reached Any Agreement On Wages. .................................. 19

        2.  Plaintiffs' Allegations Regarding Defendants' Participation in Industry Meetings and Compensation Surveys and Isolated Exchanges of Information Do Not Support a Reasonable Inference That Defendants Reached an "Agreement" on Wages. .......................... 20

        3.  Plaintiffs Fail To Allege How Compensation Was Affected.................. 22

D.   Plaintiffs Fail to State Plausible Claims Against Blue Sky, Sony Pictures, and ImageMovers, L.L.C. With Respect to the Alleged Non-Solicitation Conspiracy. ................................................................................................ 23

1.   Plaintiffs' Non-Solicitation Allegations Against Blue Sky Are Insufficient. ............................................................................................ 24

2.   Plaintiffs' Non-Solicitation Allegations Against Sony Pictures Are Insufficient. ............................................................................................ 27

3.   Plaintiffs' Allegations Against ImageMovers, L.L.C. Are Insufficient. ............................................................................................ 33

E.   The Remedies Plaintiffs Seek Are Not Available Under the UCL ..................... 34

F.   Plaintiffs Lack Standing To Seek Injunctive Relief. ........................................... 35

IV.   CONCLUSION ...................................................................................................... 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Armstead v. City of L.A.*,
-- F. Supp. 3d --, 2014 WL 6896039 (C.D. Cal. Dec. 5, 2014) ........................................28

*Aryeh v. Canon Bus. Solutions, Inc.*,
55 Cal. 4th 1185 (2013) .........................................................................................4, 17, 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................... *passim*

*In re Aspartame Antitrust Litig.*,
2007 WL 5215231 (E.D. Pa. Jan. 18, 2007) .........................................................12

*AT&T Corp. v. JMC Telecom, LLC*,
470 F.3d 525 (3d Cir. 2006).........................................................................................22

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999).........................................................................................21

*Baker v. Beech Aircraft Corp.*,
39 Cal. App. 3d 315 (1974) ...........................................................................................9

*BanxCorp. v. Apax Partners, L.P.*,
2011 WL 1253892 (D.N.J. Mar. 28, 2011)..............................................................23

*Bell Atl. Bus. Sys. Servs. v. Hitachi Data Sys. Corp.*,
849 F. Supp. 702 (N.D. Cal. 1994) .............................................................................34

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................... *passim*

*Benak v. Alliance Capital Mgmt. L.P.*,
435 F.3d 396 (3d Cir. 2006)........................................................................................16

*Caro v. Procter & Gamble Co.*,
18 Cal. App. 4th 644 (1993) ........................................................................................36

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) ........................................................................................35

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) .............................................................................2, 20

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)........................................................................................................35

*Conmar Corp. v. Mitsui & Co., Inc.*,
   858 F.2d 499 (9th Cir. 1988) ........................................................................... *passim*

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984)..........................................................................................34

*Cortez v. Purolator Air Filtration Prods. Co.*,
   23 Cal. 4th 163 (2000) ......................................................................................35

*Credit Suisse Sec. (USA), LLC v. Simmonds*,
   132 S. Ct. 1414 (2012).........................................................................................5

*DeBenedictis v. Merrill Lynch & Co., Inc.*,
   492 F.3d 209 (3d Cir. 2007)..............................................................................16

*Desai v. Deutsche Bank Sec. Ltd.*,
   573 F.3d 931 (9th Cir. 2009) .............................................................................10

*Digital Sun v. The Toro Co.*,
   2011 WL 1044502 (N.D. Cal. Mar. 22, 2011)...................................................35

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
   595 F. Supp. 2d 1253 (M.D. Fla. 2009) ............................................................16

*In re Elec. Carbon Prods. Antitrust Litig.*,
   333 F. Supp. 2d 303 (D.N.J. 2004) ...................................................................33

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007).................................................................................23

*Fayer v. Vaughn*,
   649 F.3d 1061 (9th Cir. 2011) .............................................................................3

*Fenerjian v. Nongshim Co.*,
   -- F. Supp. 3d --, 2014 WL 5685562 (N.D. Cal. Nov. 4, 2014)........................18

*Freeman v. San Diego Ass'n of Realtors*,
   322 F.3d 1133 (9th Cir. 2003) ...........................................................................34

*Gardner v. Baby Trend, Inc.*,
   2012 WL 130724 (Cal. Ct. App. Jan. 13, 2012) ...............................................17

*Glenbrook Capital P'ship Ltd. v. Kuo*,
   2008 WL 929429 (N.D. Cal. Apr. 3, 2008) .......................................................28

*Global Servs. v. Ikon Office Solutions*,
   2011 WL 6182425 (N.D. Cal. Dec. 13, 2011)...................................................12

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ............................................................20

iv

*Guerrero v. Gates*,
  442 F.3d 697 (9th Cir. 2006) ...................................................................................10, 11

*Hamilton v. Aubrey*,
  2008 WL 1774469 (D. Nev. Apr. 15, 2008) ...................................................................13

*Hangarter v. Provident Life & Accident Ins. Co.*,
  373 F.3d 998 (9th Cir. 2004) ...........................................................................................35

*Hexcel Corp. v. Ineos Polymers, Inc.*,
  681 F.3d 1055 (9th Cir. 2012) ......................................................................9, 10, 14, 17

*In re High-Tech Employee Antitrust Litig.*,
  2014 WL 3917126 (N.D. Cal. Aug. 8, 2014) ..................................................................15

*In re High-Tech Employee Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ............................................................... *passim*

*In re High-Tech Employee Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...........................................................31, 34, 35

*Hodgers-Durgin v. de la Vina*,
  199 F.3d 1037 (9th Cir. 1999) .........................................................................................36

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010)..............................................................................................20

*Huynh v. Chase Manhattan Bank*,
  465 F.3d 992 (9th Cir. 2006) .............................................................................................4

*Ilaw v. Daughters of Charity Health Sys.*,
  2012 WL 381240 (N.D. Cal. Feb. 6, 2012) ......................................................................4

*Jadwin v. Cnty. of Kern*,
  2009 WL 2424565 (E.D. Cal. Aug. 6, 2009) ..................................................................35

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ................................................................................ *passim*

*Koch v. Christie's Int'l, PLC*,
  699 F.3d 141 (2d Cir. 2012)..............................................................................................14

*Korea Kumho Petrochemical v. Flexsys America LP*,
  2008 WL 686834 (N.D. Cal. Mar. 11, 2008).................................................................6, 8

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ...................................................................................................35

*Laird v. Capital Cities/ABC, Inc.*,
  68 Cal. App. 4th 727 (1998) ............................................................................................34

v

*Lane v. Page*,
    649 F. Supp. 2d 1256 (D.N.M. 2009) .................................................................................16

*In re Lithium Ion Batteries Antitrust Litig.*,
    2014 WL 309192 (N.D. Cal. Jan. 21, 2014) .............................................................6, 23, 32

*In re Lithium Ion Batteries Antitrust Litig.*,
    2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ................................................................33, 34

*Lopez v. Regents of Univ. of Cal.*,
    5 F. Supp. 3d 1106 (N.D. Cal. 2013) ..................................................................................28

*In re Magnesium Oxide Antitrust Litig.*,
    2011 WL 5008090 (D.N.J. Oct. 20, 2011) ..........................................................................12

*Marder v. Lopez*,
    450 F.3d 445 (9th Cir. 2006) ................................................................................................3

*Mathews v. Kidder, Peabody & Co., Inc.*,
    260 F.3d 239 (3d Cir. 2001) ...............................................................................................17

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) .............................................................................................35

*Mayfield v. United States*,
    599 F.3d 964 (9th Cir. 2010) ..............................................................................................35

*McMunigal v. Bloch*,
    2010 WL 5399219 (N.D. Cal. Dec. 23, 2010) ...................................................................28

*MedioStream, Inc. v. Microsoft Corp.*,
    869 F. Supp. 2d 1095 (N.D. Cal. 2012) ...............................................................................6

*In re Merrill Lynch Ltd. P'ships Litig.*,
    154 F.3d 56 (2d Cir. 1998) ..................................................................................................14

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ............................................................................................................30

*In re NCAA Student-Athlete Name & Likeness Litig.*,
    2011 WL 1642256 (N.D. Cal. May 2, 2011) ......................................................................30

*Nordberg v. Trilegiant Corp.*,
    445 F. Supp. 2d 1082 (N.D. Cal. 2006) .............................................................................34

*Pace Indus., Inc. v. Three Phoenix Co.*,
    813 F.2d 234 (9th Cir. 1987) ............................................................................................4, 6

*Phillips v. Bank of America, N.A.*,
    2011 WL 2160583 (D. Haw. 2011) ......................................................................................6

*Pineda v. Bank of America*,
  50 Cal. 4th 1389 (2010) .................................................................................................35

*Plumlee v. Pfizer, Inc.*,
  2014 WL 695024 (N.D. Cal. Feb. 21, 2014) ...................................................................23

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*,
  988 F. Supp. 2d 696 (E.D. La. 2013) .........................................................................11, 13

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
  442 F.3d 741 (9th Cir. 2006) ...........................................................................................28

*Richards v. Neilsen Freight Lines*,
  810 F.2d 898 (9th Cir. 1987) .....................................................................................30, 31

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
  532 F.3d 963 (9th Cir. 2008) .....................................................................................19, 20

*Rutledge v. Boston Woven Hose & Rubber Co.*,
  576 F.2d 248 (9th Cir. 1978) ...........................................................................................11

*Santa Maria v. Pacific Bell*,
  202 F.3d 1170 (9th Cir. 2000) .........................................................................................11

*SEC v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011).........................................................................................11, 16

*Shamsnia v. Anaco*,
  2014 WL 3854325 (C.D. Cal. Aug. 5, 2014).....................................................................9

*Shaw v. Hahn*,
  56 F.3d 1128 (9th Cir. 1995) .............................................................................................3

*Sourcinglink.NET, Inc. v. Oracle Corp.*,
  2006 WL 2130433 (Cal. Ct. App. Aug. 1, 2006)..............................................................14

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ...........................................................................................24

*Stutz Motor Car of America, Inc. v. Reebok Int'l, Ltd.*,
  909 F. Supp. 1353 (C.D. Cal. 1995) ...........................................................................11, 17

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007) .....................................................................................10, 28

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
  633 F. Supp. 2d 763 (D. Ariz. 2009) ...............................................................................28

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006).............................................................................................................22

*Thorman v. American Seafoods Co.*,
    421 F.3d 1090 (9th Cir. 2005) ...........................................................................9, 11, 14

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)..............................................................................................18

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
    2013 WL 368365 (N.D. Cal. Jan. 29, 2013) ........................................................35

*United States v. Adobe Sys., Inc.*,
    2011 WL 10883994 (D.D.C. Mar. 18, 2011).........................................................7

*United States v. Lucasfilm, Inc.*,
    2011 WL 2636850 (D.D.C. June 3, 2011)..............................................................7

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ..........................................................................23, 25

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978).............................................................................................21

*Vernon v. City of Dallas*,
    2009 WL 2486033 (N.D. Tex. Aug. 13, 2009)....................................................14

*Volk v. D.A. Davidson & Co.*,
    816 F.2d 1406 (9th Cir. 1987) ...................................................................9, 10, 17

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011).........................................................................................36

*Walsh v. Nevada Dep't of Human Res.*,
    471 F.3d 1033 (9th Cir. 2006) .............................................................................36

*Ward v. Caulk*,
    650 F.2d 1144 (9th Cir. 1981) ...............................................................................6

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009) ..................................................................19, 21, 25

*Yumul v. Smart Balance, Inc.*,
    733 F. Supp. 2d 1117 (C.D. Cal. 2010) .................................................................9

*Zenith Radio Crop. v. Hazeltine Research*,
    401 U.S. 321 (1971)...................................................................................4, 15, 16

**Statutes**

15 U.S.C. § 15b..........................................................................................................4

15 U.S.C. § 16(i)......................................................................................................17

Cal. Bus. & Prof. Code § 16720 ...........................................................................................22

Cal. Bus. & Prof. Code § 16750.1 ..........................................................................................4

Cal. Bus. & Prof. Code § 17208 ............................................................................................4

**Rules**

Fed. R. Civ. Proc. 9(b) .............................................................................2, 9, 10, 11, 14

Fed. R. Civ. Proc. 12(b)(1) .................................................................................................35

Fed. R. Civ. Proc. 12(b)(6) ........................................................................................3, 4, 31

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION AND SUMMARY OF ISSUES TO BE DECIDED

More than five years ago, the Department of Justice launched a wide-ranging antitrust investigation of recruiting practices among Silicon Valley and other technology companies. The investigation was broadly reported in mainstream and industry publications. The investigation involved animation studios, including defendants Pixar and Lucasfilm Ltd., LLC ("Lucasfilm"), as well as DreamWorks Animation SKG, Inc. ("DreamWorks"), Sony Pictures Imageworks Inc. and Sony Pictures Animation Inc. (collectively, "Sony Pictures"), and Blue Sky Studios ("Blue Sky"). In 2010, the DOJ brought cases against Pixar, Lucasfilm, and other companies. It did not pursue claims of any kind against any of the other defendants in this action.

