UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE ANIMATION WORKERS ANTITRUST LITIGATION<br><br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Master Docket No.:14-CV-04062-LHK<br><br>**ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS**<br><br>Re: Dkt. No. 75 |

Defendants DreamWorks Animation SKG, Inc.; The Walt Disney Company; Lucasfilm Ltd., LLC; Pixar; ImageMovers, LLC.; Two Pic MC LLC (f/k/a ImageMovers Digital); Sony Pictures Animation Inc.; Sony Pictures Imageworks Inc.; and Blue Sky Studios have filed a joint motion to dismiss the consolidated amended complaint. ("MTD"), ECF No. 75. Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS Defendants' motion.

## I.  BACKGROUND

This is a consolidated class action brought by former employees alleging antitrust claims against their former employers, various animation studios with principal places of business in

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

California.[1] Plaintiffs contend that Defendants engaged in a conspiracy to fix and suppress employee compensation and to restrict employee mobility.

### A. Factual Background

The Court draws the following factual background from the uncontroverted allegations in the Consolidated Amended Complaint ("CAC"), and from judicially noticed documents.[2] Unless otherwise noted, Plaintiffs' allegations are presumed to be true for purposes of ruling on Defendants' motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 1. The Parties

Defendants include the following animation and visual effects studios: Blue Sky Studios, Inc. ("Blue Sky"), a Delaware corporation with its principal place of business in Greenwich, CT; DreamWorks Animation SKG, Inc. ("DreamWorks"), a Delaware corporation with its principal place of business in Glendale, CA; ImageMovers LLC, a California corporation with its principal place of business in Los Angeles, CA; ImageMovers Digital LLC, a Delaware corporation with its principal place of business in Burbank, CA; Lucasfilm Ltd., LLC ("Lucasfilm"), a California corporation with its principal place of business in San Francisco, CA;[3] Pixar, a California

---

[1] Defendant Blue Sky Studios, Inc. has its principal place of business in Greenwich, CT, but Plaintiffs allege that it is owned by Twentieth Century Fox Film Corporation, which has its principal place of business in Los Angeles, California. Consol. Am. Compl. ("CAC"), ¶ 21.

[2] The Court grants Defendants' unopposed request for judicial notice, ECF No. 76, and has taken notice of the adjudicative facts contained therein. Defendants request that the Court take judicial notice of the Civil Investigative Demands issued by the Department of Justice; public records from the State of Delaware; the expert report of Edward E. Leamer, as filed in *In re High-Tech Antitrust Litig.*, Case No. 11-CV-2509-LHK, ECF No. 856-8; media articles regarding the DOJ investigation; and an advertisement published by Plaintiffs' counsel. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (holding a court may take notice of proceedings in other courts); *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001) (matters of public record); *MGIC Indem. Co. v. Weisman*, 803 F.2d 500, 505 (9th Cir. 1986) (court records); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002) (media publications); *see also* Fed. R. Evid. 201(d).

The Court grants Plaintiffs' unopposed request for judicial notice, ECF No. 97 at 37, and has taken notice of the adjudicative facts contained therein. Plaintiffs request that the Court take judicial notice of two sealing orders from the *High-Tech* litigation and a media report. *See Lee*, 250 F.3d at 689–90; *Van Saher*, 592 F.3d at 960.

[3] Plaintiffs aver that Industrial Light & Magic ("ILM") is a division of Lucasfilm.

2

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

corporation with its principal place of business in Emeryville, CA;[4] Sony Pictures Animation, Inc. and Sony Pictures Imageworks, Inc. (collectively, "the Sony Defendants"), California corporations with their principal places of business in Culver City, CA; and The Walt Disney Company ("Disney") is a Delaware corporation with its principal place of business in Burbank, CA.[5] CAC ¶¶ 21–29.

Plaintiffs Robert A. Nitsch, Jr., Georgia Cano, and David Wentworth (collectively, "Plaintiffs"), are artists and engineers that were previously employed by four of the named Defendants. *Id.* ¶¶ 18–20. Nitsch worked for Sony Picture Imageworks in 2004 and DreamWorks from 2007 to 2011. *Id.* ¶ 18. Cano worked for Walt Disney Feature Animation from 2004 to 2005, ImageMovers Digital in 2010, and at various other visual effects and animation studios. *Id.* ¶ 19. Wentworth worked at ImageMovers Digital from 2007 to 2010. *Id.* ¶ 20. Nitsch is a resident of Massachusetts, and Cano and Wentworth are residents of California. *Id.* ¶¶ 18–20.

Plaintiffs seek to represent the following class:

> All persons who worked at any time from 2004 to the present for Pixar, Lucasfilm, DreamWorks Animation, Walt Disney Animation Studios, Walt Disney Feature Animation, Blue Sky Studios, Digital Domain, ImageMovers Digital, Sony Pictures Animation or Sony Pictures Imageworks in the United States. Excluded from the Class are officers, directors, senior executives and personnel in the human resources and recruiting departments of the Defendants.

*Id.* ¶ 113.[6]

### 2. *In re High-Tech Employees Litigation* **and the Department of Justice Investigation**

There is significant factual overlap between Plaintiffs' allegations and the related action *In re High-Tech Employees Litigation*, No. 11-CV-02509-LHK, as well as the civil complaints filed

---

[4] According to Plaintiffs, ILM, Lucasfilm, and Pixar have been owned by Defendant The Walt Disney Company since 2012. CAC ¶¶ 25–26.
[5] Disney also "oversees the operations of" Walt Disney Animation Studios, formerly known as Walt Disney Feature Animation. CAC ¶ 29.
[6] Plaintiffs also allege that "[t]he members of the Settlement Class under the September 20, 2013 Settlement Agreement with Pixar and Lucasfilm [in *High-Tech*] . . . do not bring in this complaint any claims against Pixar, Lucasfilm, and Disney that were released pursuant to the Settlement Agreement." *Id.* ¶ 114.

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

by the Department of Justice ("DOJ") against several Silicon Valley technology companies, Pixar, and Lucasfilm. As both the factual and procedural history of the related action, *In re High-Tech*, and the DOJ investigations and complaints are relevant to the substance of Defendants' motion to dismiss, the Court briefly summarizes the background of that litigation below.

From 2009 to 2010, the Antitrust Division of the DOJ investigated the employment and recruitment practices of various Silicon Valley technology companies, including Adobe Systems, Inc., Apple, Inc., Google, Inc., Intel Corp., and Intuit, Inc. *See In re High-Tech Employees Litig.*, 856 F. Supp. 2d 1103, 1109 (N.D. Cal. 2012). In September of 2010, the DOJ then filed civil complaints against the above-mentioned technology companies, in addition to Pixar and Lucasfilm. *Id.* The DOJ filed its complaint against Adobe, Apple, Google, Intel, Intuit, and Pixar on September 24, 2010. *Id.* On December 21, 2010, the DOJ filed another complaint against Lucasfilm and Pixar. CAC ¶ 94. The defendants, including Pixar and Lucasfilm, stipulated to proposed final judgments in which they agreed that the DOJ's complaints had stated claims under federal antitrust law and agreed to be "enjoined from attempting to enter into, maintaining or enforcing any agreement with any other person or in any way refrain from . . . soliciting, cold calling, recruiting, or otherwise competing for employees of the other person. 856 F. Supp. 2d at 1109–10. (quoting Adobe Proposed Final Judgment at 5). The D.C. District Court entered the stipulated proposed final judgments in March and June of 2011. *Id.*

The *High-Tech* plaintiffs filed five separate state court actions between May and July of 2011. Following removal, transfer to San Jose to the undersigned judge, and consolidation, the *High-Tech* plaintiffs filed a consolidated amended complaint on September 13, 2011. *Id.* at 1113. In their complaint, the *High-Tech* plaintiffs alleged antitrust claims against their employers, claiming that the defendants had conspired "to fix and suppress employee compensation and to restrict employee mobility." *Id.* at 1108. More specifically, the *High-Tech* plaintiffs alleged a conspiracy comprised of "an interconnected web of express bilateral agreements." *Id*. at 1110. One agreement, the "Do Not Cold Call" agreement involved one company placing the names of the

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

other company's employees on a "Do Not Cold Call" list and instructing its recruiters not to cold call the employees of the other company. *Id.* In addition to the "Do Not Cold Call" agreements, the *High-Tech* plaintiffs also alleged that Pixar and Lucasfilm, defendants in both *High-Tech* and the instant action, entered into express, written agreements to (1) not cold call each other's employees, (2) to notify the other company whenever making an offer to an employee of the other company, and (3) not to engage in "bidding wars." *Id.* at 1111.