The DOJ's 2009 investigation, in turn, led to the *High-Tech Employee Antitrust Litigation*, filed in 2011. But the present plaintiffs did not bring litigation either in response to the DOJ investigation or after the *High-Tech* cases were filed. Instead, they waited nearly five years after the DOJ commenced its investigation. In an effort to manufacture new claims not covered by the *High-Tech* lawsuits, plaintiffs assert that animation studios, other than *High-Tech* defendants Pixar and Lucasfilm, also participated in the alleged conspiracy. However, plaintiffs' attempt is futile as a matter of law and comes far too late. The statutes of limitations for their claims expired long ago.

Plaintiffs allege no facts to support their improbable theory that the challenged conduct continued beyond the DOJ investigation, the consent judgments with some defendants, and the *High-Tech* litigation. In fact, they cite no allegedly wrongful communications or actions *at all* within the past five years. Instead, they refer to communications and actions by some defendants that occurred before the DOJ investigation and then conclusorily assert that defendants' alleged conduct continued despite the obvious peril of conspiring in the face of such intense scrutiny. Under settled law, the Court should not credit such conclusory and implausible allegations to plead around the four-year limitations period. That is particularly true given that plaintiffs have obtained extensive pre-complaint discovery and the *High-Tech* public record, and purportedly have interviewed roughly 80 former industry employees.

Nor can plaintiffs use the doctrine of fraudulent concealment or any other tolling doctrine to excuse their failure to timely bring suit. The Ninth Circuit has held repeatedly that it is not enough

for a plaintiff to allege, as plaintiffs do here, that it was unaware of its claim. Instead, a plaintiff must allege that defendants committed affirmative acts of concealment above and beyond the challenged conduct itself. Plaintiffs have not met that burden. Rather than allege such acts with the specificity required by Rule 9(b), plaintiffs make only conclusory allegations that some unidentified persons made unspecified statements to other unidentified persons at unknown times that somehow misled them about the nature of defendants' recruiting practices. That is not nearly enough.

In addition to the non-solicitation conspiracy alleged in *High-Tech*, plaintiffs also allege that defendants entered into a *per se* unlawful conspiracy to fix their employees' wages. Yet, as explained more fully below, plaintiffs provide nothing of the "who, what, when, where, and how" of such a supposed conspiracy as required by *Ashcroft v. Iqbal*, 556 U.S. 662, 678-80 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007). Indeed, they do not allege a single term of this alleged agreement to fix compensation levels or point to a single communication evidencing any such agreement. Rather, plaintiffs allege that defendants participated in a third-party industry salary survey, attended meetings in connection with that survey and other industry conferences, and occasionally communicated about compensation issues. But it is well-settled that such allegations, showing a mere "opportunity" to conspire, are insufficient to plead a price-fixing agreement. *In re Citric Acid Litig.*, 191 F.3d 1090, 1097, 1103 (9th Cir. 1999). Similarly, plaintiffs' allegations that defendants sometimes communicated to exchange certain information regarding wages fail to support an inference of a *per se* unlawful wage-fixing agreement. Nothing in the alleged communications reflects a meeting of the minds among the defendants to fix compensation levels for employees. Finally, plaintiffs allege nothing about how actual wages reflect such an agreement beyond the conclusory allegation that compensation was somehow "suppressed." Under a longstanding, consistent line of antitrust authority discussed more fully below, plaintiffs' attempt to plead a wage-fixing conspiracy falls far short of the *Iqbal* standard.

Finally, plaintiffs fail to meet the *Iqbal* standard as to *any* theory of liability with respect to Sony Pictures, Blue Sky, and ImageMovers, L.L.C.

## II.     FACTUAL BACKGROUND

The three named plaintiffs are former employees of animation and visual effects studios, including several of the defendants. Plaintiffs allege that defendants entered into two allegedly unlawful

2

agreements: (1) not to solicit each other's employees, CAC ¶¶ 42-73; and (2) to fix the compensation of their employees.  CAC ¶¶ 74-91.  Plaintiffs assert that the conspiracy they allege "overlap[s]" with the conspiracy alleged in *High-Tech*.  *See* Motion to Relate *Nitsch* Case at 2, Dkt. No. 989 in No. 11-cv-02509.  Plaintiffs seek to represent a class of all persons who "worked" for any of ten animation studios at "any time from 2004 to the present."  CAC ¶ 113.  This would include salaried and non-salaried personnel, persons in the sort of non-technical positions that this Court previously denied for inclusion in the *High-Tech* class, and persons who are already members of the *High-Tech* class.

## III.   ARGUMENT

### A.   Legal Standard

A complaint must be dismissed under Rule 12(b)(6) if it lacks sufficient facts to "'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  The "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 545, 555.  Particularly in light of the expense and burden of antitrust discovery, courts "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."  *Id.* at 558 (citation and internal marks omitted).

Although the Court accepts all well-pled allegations of material fact as true, the Court need not accept as true allegations contradicted by judicially noticeable facts, and the "[C]ourt may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into one for summary judgment.  *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995).  The Court also may consider the actual contents of any documents or other material referenced in the CAC, rather than the complaint's characterization of that material.  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  Also, the Court is not required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations."  *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (citation and internal marks omitted).  To the contrary, the Supreme Court has made clear that evaluating "whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

### B.    Plaintiffs' Claims Are Clearly Barred By the Statutes of Limitations.

A claim should be dismissed as time-barred under Rule 12(b)(6) when "the running of the statute is apparent on the face of the complaint." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (citation and internal marks omitted). If the statute of limitations has run, "a plaintiff must allege facts to support a plausible claim that [an] equitable tolling doctrine applies in order to survive a motion to dismiss." *Ilaw v. Daughters of Charity Health Sys.*, 2012 WL 381240, at *4 n.4 (N.D. Cal. Feb. 6, 2012).

As a matter of well-established law, plaintiffs' claims under the Sherman Act began to accrue when they were injured by defendants' allegedly unlawful conduct. *See Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) (Sherman Act claim "accrues each time a plaintiff is injured by an act of the defendant"). As the Supreme Court held, "the statute begins to run when a defendant commits an act that injures a plaintiff's business … This much is plain from the treble-damage statute itself." *Zenith Radio Crop. v. Hazeltine Research*, 401 U.S. 321, 338 (1971). This "injury accrual" rule also applies to plaintiffs' claims under California law.[2] Because all three statutes have a four-year statute of limitations, plaintiffs' claims are time-barred unless they sufficiently allege that after September 8, 2010, *i.e.*, four years before the *Nitsch* complaint was filed, defendants engaged in conduct that caused an actionable injury. *See* 15 U.S.C. § 15b (Sherman Act); Cal. Bus. & Prof. Code § 16750.1 (Cartwright Act); *id.* § 17208 (UCL).[3] They utterly fail to do so. This belated action

---

[2]    *See Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1191 (2013) (holding that claims under the UCL accrue with "the *occurrence* of the last element essential to the cause of action," those elements being "wrongdoing, harm, and causation") (citation and internal marks omitted) (emphasis added); *id.* at 1195 (observing that interpretations of the Sherman Act are instructive when construing the Cartwright Act).

[3]    The class proposed in the CAC is broader than the class proposed in the first-filed *Nitsch* complaint in at least two respects: the class proposed in *Nitsch* was limited to "technical, artistic, creative and/or research and development positions" (*Nitsch* Complt. ¶ 89) whereas the class in the CAC has no such restriction, and the class proposed in *Nitsch* did not include workers at Blue Sky Studios (*id.*) whereas the CAC includes such workers. The timeliness of claims and claimants not included in the *Nitsch* complaint would be based on the date of the complaint that first included such claims and claimants. Thus, for example, as to Blue Sky, plaintiffs' claims as to all claimants are time-barred unless they sufficiently allege an injury caused by some act of the defendants after September 17, 2010, as are the plaintiffs' claims, as to all other defendants, putatively on behalf of workers other than "technical, artistic, creative and/or research and development positions."

exemplifies why legislatures impose a statute of limitations:  to protect against "stale or unduly delayed claims" and bar plaintiffs, like these, who have slept on their rights.  *Credit Suisse Sec., (USA), LLC v. Simmonds*, 132 S. Ct. 1414, 1419-20 (2012) (citation and internal marks omitted).

### 1.   The CAC Does Not Adequately Allege Unlawful Conduct or a Continuing Violation Within the Limitations Period.

Plaintiffs have not alleged any wrongful conduct after the DOJ investigation began in 2009, let alone after September 8, 2010.  They do not allege a single wrongful communication or action taken by any defendant after September 8, 2010, much less facts sufficient to state a claim that the defendants were conspiring after that date.  On the contrary, the very latest conduct they allege with even the slightest specificity is from January 2009.  *See* CAC ¶¶ 83, 88.[4]  All other alleged communications occurred before 2008.  *See, e.g.*, *id.* ¶¶ 4-7, 12-14, 48, 50, 52-73, 78, 82, 84-86, 90 (alleging communications between 2004 and 2007).  With respect to conduct within the limitations period, plaintiffs offer nothing more than entirely conclusory allegations.

### a)   Plaintiffs' Conclusory Allegation of a "Continuing Violation" Lacks the Detail Required by *Twombly*.

The CAC contains a conclusory allegation that "Defendants' conspiracy was a continuing violation," CAC ¶ 123, but plaintiffs fail to substantiate this bare allegation with any specific factual allegation.  The fact that the last communication alleged is from 2009 further confirms that plaintiffs have no basis to allege that the conspiracy continued into the four-year limitations period.

If, by using the phrase "continuing violation," plaintiffs intended to allege a conspiracy during the past four years, they have failed to do so.  Pursuant to *Twombly*, plaintiffs' mere say-so that a conspiracy was a "continuing violation" is insufficient to allege a conspiracy beyond 2009.  *See* 550 U.S. at 570; *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (conclusory allegations that a conspiracy existed are insufficient, as plaintiffs must allege facts to answer the "basic questions,"

---

[4]      The 2009 communications concerned information on salaries and, as shown in Section III.C below, plaintiffs have failed to state plausible claims regarding a conspiracy to fix salaries.  The most recent communication between two defendants relating to the alleged "no-poaching" agreement is from 2007.

1    including "who, did what, to whom (or with whom), where, and when?"); *see, e.g.*, *In re Lithium Ion*

2    *Batteries Antitrust Litig.*, 2014 WL 309192, at *12 (N.D. Cal. Jan. 21, 2014) (rejecting class period

3    before 2002 where there was a "dearth of meetings alleged … in the years 2000 and 2001, despite [the

4    complaints] having been drafted with the benefit of substantial document production," and plaintiffs

5    "alleg[ed] only in conclusory fashion that meetings occurred in those years").  In *Korea Kumho*

6    *Petrochemical v. Flexsys America LP*, 2008 WL 686834, at *8 (N.D. Cal. Mar. 11, 2008), for example,

7    plaintiffs asserted a conspiracy to monopolize after 2005, but the court observed that "all of the factual

8    allegations of conspiracy found in the [complaint] predate 2002."  Accordingly, the court concluded that

9    plaintiffs' allegation that the "conspiracy extended into 2005 and beyond" was not "supported by factual

10   allegations in the [complaint] that meet the *Twombly* standard."  *Id.*

11           "[W]hen a plaintiff alleges a continuing violation, an overt act by the defendant is

12   required to restart the statute of limitations and the statute runs from the last overt act."  *Pace*, 813 F.2d

13   at 237 (citation omitted).  To allege a continuing violation, then, plaintiffs must at a minimum allege an

14   "overt act" after September 8, 2010.  An "overt act" has two elements: "[i]t must be a new and

15   independent act that is not merely a reaffirmation of a previous act; and . . . it must inflict new and

16   accumulating injury on the plaintiff."  *Id.* at 238; *see also Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir.

17   1981) ("A continuing violation is occasioned by continual unlawful acts, not by continual ill effects

18   from an original violation.").  Plaintiffs fail to allege either element.

19           First, the CAC does not allege any act, much less a "new and independent act," within the

20   last four years.  *See Pace*, 813 F.2d at 238.  Instead, plaintiffs' allegations focus exclusively on conduct

21   predating 2010.  *See, e.g.*, *Phillips v. Bank of America, N.A.*, 2011 WL 2160583, at *7 (D. Haw. 2011)

22   (rejecting attempt to invoke continuing violation theory because that theory "requires at least one act

23   within the limitations period, and none is alleged here"); *MedioStream, Inc. v. Microsoft Corp.*, 869 F.

24   Supp. 2d 1095, 1106 (N.D. Cal. 2012) (claims time-barred where plaintiff failed to plead "overt" act

25   within the limitations period).  Second, plaintiffs have failed to allege how such overt act, if any,

26   inflicted "new and accumulating injury" on them.  *See Pace*, 813 F.2d at 238.  Rather, all plaintiffs offer

27   is an unadorned conclusion that the alleged conspiracy "repeatedly invaded" their interests, which is

28

exactly what *Twombly* forbids: a "formulaic recitation" of the elements of the continuing violation doctrine.  *See Twombly*, 550 U.S. at 555.  In short, plaintiffs have failed to allege a continuing violation.