### 3. Alleged Conspiracy in the Instant Action

Here, Plaintiffs allege that Defendants conspired to suppress compensation in two ways. First, Defendants allegedly entered into a scheme not to actively solicit each other's employees. CAC ¶ 41. Second, Defendants allegedly engaged in "collusive discussions concerning competitively sensitive compensation information and agreed upon compensation ranges," which would artificially limit compensation offered to Defendants' current and prospective employees. *Id.*

### a. Anti-Solicitation Scheme

According to Plaintiffs, "Defendants agreed not to contact their coconspirators' employees to inform them of available positions unless that individual employee had applied for a job opening on his or her own initiative." *Id.* ¶ 42. This solicitation, also known as "cold calling," is "a key competitive tool in a properly functioning labor market, especially for skilled labor." *Id.* ¶ 42. Plaintiffs aver that employees of competitor studios represent "one of the main pools of potential hires," and that employees of competitor studios that are not actively searching for new employment are "more likely to be among the most sought after employees." *Id.* ¶ 43. Hiring an employee from a competitor studio "can save costs and avoid risks." *Id.* Absent active solicitation, these employees are also difficult to reach. *Id.* Defendants' anti-solicitation scheme also allegedly included "notifying each other when an employee of one Defendant applied for a position with another Defendant, and agreeing to limit counteroffers in such situations." *Id.* ¶ 44. Moreover, Defendants allegedly "often refrained from hiring other Defendants' employees at all without the

United States District Court
Northern District of California

1    permission of the current employer," and would sometimes decline to make offers of employment

2    to an unemployed prospective hire if that individual had an outstanding offer from another

3    Defendant. *Id.* ¶ 45.

4         *Pixar and Lucasfilm*: According to Plaintiffs, "the roots of the conspiracy reach back to the

5    mid-1980s," when George Lucas, the former Lucasfilm Chairman of the Board and CEO, sold

6    Lucasfilm's "computer division" to Steve Jobs, who had recently left Apple. *Id.* ¶ 46. Jobs named

7    his new company Pixar. *Id.* Pixar's President, Ed Catmull, Lucas, and "other senior executives,

8    subsequently reached an agreement to restrain their competition for the skilled labor that worked

9    for the two companies." *Id.* Pixar drafted the terms of the agreement, which both Defendants

10   communicated to their senior executives and "select human resources and recruiting employees."

11   *Id.* Lucas stated in an email that Pixar and Lucasfilm "have agreed that we want to avoid bidding

12   wars," and that the agreement prevented the two companies from "raid[ing] each other's

13   companies." *Id.* Pixar and Lucasfilm allegedly agreed to the following terms: (1) not to cold call

14   each other's employees; (2) to notify each other when making an offer to the other company's

15   employee; and (3) that any offer by the other company would be "final," i.e., neither Pixar nor

16   Lucasfilm would engage in counteroffers. *Id.* ¶¶ 46–48 (citing internal Pixar email sent on January

17   16, 2006).

18        Plaintiffs further allege that while the conspiracy originated with Pixar and Lucasfilm,

19   Catmull brought additional studios into the fold. *Id.* ¶ 49. In a 2005 email, then Vice President of

20   Human Resources at Pixar, Lori McAdams, wrote "With regard to ILM, Sony, Blue Sky, etc., we

21   have no contractual obligations, but we have a gentleman's agreement not to directly solicit/poach

22   from their employee pool." *Id.* ¶ 50. Pixar also drafted an internal "competitors list" that "listed

23   anti-solicitation rules for each of the Defendants . . . ." *Id.* According to Plaintiffs, Blue Sky,

24   DreamWorks, ImageMovers Digital, Sony Pictures Imageworks, and Walt Disney Animation

25   Studios were "all listed with directions not to 'recruit directly' or 'solicit or poach employees.'"

26   *Id.* Plaintiffs' allegations as to each Defendants' alleged role and participation in the anti-

27

28

6

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1    solicitation scheme is detailed below.

2        *DreamWorks*: Jobs and DreamWorks CEO, Jeffrey Katzenberg, "personally discussed

3    DreamWorks joining into the conspiracy." *Id.* ¶ 52. In a February 18, 2004 email from Catmull to

4    Jobs, Catmull stated that the mutual agreement "worked quite well." *Id.* A January 14, 2007 email

5    from Catmull to Disney's Chairman Dick Cook, also provided that "we have an agreement with

6    Dreamworks not to actively pursue each other's employees." *Id.* In further emails between

7    Catmull, McAdams, and DreamWorks' head of human resources, Kathy Mandato, Pixar and

8    DreamWorks reiterated their "non-poaching practices." *Id.* ¶ 53. When a Pixar recruiting email

9    was sent to a DreamWorks employee, Mandato reached out to McAdams, and McAdams

10   responded that she'd "put a stop to it!" *Id.* ¶ 54.

11       *Disney*: A 2005 Pixar email "confirmed that Pixar would not recruit workers out of Disney

12   or other studios." *Id.* ¶ 56. In 2006, Disney purchased Pixar, and Catmull assumed responsibility

13   for Walt Disney Animation Studios. *Id.* In communications between Disney Chairman Cook and

14   Catmull, Cook agreed that "avoid[ing] raiding each other" was necessary to avoid "seriously

15   mess[ing] up the pay structure." *Id.* Cook allegedly promised to "reaffirm our position again" with

16   ImageMovers Digital, which Plaintiffs contend is a joint venture Disney launched with

17   ImageMovers.[7] *Id.* In 2006, Disney's Director of Animation Resources apparently asked ILM, a

18   division of Lucasfilm, to "observe 'the Gentlewomen's agreement'" that ILM not recruit Disney

19   digital artists. *Id.* ¶ 57.

20       *Sony Defendants*: Beginning in 2002, Sony Pictures Imageworks expanded significantly by

21   offering higher salaries to lure workers away from other studios. *Id.* ¶ 58. In response, Catmull

22   allegedly met with Sony executives in person in 2004 or 2005 to "ask[] them to quit calling our

---

24   [7] Defendants submit that Exhibit F in their request for judicial notice, consisting of Certificates of
25   Corporate Formation and Amendment filed with the Secretary of State of the State of Delaware,
     Division of Corporations, disproves Plaintiffs' allegation that ImageMovers LLC was a party to
26   the joint venture that created ImageMovers Digital. *See* ECF No. 76. Plaintiffs voluntarily
     dismissed ImageMovers LLC from this action after Defendants filed their motion to dismiss and
27   request for judicial notice. Consequently, the Court concludes that ImageMovers' involvement in
     the purported joint venture is not relevant.

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

1    employees." *Id.* ¶ 59. Plaintiffs allege that Catmull reached an agreement with Sony at that time

2    that the companies would not directly solicit or poach from each other. *Id.* Moreover, Sony

3    allegedly then began to "restrain its relatively higher-wage practices to levels below what would

4    otherwise have existed in a competitive market." *Id.* ¶ 62.

5        *Blue Sky Studios*: Plaintiffs aver that Blue Sky "similarly entered the conspiracy," did not

6    recruit from other studios, and requested that other studios not recruit from Blue Sky. *Id.* ¶ 63. In

7    2005, Blue Sky allegedly declined to pursue a DreamWorks employee that would have been "an

8    amazing addition," because Blue Sky did not "want to be starting anything with [Katzenberg, the

9    DreamWorks CEO] over one story guy." *Id.* Blue Sky's Director of Human Resources, Linda

10   Zazza, also allegedly spoke with Pixar's McAdams to discuss "our sensitive issue of employee

11   retention," and McAdams assured Blue Sky that Pixar was not attempting to poach Blue Sky

12   employees. *Id.* ¶ 64.

13       *ImageMovers Defendants*:[8] The ImageMovers Defendants allegedly also joined the

14   conspiracy. Catmull wrote in a January 2007 email to Disney Chairman Cook that Catmull knew

15   ImageMovers would "not target Pixar." *Id.* ¶ 65. Plaintiffs allege, however, that ImageMovers

16   continued to recruit from other conspiring studios, including DreamWorks, by "offering higher

17   salaries." *Id.* ¶ 66. Catmull then met with one of the founders of ImageMovers, Steve Starkey.

18   Starkey allegedly told Catmull that ImageMovers had informed Lucas that ImageMovers would

19   "not raid ILM." *Id.* ¶ 67. Catmull then contacted Disney Studio's President, Alan Bergman, and

20   Senior Vice President of Human Resources, Marjorie Randolph, requesting that they require the

21   ImageMovers Defendants to comply with the anti-solicitation scheme. *Id.* ¶ 68. According to

22   Plaintiffs, Randolph "responded that Disney had in fact gotten the ImageMovers Defendants to

23   agree to the 'rules' of the anti-solicitation scheme." *Id.*

24       *Digital Domain*[9]: Digital Doman allegedly joined the conspiracy and had anti-solicitation

25

26   _____

     [8] Plaintiffs dismissed ImageMovers LLC without prejudice pursuant to a tolling agreement on
     January 14, 2015. ECF No. 83.