### b)   Allegations That a Conspiracy Continued Beyond the DOJ's 2009 Investigation Are Implausible.

Particularly in light of the 2009 DOJ investigation, it is plaintiffs' burden to allege specific anticompetitive conduct that occurred within the limitations period, and thus after the DOJ investigation began – not merely conclusory allegations that the alleged conspiracy continued during and after that investigation.  The DOJ began its investigation of employment practices, including those of defendant Pixar, no later than the "summer of 2009."  *See In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1173 1190 (N.D. Cal. 2013); Joint Request for Judicial Notice ("RJN") Ex. A (DOJ Civil Investigative Demand ("CID") received by Pixar).  In late November 2009, *High-Tech* defendant Lucasfilm, as well as Blue Sky, Sony Pictures, and DreamWorks – the newly-named defendants – also received a CID from the DOJ.  *See id.* Exs. B-E (copies of CIDs received by Lucasfilm, DreamWorks, Sony Pictures, and Blue Sky).  These CIDs called for information and documents relating, *inter alia*, to "each actual or possible agreement that has been discussed or in effect between the company and any other person relating to the recruitment, solicitation, or hiring of each other's employees, contractors or consultants."  *See, e.g.*, *id.* Ex. A.  Pixar and Lucasfilm, defendants then and now, ultimately entered stipulated final judgments with the DOJ.  *See High-Tech*, 985 F. Supp. 2d at 1173.[5]  The DOJ dropped its investigation as to DreamWorks, Sony Pictures, and Blue Sky.

This Court should view plaintiffs' deficient allegations of a continuing conspiracy in light of the undisputed fact of the DOJ investigation.  It is highly improbable, to say the least, that parties under a DOJ investigation of their allegedly unlawful conduct would continue to engage in any such conduct while under that scrutiny.  The Court should therefore test plaintiffs' contention that the alleged conduct continued during and after the DOJ's investigation by asking: what specific facts have plaintiffs

---

[5]      *See also United States v. Lucasfilm, Inc.*, 2011 WL 2636850, at *3 (D.D.C. June 3, 2011) (entering final judgment in DOJ action against Lucasfilm); *United States v. Adobe Sys., Inc.*, 2011 WL 10883994 (D.D.C. Mar. 18, 2011) (final judgment in DOJ action against various parties, including Pixar).

alleged to show any assertedly unlawful conduct continued into the limitations period?  In *Korea Kumho*, for example, the court found it implausible that the challenged conspiracy continued into "2005 and beyond" where, among other things, "all of the factual allegations of conspiracy . . . predate 2002 . . . ."  *See* 2008 WL 686834, at *8.  The same is true here.  Plaintiffs allege no facts indicating the alleged conspiracy continued after 2009.

Even the *High-Tech* plaintiffs and their expert – with the benefit of documents produced through December 2011 – did not argue that defendants continued their alleged conspiracy after the DOJ began its investigation in 2009.  *See High-Tech*, 985 F. Supp. 2d at 1179-80 (observing that "Plaintiffs contend that … the DOJ ultimately put an end to Defendants' illegal agreements"); RJN Ex. G (Expert Report of Edward E. Leamer, Ph.D., dated October 28, 2013, Dkt. No. 856-8 in No. 11-cv-02509, at ¶ 6 (expert analysis assumes that "the agreements between the defendants ceased to have an effect on their recruiting and hiring activities" as of March 2009, when defendants received DOJ notices)).  Indeed, after scouring many thousands of documents and taking dozens of depositions, the *High-Tech* plaintiffs not only determined not to allege a conspiracy after 2009, but they and their expert actually used 2010 as a non-conspiratorial benchmark year for their "before and after" analysis for damages.  That is, *they treated 2010 compensation as reflecting post-conspiracy competitive market conditions*.[6]

Given the instant plaintiffs' assertion (in their motion to relate the *Nitsch* case) that the alleged animation and *High-Tech* conspiracies "overlapp[ed]" and that "a substantial portion of both [alleged conspiracies] concerns identical parties, facts, evidence, [and] witnesses," the Court might ask what, exactly, these plaintiffs have uncovered that was somehow missed by the industrious *High-Tech* plaintiffs.  The short answer is: nothing.  By merely recycling allegations regarding communications from prior to 2009 and then simply asserting without any support that the alleged conspiracy "was a

---

[6]     Dr. Leamer had data for the years 2001 to 2011.  *See* RJN Ex. G at ¶ 17.  In his regression, the "Conduct" variable was "zero" for years having no non-compete agreement, *see id.* at ¶ 20, which he defined as ending in 2009.  *Id.* at Fig 1.  His damages were the difference between compensation during the non-compete years and the years, such as those after 2009, when then conduct variable was "turn[ed] off."  *Id.* at ¶ 44.  This Court found Google's "Big Bang" compensation increase in 2010 illustrated "genuine competition for labor."  *High-Tech*, 985 F. Supp. 2d at 1222-23.

continuing violation," plaintiffs have utterly failed to meet their burden under Rule 9(b) and *Twombly* to allege specific facts showing that new and independent acts in furtherance of the alleged conspiracy occurred within the limitations period.

### 2. Plaintiffs Have Failed To Allege Facts To Support a Plausible Claim That the Limitations Period Should Be Tolled Because of Fraudulent Concealment.

Lacking any actionable conduct within the limitations period, plaintiffs seek to rely on the doctrine of fraudulent concealment. Under that doctrine, a statute of limitations may be tolled if defendants "fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). Plaintiffs must allege facts establishing all three elements of fraudulent concealment: (1) that they were affirmatively misled by defendants; (2) that they had neither actual nor constructive knowledge of the facts giving rise to their claim before the limitations period; and (3) that they exercised due diligence in attempting to discover the facts. *See id.*; *Conmar Corp. v. Mitsui & Co., Inc.*, 858 F.2d 499, 502 (9th Cir. 1988).[7] Here, they fail on all three.

A failure to satisfy any of the required elements defeats application of the doctrine. *See Thorman v. American Seafoods Co.*, 421 F.3d 1090, 1096 (9th Cir. 2005) (where plaintiff failed to allege affirmative acts and thus could not "establish[] fraudulent concealment as a matter of law," it was unnecessary to consider other elements). For example, an allegation that plaintiffs were ignorant of their claims does not suffice. *See Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987)

---

[7]    The standard for fraudulent concealment under California law is substantively equivalent. *See Baker v. Beech Aircraft Corp.*, 39 Cal. App. 3d 315, 321 (1974) (under California law, "[i]n order to establish fraudulent concealment, the complaint must show: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry."). As under federal law, plaintiffs must allege affirmative acts of concealment. *See Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1132 n.18 (C.D. Cal. 2010) (observing that "the court's independent research suggests that California views an affirmative act of concealment, rather than mere nondisclosure, as a prerequisite to invocation of the fraudulent concealment doctrine"); *Shamsnia v. Anaco*, 2014 WL 3854325, at *3 (C.D. Cal. Aug. 5, 2014) (under California law, "the fraudulent-concealment doctrine requires affirmative concealment by the defendant").

1   (plaintiffs' "mere ignorance of the cause of action does not, in itself, toll the statute").[8]   As the Ninth

2   Circuit has held, fraudulent concealment "requires a showing *both* that the defendant used fraudulent

3   means to keep the plaintiff unaware of his cause of action, and *also* that the plaintiff was, in fact,

4   ignorant of the existence of his cause of action."  *Hexcel*, 681 F.3d at 1060 (citation and internal marks

5   omitted) (emphasis added).  Allegations of fraudulent concealment must meet Rule 9(b)'s heightened

6   pleading standard.  *See Guerrero v. Gates*, 442 F.3d 697, 707 (9th Cir. 2006).  Accordingly, the CAC

7   must plead facts with "specificity including an account of the 'time, place, and specific content of the

8   false representations as well as the identities of the parties to the misrepresentations.'"  *Swartz v. KPMG*

9   *LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted).  It does not.

10                  **a)      Plaintiffs Have Not Alleged Affirmative Acts of Concealment.**

11                  To satisfy the first element of fraudulent concealment, plaintiffs must plead facts

12   evidencing defendants' *affirmative* acts to conceal or otherwise mislead them about the alleged

13   conspiracy.  *See Conmar*, 858 F.2d at 505 ("A plaintiff alleging fraudulent concealment must establish

14   that its failure to have notice of its claim was the result of affirmative conduct by the defendant.").  Mere

15   "silence or passive conduct does not constitute fraudulent concealment."  *Volk*, 816 F.2d at 1416; *see*

16   *also Conmar*, 858 F.2d at 505 ("passive concealment of information is not enough to toll the statute of

17   limitations").  And, as with all elements of fraudulent concealment, plaintiffs must allege such

18   affirmative acts occurring within the limitations period.  *See Guerrero*, 442 F.3d at 706 (observing

19   fraudulent concealment "halts the statute of limitations" when there is "active conduct by a defendant

20   …. to prevent the plaintiff from suing in time.") (citation and internal marks omitted).

21                  Plaintiffs begin with conclusory allegations that "[d]efendants engaged in a "secret

22   conspiracy," which "often occurred at small meetings" and "was concealed and carried out in a manner

23   specifically designed to avoid detection."  CAC ¶¶ 126-127.  But every "fraudulent scheme requires

24   some degree of concealment, both of the truth and of the scheme itself."  *Desai v. Deutsche Bank Sec.*

25

26   [8]      In this regard, among others, the fraudulent concealment doctrine is different from the so-called
27   "discovery rule," which is not applicable to antitrust claims.  Section III.B.3 below discusses the
     inapplicability of the discovery rule in this action in more detail.

28

*Ltd.*, 573 F.3d 931, 941 (9th Cir. 2009). Thus, plaintiffs must allege "active conduct by a defendant, above and beyond the wrongdoing upon which the plaintiff's claim is filed." *Guerrero*, 442 F.3d at 706 (citation and internal marks omitted). Merely labeling a conspiracy "secret" is not enough, because that does not evidence conduct "above and beyond" the challenged conspiracy itself. As held by the Ninth Circuit:

> [Plaintiff] claims that [defendant's] acts constitute fraudulent concealment because they were by nature self-concealing. We require more. A plaintiff alleging fraudulent concealment must establish that its failure to have notice of its claims was the result of affirmative conduct by the defendant.

*Conmar*, 858 F.2d at 505; *see also Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1177 (9th Cir. 2000) (holding that "[f]raudulent concealment necessarily requires active conduct by a defendant, above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time" as otherwise "the tolling doctrine [would merge] with the substantive wrong, and would virtually eliminate the statute of limitations"); *SEC v. Gabelli*, 653 F.3d 49, 59-60 (2d Cir. 2011) (same), *overruled on other grounds*, 133 S. Ct. 1216 (2012).[9]

Moreover, "[m]erely keeping someone in the dark is not the same as affirmatively misleading him." *American Seafoods*, 421 F.3d at 1095. Thus, plaintiffs' allegations that the conspiracy was "secret" does not show that plaintiffs were *affirmatively* misled about the conspiracy's existence. *See, e.g.*, *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978) (plaintiff could not invoke fraudulent concealment through conclusory allegations that defendant "fraudulently concealed the existence of the aforesaid price discrimination through the adoption of elaborate schemes" and "resort[ed] to secrecy to avoid detection"); *Stutz Motor Car of America, Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp. 1353, 1363 (C.D. Cal. 1995) (rejecting fraudulent concealment where plaintiff offered

---

[9]     Plaintiffs' conclusory allegations of a "secret" conspiracy also lack the specificity required by Rule 9(b). *See In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 724-25 (E.D. La. 2013) (rejecting theory of fraudulent concealment where there was no "specific allegations of who participated in the allegedly secret and/or fraudulent communications that purportedly concealed [the unlawful] conduct, where and when the communications took place, or what was actually communicated").

"[b]ald allegations of conspiracy and concealment" and "cited no evidence whatsoever of affirmative conduct").[10]  Moreover, plaintiffs' allegation of a "secret" conspiracy is incompatible with their assertion that defendants used the Croner survey to communicate wage information to each other.  CAC ¶ 75.  Plaintiffs cannot allege that the existence of the Croner survey was concealed.[11]  Nor can they allege that holding an "annual HR directors dinner" in conjunction with a "major visual effects industry conference," CAC ¶ 79, constitutes an act of concealment.  Having dinner at a widely publicized industry conference is, if anything, the opposite of concealment.