27   [9] Plaintiffs also dismissed Digital Domain 3.0 without prejudice pursuant to a tolling agreement.

28
     Case No.: 14-CV-04062-LHK
     ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

agreements with "at least" DreamWorks, Lucasfilm/ILM and the Sony Defendants. *Id.* ¶ 69. According to Plaintiffs, starting in 2007, Digital Domain's Head of Human Resources was Lala Gavgavian, who had previously worked at Lucasfilm's ILM division "in senior roles in talent acquisition . . . during which time Pixar President Jim Morris explicitly informed her that Pixar and Lucasfilm" had an anti-solicitation/no-poaching agreement. *Id.* ¶ 70. Gavgavian and other senior personnel at Digital Domain allegedly "specifically instructed employees not to cold call or otherwise solicit other Defendants' employees." *Id.* ¶ 71.

As to all Defendants, Plaintiffs contend that Defendants "repeatedly sought to recruit" new studios into the scheme, including a small studio in 2008. *Id.* ¶ 72.

### b. Compensation Ranges

In addition to the anti-solicitation scheme, Plaintiffs further allege that Defendants "directly communicated and met regularly to discuss and agree upon compensation ranges." *Id.* ¶ 74. According to Plaintiffs, Defendants met at least once a year in California at meetings organized by the Croner Company, a third-party that apparently collects industry-specific salary information. At the official meetings, the Defendants "set the parameters of a compensation survey" that "provides wage and salary ranges for the studios' technical or artistic positions, broken down by position and experience level." *Id.* ¶ 75. Senior human resources and recruiting personnel from DreamWorks, Pixar, Lucasfilm/ILM, Disney, ImageMovers Digital, the Sony Defendants, Blue Sky, and Digital Domain attended these survey meetings, in addition to other studios. *Id.* ¶ 76. Plaintiffs aver that Defendants used the Croner meetings to "go further than their matching of job positions across companies; they discussed, agreed upon and set wage and salary ranges during meals, drinks and other social gatherings that they held outside of the official Croner meetings." *Id.* ¶ 77. Defendants' human resources and recruiting personnel also allegedly held "side" meetings at the Siggraph conference, a major visual effects industry conference, which senior personnel from Blue Sky, Pixar, DreamWorks, Lucasfilm, and Sony Picture ImageWorks

---

*See* CAC at 16 n.3.

9

attended. *Id.* ¶ 79.

Defendants' Directors of Human Resources also allegedly "frequently sought to create new relationships when one of their counterparts was replaced at a co-conspirator to ensure the efficacy of communications about the conspiracy," and met with each other one-on-one "on many occasions." *Id.* ¶¶ 79–80. Plaintiffs further allege that Defendants regularly emailed each other with specific salary ranges. On May 13, 2005, DreamWorks requested that Disney provide salary information on three positions, and Disney promptly responded. *Id.* ¶ 81. The following spring, DreamWorks also requested similar information from Pixar and Disney, and "made clear it was surveying multiple studios." *Id.* ¶ 82. On September 2, 2009, Blue Sky's Director of Human Resources requested salary range information from Pixar. *Id.* ¶ 83. In a 2007 email, DreamWorks' Head of Compensation explained that "we do sometimes share general comp information (ranges, practices) in order to maintain the relationships with other studios and to be able to ask for that kind of information ourselves when we need it." *Id.* ¶ 84.

According to Plaintiffs, Defendants' communications regarding salary ranges were not limited to bilateral "one off" exchanges, but rather Defendants would "openly email[] each other in large groups with competitively sensitive confidential current and future compensation information." *Id.* ¶ 85. On November 17, 2006, Pixar's McAdams emailed senior human resources personnel at DreamWorks, Sony Pictures Imageworks, Lucas Film, Walt Disney Animation Studios, and others:

> Quick question from me, for those of you who can share the info.
>
> What is your salary increase budget for FY '07? Ours is [REDACTED] but we may manage it to closer to [REDACTED] on average. Are you doing anything close, more, or less?

*Id.* ¶ 86. In January 2009, DreamWorks' Head of Production Technology emailed the heads of human resources at Pixar, ILM, Sony Pictures Animation, and Disney to "learn how they handled overtime." More specifically, DreamWorks wanted to "see if the other companies were 'as generous.'" *Id.* ¶ 88.

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1   Defendants' human resources and recruiting personnel also allegedly regularly

2   communicated via telephone. *Id.* ¶ 89. Plaintiffs quote emails from Pixar's McAdams to Sony

3   Pictures Imageworks, ILM, DreamWorks, Disney, and Blue Sky "in early 2007" stating

4   "[c]hatting with all of you each day is really becoming a fun habit," and an email response from

5   Walt Disney Animation Studios Vice President of Human Resources also commenting that "[i]t is

6   fun to hear from you all on a daily basis." *Id.* ¶ 90.

7   As Plaintiffs describe it, the Croner survey meetings, side meetings, emails, and telephone

8   calls "provided the means and opportunities for Defendants to collude and to implement and

9   enforce the conspiracy to suppress workers' compensation." *Id.* ¶ 91. Plaintiffs further allege that

10  while press reports in 2009 noted that the DOJ was investigating anti-solicitation agreements

11  among high-tech companies, including Google and Apple, there was no indication that the DOJ

12  was also investigating Pixar, Lucasfilm, or any other animation company. *Id.* ¶ 95. Plaintiffs aver

13  that September 17, 2010 marked the first news story naming Pixar as a company under

14  investigation, but that there was no public disclosure that any other Defendant in the instant action

15  was part of the conspiracy. *Id.* According to Plaintiffs, Lucasfilm was implicated in the Pixar

16  investigation in December 2010, but until the Court unsealed certain filings in the *High-Tech* case,

17  there was no public information that the other Defendants in this action had engaged in similar

18  conduct. *Id.*

19  **4.   Claims**

20  Plaintiffs' CAC contains three claims for relief under the following statutes: (1) Section 1

21  of the Sherman Act, 15 U.S.C. § 1; (2) California's Cartwright Act, Cal. Bus. & Prof. Code

22  § 16720; and (3) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200

23  *et seq*. Plaintiffs seek damages, pre- and post-judgment interest, attorney's fees and expenses, and

24  a permanent injunction. *Id.* ¶ 147.

25  **B.   Procedural Background**

26  In light of the relationship between the instant case and the *High-Tech* case, the Court

27

28

United States District Court
Northern District of California

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

briefly summarizes the relevant procedural history in *High-Tech* in addition to the instant case.

### 1.   *High-Tech* Procedural Background

The *High-Tech* defendants removed the first state-court action on May 23, 2011. No. 11-2509, ECF No. 1. On April 18, 2012, the Court granted in part and denied in part the *High-Tech* defendants' joint motion to dismiss and denied Lucasfilm's motion to dismiss. No. 11-2509, ECF No. 119. On April 5, 2013, the Court granted in part and denied in part the *High-Tech* plaintiffs' motion for class certification with leave to amend. No. 11-2509, ECF No. 382. The Court granted the *High-Tech* plaintiffs' supplemental motion for class certification on October 24, 2013. No. 11-2509, ECF No. 531.  On November 13, 2013, the *High-Tech* defendants filed a Rule 23(f) petition before the Ninth Circuit, requesting permission to appeal this Court's October 24, 2013 class certification order. No. 13-80223, ECF No. 1. The Ninth Circuit denied the defendants' petition on January 14, 2014. No. 13-80223, ECF No. 18.

In the interim, three of the *High-Tech* defendants, Intuit, Lucasfilm, and Pixar, reached an early settlement with the plaintiffs. On September 21, 2013, the *High-Tech* plaintiffs filed a motion for preliminary approval of a proposed class action settlement as to defendants Intuit, Lucasfilm, and Pixar. No. 11-2509, ECF No. 501. On October 30, 2013, the Court preliminarily approved the proposed settlement with Intuit, Lucasfilm, and Pixar. No. 11-2509, ECF No. 540. The Court granted final approval as to that settlement on May 16, 2014. No. 11-2509, ECF No. 915. The Court entered a final judgment with regards to Lucasfilm, Pixar, and Intuit on June 9, 2014. No. 11-2509, ECF No. 936. At the request of Intuit, the Court entered an amended final judgment on June 20, 2014. No. 11-2509, ECF No. 947.