Plaintiffs also allege that defendants offered "pretextual, incomplete, or materially false and misleading explanations for hiring, recruitment, and compensation decisions made pursuant to the conspiracy."  CAC ¶ 130.  But plaintiffs never allege what was said, much less when, where, to whom, and by whom these unidentified explanations were made.  None of the named plaintiffs alleges that he or she received any such explanation for any aspect of his or her hiring, recruitment, or compensation.  No defendant is specifically identified as having made such explanations.  Plaintiffs do not describe the content of even a single supposedly pretextual explanation, much less the broad pattern of misrepresentations required to conceal the alleged conspiracy from these disparate employees who worked at numerous different animation studios over many years.  In sum, plaintiffs' conclusory allegations as to supposedly "pretextual" explanations are insufficient.  *See, e.g.*, *In re Aspartame Antitrust Litig.*, 2007 WL 5215231, at * 5 (E.D. Pa. Jan. 18, 2007) (allegation that defendants offered "false and pretextual reasons" for their conduct did not establish affirmative conduct where the "complaint [] provide[d] scant detail about these alleged statements" and did not state "who made these statements, to whom they were made, when they were made, or what was said"); *In re Magnesium*

---

[10]     Indeed, even denying a conspiracy, which is not alleged, does not constitute fraudulent concealment.  *See Global Servs. v. Ikon Office Solutions*, 2011 WL 6182425, at *3 (N.D. Cal. Dec. 13, 2011) ("In general, [a] mere denial of liability, rather than a misrepresentation bearing on the necessity of bringing a timely suit, is insufficient to establish an estoppel to assert the statute of limitations.") (citation and internal marks omitted).

[11]     The details of the Croner survey, including the participating companies, are readily available.  *See* http://www.croner.biz/compensation-surveys/croner-animation-and-visual-effects-survey (stating that, "[f]or nine years, the Croner Survey has provided up-to-date competitive compensation information" for positions in the animation and visual effects industry) (last visited January 9, 2015).

*Oxide Antitrust Litig.*, 2011 WL 5008090, at *22 (D.N.J. Oct. 20, 2011) (affirmative act inadequately pled where plaintiffs did not allege context of the supposedly pretextual explanations). Further, even if plaintiffs alleged specific examples of pretextual explanations, they also would need to allege that they relied on those explanations, and that their reliance was reasonable. *See Conmar*, 858 F.2d at 505. They have failed to do so.

Next, plaintiffs' allegation that defendants "avoided discussing the agreements in written documents," CAC ¶ 127, is deficient in three respects. First, keeping communications private or not memorializing them is not an affirmative act of deception. *See Pool Prods.*, 988 F. Supp. 2d at 725-26 (allegations that "defendants engaged in communications that were not disclosed to outsiders" found "insufficient" to show affirmative concealment). Second, plaintiffs do not allege where, when, and how defendants supposedly agreed to avoid discussing the conspiracy in written documents, or even any evidence of such an agreement. Third, this allegation is contradicted by other allegations – including in the *same section* of the CAC – that defendants repeatedly exchanged emails about the alleged conspiracy. *See, e.g.*, CAC ¶ 131 (alleging defendants shared information "by phone, email, and other secret means"). This includes emails and other written documentation that plaintiffs quote *verbatim* in the CAC. *See, e.g.*, *id.* ¶¶ 48, 50-56, 81-88, 90. Indeed, plaintiffs allege that defendants "openly emailed each other in large groups." *Id.* ¶ 85. Plaintiffs cannot have it both ways: either defendants facilitated the alleged conspiracy by email or they concealed the alleged conspiracy by conspicuously avoiding email. It cannot be both. *See Hamilton v. Aubrey*, 2008 WL 1774469, at *1 (D. Nev. Apr. 15, 2008) (court not required to assume the truth of internally contradictory allegations).

Finally, plaintiffs allege that defendants "attempted to create a false impression that their decisions are independent and they were acting in accordance with the antitrust laws." CAC ¶ 131. As an example of defendants' attempt "to create [such] a false impression," plaintiffs refer to the Croner survey. However, the nature of the "false impression" regarding that survey is unexplained. Plaintiffs claim that the Croner report was described as an "independent third party" survey, *see id.* ¶ 131, but they never allege that this characterization was false. Nor do they allege when, where, and to whom this characterization was made, or that any plaintiff relied on any such mischaracterization.

13

In sum, plaintiffs' attempt to plead "affirmative acts" of concealment relies on conclusory allegations with none of the specificity required by Rule 9(b).  Failure to allege affirmative acts of deception, by itself, defeats fraudulent concealment.  *See American Seafoods*, 421 F.3d at 1095.

          **b)**      **Plaintiffs Have Not Alleged Diligence In Investigating Their Claims.**

Plaintiffs also fail to plead that they exercised reasonable diligence in pursuing further information once their suspicions were or should have been aroused.  *See Hexcel*, 681 F.3d at 1060. Reasonable "diligence is a prerequisite to the application of equitable tolling" for fraudulent concealment.  *Koch v. Christie's Int'l, PLC*, 699 F.3d 141, 157 (2d Cir. 2012); *see also Sourcinglink.NET, Inc. v. Oracle Corp.*, 2006 WL 2130433, at *5-8 (Cal. Ct. App. Aug. 1, 2006) (fraudulent concealment did not apply where plaintiff had failed to show reasonable diligence or an inability to discover its claim using reasonable diligence).  Courts require specific details about the investigations.  *See, e.g.*, *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (dismissing complaint when plaintiff made "no allegation of any specific inquiries … let alone detail when such inquiries were made, to whom, regarding what, and with what response"); *Vernon v. City of Dallas*, 2009 WL 2486033, at *5-6 (N.D. Tex. Aug. 13, 2009) (dismissing claim as untimely where there was no allegation of "when she became aware of her cause of action and the diligent steps she took toward discovering her claims").

There is not a single allegation of such diligence in the CAC; if anything, the CAC reveals plaintiffs' inattention to their claims.  Plaintiffs concede that they were on constructive notice of their claims at least by no later than September 17, 2010.  CAC ¶ 95.  Yet, the first complaint in this consolidated action was filed on September 8, 2014 – almost exactly four years later.  The CAC is silent as to what plaintiffs were doing during that four-year period or why they were unable to discover a basis for their allegations.  There are no allegations, for example, that plaintiffs were researching facts, interviewing employees, or otherwise "diligently" investigating their potential claims.  To the contrary, plaintiffs have now admitted their investigation did not begin until 2014.  *See* Tr. of Proceedings (November 5, 2014) ("Tr."), at 34.

One event that *did* transpire during the intervening years, and which surely did not escape plaintiffs' attention, was the vigorously litigated *High-Tech* litigation, in which this Court rejected a

14

proposed $324.5 million settlement as too low.  *See In re High-Tech Employee Antitrust Litig.*, 2014 WL

3917126, at *3-*4, *17 (N.D. Cal. Aug. 8, 2014).  Counsel, not the plaintiffs, then sprang into action.

Within a week of the Court's order, an advertisement by the Cohen Milstein firm (counsel to Mr. Nitsch,

who filed the first complaint) appeared in an online visual effects publication seeking a plaintiff

"interested in participating in a lawsuit against DreamWorks and other studios."[12]  As for the named

plaintiffs, there is no allegation that any of them ever did anything to investigate his or her claim.

**c)**     **Plaintiffs' Allegation That They Did Not Have Knowledge of Their Claims Before the Limitations Period Is Irrelevant.**

Plaintiffs also allege that they had neither actual nor constructive knowledge of their

claims before the limitations period.  CAC ¶ 125.  In light of plaintiffs' failure to allege affirmative acts

of concealment, the date on which they allegedly learned about their claims is irrelevant.  As described

above (at p. 4), it is black-letter law that plaintiffs' claims accrued when they were injured, not when

they claim to have learned about their injury.  *See Zenith*, 401 U.S. at 338.

Further, even if plaintiffs *had* alleged affirmative acts of concealment, their allegation

that they could not have known of their claims before September 17, 2010 is contradicted by widespread

reporting about the DOJ investigation in 2009 and early 2010.  Starting in mid-2009, many widely read

publications reported on the DOJ's investigation into employment practices at high tech companies –

specifically including firms in Northern California, where Pixar and Lucasfilm are located.  *See* CAC ¶¶

25-26.  In June 2009, for example, the *New York Times*, *Washington Post*, and CNET.com reported that

the DOJ was investigating hiring practices at Google, Apple, and Genentech, "among others."[13]  The

investigation was reported to be "industry-wide," and involved possible "non-solicitation" or "no

poaching" practices.  One recruiter observed that "it was commonplace for companies to have a list of

---

[12]     *See* RJN Ex. M (Copy of "Anti-poaching Inquiry," posted August 15, 2014 and available at http://vfxsoldier.wordpress.com/2014/08/15/anti-poaching-inquiry).

[13]     *See* RJN Ex. H (Miguel Helft, "U.S. Inquiry Into Hiring at High-Tech Companies," *New York Times*, June 3, 2009); Ex. I (Cecilia Kang, "Federal Antitrust Probe Targets Tech Giants, Sources Say," *Washington Post*, June 3, 2009); Ex. J (Ina Fried, "DOJ hiring probe includes many big names," CNET.com, June 3, 2009).

DEFS.' MOTION TO DISMISS THE CAC
Master Docket No. 14-cv-4062-LHK

partners that were off-limits."[14]  In 2010 the DOJ investigation was described as "a *broad-ranging* inquiry of technology and nontechnology companies regarding hiring practices" (emphasis added).[15] These 2009 and 2010 reports confirmed that the DOJ's investigation included non-technology companies.  Plaintiffs have specifically alleged the overlap between the conduct at issue in the present case and the agreements at issue in these publicly disclosed matters and therefore were on notice of their potential claims.[16]

### 3.   The "Discovery Rule" Does Not Apply To Antitrust Claims.

Plaintiffs also allege that they could not have discovered the existence of the alleged conspiracy until the first public revelation that the DOJ investigation included animation firms.  *See* CAC ¶¶ 95, 125.  To the extent plaintiffs are attempting to invoke the so-called "discovery rule," they have made "the all-too-common mistake" of confusing that accrual doctrine with a tolling doctrine, such as fraudulent concealment.  *Gabelli*, 653 F.3d at 59.  The two doctrines are different and analytically distinct.  As a matter of law, the discovery rule does not apply to the antitrust claims asserted here.

The "discovery rule," where applicable, provides that the "statute of limitations does not accrue until that claim is discovered, or could have been discovered with reasonable diligence, by the plaintiff."  *Id.*  But the discovery rule "does not govern the accrual of most claims," and it specifically does not apply to claims in antitrust, which (as was described above, at p. 4) uses the "injury" accrual rule, rather than the discovery rule.  *See Zenith*, 401 U.S. at 338 (cause of action "accrues and the statute begins to run when a defendant commits an act that injures" the plaintiff).  Accordingly, the Ninth

---

[14]     *See* RJN Ex. K (Miguel Helft, "Unwritten Code Rules Silicon Valley Hiring," *New York Times*, June 4, 2009).

[15]     *See* RJN Ex. L (Thomas Catan, "U.S. Steps Up Probe Of Hiring In Tech," *Wall Street Journal*, April 9, 2010).

[16]     *See DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209, 217-18 (3d Cir. 2007) (affirming dismissal of action as time-barred because a *Wall Street Journal* article and other publications placed plaintiff on inquiry notice); *Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 403 (3d Cir. 2006) (same); *Lane v. Page*, 649 F. Supp. 2d 1256, 1302-03 (D.N.M. 2009) (*Wall Street Journal* article triggered inquiry notice); *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1280-81 (M.D. Fla. 2009) (claim dismissed as untimely because *Wall Street Journal* article placed plaintiffs on inquiry notice).

Circuit has *never* applied the discovery rule to a cause of action under the Sherman Act.  To the contrary, the Ninth Circuit has repeatedly held that "[a]ntitrust actions must be commenced within four years from the date when the causes of action accrue" and, critically, that "[w]e do not require a plaintiff to actually discover its antitrust claims before the statute of limitations begins to run."  *Hexcel*, 681 F.3d at 1060; *see also Volk*, 816 F.2d at 1416 (plaintiffs' "mere ignorance of the cause of action does not, in itself, toll the statute").[17]  Other courts are in accord, holding that the discovery rule does not apply to antitrust claims.  *See, e.g.*, *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 246 n.8 (3d Cir. 2001) ("antitrust claims are subject to the less plaintiff-friendly 'injury occurrence' accrual rule" and not "a more lenient 'injury discovery' rule"); *Stutz*, 909 F. Supp. at 1363  (collecting cases).[18]

Adoption of a discovery rule would effectively nullify the requirement that a plaintiff alleging fraudulent concealment "must do more than show that it was ignorant of its cause of action.  It must prove that the [defendant] fraudulently concealed the existence of the cause of action."  *Conmar*, 858 F.2d at 502 (citation and internal marks omitted).  If mere ignorance of one's claim sufficed to toll

---

[17]     The Clayton Act's provision for civil actions following a government proceeding, 15 U.S.C. § 16(i), supports this conclusion.  Section 16(i) provides that, in addition to the usual four-year limitations period, a plaintiff also has one year after the conclusion of a government antitrust action to bring suit. Because the limitations period in antitrust cases begins running upon injury, not discovery, the one-year savings period after government lawsuits can expand a plaintiffs' rights.  If the discovery rule applied, and the limitations period did not begin to run until public revelation of the government investigation, section 16(i) would be superfluous.  Of course, unlike the *High-Tech* plaintiffs, plaintiffs here did not file within one year of the DOJ investigation, but years thereafter.