The remaining *High-Tech* defendants, Adobe, Apple, Google, and Intel, filed individual motions for summary judgment, and joint motions for summary judgment and to strike certain expert testimony on January 9, 2014. No. 11-2509, ECF Nos. 554 (Intel), 556–57 (joint motions), 560 (Adobe), 561 (Apple), 564 (Google). The Court denied the *High-Tech* defendants' individual motions for summary judgment on March 28, 2014. No. 11-2509, ECF No. 771. On April 4, 2014,

United States District Court
Northern District of California

12

the Court granted in part and denied in part the *High-Tech* defendants' motion to strike, and denied the defendants' joint motion for summary judgment. No. 11-2509, ECF No. 778.

On May 22, 2014, the *High-Tech* plaintiffs filed a motion for preliminary approval of class action settlement as to the remaining defendants. No. 11-2509, ECF No. 920. On August 8, 2014, the Court denied the *High-Tech* plaintiffs' motion for preliminary approval, concluding that the proposed settlement did not fall "within the range of reasonableness." No. 11-2509, ECF No. 974, at 30. On September 4, 2014, the *High-Tech* defendants filed a petition for a writ of mandamus with the Ninth Circuit. No. 14-72745, ECF No. 1. On January 13, 2015, the *High-Tech* defendants filed correspondence with the Ninth Circuit referring to a new proposed settlement agreement. No. 14-72745, ECF No. 21. On January 30, 2015, the defendants filed an unopposed motion to dismiss the petition, which the Ninth Circuit granted on February 2, 2015. No. 14-72745, ECF Nos. 23, 24.

On January 15, 2015, the *High-Tech* plaintiffs filed a motion for preliminary approval of class action settlement as to the remaining defendants. No. 11-2509, ECF No. 1032. In this second proposed class action settlement, the parties had reached a settlement amount exceeding the previously rejected settlement by approximately $90.5 million dollars. *Id.* at 1. Following a fairness hearing on March 2, 2015, the Court granted preliminary approval to the January 2015 settlement agreement on March 3, 2015. No. 11-1509, ECF Nos. 1051, 1054. A final approval hearing is scheduled for July 9, 2015.

### 2.   Procedural Background in the Instant Action

Plaintiff Nitsch filed the first complaint against all Defendants but Blue Sky on September 8, 2014. ECF No. 1. The Court related Nitsch's action to *In re High-Tech Employee Antitrust Litigation*, No. 11-2509, on September 23, 2014. Plaintiff Cano filed the second complaint against all Defendants on September 17, 2014, which the Court related to *High-Tech* on October 7, 2014. *See* Case No. 14- 4203, ECF Nos. 1, 9. Plaintiff Wentworth filed the third complaint against all Defendants but Blue Sky on October 2, 2014, which the Court related to *High-Tech* on October

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1   28, 2014. *See* Case No. 14-4422, ECF Nos. 1, 26. On November 5, 2014, the Court granted

2   Plaintiffs' motion to consolidate the above-mentioned three cases into a single action, *In re*

3   *Animation Workers Antitrust Litigation*. *See* Case No. 14-4062, ECF No. 38.

4       Pursuant to the Court's case management order, Plaintiffs filed their CAC on December 2,

5   2014. ECF No. 63. On January 9, 2015, Defendants filed the instant joint motion to dismiss, and a

6   request for judicial notice. ECF Nos. 75, 76. Defendants also filed an administrative motion to seal

7   exhibits in support of their motion to dismiss. ECF No. 79. Plaintiffs filed a timely opposition,

8   ECF No. 97, and Defendants replied, ECF No. 100.

9       Also pending before the Court is Defendants' January 9, 2015, motion to compel

10  arbitration. ECF No. 71. As that motion is set for hearing on April 23, 2015, the Court does not

11  address that motion in the instant order.

12  **II.  LEGAL STANDARD**

13      **A.  Rule 12(b)(6)**

14      Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint

15  for failure to state a claim upon which relief can be granted. Such a motion tests the legal

16  sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In considering

17  whether the complaint is sufficient, the Court must accept as true all of the factual allegations

18  contained in the complaint. *Iqbal*, 556 U.S. at 678. However, the Court need not accept as true

19  "allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations

20  that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re*

21  *Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). While a

22  complaint need not allege detailed factual allegations, it "must contain sufficient factual matter,

23  accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678

24  (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility

25  when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

26  the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a

27  'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

14

United States District Court
Northern District of California

1    unlawfully." *Iqbal*, 556 U.S. at 678 (internal citation omitted).

2    **B.  Rule 9(b)**

3           Claims sounding in fraud or mistake are subject to the heightened pleading requirements of

4    Federal Rule of Civil Procedure 9(b), which require that a plaintiff alleging fraud "must state with

5    particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see Kearns v. Ford Motor*

6    *Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). To satisfy the heightened standard under Rule 9(b), the

7    allegations must be "specific enough to give defendants notice of the particular misconduct which

8    is alleged to constitute the fraud charged so that they can defend against the charge and not just

9    deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.

10   1985). Thus, claims sounding in fraud must allege "an account of the time, place, and specific

11   content of the false representations as well as the identities of the parties to the

12   misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam)

13   (internal quotation marks and citation omitted). A plaintiff must set forth what is false or

14   misleading about a statement, and why it is false." *In re GlenFed, Inc. Secs. Litig.*, 42 F.3d 1541,

15   1548 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as stated in Marksman*

16   *Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1309 (C.D. Cal. 1996). However,

17   "intent, knowledge, and other conditions of a person's mind" need not be stated with particularity,

18   and "may be alleged generally." Fed. R. Civ. P. 9(b).

19   **C.  Leave to Amend**

20          If the court concludes that the complaint should be dismissed, it must then decide whether

21   to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend

22   "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule

23   15 . . . [is] to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez*

24   *v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citation

25   omitted). Nonetheless, a district court may deny leave to amend a complaint due to "undue delay,

26   bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

27

28

United States District Court
Northern District of California

15

1    amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of

2    the amendment, [and] futility of amendment." *See Leadsinger, Inc. v. BMG Music Publ'g*, 512

3    F.3d 522, 532 (9th Cir. 2008).

4    **III. DISCUSSION**

5         Defendants move to dismiss on the following grounds: that (1) Plaintiffs' claims are barred

6    under the relevant statutes of limitations; (2) Plaintiffs fail to sufficiently allege a *per se* antitrust

7    claim based on wage-fixing agreements; (3) Plaintiffs fail to state plausible claims against Blue

8    Sky, the Sony Defendants, and the ImageMovers Defendants; (4) Plaintiffs' requested remedies

9    are not unavailable under the UCL; and (5) Plaintiffs lack standing to seek injunctive relief. The

10   Court begins by addressing whether Plaintiffs' claims are time barred.

11        **A.  Statute of Limitations**

12        In the instant case, Defendants contend that Plaintiffs' claims are time barred. The parties

13   agree that Plaintiffs' claims are subject to a four year statute of limitations. The parties dispute

14   when Plaintiffs' claims accrued, whether Plaintiffs have adequately alleged a continuing violation,

15   and whether Plaintiffs have sufficiently alleged fraudulent concealment so as to toll the statute of

16   limitations.

17        As a threshold matter, the Court agrees that Plaintiffs' claims under the Sherman Act,

18   Cartwright Act, and UCL are all subject to a four year statute of limitations. *See* 15 U.S.C. § 15b

19   (Sherman Act); Cal. Bus. & Prof. Code § 16750.1 (Cartwright Act); Cal. Bus. & Prof. Code

20   § 17208 (UCL). The statute of limitations provision in the Sherman Act provides:

21            Any action to enforce any cause of action under section 15, 15a, or
             15c of this title shall be forever barred unless commenced within
22           four years after the cause of action accrued. No cause of action
             barred under existing law on the effective date of this Act shall be
23           revived by this Act.

24   15 U.S.C. § 15b. The statute of limitations provision under California's Cartwright Act is

25   functionally identical:

26            Any civil action to enforce any cause of action for a violation of this
             chapter shall be commenced within four years after the cause of
27

28   Case No.: 14-CV-04062-LHK
     ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

16

1

2

> action accrued. No cause of action barred under existing law on the effective date of the amendment of this section at the 1977-78 Regular Session of the Legislature shall be revived by such amendment.

3

4

Cal. Bus. & Prof. Code § 16750.1. California's UCL similarly provides for a four-year statute of limitations:

5

6

7

> Any action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this section shall be revived by its enactment.

8

9

10

11

Cal. Bus. & Prof. Code § 17208 (UCL). The Court begins by addressing the accrual rule applicable to Plaintiffs' Sherman Act claim, which the parties do not dispute would also apply to Plaintiffs' Cartwright Act claim.[10] *See* MTD at 4; Opp. at 10 n.36. The Court then addresses Plaintiffs' UCL claim.