[18]     Nor does the discovery rule apply to plaintiffs' claim under California law.  The many decisions cited above holding that the Sherman Act does not contemplate a discovery rule serve as instructive authority that the rule does not apply to the Cartwright Act either.  *See Aryeh*, 55 Cal. 4th at 1195. Further, because the UCL is a "chameleon" that "borrows violations of other laws and treats them as unlawful practices," whether the discovery rule applies to a particular claim under that statute depends on the "the nature of the right sued upon."  *Id.* at 1196 (citations and internal marks omitted).  Plaintiffs' claims under the UCL challenge precisely the same conduct as their Sherman Act claim: defendants' alleged entry into no-solicitation and wage-fixing agreements.  CAC ¶¶ 143-144.  Plaintiffs should not be permitted to invoke the discovery rule to save untimely UCL claim from dismissal when no such exception is available for the statutes from which they are wholesale "borrowing" to make out a violation of the UCL.  *See Gardner v. Baby Trend, Inc.*, 2012 WL 130724, at *21 (Cal. Ct. App. Jan. 13, 2012) (expressing "discomfort with the notion that the UCL could be used as an end-run around the statute of limitations otherwise applicable to a specific type of misconduct").

17

the statute of limitations, the Ninth Circuit would not also require, as it does, that a plaintiff also allege affirmative acts of concealment.[19]

###    C.    Plaintiffs Fail To State a *Per Se* Antitrust Claim Based on Wage-Fixing Agreements.

In addition to recycling the *High-Tech* plaintiffs' allegations regarding a non-solicitation conspiracy, the CAC asserts that, as a further "method" of their purported *per se* conspiracy to suppress compensation (CAC ¶¶ 1, 16, 92, 119, 136, 141), defendants conspired to fix their employees' wages.[20] *See, e.g.*, CAC ¶¶ 74-91.  However, the fundamental problem with this claim is that plaintiffs have no facts to support it.  Plaintiffs' superficial and conclusory allegations do not pass muster under *Twombly*, particularly in support of a *per se* claim.  In short, there is a reason why the DOJ and the *High-Tech* plaintiffs, who had a full discovery record, never asserted claims based on alleged compensation-fixing agreements: the claims have no basis.[21]

---

[19]    Defendants are aware that a court in this district recently concluded that the discovery rule did apply to federal antitrust claims.  The order includes little explanation on that point and rests largely on the proposition that the "discovery rule applies broadly to federal litigation."  *See Fenerjian v. Nongshim Co.*, -- F. Supp. 3d --, 2014 WL 5685562, at *13 (N.D. Cal. Nov. 4, 2014) (citation omitted). Respectfully, that is incorrect.  The Supreme Court has cautioned courts against reading a discovery rule into federal statutes (such as the Sherman Act) that are otherwise silent on that point.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 27 (2001).

[20]    Defendants note that many members of the putative class are union members who are subject to collective bargaining agreements that fix minimum wages.

[21]    In the event the Court does not grant the motion to dismiss the CAC in its entirety, the Court should nonetheless dismiss and/or strike the claim for wage-fixing set forth in paragraphs 74-91 of the CAC.  Although that claim is joined with the claim regarding no-poaching agreements as part of a claim under Section 1 of the Sherman Act, the claim regarding wage-fixing is entirely deficient and should not proceed into the discovery phase.  Indeed, the wage-fixing claim is at odds with the no-poaching claim: why would poaching upset the pay structure if there also were an agreement among defendants to fix the compensation paid to employees?  It asserts conduct very different from that asserted by the no-poaching allegations and is set forth in a distinct section of the CAC.  Plaintiffs cannot evade having the sufficiency of their wage-fixing claim tested – and its clear insufficiency exposed – simply by choosing to assert a single claim under Section 1 of the Sherman Act which purportedly includes both the no-poaching and wage-fixing aspects.  Plaintiffs have no right to proceed on their wage-fixing claim, and subject defendants to potentially highly burdensome discovery, unless plaintiffs can meet the *Twombly* standard with respect to the wage-fixing claim.  Accordingly, even if, notwithstanding the statute of limitations arguments raised above, the Court finds that plaintiffs have stated a timely claim based on alleged no-poaching agreements, the Court should limit the case to the no-poaching aspects and dismiss and/or strike the demonstrably inadequate and impertinent allegations regarding a supposed agreement on wage-fixing.

18

To assert a *per se* wage-fixing claim, plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 970 (9th Cir. 2008); *see also William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 665 (9th Cir. 2009) (plaintiffs must allege "some meeting of the minds . . . between those defendants whom [allegedly] coordinated their actions").  A court is not obligated to accept unadorned terms like "conspiracy" or "agreement" as a sufficient basis for such claims.  *See Kendall*, 518 F.3d at 1047.  Yet, here, despite having access to the extensive public record from the *High-Tech* case as well as defendants' productions to the DOJ, plaintiffs' wage-fixing allegations rest, almost exclusively, on the conclusory assertion –repeated, again and again – that defendants "conspired" or "agreed" to "depress compensation throughout the industry."  CAC ¶¶ 78; *see also id.* ¶¶ 1, 16, 92, 119, 136, 141.  But neither rhetoric nor repetition is a substitute for factual allegations, and plaintiffs' conclusory assertion of an agreement does not create one, no matter how colorfully or how often it is repeated.

### 1. Plaintiffs Fail To Allege Facts Sufficient To Show That Defendants Reached Any Agreement On Wages.

Although a plaintiff need not allege every detail of the terms of an alleged price-fixing agreement, a plaintiff must do more than simply allege that prices were fixed.  *Rick-Mik Enters.*, 532 F.3d at 970.  Yet, plaintiffs here literally allege nothing to put even the slightest flesh on their bare-bones conclusion that there was such an agreement.  Rather, to the extent that plaintiffs offer any factual allegations at all, they are limited to allegations about sporadic exchanges of information.  Plaintiffs simply describe those isolated communications as "collusive" and then further assert, in a wholly conclusory fashion, that the defendants "agreed" to fix their employees' compensation.  *See, e.g.*, CAC ¶¶ 8, 74, 77, 89.  However, the CAC fails both to offer a single factual allegation of an *actual* agreement and to bridge the wide gap between learning something about competitors' compensation and actually agreeing to fix compensation.[22]

---

[22]     *Rick-Mik* is instructive.  There, plaintiffs alleged that the defendants "conspired with numerous banks, banking associations and financial institutions … to fix, peg and stabilize the price of credit and debit card processing fees."  532 F.3d at 975.  The Ninth Circuit affirmed dismissal of the price-fixing claim because "all that [was] alleged [was that] there was an agreement on price."  *Id.* at 976.  The Court (continued…)

DEFS.' MOTION TO DISMISS THE CAC
Master Docket No. 14-cv-4062-LHK

The CAC does not allege a single term of *any* alleged wage-fixing agreement.  For example, did defendants agree to each set the same wage for a given job title or function?  What job titles and functions were covered?  What elements of compensation were fixed?[23]  How rigid or flexible were these purportedly agreed compensation levels?  Which defendants agreed to what?  These and the other "basic questions: who, did what, to whom (or with whom) where and when," *Kendall*, 518 F.3d at 1048, are left completely unanswered.  Plaintiffs' mere say-so that an agreement existed "does not make it so for pleading-sufficiency purposes."  *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 258 (3d Cir. 2010); *see also Kendall*, 518 F.3d at 1048 (upholding dismissal of claims against banks because the complaint did "not allege any facts to support [the] theory that the Banks conspired or agreed with each other . . . to restrain trade").

> **2.**     **Plaintiffs' Allegations Regarding Defendants' Participation in Industry Meetings and Compensation Surveys and Isolated Exchanges of Information Do Not Support a Reasonable Inference That Defendants Reached an "Agreement" on Wages.**

Not only do plaintiffs' allegations fail to answer the "basic questions" of any wage-fixing agreement, plaintiffs fail to allege the communications through which any such agreement was reached.  Alleging a mere "opportunity" to conspire – such as in conferences and trade association meetings – does not support an inference of an unlawful conspiracy.  *See Citric Acid*, 191 F.3d at 1103.  Every industry has conferences, and it is well-settled that attendance at such conferences is perfectly consistent with competitive behavior.  *See, e.g.*, *id.* at 1097 (noting that semi-annual trade association meetings, though attended in part by conspirators, were legitimate); *see also In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("[P]laintiffs have pleaded no facts indicating that defendants' attendance at trade shows and conferences was part of a conspiracy.").

---

observed that plaintiffs had failed to allege the specific co-conspirators or financial institutions involved in the conspiracy, the nature of the conspiracy or agreement, and the type of agreements.  *Id.*

[23]     The CAC repeatedly refers to fixing "compensation," which normally includes all elements of compensation, including bonuses, stock, and other incentives, but cites documents which refer only to a "salary" survey.  The CAC's interchanging of these two quite different concepts is but one of many illustrations of the fact that the CAC does even attempt to define what, exactly, defendants allegedly fixed.

Plaintiffs also allege that defendants participated in annual industry salary surveys conducted by the Croner Company.  CAC ¶¶ 74-76.  But, again, there is nothing unlawful about participation in a wage survey.  Indeed, wage surveys are a commonplace mechanism to increase transparency about the market and enable employers to compete in labor markets.  Participation in such a survey does not, without more, arouse suspicion or trigger the antitrust laws.  *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

Acknowledging this, plaintiffs do not assert that the surveys were problematic in and of themselves, but instead claim that defendants used the "opportunity" presented by the annual Croner survey meetings "to agree upon and set wage and salary ranges" during "meals, drinks and other social gatherings" that they held outside of the official survey meetings.  CAC ¶ 77.  They assert that defendants met outside the Croner setting, including at the Siggraph industry conference, where HR directors had dinner.  *Id.* ¶¶ 79-80.  But mere discussions among competitors "do not permit an inference of an agreement to fix prices unless those communications rise to the level of an agreement, tacit or otherwise."  *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) (citation and internal marks omitted).  To be actionable, there must have been a "meeting of the minds."  *William O. Gilley Enters., Inc.*, 588 F.3d at 665.  And that is where plaintiffs fall fatally short:  There are no facts indicating that anything competitively untoward actually occurred during these various "meals, drinks and other social gatherings" that would turn innocuous occasions into "collusive" ones.  Simply adding words such as "collusive," "conspiracy," or "agreement" does not remotely suffice.

The same is true of plaintiffs' allegations regarding isolated exchanges of information regarding compensation issues.  For example, plaintiffs allege that defendants intermittently communicated with one another via telephone and email regarding certain salary information.  CAC ¶¶ 81-90.  Yet to the extent plaintiffs assert a *per se* claim based on agreements defendants may have reached to exchange information, that claim fails as a matter of law.  As the Supreme Court explained in *Gypsum*, the mere exchange of information is not a *per se* violation of the Sherman Act, but instead is subject to the rule of reason.  *Gypsum Co.*, 438 U.S. at 441 n.16 ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed, such practices can in certain circumstances increase economic efficiency and render markets more, rather than less,

21

competitive.").  Plaintiffs expressly limit themselves to a *per se* claim and do not even attempt to satisfy the requirements for pleading a rule of reason claim based on information exchanges.  While limiting themselves to a *per se* claim is plaintiffs' prerogative, it is a decision that dooms their claim.  *See Texaco Inc. v. Dagher*, 547 U.S. 1, 6 n.2 (2006) (refusing to analyze claim under rule of reason when plaintiffs put forth solely a *per se* claim); *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006) ("JMC could have argued that the restraint at issue ought to be analyzed under the traditional rule of reason rather than attempt to squeeze the restraint into the *per se* realm.  JMC, however, did not.  Accordingly, JMC failed to state a claim pursuant to the Sherman Act.").[24]

### 3.    Plaintiffs Fail To Allege How Compensation Was Affected.

Finally, plaintiffs allege no facts suggesting that defendants' actual wages (or any other element of compensation) reflect any wage-fixing agreement.  There is no allegation that: (1) any defendant's compensation is suspiciously similar to that of even one other defendant, much less to that of all defendants, (2) such similarity first arose after the alleged start of the conspiracy, or (3) any defendant, much less every defendant, reduced compensation after the (unidentified) start of the conspiracy.  None of the three named plaintiffs alleges anything about his or her compensation.  In short, there is no allegation about any aspect of compensation, beyond the purely conclusory allegation that compensation was suppressed.  Since plaintiffs fail to allege what the conspirators agreed to regarding compensation, plaintiffs obviously cannot allege that their compensation was lowered in a manner consistent with that purported agreement.  Because plaintiffs have failed to set forth any plausible support for their wage-fixing claim, the claim should be dismissed.[25]

---

[24]    Even if the CAC could be read to pursue a rule of reason of claim, it fails to state such a claim because there is no allegation of the relevant market, defendants' market power in that market, or other required elements of a rule of reason claim.