### 1. Accrual Rule

12

13

14

15

16

As an initial matter, the parties dispute whether Plaintiffs' claims accrued at the time of Plaintiffs' injuries (the "injury rule") or at the time that Plaintiffs discovered, or reasonably should have discovered their injuries (the "discovery rule"). Under controlling Supreme Court and Ninth Circuit authority, Plaintiffs' antitrust claims began to accrue at the time of injury.

17

18

19

20

> Generally, [an antitrust cause] of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. . . . This much is plain from the treble-damage statute itself. . . . [E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.

21

22

23

24

25

26

27

_____

[10] As Defendants note, under California law the general accrual rule is the "last element rule," where a claim accrues "'when [it] is complete with all of its elements'—those elements being wrongdoing, harm, and causation." *Pooshs v. Philip Morris USA, Inc.*, 51 Cal. 4th 788, 797 (2011) (quoting *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999)). The "discovery rule" is an exception to the common law accrual rule. *Id.* In light of the fact that the discovery rule is an exception and not the default rule, the *Aryeh* court's holding that federal interpretation of the Sherman Act is instructive in interpreting the Cartwright Act, and the absence of any contrary argument from Plaintiffs, the Court focuses on the Sherman Act to resolve whether both Plaintiffs' Sherman and Cartwright Act claims are time barred. *See Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1196 (2013). Moreover, as stated above, the parties do not dispute that resolution of Plaintiffs' Sherman Act claim would also resolve Plaintiffs' Cartwright Act claim.

28

17

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *see also* P. Areeda and H. Hovencamp, Antitrust Law ¶ 320a–b. As the Ninth Circuit explained in *Beneficial Standard Life Insurance Co. v. Madariaga*, 851 F.2d 271, 274–75 (9th Cir. 1988), "In [antitrust] actions governed by 15 U.S.C. § 15b, the plaintiff's knowledge is generally irrelevant to accrual, which is determined according to the date on which injury occurs."

While Plaintiffs are correct that some of the authorities Defendants cite are discussing accrual rules in the civil RICO context, the Court concludes that the U.S. Supreme Court and Ninth Circuit have clearly held that claims under the Sherman Act are subject to an injury rule, rather than a discovery rule. For example, although *Klehr v. A.O Smith Corp.*, 521 U.S. 178 (1997), addressed accrual rules in the civil RICO context, the *Klehr* Court explicitly noted that "the ordinary Clayton Act rule, applicable in private antitrust treble damages actions, [is where] a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Id.* at 188. The *Klehr* Court explicitly distinguished the "pure injury accrual rule . . . [as] it applies in traditional antitrust cases," from the possible discovery accrual rules in the civil RICO context. *See id.*; *see also id.* at 191 ("The use of a discovery rule may reflect the fact that a high percentage of civil RICO cases, unlike typical antitrust cases, involve fraud claims."). If there were any remaining doubts, Justice Scalia's concurrence in *Klehr* explicitly listed the potential accrual rules to be applied in RICO cases: "last predicate act, injury discovery, and injury and pattern discovery . . . [and] the fourth accrual rule—the Clayton Act 'injury' rule." *Id.* at 197 n.1 (Scalia, J., concurring in part and concurring in the judgment).

Plaintiffs also take issue with Defendants' reliance on *Hexcel Corp. v. Ienos Polymers, Inc.*, 681 F.3d 1055 (9th Cir. 2012). Plaintiffs contend that the Ninth Circuit did not apply an injury rule, but rather addressed whether the plaintiff had sufficient actual or constructive knowledge of its injuries so as to defeat its fraudulent concealment claim. *Id.* at 1060–61. What Plaintiffs fail to recognize, however, is that the Ninth Circuit began with the basic statement of law: "We do not require a plaintiff to actually discover its antitrust claims before the statute of

United States District Court
Northern District of California

limitations begins to run." *Id.* at 1060 (citing *Beneficial Life Ins.*, 851 F.2d at 274–75). Plaintiffs may be correct in a hypertechnical sense that Defendants cite no Ninth Circuit authority explicitly "rejecting" the discovery rule for antitrust claims, but that appears to be a function of the fact that the Ninth Circuit has consistently interpreted 15 U.S.C. § 15b as requiring an injury rule since 1950. *See Suckow Borax Mines Consol. v. Borax Consol.*, 185 F.2d 196, 208 (9th Cir. 1950) (cited approvingly in *Zenith*, 401 U.S. at 338). Simply put, both the Ninth Circuit and the U.S. Supreme Court have long assumed as a basic principle of antitrust law that antitrust claims accrue at the time of injury. In light of that established assumption, there has been no need for the Ninth Circuit to explain why a different accrual rule does not apply.

Plaintiffs' reliance on the general proposition that "in general, the discovery rule applies to statutes of limitations in federal litigation," is unavailing. *See* Opp. at 6 (quoting *Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 940 (9th Cir. 2009)). In light of explicit, longstanding U.S. Supreme Court and Ninth Circuit authority specifically holding that antitrust claims accrue at the time of injury, the Court declines to rely on general policy justifications for the discovery rule. Moreover, while the Seventh Circuit may have applied the discovery rule to antitrust claims in *In re Copper Antitrust Litigation*, 436 F.3d 782 (7th Cir. 2006), this Court is bound by contrary Ninth Circuit authority. Insofar as Plaintiffs contend that the Ninth Circuit has not directly rejected the discovery rule, the Court further concludes that clear U.S. Supreme Court authority and the overwhelming majority of Circuits have explicitly held that antitrust claims are subject to a pure injury rule, not a discovery rule. *See Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir. 1996) ("An antitrust cause of action accrues as soon as there is injury to competition."); *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 246 n.8 (3d Cir. 2001) ("[A]ntitrust claims are subject to the less plaintiff-friendly 'injury occurrence' accrual rule" as opposed to "a more lenient 'injury discovery' rule"); *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 538 (4th Cir. 1997) (agreeing that "under the antitrust accrual rule, the statute of limitations is triggered by the date of the injury alone"); B*ell v. Dow Chem. Co.*, 847 F.2d 1179, 1186 (5th Cir. 1988) ("The general rule in our

19

1   Circuit is that an antitrust cause of action accrues each time a defendant commits an act that

2   injures plaintiff."); *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996)

3   (holding that "[f]or statute of limitations purposes . . . the focus is on the timing of the causes of

4   injury . . .") (internal quotation marks omitted); *Granite Falls Bank v. Henrikson*, 924 F.2d 150,

5   153 (8th Cir. 1991) ("[A]ccrual in antitrust actions depends on the commission of the defendant's

6   injurious act rather than on the plaintiff's knowledge of that act or the resulting injury . . . ."),

7   *disapproved on other grounds by Rotella v. Wood*, 528 U.S. 549 (2000); *Robert L. Kroenlein Trust*

8   *ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1276 (10th Cir. 2014) (noting that "the Clayton Act . . .

9   employs the injury-occurrence rule" as opposed to the "the injury-discovery rule"); *Connors v.*

10  *Hallmark & Son Coal Co.*, 935 F.2d 336, 342 n.10 (D.C. Cir. 1991) ("[I]n the area of antitrust, . . .

11  the Supreme Court has held, as a matter of statutory interpretation, that a cause of action accrues at

12  the time of injury.").

13          Plaintiffs also rely on a recent decision from this District, *Fenerjian v. Nongshim Co., Ltd.*,

14  No. 13-CV-04115-WHO, 2014 WL 5685562 (N.D. Cal. Nov. 4, 2014). While the *Fenerjian* court

15  applied the discovery rule to Sherman Act claims, for the reasons stated above, this Court

16  respectfully disagrees. In *Fenerjian*, the parties *did not dispute* that the discovery rule applied to

17  Sherman Act claims, and the *Fenerjian* court therefore did not have the benefit of briefing on the

18  question. *See* 2015 WL 585562, at *12 n.27 ("Defendants do not dispute that the 'discovery rule'

19  or fraudulent concealment are available to toll [the antitrust] statutes of limitation."). In the instant

20  case, the Court agrees with Defendants that Plaintiffs' antitrust claims began to accrue at the time

21  Plaintiffs suffered their injury, regardless of whether or not Plaintiffs knew of their injury at the

22  time it occurred.

23          Moreover, the Court also concludes that Plaintiffs' UCL claim based on Defendants'

24  alleged anticompetitive conduct also began to accrue at the time Plaintiffs suffered their injury.