[25]    Plaintiffs also assert a claim under California's Cartwright Act, Cal. Bus. & Prof. Code § 16720.  Plaintiffs' federal and state antitrust claims rise and fall together, as interpretations of the Sherman Act are instructive authority when construing the Cartwright Act.  *See Aryeh*, 55 Cal. 4th at 1195.  Because plaintiffs have not pled a valid Sherman Act claim, their Cartwright Act claim fails as well.

**D.   Plaintiffs Fail to State Plausible Claims Against Blue Sky, Sony Pictures, and ImageMovers, L.L.C. With Respect to the Alleged Non-Solicitation Conspiracy.**

It is fundamental that plaintiffs must allege the participation of every defendant in the alleged conspiracy. *See Lithium Ion*, 2014 WL 309192, at *13 ("Plaintiffs are required to allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it.") (citation and internal marks omitted); *BanxCorp. v. Apax Partners, L.P.*, 2011 WL 1253892, at *4 (D.N.J. Mar. 28, 2011) (use of "global term defendants to apply to numerous parties without any specific allegations that would tie each particular defendant to the conspiracy is not sufficient under *Twombly*") (citation and internal marks omitted).  Group pleading does not suffice.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007).  As set forth in Section III.C above, plaintiffs have not alleged any defendant's participation in a conspiracy to fix wages through participation in the Croner survey.  And, as to their allegations of a no-poaching conspiracy, plaintiffs' allegations are insufficient as to Blue Sky, Sony Pictures, and ImageMovers, L.L.C.  In submitting this separate argument, the moving defendants do not intend to imply that plaintiffs' allegations against any other party are sufficient or that any other party engaged in any unlawful conduct.[26]  The point, instead, is that – separate and apart from the other defects that render the CAC unsustainable in its entirety – the CAC does not adequately allege that Blue Sky, Sony Pictures, or ImageMovers, L.L.C. participated in a non-solicitation conspiracy.

Under *Twombly* and *Iqbal*, the court must determine whether the *facts* alleged in a non-conclusory fashion are sufficient to state a claim that is legally "plausible" with respect to the moving defendant.  In doing so, the court may consider matters outside the pleadings that are subject to judicial notice, involve matters of public record, or are contained in documents that are expressly relied upon or incorporated by reference in the complaint.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Furthermore, the Court need not accept as true allegations that are contradicted by facts set forth in documents incorporated by reference in the complaint or otherwise subject to judicial notice.  *Plumlee v.*

---

[26]     Indeed, while the remaining defendants are not moving to dismiss the allegations of a "no-poaching" conspiracy against them, they vigorously deny that they participated in any alleged agreement not to solicit employees.

*Pfizer, Inc.*, 2014 WL 695024, at *4 (N.D. Cal. Feb. 21, 2014); *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on other grounds*, 275 F.3d 1187 (9th Cir. 2001).

These principles are important in this case, which was brought long after the DOJ's investigation concluded and substantial amounts of discovery in the *High-Tech* litigation were made public.  In the DOJ investigation, Blue Sky and Sony Pictures produced documents but were not charged with any wrongdoing, and the DOJ did not even request information from ImageMovers, L.L.C.  In *High-Tech*, there was very extensive document and deposition discovery from two animation studios: Pixar and Lucasfilm.  Yet, Blue Sky, Sony Pictures, and ImageMovers, L.L.C. were not named as defendants in that case.  Plaintiffs have had access to, and have relied upon, the public record in that case and the documents defendants produced to the DOJ.  They also claim to have conducted approximately 80 interviews of former employees in the industry.  Tr. at 34:19-23; 38:9-10.

Despite the availability of this extensive "pre-complaint discovery," plaintiffs have failed to generate facts remotely sufficient to suggest that Blue Sky, Sony Pictures, or ImageMovers, L.L.C. agreed to "join" in the alleged "anti-solicitation scheme."  *See* CAC ¶¶ 42-45.  As set forth below, the few allegations plaintiffs have cobbled together to show that they did are wholly inadequate to state a claim against these defendants.  Accordingly, plaintiffs' non-solicitation claim should be dismissed, or in the alternative stricken, as to these defendants.

### 1.    Plaintiffs' Non-Solicitation Allegations Against Blue Sky Are Insufficient.

At the November 5, 2014 Case Management Conference, the Court noted that plaintiffs' "allegations in [their initial] complaints are really weak as to" Blue Sky.  Tr. at 37.  Plaintiffs conceded as much.  *Id.* at 38.  The Court ordered all defendants to produce to plaintiffs the documents they had produced to the DOJ, so it could assess the sufficiency of the most robust complaint plaintiffs could manage to produce – one that would be based not only on the "very extensive prefiling investigation" plaintiffs claim they did, *id.* at 13, but also on Pixar's, Lucasfilm's, DreamWorks', Sony Pictures', and Blue Sky's entire DOJ productions, *id.* at 36.  Having now had the benefit of its investigation and the full set of documents most central to their allegations, plaintiffs still fail to allege even the most basic facts about Blue Sky's supposed participation in a conspiracy.

The few places where Blue Sky is mentioned in the CAC collectively fail to provide any detail about when Blue Sky supposedly joined the conspiracy, what it supposedly did in furtherance of the conspiracy, where any such actions supposedly took place, or which other studios it allegedly asked to refrain from recruiting its employees.  Without such allegations, no conspiracy claim can stand as against Blue Sky.  *See, e.g.*, *William O. Gilley Enters., Inc.*, 588 F.3d at 665; *Kendall*, 518 F.3d at 1048.

The section of the CAC that purports to show that "Blue Sky Studio [j]oin[ed] the [alleged c]onspiracy," CAC at p. 14, consists of two very short paragraphs, neither of which demonstrates that Blue Sky joined any "conspiracy."  Paragraph 63 starts with purely conclusory assertions that "Blue Sky similarly entered the conspiracy," and "Blue Sky both requested that other studios not recruit from it and refrained from recruiting from others."  CAC ¶ 63.  The only specifics paragraph 63 purports to identify are included in an "example" of the conduct plaintiffs say they find offensive, but which is utterly inadequate for pleading purposes.

That "example" – a statement by a Blue Sky employee that he did not "want to be starting anything with [a DreamWorks executive] over one story guy" – has nothing to do with any "conspiracy" that includes Blue Sky.  At most, it is an example of Blue Sky's unilateral desire to avoid starting a wage war with DreamWorks.  Declaration of Jonathan B. Pitt ("Pitt Decl.") Ex. 1 (BSK-001976).[27]  Such conduct cannot violate the antitrust laws.  *See, e.g.*, *Twombly*, 550 U.S. at 553-54.  Nor can an allegation of such conduct, which is fully consistent with Blue Sky's unilateral self-interest, satisfy *Twombly*'s requirement that, to avoid dismissal, plaintiffs must plausibly allege facts "tending to exclude the possibility of independent action."  *Id.* at 554.  Such facts "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Id.* at 557.

The other paragraph in that section, CAC ¶ 64, selectively quotes an email to Pixar's then CFO, Simon Bax, in which Blue Sky's Chris Meledandri references "our sensitive issue of employee

---

[27]     Exhibits 1-3 and 6-7 to the Pitt Declaration all are referenced and quoted in the CAC; accordingly, the Court may consider them on a motion to dismiss.  *See Ritchie*, 342 F.3d at 908; *see also infra* note 29 and sources cited therein.

retention," and then quotes an internal Pixar conversation in which Pixar HR Director Lori McAdams suggests that Bax inform Meledandri that McAdams had "spoken to Linda Zazza, his Director of HR[,] to assure her that we are not making calls to their people or trying to poach them in any way."  Pitt Decl. Ex. 2 (PIXAR_AWAL_00003776).  But the CAC purposefully omits the portions of this email that make it clear that Meledandri's concern is simply Blue Sky's ability to keep certain employees "*through the completion of ICE 2*," and that the purpose for McAdams's conversation to Zazza was to assure Blue Sky that "we don't need [the Blue Sky employees being hired away by Pixar] immediately and *they can finish what they're doing*" – *i.e.*, their work on the movie "Ice Age 2" – before Pixar hires them away. *Id.*  Not only does this email *not* suggest Blue Sky's involvement in some broad anti-solicitation conspiracy, it demonstrates that Pixar frequently hired Blue Sky employees.

Thus, the only paragraphs that purport to show Blue Sky's participation in the alleged broad non-solicitation conspiracy in fact demonstrate nothing more than Blue Sky's unilateral (and perfectly legal) preference not to start a wage war with one defendant (DreamWorks), and efforts on the part of a different defendant (Pixar) to allow Blue Sky's employees to finish the projects they were working on before hiring them away.  The only other places in the CAC that even mention Blue Sky in connection with an alleged anti-solicitation conspiracy, aside from conclusory assertions that Blue Sky "join[ed] the conspiracy," *see, e.g.*, CAC ¶ 49, are more selective quotations from internal Pixar documents:

- an internal email that purports to identify Blue Sky as a participant in a "gentlemen's agreement," CAC ¶¶ 5, 50 (quoting email attached hereto as Pitt Decl. Ex. 3 (PIXAR_AWAL_00000276)), but which at best only describes Pixar HR Director Lori McAdams' understanding, which is unsupported by *any* document or well-pled allegation;[28]

---

[28]    Although the Court need not consider any materials not referenced in the CAC to resolve this motion, it bears noting that when asked specifically about the above-referenced document during her deposition in *High-Tech*, McAdams testified that it was not true that Blue Sky was party to any agreement, "gentlemen's" or otherwise, and that she had simply misspoken in the email: "I think we had a gentleman's agreement with ILM, and I think we didn't directly solicit employees from Sony or Blue Sky or any other company, and I think as I wrote this, I merged the two.  I – I don't believe we had a gentleman's agreement with the other animation companies."  Pitt Decl. Ex. 4 at 200-01.  Similarly, Ed Catmull (whose *High-Tech* deposition is referenced in the CAC) testified that it was simply incorrect that Pixar had any sort of agreement with Blue Sky: "[W]e behaved the same way towards all of them. So that was just our behavior.  But I have no idea what they thought at Blue Sky."  *Id.* Ex. 5 at 52-53. Catmull was specifically asked: "Did Pixar have an understanding with Blue Sky that you wouldn't

(continued…)

DEFS.' MOTION TO DISMISS THE CAC
Master Docket No. 14-cv-4062-LHK

- an internal "Competitors List" which provides no reason to conclude Pixar is describing anything other than its own policies, CAC ¶ 50 (quoting document attached hereto as Pitt Decl. Ex. 6 (PIXAR_AWAL_00003479); and

- an email in which Ed Catmull remarks that a "couple of smaller places" in "Norther[n] California" supposedly refrained from "raiding" each other's employees, and plaintiffs' conclusory assertion that the alleged conspiracy "came to extend well beyond [Northern California], as shown by the involvement of Blue Sky and the Sony Defendants," CAC ¶ 51 (quoting email attached hereto as Pitt Decl. Ex. 7 (PIXAR_AWAL_00000227)). This is an obvious effort by plaintiffs to respond to counsel for Blue Sky having pointed out that the allegation that Blue Sky was one of the "smaller places" in "Norther[n] California" was implausible because, among other reasons, Blue Sky is located in Connecticut. *See* Tr. at 27-28. But the assertion lacks support altogether.

None of this sheds any light whatsoever on any of the facts plaintiffs need to allege to demonstrate Blue Sky was part of a supposed anti-solicitation conspiracy: "who, did what, to whom (or with whom), where, and when." *Kendall*, 518 F.3d at 1048. In the absence of such allegations, the anti-solicitation conspiracy claim must be dismissed as to Blue Sky.

### 2. Plaintiffs' Non-Solicitation Allegations Against Sony Pictures Are Insufficient.

The CAC is equally deficient as to Sony Pictures. Plaintiffs fail to allege plausibly that Sony Pictures entered into non-solicitation agreements with anyone, let alone that it participated in the purported overarching conspiracy that is described in the CAC. To the contrary, the picture that emerges from the CAC, and the record it relies upon, is not that Sony Pictures entered into non-solicitation agreements, but that Sony Pictures consistently engaged in aggressive recruiting practices.

The portion of the CAC devoted to Sony Pictures' alleged participation in a non-solicitation conspiracy consists of a mere five paragraphs – totaling 21 lines of text. CAC ¶¶ 58-62. However, that vastly *overstates* the substance of plaintiffs' allegations regarding Sony Pictures. The first two of the paragraphs (*id.* ¶¶ 58-59) actually describe how Sony Pictures sought to "expan[d]" its

---

proactively recruit out of each other's companies?" and responded: "No. That's what I'm saying. It did not have." *Id.* at 53. Asked again about that document later in his deposition, Catmull testified: "I know of no contact with Blue Sky. I have no knowledge of that at all." *Id.* at 106-07. Courts have taken judicial notice of deposition testimony from prior, related actions if the plaintiff cites a portion of that deposition testimony in the complaint. *See infra* note 29 and sources cited therein.

business "by offering higher salaries to lure workers away from other studios" (*id.* ¶ 58) – "efforts [that] were met with displeasure by other studios," because doing so "'seriously messes up the pay structure.'" *Id.* ¶ 59; Declaration of David M. Goldstein ("Goldstein Decl.") Ex. A (PIXAR_AWAL_00000227).[29] In other words, plaintiffs affirmatively assert that Sony Pictures was aggressively recruiting other studios' employees by offering them more money. The third paragraph (CAC ¶ 60), then, alleges that, as a result of its unhappiness with Sony Pictures' behavior, Pixar (specifically, Ed Catmull) sought and obtained a meeting with Sony Pictures executives in 2004 or 2005 to "'ask[ ] them to quit calling [Pixar's] employees.'" That paragraph does not allege that Sony Pictures agreed to do so.