25  Plaintiffs assert that the discovery rule applies as a matter of law to their UCL claim under *Aryeh*

26  *v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1196 (2013). However, the Court agrees with

27

28

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Defendants that Plaintiffs mischaracterize the breadth of *Aryeh*. The *Aryeh* court held only that the

2   UCL does not categorically *forbid* the application of the discovery rule under appropriate

3   circumstances, not that the UCL requires application of the discovery rule to every cause of

4   action.[11] *See id.* at 1196–97. More specifically, the *Aryeh* court explained that the "UCL is a

5   chameleon," and that the discovery rule might be appropriate for misrepresentation or fraud

6   claims, but not in unfair competition claims. *See id.* (citing approvingly *M&F Fishing, Inc. v. Sea-*

7   *Pac Ins. Managers, Inc.* 202 Cal. App. 4th 1509, 1531–32 (Ct. App. 2012) (nature of UCL unfair

8   competition claim rendered discovery rule inappropriate)). As Plaintiffs' UCL claim here is based

9   purely on Defendants' alleged anticompetitive conduct, the Court concludes that Plaintiffs' UCL

10  claim is also subject to the injury rule.

11      Here, Plaintiffs' claims began to accrue as early as 2004–05, when Plaintiff Cano worked

12  for Defendant Disney and Plaintiff Nitsch worked for Sony. *See* CAC ¶¶ 19, 49–50, 56–57. At the

13  latest, Plaintiffs' claims began to accrue in 2007 when Plaintiff Nitsch worked for DreamWorks

14  and Plaintiff Wentworth worked at ImageMovers Digital. *Id.* ¶¶ 18, 20. As a result, the four-year

15  statute of limitations ran on Plaintiffs' claims as early as 2008, and at best in 2011. The Court

16  therefore concludes that Plaintiffs' claims are time barred absent sufficient allegations that

17  Defendants engaged in "continuing violations" after September 8, 2010, i.e., four years prior to the

18  first-filed complaint in this consolidated action, or that Defendants' fraudulent concealment should

19  toll the statute of limitations.[12]

20

21

---

22  [11] Plaintiffs cite this Court's order in *Plumlee v. Pfizer*, No. 13-CV-414-LHK, 2014 WL 695024,

23  at *8 (N.D. Cal. Feb. 21, 2014), for the proposition that the delayed discovery rule applies to UCL
    claims as a matter of law. However, the UCL claims at issue in *Plumlee* were based on alleged

24  fraudulent misrepresentations to consumers, precisely the type of UCL claim the *Aryeh* court
    recognized might be subject to the delayed discovery rule. *See Aryeh*, 55 Cal. 4th at 1195–96.

25  Thus in the fraud context, the Court observed that under *Aryeh*, the delayed discovery rule was
    "*available* to toll the statute of limitations" for a UCL claim. The Court did not hold that the

26  discovery rule applied to all UCL claims. *See id.* at *8 n.6 (emphasis added).
    [12] The Court notes that Defendants contend that Blue Sky was not named in the first-filed

27  complaint, the *Nitsch* complaint, but rather was only named on September 17, 2014 in the
    *Wentworth* complaint. *See* MTD at 4 n.3.

28

21

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

### 2. Continuing Violations

Plaintiffs contend that even if the injury rule applies to antitrust claims, Plaintiffs have alleged that Defendants engaged in "continuing violations," that would render Plaintiffs' claims timely. Defendants argue that Plaintiffs have failed to allege that Defendants took any "overt acts" that would restart the statute of limitations. According to Defendants, Plaintiffs' allegations are both insufficient under *Twombly* and also implausible in light of the 2009 DOJ investigation and 2011 stipulated final judgments.

Under the "continuing violation" doctrine, "each overt act that is part of the [antitrust] violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr*, 521 U.S. at 189 (internal citations and quotations omitted); *Pace Indus. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) ("A continuing violation is one in which the plaintiff's interests are repeatedly invaded and a cause of action arises each time the plaintiff is injured."). In the Ninth Circuit, an overt act restarts the statute of limitations if it: (1) is "a new and independent act that is not merely a reaffirmation of a previous act"; and (2) "inflict[s] new and accumulating injury on the plaintiff." *Pace*, 813 F.2d at 237; *see also Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1202–03 (9th Cir. 2014).

Here, the Court concludes that the bald assertion that "Defendants repeatedly invaded Plaintiffs' . . . interests," is insufficient to show a continuing violation. *See* CAC ¶ 123. Plaintiffs allege that "Defendants' conspiracy was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and class members' interest by adhering to, enforcing and reaffirming the anticompetitive agreements described herein." CAC ¶ 123. A review of the specific factual allegations in Plaintiffs' CAC, however, reveals no alleged wrongful communications or specific conduct during the limitations period. The Court observes the rather conspicuous absence of specific dates for many of Plaintiffs' factual allegations, but those allegations that do contain specific dates all pre-date 2009, with the vast majority occurring between 2004 and 2007. *See* CAC ¶¶ 4–7, 12–14, 48, 50, 52–73, 78, 82, 84–86, 90 (2004–2007 communications and conduct);

22

United States District Court
Northern District of California

*id.* ¶ 83 (September 2, 2009 email); *id.* ¶ 88 (January 2009 email). Plaintiffs do not allege that any Defendant abided by, attempted to enforce, or otherwise "reaffirmed" the anti-solicitation scheme or salary range setting on or after September 8, 2010, i.e., four years prior to the first-filed complaint in this consolidated action. There are no allegations of any new or independent actions taken by the Defendants after September 8, 2010 that caused Plaintiffs any new or accumulating injury. *See Pace*, 813 F.2d at 237. Plaintiffs fail to allege any new or accumulating injuries within the limitation period. The remainder of Plaintiffs' allegations in the "Statute of Limitations" portion of the CAC focus on Plaintiffs' fraudulent concealment claim. *See* CAC ¶¶ 124–32.

In opposition, Plaintiffs appear to concede that the CAC lacks factual allegations that Defendants engaged in any new and independent wrongful conduct after September 8, 2010, but instead rely on a price-fixing analogy. *See* Opp. at 20–21. Plaintiffs put forward the novel theory that because they entered into employment agreements with Defendants during the alleged conspiracy, and because Plaintiffs received artificially depressed compensation as a result, Plaintiffs suffered antitrust injury each time they received "price-fixed" compensation. As Plaintiff Nitsch worked for DreamWorks through 2011, Plaintiffs' theory is that Nitsch continued to be injured through 2011. According to Plaintiffs, their injuries are no different than consumers who suffer antitrust injury when purchasing artificially higher priced goods as a result of a price-fixing conspiracy. *Id.*

However, the Court is not persuaded that Plaintiffs' "price-fixed compensation" theory, as put forth in Plaintiffs' opposition, satisfies the "overt act" requirement. As a threshold matter, Plaintiffs need to do more than merely allege a continuing violation—they must also allege an overt act:

> A continuing violation is one in which the plaintiff's interests are repeatedly invaded and a cause of action arises each time the plaintiff is injured. *However, even when a plaintiff alleges a continuing violation, an overt act by the defendant is required* to restart the statute of limitations and the statute runs from the last overt act.

*Pace*, 813 F.2d at 237 (emphasis added). Plaintiffs' bare allegation that their interests were

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1    "repeatedly invaded" is therefore insufficient as a matter of law. Rather, Plaintiffs must plead that

2    Defendants engaged in an overt act, e.g., that Defendants engaged in a "new and independent act

3    that is not merely a reaffirmation of a previous act," which "inflict[ed] new and accumulating

4    injury" on Plaintiffs. *Id.* at 238.

5            Here, even assuming that Plaintiff's "price-fixed" compensation theory is viable, the Court

6    concludes that Plaintiffs have failed to sufficiently allege that Defendants took any overt act that

7    would restart the statute of limitations. Plaintiffs do not allege that their compensation was

8    permanently depressed or otherwise continued to be affected by Defendants' wrongful conduct,

9    which allegedly took place from 2004 to, at best, 2009. In other words, while Plaintiffs may have

10   sufficiently pled facts showing Defendants' wrongful conduct from 2004 to 2009 prevented

11   employees from receiving higher pay during that period of time, Plaintiffs have not pled any facts

12   showing that Defendants continued to engage in the wrongful conduct which would have resulted

13   in "artificially depressed compensation" on or after September 8, 2010. While Plaintiffs are

14   correct that the Court generally takes as true factual allegations made in the complaint, *see Iqbal*,

15   556 U.S. 678, Plaintiffs have failed to allege any facts showing that their compensation was at all

16   impacted at any point after September 8, 2010. This is unsurprising in light of Plaintiffs' failure to

17   allege any wrongful conduct post-2009.