In fact, paragraph 61 is the only paragraph regarding Sony Pictures' supposed participation in a "non-solicitation" agreement. It consists of snippets from two emails, from Pixar employee Lori McAdams, suggesting that, as an apparent consequence of the Catmull/Sony Pictures meeting, Sony Pictures did an about-face and entered into a "gentleman's agreement" not to solicit or poach Pixar's employees.[30] However, the fatal problem with that allegation is that Ms. McAdams' second-hand ruminations are flatly contradicted by Mr. Catmull – the person who supposedly made this "gentleman's agreement" during his meeting with two Sony Pictures executives. While plaintiffs are

---

[29]     The Court may consider Exhibits A-E & G to the Goldstein Declaration because they are incorporated by reference in the CAC. *See Swartz*, 476 F.3d at 763. Applying this rule, courts may take judicial notice of emails quoted or referred to in the complaint. *See, e.g.*, *McMunigal v. Bloch*, 2010 WL 5399219, at *7 (N.D. Cal. Dec. 23, 2010); *Lopez v. Regents of Univ. of Cal.*, 5 F. Supp. 3d 1106, 1111 n.2 (N.D. Cal. 2013). Courts also may take judicial notice of deposition testimony from prior, related actions if the complaint cites a portion of that deposition testimony. *See, e.g.*, *Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 633 F. Supp. 2d 763, 775-76 (D. Ariz. 2009); *Glenbrook Capital P'ship Ltd. v. Kuo*, 2008 WL 929429, at *6 (N.D. Cal. Apr. 3, 2008). The Court may consider Exhibit F because it is filed in the public record in *High-Tech* and therefore is subject to judicial notice. *See, e.g.*, *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); *Armstead v. City of L.A.*, -- F. Supp. 3d --, 2014 WL 6896039, at *4-5 & n.51 (C.D. Cal. Dec. 5, 2014) (taking judicial notice of nearly 50 documents from court files in related cases); *see also* Defendants' Joint Request for Judicial Notice.

[30]     The first McAdams email purportedly states that Pixar has "a gentleman's agreement not to directly solicit/poach from [Sony Pictures'] employee pool." *See* Goldstein Decl. Ex. B (CAC ¶ 61, PIXAR_AWAL_00000276); *see also* CAC ¶ 50 (quoting this email). The second email is part of an email chain involving an incident in which according to plaintiffs, in response to "a Sony recruiter having asked if another [Pixar] employee was 'still employed and if she can contact,'" Ms. McAdams claims to have spoken to some unidentified person at Sony Pictures to determine whether it was "honoring" the purported Pixar/Sony Pictures agreement inasmuch as "they may have had turnover in their Recruiting team." *See* Goldstein Decl. Ex. C (CAC ¶ 61, PIXAR_AWAL_00000309).

correct in alleging that Mr. Catmull did have such a meeting at which he attempted to persuade Sony Pictures to discontinue its aggressive recruiting conduct, *absolutely no change in Sony Pictures' behavior resulted from his efforts.*

That fact is reflected in contemporaneous Pixar emails sent by Mr. Catmull subsequent to the meeting (and referred to in the CAC) and is confirmed, even more definitively, in Mr. Catmull's deposition testimony in the *High-Tech* litigation.  In January 2007, for example, Mr. Catmull sent an email stating that "every time a studio tries to grow rapidly, whether it is DreamWorks in 2D animation or Sony in 3D, it seriously messes up the pay structure."  Goldstein Decl. Ex. A (CAC ¶ 59; PIXAR_AWAL_00000227).  Approximately a year later, in December 2007, Mr. Catmull succinctly summarized Sony Pictures' approach to recruiting:  "[G]iven Sony's extremely poor behavior in its recruiting practices, I would feel very good about aggressively going after Sony people."  *Id.* Ex. D (CAC ¶ 68; PIXAR_AWAL_00000242).

Mr. Catmull confirmed, and elaborated on, his evaluation of Sony Pictures' conduct during his deposition in *High-Tech* – testimony on which plaintiffs selectively rely in the CAC (CAC ¶¶ 4, 7, 102).  According to that testimony, the meeting described in paragraph 60 was the only conversation he ever had with anyone at Sony Pictures regarding the solicitation of employees. Goldstein Decl. Ex. E at 104:21-22.  Consistent with plaintiffs' own description of Sony Pictures' aggressive recruiting behavior in paragraphs 58-59, Mr. Catmull put the meeting in context as follows:

> Sony was trying to grow very rapidly and was going down the list of companies [*i.e,* engaging in systematic cold-calling].  And since I believed at the time that that rapid kind of thing was actually long-term destructive to the industry and to them, that when they did that, then I wanted to go down and meet with them.  And did meet with them.  And I told them the way that we operated.  *Id.* at 56:24-57:05.

Plaintiffs' counsel then asked Mr. Catmull whether he "reached an understanding or agreement with Sony as a result of that communication or meeting."  *Id*. at 57:08-09.  He responded: "Well, I – **their behavior didn't change.**  So in one respect I would say no, but – I mean, I actually walked away thinking that – that they wouldn't work that way anymore, but **they still went down the**

**list**, so . . . .  And there was no recourse.  I mean if they didn't do it, there wasn't anything I was going to do that was different." *Id.* at 57:10-18 (emphasis added).[31]

In short, while plaintiffs artfully quote two after-the-fact emails written by a Pixar employee who was not even at the Sony Pictures/Catmull meeting, it is clear that there was never anything resembling a "meeting of the minds" between Pixar and Sony Pictures pursuant to which Sony Pictures would abandon its aggressive approach to recruiting.  Yet without such a "conscious commitment" by a defendant "to a common scheme designed to achieve an unlawful objective" there can be no unlawful agreement.  *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764 (1984) (internal marks omitted); *see also In re NCAA Student-Athlete Name & Likeness Litig.*, 2011 WL 1642256, at *5-6 (N.D. Cal. May 2, 2011).

But there is still more to the story – or, to be precise, less:  Plaintiffs point to nothing in Sony Pictures' DOJ production demonstrating that Sony Pictures agreed not to solicit Pixar employees.  Yet, it is implausible, to say the very least, that if Sony Pictures executives had reached such an agreement with Mr. Catmull that there would be absolutely no reference to it in Sony Pictures' documents produced to the DOJ.  After all, if Sony Pictures executives agreed to radically alter the aggressive hiring activities described in the CAC based upon some "gentleman's agreement" with Mr. Catmull, they would have had to communicate that fact to the Sony Pictures employees responsible for recruiting.  Yet no such communication (or, indeed, anything about the Catmull meeting at all) appears in Sony Pictures' DOJ production.  The DOJ recognized this dearth of evidence in documents produced by Sony Pictures, Pixar, Lucasfilm, DreamWorks, Blue Sky and others, so it closed its Sony Pictures file without even requesting a meeting with Sony Pictures' employees or its counsel.[32]

---

[31]     In other portions of his testimony, Mr. Catmull described Sony Pictures' recruiting efforts as "clearly brazen" conduct (Goldstein Decl. Ex. E at 90:19), which is what led him to arrange the meeting referenced above.  He testified that he expressed the "general principle . . . that the act of systematically going after everybody was just bad for everybody," and then flatly reiterated:  "I walked away believing that they would not do that anymore.  **I was wrong**." *Id.* at 104:5-8 (emphasis added).

[32]     Even if – contrary to fact – there was a "gentleman's agreement" as alleged in paragraph 61, it would not be sufficient to state an actionable claim under *Twombly*.  In *Richards v. Neilsen Freight Lines*, 810 F.2d 898 (9th Cir. 1987), plaintiffs accused several trucking companies of agreeing to boycott a competitor by refusing to employ it to provide interlining freight services.  During pretrial discovery,

(continued…)

Not only does the existence of a purported Sony Pictures-Pixar "agreement" confound both "experience" and "common sense," *see Iqbal*, 556 U.S. at 679, there is literally nothing else in the CAC suggesting that Sony Pictures entered into a non-solicitation agreement with any *other* defendant, let alone that it entered into an overarching conspiracy "including each of the other Defendants" (CAC ¶ 3) and encompassing the terms described in paragraphs 42-45 of the CAC.  Since plaintiffs have chosen to assert a unified conspiracy on those terms, that failure, without more, requires dismissal of the non-solicitation claim against Sony Pictures.

Under the Ninth Circuit's decision in *Kendall,* a complaint alleging an antitrust conspiracy must "answer the basic questions:  who, did what, to whom (or with whom) where and when?"  518 F.3d at 1048.  This Court applied that standard in its decision on defendants' motion to dismiss in *High-Tech*, which carefully discussed the alleged facts regarding the conduct of each defendant in entering into the alleged conspiracy pleaded in that case.  856 F. Supp. 2d 1103, 1115-18 (N.D. Cal. 2012).

While that careful analysis led the Court to deny defendants' motion to dismiss in the earlier case, the same fact-specific scrutiny yields a wholly different outcome here.  Nowhere do plaintiffs allege that anyone at Sony Pictures was ever advised of the existence of any supposedly overarching agreement, informed of its purported terms, or told who the other parties to it were.  More important, plaintiffs provide no factual information suggesting that Sony Pictures ever knowingly committed to join such a conspiracy.

Those are critical omissions, particularly when viewed in context.  While a Rule 12(b)(6) motion under *Twombly* is directed to the sufficiency of the pleadings, courts have been instructed to

the President of one of the defendants acknowledged the existence of a long-standing "gentlemen's agreement" or "agreements" among the defendants not to utilize "back solicitation" (the alleged boycott mechanism).  *Id.* at 903.  The Ninth Circuit nonetheless concluded (on *de novo* review following summary judgment) that such evidence could not support the existence of a conspiracy, noting that since "each trucking company defendant had an independent interest in preventing back solicitation to protect its own accounts," it was "unreasonable to infer from the cited testimony a horizontal conspiracy."  *Id.* at 903-04.  "If a jury verdict were based on the 'gentlemen's agreement' testimony, it necessarily would be speculative."  *Id.* at 904.

1    bring both their "experience" and their "common sense" to bear in ruling on such motions. *Iqbal*, 556

2    U.S. at 679.  Consistent with that standard, decisions applying *Twombly* appropriately have considered

3    the posture in which a motion to dismiss is presented.  In *Kendall,* for example, the Ninth Circuit noted

4    that plaintiffs were unable to allege a legally sufficient claim even after taking discovery from the

5    defendants before framing their amended complaint.  518 F.3d at 1048.  Similarly, as noted previously,

6    in *Lithium Ion* the court partially granted defendants' motion to dismiss because plaintiffs were unable

7    to point to any evidence of conspiratorial activities before 2002 despite having had access to the

8    defendants' DOJ productions.  2014 WL 309192, at *12.

9           Plaintiffs here have had access both to the defendants' DOJ productions as well as to the

10   extensive public record in the "overlapping" *High-Tech* case.  Given plaintiffs' own statements in

11   paragraphs 58-60 regarding Sony Pictures' aggressive recruiting tactics, their failure to allege facts

12   showing that Sony Pictures entered into non-solicitation agreements or an overarching conspiracy

13   speaks volumes in evaluating the CAC's allegations against Sony Pictures.[33]

14          Finally, the CAC fails as to Sony Pictures because plaintiffs nowhere allege that Sony

15   Pictures in fact ever changed its recruiting practices.  Paragraph 62 – the final paragraph in the

16   abbreviated "Sony Pictures" section – merely states that, following the purported "gentleman's

17   agreement" with Pixar, "Sony would soon restrain its relatively higher-wage practices to levels below

18   what otherwise would have existed in a competitive market."  Not only is this allegation equally devoid

19   of details, it is a complete *non-sequitur* regarding any supposed non-solicitation agreement.  The

20   allegation required to adequately assert Sony Pictures' participation in an agreement not to solicit its co-

21

22   ───────────────────────

23   [33]    In fact, while the absence of any evidence is sufficient to require dismissal as to Sony Pictures, plaintiffs are well aware that the public *High-Tech* record provides affirmative evidence that Sony

24   Pictures did *not* enter into non-solicitation agreements.  For example, an internal Lucasfilm document expressly states that Lucasfilm had "no agreement" regarding non-solicitation with Sony Pictures and

25   "[w]e should feel completely free to actively recruit and hire anyone from Sony with no qualifiers, other than to be careful about people under contracts . . . ."  Goldstein Decl. Ex. F (LUCAS00195586 at 588).