18           To be clear, the Court does not rely on Defendants' arguments regarding the plausibility of

19   Plaintiffs' factual allegations. For instance, Defendants' reliance on the fact that the DOJ chose not

20   to bring complaints against certain Defendants is irrelevant on a motion to dismiss, as that goes to

21   the weight and veracity of Plaintiffs' factual allegations. *See Iqbal*, 556 U.S. at 678. Nor does the

22   fact that an expert in *High-Tech* assumed that the anti-solicitation agreements at issue in that

23   litigation stopped affecting wages in 2010 affect the adequacy of Plaintiffs' allegations in the

24   instant case. *See* MTD at 8 n.6. Whether or not Defendants continued to engage in anticompetitive

25   behavior in the four year period preceding the filing of the first complaint in this action is a factual

26   question that the Court does not resolve on a motion to dismiss. Rather, the Court concludes that

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1    Plaintiffs have failed to state any such allegations in the first instance. In opposition, Plaintiffs rely

2    on a single paragraph in the CAC, where Plaintiffs allege: "Nor did DreamWorks make any

3    changes to its practices in the wake of the entrance of the Lucasfilm consent decree in 2011 that

4    might have alerted its workers to the company's prior misconduct." CAC ¶ 129. Even construing

5    this allegation broadly, the Court concludes this allegation has nothing to do with whether

6    DreamWorks, or any other Defendant, continued to engage in anticompetitive behavior within the

7    limitations period.

8         Furthermore, Plaintiffs cite *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086–87 (9th Cir. 2014),

9    in support of their price-fixing analogy, but that case is distinguishable. As *Oliver* relied on the

10   factual background of the related case *Samsung Electronics Co., Ltd. v. Panasonic Corp.*, 747

11   F.3d at 1201–02, the Court also relies on *Samsung*. In both *Oliver* and *Samsung*, the price-fixing

12   conspiracy involved a group of defendants that had adopted two license agreements, in 2003 and

13   2006, which imposed royalties on non-group member manufacturers of flash memory storage

14   cards ("SD cards"). *Id.* Subsequently, in late 2006, the defendants attempted to enforce the royalty

15   term on the plaintiff, a non-group member. *Id.* In *Samsung*, the Ninth Circuit held that the

16   defendants' 2006 amended license agreement and the defendants' subsequent efforts to enforce the

17   royalty agreement against the plaintiff constituted overt acts that restarted the statute of

18   limitations, notwithstanding the fact that the alleged conspiracy began in 2003. *Id.* In *Oliver*,

19   consumers of the SD cards sued the *Samsung* defendants, alleging, among other theories, a price-

20   fixing conspiracy. 751 F.3d at 1086. The *Oliver* plaintiffs alleged that they purchased SD cards

21   within four years of filing their complaint and that they had been injured by the unlawfully high

22   priced sales at the time of purchase.[13] *Id.* at 1086–87. Applying *Klehr*, the Ninth Circuit concluded

23   that the *Oliver* plaintiffs had alleged both a continuing violation and an overt act within the

24   limitations period. *Id.* at 1086–87.

25

26   [13] Plaintiffs also neglect to mention that the Ninth Circuit in *Oliver* explicitly held that the four
     year statute of limitation in 15 U.S.C. § 15b did not apply to the plaintiffs' claims, as they sought
27   only injunctive relief. 751 F.3d at 1084.

28

United States District Court
Northern District of California

25

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

1    Here, in contrast, there is no allegation that Defendants continued to compensate Plaintiffs

2    at an artificially depressed rate. Unlike in *Samsung* and *Oliver*, where the defendants had

3    continued to enforce the allegedly anticompetitive agreement such that prices continued to be

4    artificially high, the CAC is bereft of any allegations that Defendants continued to abide by or

5    enforce the anti-solicitation scheme or salary ranges such that compensation continued to be

6    artificially low. The continuing violations doctrine requires *both* continuing invasions of a

7    plaintiff's interests *and* an overt act by the defendant. "Any other holding would destroy the

8    function of the statute, since parties may continue indefinitely to receive some benefit as a result

9    of an illegal act performed in the distant past." *Aurora Enterprises v. National Broadcasting Co.*,

10   688 F.2d 689, 694 (9th Cir. 1982). Absent a showing that Defendants took some "new and

11   independent act" that "inflict[ed] new and accumulating injury," the Court concludes that

12   Plaintiffs have failed to adequately allege a continuing violations theory.

13       As a result, the Court concludes that Plaintiffs' claims, as currently alleged, are time

14   barred.

15       **3.  Fraudulent Concealment**

16       Plaintiffs' final argument is that the statute of limitations should be tolled under the

17   fraudulent concealment doctrine.

18       "A statute of limitations may be tolled if the defendant fraudulently concealed the

19   existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did

20   not know of its existence." *Hexcel*, 681 F.3d at 1060. The plaintiff bears the burden of pleading

21   and proving fraudulent concealment. *Id.*; *see also Conmar*, 858 F.2d at 502. To plead fraudulent

22   concealment, the plaintiff must allege that: (1) the defendant took affirmative acts to mislead the

23   plaintiff; (2) the plaintiff did not have "actual or constructive knowledge of the facts giving rise to

24   its claim" as a result of defendant's affirmative acts; and (3) the plaintiff acted diligently in trying

25   to uncover the facts giving rise to its claim. *Hexcel*, 681 F.3d at 1060; *see also Conmar*, 858 F.2d

26   at 502; *Beneficial Life Ins.*, 851 F.2d at 276. Moreover, allegations of fraudulent concealment must

27

28

United States District Court
Northern District of California

26

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

be pled with particularity. *Conmar*, 858 F.2d at 502.

Here, Defendants contend that Plaintiffs have failed to adequately allege any of the three elements of a fraudulent concealment claim. As the Court concludes that Plaintiffs have failed to adequately allege affirmative acts, the Court does not reach Defendants' arguments as to knowledge and diligence.

In the instant case, Plaintiffs contend that they have alleged three categories of conduct that satisfy the element of "affirmative acts": (1) Defendants' secret meetings; (2) Defendants' efforts to "minimize any written record of the conspiracy"; and (3) Defendants' efforts to mislead the public through use of the Croner survey. As to Plaintiffs' three categories of conduct, the Court concludes that these allegations fail to show affirmatively misleading conduct "above and beyond" the alleged conspiracy itself. *See Guerrero v. Gates*, 442 F.3d 697, 706–07 (9th Cir. 2003) (quoting *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000)).[14] As the Ninth Circuit explained in *Conmar*, the fact that a defendant's acts are "by nature self-concealing" is insufficient to show that the defendant has affirmatively misled the plaintiff as to the existence of the plaintiff's claim. *See* 858 F.2d at 505. In doing so, the *Conmar* court concluded that "[p]assive concealment of information is not enough to toll the statute of limitations, unless the defendant had a fiduciary duty to disclose information." *Id.* (internal citation omitted).

Here, the Court finds that the allegation that "Defendants engaged in a secret conspiracy"

---

[14] While Plaintiffs are correct that the Ninth Circuit overruled *Santa Maria* in *Socop-Gonzales v. INS*, 272 F.3d 1176,1194–95 (9th Cir. 2001), the Ninth Circuit did so on other grounds. In *Socop-Gonzales*, the Ninth Circuit held that *Santa Maria*'s suggestion that "courts should not apply equitable tolling in situations where a plaintiff discovers the existence of a claim before the end of a limitations period and the court believes that the plaintiff reasonably could have been expected to bring a claim within the remainder of the limitations period," was contrary to Supreme Court precedent. *Id.*

The *Socop-Gonzales* court did not, however, overrule the general proposition that fraudulent concealment requires some affirmative acts of misconduct "above and beyond" the conduct inherent to the underlying claims themselves. The "above and beyond" language has been cited by the Ninth Circuit approvingly in subsequent cases as an element of fraudulent concealment claims. *See, e.g., Guerrero*, 442 F.3d at 706–07; *Lukovsky v. City and Cnty. of San Francisco*, 535 F.3d 1044, 1052 (9th Cir. 2008); *Coppinger-Martin v. Solis*, 627 F.3d 745, 751 (9th Cir. 2010).