26   George Lucas, Lucasfilm's Chairman, also testified in *High-Tech* that "when a company is formed, they immediately go out and raid all the other companies. . . . And they will pay whatever it takes, even

27   though it is irresponsible."  *Id.* Ex. G at 184:13-16.  He then identified Sony Pictures as a company that engaged in that aggressive practice.  *Id.* at 185:12-17.

28

DEFS.' MOTION TO DISMISS THE CAC
Master Docket No. 14-cv-4062-LHK

1    defendants' employees would be a factually supported statement that on account of the supposed

2    "gentleman's agreement," Sony Pictures changed its *recruitment* practices, not the wages it paid.  That

3    allegation is, fatally, absent.[34]

### 3.   Plaintiffs' Allegations Against ImageMovers, L.L.C. Are Insufficient.

4

5    The CAC alleges *no* facts to plausibly suggest that ImageMovers, L.L.C. made any

6    illegal agreement of any kind.  *See Twombly*, 550 U.S. at 555-57.  Plaintiffs do not even allege that

7    ImageMovers, L.L.C. employed any class members.  Plaintiffs' only allegations about any involvement

8    by ImageMovers, L.L.C. in the alleged conspiracy involve vague references to the "ImageMovers

9    Defendants," *see, e.g.*, CAC ¶¶ 65-68, defined in the CAC to include ImageMovers, L.L.C. and

10   ImageMovers Digital, LLC ("IMD," now called Two Pic MC LLC).  *Id.* ¶ 24.  Plaintiffs acknowledge

11   that ImageMovers, L.L.C. and IMD are separate corporate entities.  *Id.*  ¶¶ 23-24.  By simply lumping

12   together those two separate entities and attributing actions of IMD to the "ImageMovers Defendants,"

13   plaintiffs fail to state claims against ImageMovers, L.L.C.  *See In re Elec. Carbon Prods. Antitrust*

14   *Litig.*, 333 F. Supp. 2d 303, 312 (D.N.J. 2004) ("[P]laintiffs must allege that each individual defendant

15   joined the conspiracy and played some role in it.") (citation and internal marks omitted).

16   Plaintiffs cannot cure this defect by imputing to ImageMovers, L.L.C. the alleged

17   conduct of IMD.  Plaintiffs allege that "ImageMovers L.L.C. and ABC Inc., a subsidiary of The Walt

18   Disney Company," formed IMD.  CAC ¶ 24.  In fact, IMD was created by ABC, Inc. and *a different*

19   *entity*, IM Holdings, LLC, *see* RJN Ex. F, so plaintiffs' threadbare premise for naming ImageMovers,

20   L.L.C. is false.  But accepting that allegation as true for this motion, plaintiffs do not allege a basis to

21   disregard the distinction between IMD and ImageMovers, L.L.C.  Absent "something more than a bare

22   allegation of a joint venture relationship, [courts] will not impute the acts of [the joint venture] to [its

23   owners.]"  *In re Lithium Ion Batteries Antitrust Litig.,* 2014 WL 4955377, at *37 (N.D. Cal. Oct. 2,

24

25   ────────────────

[34]    The allegation that Sony Pictures at some point brought its wages into closer alignment with
those of other animation companies is also legally innocuous and states no plausible claim of

26   conspiracy.  At most it describes rational parallel conduct that is independent of any agreement with its
competitors.  It is far from unusual for a company entering or seeking to expand its business to price in

27   an aggressive way for a period of time but, then, revert to industry pricing norms.  In fact, it would be
competitively irrational to do otherwise.

28

2014).  To pierce the corporate veil, "a plaintiff must show that there is such a unity of interest and ownership between the two corporations that their separate personalities no longer exist, and that an inequitable result would follow if the parent were not held liable." *Laird v. Capital Cities/ABC, Inc.*, 68 Cal. App. 4th 727, 742 (1998), *overruled on other grounds by Reid v. Google*, 50 Cal. 4th 512 (2010)). Pertinent factors include "inadequate capitalization, commingling of assets, [or] disregard of corporate formalities." *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1102 (N.D. Cal. 2006) (citation and internal marks omitted).

No such facts are alleged here.  The CAC fails to allege that ImageMovers, L.L.C. comingled assets with IMD, disregarded corporate formalities, or is undercapitalized.  Plaintiffs merely (and inaccurately) allege that IMD is a joint venture of ImageMovers, L.L.C. and Disney.  Even assuming, *arguendo*, the truth of that allegation, a mere stake in a joint venture is not grounds for imputation of wrongdoing.  *See Lithium Ion*, 2014 WL 4955377, at *37.  The claims against ImageMovers, L.L.C. should be dismissed.[35]

### E.    The Remedies Plaintiffs Seek Are Not Available Under the UCL.

Plaintiffs' demand for money damages under the UCL for defendants' "unlawfully retain[ing] money that otherwise would have been paid to Plaintiffs" is fatally flawed.  *See* CAC ¶ 145. First, disgorgement is unavailable under the UCL.  *See High-Tech*, 856 F. Supp. 2d at 1124 (observing "[d]amages and disgorgement are unavailable under the UCL").  Second, plaintiffs are not entitled to restitution.  Under the UCL, the concept of restitution "allow[s] a plaintiff to recover money or property

---

[35]    In addition, all of the allegations relating to IMD relate to events occurring in or around January 2007 or later.  *See, e.g.*, CAC ¶¶ 6, 56, 65-68, 78.  At this point in time, Pixar was a wholly-owned subsidiary of Disney, *see* CAC ¶ 26, and IMD was majority owned by ABC, Inc., another subsidiary of Disney.  Thus, to the extent plaintiffs allege an illegal agreement between Disney and IMD (and Disney's wholly-owned subsidiary, Pixar), the conduct is not actionable under the antitrust laws because of Disney's ownership interests in IMD and Pixar.  *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984) (a corporation cannot conspire in violation of Section 1 of the Sherman Act with its wholly-owned subsidiary); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147-48 (9th Cir. 2003) (partnerships and other joint arrangements in which entities pool their capital and share the risks of loss as well as the opportunities for profit are not capable of conspiring); *Bell Atl. Bus. Sys. Servs. v. Hitachi Data Sys. Corp.*, 849 F. Supp. 702, 706 (N.D. Cal. 1994) (a parent cannot conspire with its 80% owned subsidiary).

in which he or she has a vested interest." *Id.*  While "a plaintiff has a vested interest in unpaid wages[,] … a mere 'expectation interest' is not a 'vested interest' for purposes of stating a claim for restitution under the UCL." *Id.* (citing *Pineda v. Bank of America*, 50 Cal. 4th 1389, 1401-02 (2010)).  Plaintiffs are not claiming "earned wages that are due and payable pursuant to . . . the Labor Code." *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 178 (2000) (holding such wages were the proper subject of restitution).  Instead, plaintiffs are claiming compensation they otherwise might have received absent defendants' alleged wage-fixing agreements.  This amounts to nothing more than an "'attenuated expectancy' – akin to a 'lost business opportunity' or lost revenue – which cannot serve as the basis for restitution." *High-Tech*, 856 F. Supp. 2d at 1124-25 (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150-51 (2003)).[36]

## F.    Plaintiffs Lack Standing To Seek Injunctive Relief.

Plaintiffs lack standing to seek a permanent injunction prohibiting defendants from a wide range of conduct.  CAC ¶¶ 146, 147(e).[37]  The named plaintiffs fail to satisfy the fundamental rule that they are "entitled to injunctive relief only if [they] can show that [they] face[] a 'real or immediate threat . . . that [they] will again be wronged in a similar way.'" *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).[38]  Plaintiffs are all

---

[36]    To the extent plaintiffs allege a violation of the UCL based on the alleged wage-fixing agreements, this claim also must be dismissed because plaintiffs have failed to allege a violation of the Sherman Act and the Cartwright Act with respect to those alleged agreements. *See, e.g., Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, 2013 WL 368365, at *13 (N.D. Cal. Jan. 29, 2013) ("Defendants' UCL counterclaim arises entirely from their . . . antitrust counterclaims. . . .  Because all of those claims fail, so, too, does their UCL claim."); *Digital Sun v. The Toro Co.*, 2011 WL 1044502, at *5 (N.D. Cal. Mar. 22, 2011) ("Because the Sherman Act violation is insufficiently pled, it follows that [plaintiff] has also failed to plead any violation of the Unfair Competition Law.").  Plaintiffs' claim of "unfair" conduct similarly fails. *See Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) ("[W]e hold that conduct alleged to be 'unfair' because it unreasonably restrains competition and harms consumers … is not 'unfair' if the conduct is deemed reasonable and condoned under the antitrust laws.").

[37]    A challenge to plaintiffs' Article III standing implicates the Court's subject matter jurisdiction, and is thus properly brought under Rule 12(b)(1). *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011); Fed. R. Civ. P. 12(b)(1).

[38]    These requirements also apply to plaintiffs' state law claims. *See Jadwin v. Cnty. of Kern*, 2009 WL 2424565, at *6 n.2 (E.D. Cal. Aug. 6, 2009) ("Article III standing requirements are equally applicable to state law claims"); *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1022 (9th Cir. 2004) (holding that plaintiff lacked standing to pursue injunctive relief under state law).

former employees of defendants, CAC ¶¶ 18-20, and none of them alleges that he or she intends to work for any defendant again. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2560 (2011) (former employees "have no . . . need for prospective relief"); *Walsh v. Nevada Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) (plaintiff would not stand to benefit from an injunction where there was "no indication in the complaint that [she] has any interest in returning to work" for her employer).  The fact that Nitsch, Cano, and Wentworth seek to represent a class makes no difference.  *See Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) ("Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief.").

Moreover, because Pixar and Lucasfilm already have entered into stipulated judgments with the DOJ, pursuant to which they are broadly enjoined from anti-competitive agreements on hiring, *see* CAC ¶ 94, the requested injunction is moot as to those two firms.  *Cf. Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 660 (1993) (where defendant had already complied with an FDA consent decree addressing the alleged misconduct, rendering plaintiff's "prayer for [an] injunction . . . effectively moot" on its UCL claim).

## IV.     CONCLUSION

For the foregoing reasons, this Court should dismiss the CAC.  Because there is no set of allegations that would establish plaintiffs' entitlement to relief, dismissal with prejudice is appropriate.

DATED:   January 9, 2015                    COVINGTON & BURLING LLP


By:  */s/ Emily Johnson Henn*
     Emily Johnson Henn
     333 Twin Dolphin Drive, Suite 700
     Redwood Shores, CA 94061
     Telephone: 650-632-4700
     Facsimile: 650-632-4800
     Email: ehenn@cov.com

     *Attorneys for Defendants*
     The Walt Disney Company
     Lucasfilm Ltd., LLC
     Pixar
     ImageMovers, L.L.C.
     Two Pic MC LLC

36

1    DATED:  January 9, 2015                GIBSON, DUNN & CRUTCHER LLP

2

3                                           By:  */s/ Rod J. Stone*
                                                 Rod J. Stone
4                                                333 South Grand Avenue
                                                 Los Angeles, CA 90071-3197
5                                                Telephone: 213-229-7256
                                                 Facsimile: 213-229-6256
6                                                Email: rstone@gibsondunn.com

7                                                *Attorneys for Defendant*
                                                 DreamWorks Animation SKG, Inc.

8

9    DATED:   January 9, 2015               ORRICK, HERRINGTON & SUTCLIFFE
                                            LLP
10
                                            By:  */s/ Stephen V. Bomse*
11                                               Stephen V. Bomse
                                                 405 Howard Street
12                                               San Francisco, CA 94105-2669
                                                 Telephone: 415-773-4145
13                                               Facsimile: 415-773-5759
                                                 Email: sbomse@orrick.com
14
                                                 *Attorneys for Defendants*
15                                               Sony Pictures Animation Inc.
                                                 Sony Pictures Imageworks Inc.
16
17   DATED:   January 9, 2015               WILLIAMS & CONNOLLY LLP

18                                          By:  */s/ John E. Schmidtlein*
                                                 John E. Schmidtlein
19                                               725 Twelfth Street, N.W.
                                                 Washington, D.C. 20005
20                                               Telephone: 202-434-5901
                                                 Facsimile: 202-434-5029
21                                               Email: jschmidtlein@wc.com

22                                               William Faulkner (SBN 83385)
                                                 McMANIS FAULKNER
23                                               50 West San Fernando Street, 10th Floor
                                                 San Jose, CA 95113
24                                               Telephone: 408-279-8700
                                                 Facsimile: 408-279-3244
25                                               Email: wfaulkner@mcmanislaw.com

26                                               *Attorneys for Defendant*
                                                 Blue Sky Studios, Inc.
27

28

1

## **ATTESTATION**

2

I, Emily Johnson Henn, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the

3

concurrence to the filing of this document has been obtained from each signatory hereto.

4

5

DATED:   January 9, 2015                    By:   */s/ Emily Johnson Henn*
                                                   Emily Johnson Henn

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' MOTION TO DISMISS THE CAC
Master Docket No. 14-cv-4062-LHK