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

does not show that Defendants took "affirmative steps to mislead." *See Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415–16 (9th Cir. 1987). Plaintiffs allege that Defendants' senior human resources directors and senior management discussed the conspiracy in small in-person group meetings, avoided memorializing the scheme in writing, and attempted to keep the conspiracy secret from Plaintiffs. In *Volk*, however, the Ninth Circuit held that merely "passively conceal[ing]" material information is insufficient to toll the statute of limitations. In the instant action, it may be the case that Defendants engaged in a secret conspiracy, but that allegation alone does not show that Defendants affirmatively and fraudulently concealed the existence of Plaintiffs' claims. As in *Volk*, Plaintiffs have failed to "represent any facts indicating an affirmative effort on the part of any [defendant] to mislead them or to conceal the fraud." *Id.*

Moreover, Plaintiffs' failure to aver any affirmative attempts to mislead "above and beyond" the existence of the conspiracy itself is illustrated by *Conmar*. In *Conmar*, the Ninth Circuit found that the defendant's creation and dissemination of false customs forms to mislead the plaintiff, and the "direct public denial of any wrongdoing" could constitute affirmative actions to conceal anticompetitive behavior. 858 F.2d at 505. Here, while Plaintiffs do provide detailed allegations of when and where certain Defendants met and conspired, these allegations do not support the conclusion that Defendants took active, affirmative steps to mislead Plaintiffs about the existence of Plaintiffs' claims. Instead, Plaintiffs' allegations show only that Defendants engaged in a conspiracy, that "by nature [is] self-concealing." *Conmar*, 858 F.2d at 505. That Defendants did not affirmatively disclose the details of their allegedly unlawful conspiracy to Plaintiffs is neither surprising nor sufficient to constitute "affirmative steps to mislead." *See id.* If the mere fact of a secret conspiracy were sufficient to toll the statute of limitations under the fraudulent concealment doctrine, there would be little point in imposing a period of limitation in the first instance. *See, e.g.*, Areeda and Hovencamp, Antitrust Law § 320e ("Of course, regarding every secret conspiracy as sufficiently self-concealing to toll the statute would often force the courts to deal with stale, if not ancient, evidence.").

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1       Moreover, Plaintiffs cite *In re Lithium Ion Batteries Antitrust Litigation*, No. 13-MD-2420,

2   2014 WL 309192, at *16 (N.D. Cal. Jan. 21, 2014), but that case only highlights the insufficiency

3   of Plaintiffs' factual allegations. In *Lithium Ion*, the plaintiffs alleged both that the defendants had

4   made "public, putatively false statements . . . affirming their compliance with applicable antitrust

5   laws, as well as the existence of vigorous price competition in the . . . market," on which plaintiffs

6   could have reasonably relied, and that the defendants had taken affirmative steps to destroy

7   evidence of the conspirators' secret meetings, avoided memorializing conversations, and used

8   secret codes to refer to coconspirators and topics. *Id.*; *see also In re TFT-LCD (Flat Panel)*

9   *Antitrust Litig.*, 586 F. Supp. 2d 1109, 1119 (N.D. Cal. 2008) (defendants provided "numerous

10  specific pretextual reasons for inflated prices" and also kept conspiracy secret); *In re Cathode Ray*

11  *Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1101, 1024–25 (N.D. Cal. 2010) (defendants gave

12  "pretextual reasons for price increases, and coordinated their misleading announcements" and also

13  kept conspiracy secret). These cases, *Lithium Ion*, *TFT-LCD*, and *Cathode Ray*, entailed

14  affirmative, public misrepresentations by the defendants that they were not engaging in

15  anticompetitive conduct, which allegedly misled the plaintiffs as to the existence of the plaintiffs'

16  claims. It was the combination of those misleading, pretextual statements *and* the affirmative

17  efforts taken to destroy evidence of the conspiracy or otherwise keep the conspiracies secret that

18  supported the respective plaintiffs' fraudulent concealment allegations.

19      The above-mentioned cases also illustrate why Plaintiffs' allegations with regards to the

20  Croner survey are lacking. In their opposition, Plaintiffs argue for the first time that because the

21  Croner survey describes itself as providing "competitive compensation information," when the

22  survey actually reported "anticompetitive compensation," Defendants "deliberately

23  misrepresent[ed] their suppressed compensation data as 'competitive.'" Opp. at 17. However, the

24  Court concludes that this allegation is qualitatively different from the public misrepresentations

25  that the defendants made in *Lithium Ion*, *TFT-LCD*, and *Cathode Ray*. *See Lithium Ion*, 2014 WL

26  309192, at *16 (noting "public, putatively false statements by various defendants affirming their

27

28

29

compliance with applicable antitrust laws"); *TFT-LCD*, 586 F. Supp. 2d at 1119 (allegations that defendants provided "numerous specific pretextual reasons for the inflated prices"); *Cathode Ray*, 738 F. Supp. 2d at 1024–25 (allegations that defendants used "misleading announcements" and "gave pretextual reasons for price increases"). As a threshold matter, there are no allegations in the CAC that the compensation information in the Croner survey was publicly accessible, that Defendants were responsible for publishing the Croner survey, or that Defendants publicized the Croner survey as "affirming their compliance with applicable antitrust laws . . . ." *See Lithium Ion*, 2014 WL 309192, at *16. Nor do Plaintiffs allege that Defendants' participation in the Croner survey involved the type of "public statements" at issue in *Cathode Ray*, where the defendants allegedly agreed "on what to tell customers about price changes," and published misleading or pretextual statements on "capacity and supply." 738 F. Supp. 2d at 1025. At bottom, Plaintiffs simply offer no factual allegations with regards to the information in the Croner survey itself, or Plaintiffs' reliance on such information.

Moreover, to the extent Plaintiffs rely on the bare allegation that "Defendants provided pretextual, incomplete or materially false and misleading explanations for hiring, recruiting and compensation decisions made pursuant to the conspiracy," CAC ¶ 130, the Court finds this conclusory allegation insufficient under Rule 9(b). Plaintiffs offer no specific facts showing the "who, what, where, when" of these alleged incomplete or materially false statements. *See Swartz*, 476 F.3d at 764. This allegation would not satisfy *Twombly*, much less the heightened pleading standard in Rule 9(b).

In sum, the Court concludes that Plaintiffs have failed to allege that Defendants took affirmative steps to mislead Plaintiffs as to the factual basis for Plaintiffs' claims. While Plaintiffs are correct as a general matter that Plaintiffs' allegations that Defendants attempted to avoid memorializing the anti-solicitation scheme in order to keep the conspiracy secret may be relevant to Plaintiffs' fraudulent concealment claim, those allegations alone as currently pled are

30

United States District Court
Northern District of California

1  insufficient.[15] Here, the Court finds that Plaintiffs fail to allege facts showing that Defendants did

2  more than passively conceal information. *See Volk*, 816 F.2d at 1416.

3      As Plaintiffs have failed to allege an essential element of fraudulent concealment, and the

4  Court has also concluded that Plaintiffs' claims, as currently alleged, are time barred, the Court

5  grants Defendants' motion to dismiss Plaintiffs' CAC. This dismissal is without prejudice, as the

6  Court concludes that amendment would not necessarily be futile, as Plaintiffs may be able to

7  allege sufficient facts to support their continuing violations claim and their equitable tolling claim.

8  *See Leadsinger*, 512 F.3d at 532.

9      In light of this conclusion, the Court does not reach the remainder of Defendants'

10  arguments in support of their motion to dismiss Plaintiffs' CAC.[16]

11  **IV. CONCLUSION**

12      For the reasons stated above, the Court GRANTS Defendants' motion to dismiss Plaintiffs'

13  CAC. Should Plaintiffs elect to file a Second Amended Complaint curing the deficiencies

14  identified herein, Plaintiffs shall do so within 30 days of the date of this Order. Failure to meet the

15  30-day deadline to file a Second Amended Complaint or failure to cure the deficiencies identified

16  in this Order will result in a dismissal with prejudice. Plaintiffs may not add new causes of action

17  or parties without leave of the Court or stipulation of the parties pursuant to Federal Rule of Civil

18  Procedure 15.

19

20  ---

21  [15] Plaintiffs, in their opposition, raise for the first time the claim that some of the Defendants' requests to seal certain information in the *High-Tech* litigation constituted affirmative efforts to conceal information. As this theory is not pled anywhere in the CAC, the Court declines to

22  entertain this new argument. *See Barnes v. Campbell Soup Co.*, No. 12-05185, 2013 WL 5530017, at *2 (N.D. Cal. July 25, 2013).

23  [16] The Court notes that Defendants request that the Court dismiss or strike Plaintiffs' claim for wage-fixing in the event that the Court does not grant their motion to dismiss. MTD at 18 n.21.

24  That request is denied. Moreover, the Court is concerned by Defendants' contention that "the claim regarding wage-fixing . . . . should not proceed into the discovery phase." *Id*. The Court has

25  not stayed discovery in this action, and at the initial case management conference on November 5, 2014, the Court explicitly denied both Plaintiffs' request to expedite discovery and Defendants'

26  request to stay discovery. ECF No. 39. To the extent Plaintiffs have properly served discovery requests to Defendants regarding Plaintiffs' wage-fixing claims, Defendants must promptly

27  respond.

28

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS

**IT IS SO ORDERED.**

Dated: April 3, 2015

_____
LUCY H. KOH
United States District Judge

Case No.: 14-CV-04062-LHK
ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS