Daniel A. Small (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dsmall@cohenmilstein.com

Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Marc M. Seltzer (54534)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com

[Additional Counsel on Sig. Page]

*Interim Co-Lead Plaintiffs' Counsel*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| IN RE ANIMATION WORKERS ANTITRUST LITIGATION<br><br><br><br><br><br>_____<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS<br>_____ | Master Docket No. 14-cv-4062-LHK<br><br>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT<br><br><br>Date:          September 17, 2015<br>Time:          1:30 p.m.<br>Courtroom:  8<br>Judge:        Hon. Lucy H. Koh |

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................1

II.     ARGUMENT .............................................................................................................2

        A.      Plaintiffs Have Adequately Alleged that Defendants Fraudulently Concealed
                the Conspiracy ...........................................................................................2

                1.      Defendants Took Affirmative Acts to Conceal the Existence of their
                        Conspiracy to Suppress Employee Compensation .........................................3

                        a.      Defendants Made an Affirmative Effort to Mislead Plaintiffs as
                                to the Existence of their Claims................................................4

                        b.      Defendants Took Affirmative Acts to Keep Their
                                Anticompetitive Behavior Secret ......................................................10

                        c.      Plaintiffs' Allegations Toll the Statute of Limitations as to All
                                Defendants...................................................................................15

                        d.      Affirmative Acts of Concealment Need Not be "Above and
                                Beyond" the Underlying Conspiracy to Toll the Statute of
                                Limitations..........................................................................17

                2.      Plaintiffs Had No Actual or Constructive Knowledge of the Conspiracy.....19

        B.      Plaintiffs Allege a Single Conspiracy to Suppress the Compensation of Class
                Members Which is Subject to a *Per Se* Analysis Under the Sherman Act ...............21

        C.      Plaintiffs Adequately and Timely Allege Claims Against Blue Sky and Sony
                Pictures .........................................................................................25

                1.      Blue Sky .............................................................................25

                2.      Sony ...................................................................................28

III.    CONCLUSION ..............................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ........................................................... 26, 27

*Anderson v. Bessemer City*,
  470 U.S. 564 (1985) ........................................................................ 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................ 25

*Bailey v. Glover*,
  88 U.S. 342, 22 L. Ed. 636 (1874) ................................................. 19

*Baker v. F & F Inv.*,
  420 F.2d 1191 (7th Cir. 1970) ................................................... 18, 23

*Barker v. American Mobil Power Corp.*
  64 F.3d 1397 (9th Cir. 1995) .......................................................... 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................. 25, 26, 29

*Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n*,
  620 F.2d 1360 (9th Cir. 1980) ........................................................ 16

*Cervantes v. Countrywide Home Loans, Inc.*,
  656 F.3d 1034 (9th Cir. 2011) ........................................................ 18

*Conmar Corp. v. Mitsui & Co. (U.S.A.)*,
  858 F.2d 499 (9th Cir. 1988) ................................................... passim

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ........................................................................ 24

*E.W. French & Sons, Inc. v. Gen. Portland Inc.*,
  885 F.2d 1392 (9th Cir. 1989) ........................................ 4, 12, 17, 20

*Fenerjian v. Nongshim Co., Ltd.*,
  --- F. Supp. 3d ---, 2014 WL 5685562 (N.D. Cal. Nov. 4, 2014) ............ 21

*Hexcel Corporation v. Ineos Polymers, Inc.*,
  681 F.3d 1055 (9th Cir. 2012) ..................................................... 8, 18

*Hill v. Texaco, Inc.*,
  825 F.2d 333 (11th Cir. 1987) ........................................................ 18

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  No. 06-MD-1175, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ............ 22

*In re Animation Workers Antitrust Litig.*,
  *No. 14-CV-04062-LHK, 2015 WL 1522368 (N.D. Cal. Apr. 3, 2015)* ........... passim

*In re Aspartame Antitrust Litig.*,
  No. CIV.A.2:06-CV-1732, 2007 WL 5215231 (E.D. Pa. Jan. 18, 2007) ............ 18

*In re Capacitors Antitrust Litig.*,
  No. 14-CV-03264-JD, 2015 WL 3398199 (N.D. Cal. May 26, 2015) ............ passim

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  738 F. Supp. 2d 1011 (N.D. Cal. 2010) ..................................... passim

*In re Citric Acid Litig.*,
  191 F.3d 1090 (9th Cir. 1999) ........................................................................................... 23

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
  782 F. Supp. 487 (C.D. Cal. 1991) ............................................................................... passim

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
  906 F.2d 432 (9th Cir. 1990) ............................................................................................. 23

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ........................................................... 14, 19, 23, 26

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ............................. passim

*In re Magnesium Oxide Antitrust Litig.*,
  No. CIV. 10-5943 DRD, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) ................................... 18

*In re Packaged Ice Antitrust Litig.*,
  723 F. Supp. 2d 987 (E.D. Mich. 2010) ............................................................................... 5

*In re Polyurethane Foam Antitrust Litig.*,
  No. 1:10 MD 2196, 2015 WL 520930 (N.D. Ohio Feb. 9, 2015) .................................... passim

*In re Rubber Chemicals Antitrust Litig.*,
  504 F. Supp. 2d 777 (N.D. Cal. 2007) ........................................................................... passim

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008) ............................................................................................. 15

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) ................................................................................ 25

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) ........................................................................................ 22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................................................... 3, 5, 11

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
  No. C 07-05634 CRB, 2011 WL 1753738 (N.D. Cal. May 9, 2011) .................................. 16

*In re Urethane Antitrust Litig.*,
  683 F. Supp. 2d 1214 (D. Kan. 2010) .................................................................................. 5

*In re Vitamins Antitrust Litig.*,
  209 F.R.D. 251 (D.D.C. 2002) ............................................................................................ 22

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) ............................................................................................ 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................................... 27, 28

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) ............................................................................................................ 26

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
  939 F. Supp. 2d 1002 (N.D. Cal. 2013) ............................................................................. 23

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
  967 F. Supp. 2d 1347 (N.D. Cal. 2013) ............................................................................. 28

*Pinney Dock and Transport Co. v. Penn Central Corp.*,
  838 F.2d 1445 (6th Cir. 1988) ............................................................................................ 18

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.,*
  52 F. Supp. 3d 961 (N.D. Cal. 2014) ................................................................................. 7

*Riddell v. Riddell Washington Corp.,*
  866 F.2d 1480 (D.C. Cir. 1989) ............................................................................... 15, 18

*Rutledge v. Boston Woven Hose & Rubber Co.,*
  576 F.2d 248 (9th Cir. 1978) ........................................................................................ 9

*Santa Maria v. Pacific Bell,*
  202 F.3d 1170 (9th Cir. 2000) ..................................................................................... 18

*State of N.Y. v. Hendrickson Bros.,*
  840 F.2d 1065 (2d Cir. 1988) .......................................................................... 9, 15, 18

*State of Tex. v. Allan Constr. Co.,*
  851 F.2d 1526 (5th Cir. 1988) ..................................................................................... 18

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.,*
  71 F.3d 119 (4th Cir. 1995) ............................................................................. 17, 18, 19

*Thorman v. American Seafoods Co.,*
  421 F.3d 1090 (9th Cir. 2005) ...................................................................................... 6

*Transpacific Passenger Air,*
  2011 U.S. Dist. LEXIS 49853  (N.D. Cal. May 9, 2011) ............................................. 16

*United States v. Consol Packaging Corp.,*
  575 F.2d 117 (7th Cir. 1978) ....................................................................................... 24

*United States v. Container Corp.,*
  393 U.S. 333 (1969) ..................................................................................................... 24

*United States v. Edwards,*
  No. 10-cr-145-02, 2011 U.S. Dist. LEXIS 23078 (E.D. Pa. Mar. 8, 2011) ................ 22

*United States v. Hughes,*
  895 F.2d 1135 (6th Cir. 1990) ..................................................................................... 22

*United States v. Smith,*
  320 F.3d 647 (6th Cir. 2003) ....................................................................................... 22

*United States v. Smith,*
  389 F.3d 944 (9th Cir. 2004) ....................................................................................... 17

*Volk v. D.A. Davidson & Co.,*
  816 F.2d 1406 (9th Cir. 1987) .................................................................... 2, 3, 10, 20

**Other Authorities**

Areeda and Hovencamp, Antitrust Law § 320(e) ............................................................ 17

1

**STATEMENT OF ISSUES TO BE DECIDED**

2          1.   Whether plaintiffs have adequately alleged that defendants fraudulently concealed the

3   existence of plaintiffs' cause of action.

4          2.   Whether plaintiffs have adequately alleged a single conspiracy to suppress

5   compensation which is subject to a *per se* analysis under the Sherman Act.

6          3.   Whether plaintiffs have adequately and timely alleged claims against Blue Sky and

7   Sony Pictures.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

In response to the Court's order granting defendants' motion to dismiss plaintiffs' consolidated amended complaint with leave to amend, plaintiffs filed their Second Consolidated Amended Class Action Complaint ("SAC") in which they have directly addressed the aspects of their prior pleading that the Court found to be deficient. With respect to statute of limitations, plaintiffs have alleged in detail the affirmative acts defendants took to mislead the plaintiffs about the absence of collusion over plaintiffs' compensation. Plaintiffs further allege that they did not have actual or constructive knowledge of any of the facts giving rise to their claims until 2013 and that plaintiffs thereafter acted with diligence to uncover those facts. SAC ¶¶ 133-90.

Plaintiffs have alleged that defendants: (a) gave pretextual explanations for their depressed compensation; (b) falsely claimed they were in compliance with antitrust laws; (c) falsely claimed the labor market in which plaintiffs participated was competitive; and (d) took affirmative acts to keep their anticompetitive conduct secret by conspiring at locations outside their offices, limiting communications that would reveal the existence of collusion, and using code words to conceal that collusion. These allegations plainly involve conduct "above and beyond" the alleged conspiracy itself. Plaintiffs respectfully submit they have satisfied the pleading requirements of this Court's order as well as recent decisions from other courts in the Ninth Circuit regarding the sufficiency of fraudulent concealment allegations in antitrust cases. *See, infra*, § II.A.

This case was filed soon after information about the nature and extent of defendants' collusion first became publicly known as a result of this Court's unsealing of evidence adduced in the *In re High-Tech Employee Antitrust Litigation*, and after conducting an investigation including interviews of witnesses prompted by those revelations. Prior to that time, plaintiffs did not have actual or constructive knowledge that their compensation had been artificially depressed as a result of a conspiracy among the defendants. As alleged in the SAC, plaintiffs' lack of knowledge about defendants' conspiracy was due to defendants' cover up of that conspiracy by their misleading statements about the absence of collusion and their affirmative acts of concealment.

None of the defendants except for Blue Sky and Sony argues that plaintiffs have failed to adequately allege the existence of and their participation in the conspiracy that forms the basis of

plaintiffs' claims. Sony and Blue Sky's claim that plaintiffs have failed to adequately allege their participation in the conspiracy is easily refuted. The SAC alleges numerous specific example of their engaging in, and being identified as members of, the conspiracy. While defendants seek to recast plaintiffs' allegations regarding the contours of the conspiracy, the SAC plainly alleges the existence of one conspiracy, the object of which was to suppress compensation. It is inappropriate for defendants to compartmentalize and seek to dismiss one aspect of that conspiracy on the pleadings.

Defendants nonetheless request dismissal of this case at the outset of this litigation based on argument that the Court can adjudicate as a matter of law issues which are inherently fact intensive and not suitable for determination on a motion to dismiss. None of defendants' other arguments justifies dismissing the SAC, as demonstrated below. Plaintiffs respectfully submit, for the reasons set forth below, that they have more than adequately satisfied the pleading standards applicable to this case and that the motion to dismiss should be denied.

## II.   ARGUMENT

### A.   Plaintiffs Have Adequately Alleged that Defendants Fraudulently Concealed the Conspiracy

Plaintiffs' claims are subject to a four-year statute of limitations.[1] Once a cause of action accrues, a defendant's fraudulent concealment of its unlawful conduct tolls the statute of limitations. As this Court ruled, "To plead fraudulent concealment, the plaintiff must allege that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have actual or constructive knowledge of the facts giving rise to its claim as a result of defendant's affirmative acts; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to its claim."[2]

"These are all factual questions."[3] Accordingly, "'*it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the*

---

[1] *In re Animation Workers Antitrust Litig.*, No. 14-CV-04062-LHK, 2015 WL 1522368, at *9 (N.D. Cal. Apr. 3, 2015).

[2] *Id.* at *14 (internal quotation omitted).

[3] *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 782 F. Supp. 487, 489 (C.D. Cal. 1991) (citing *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987)).

*hands of the alleged conspirators*.'"[4] Plaintiffs' fraudulent concealment allegations are more than sufficient to toll the statute of limitations.

### 1. Defendants Took Affirmative Acts to Conceal the Existence of their Conspiracy to Suppress Employee Compensation

In its earlier opinion, this Court recognized that "Plaintiffs allege that Defendants' senior human resources directors and senior management . . . attempted to keep the conspiracy secret from Plaintiffs."[5] This Court held that these allegations were insufficient because: "It was the combination of [1] th[e] misleading, pretextual statements *and* [2] the affirmative efforts taken to destroy evidence of the conspiracy or otherwise keep the conspiracies secret that supported the respective plaintiffs' fraudulent concealment allegations" in prior cases that found fraudulent concealment.[6]

Although this Court's reasoning suggests that plaintiffs adequately alleged defendants' affirmative acts to keep the conspiracy secret, plaintiffs have added copious additional facts on this point. And with respect to defendants' making misleading or pretextual statements, plaintiffs added detailed allegations that the defendants: (a) publicly made false claims that they were complying with antitrust law and that market outcomes were driven by competition, *see* SAC ¶¶ 146-48, 152, 157, 160-63, 166, 169, just as in *In re Lithium Ion Batteries Antitrust Litigation*[7]; and (b) gave plaintiffs false, pretextual explanations for those market outcomes, *see* SAC ¶¶ 147-50, 165, 167-68, just as in *In re TFT-LCD (Flat Panel) Antitrust Litigation*[8] and *In re Cathode Ray Tube (CRT) Antitrust Litigation.*[9] Plaintiffs' new allegations which mirror—and in some respects exceed—these other cases should likewise toll the statute of limitations here. Indeed the combination of both types of

---

[4] *In re Capacitors Antitrust Litig.*, No. 14-CV-03264-JD, 2015 WL 3398199, at *7 (N.D. Cal. May 26, 2015) (emphasis added, bracket omitted) (quoting *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024 (N.D. Cal. 2010)); *see also, e.g.*, *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007) (same).

[5] *Animation Workers*, 2015 WL 1522368 at *15.

[6] *Id.* at *16 (emphasis in original); *cf. Volk*, 816 F.2d at 1416 (fraudulent concealment requires "facts indicating an affirmative effort on the part of any [defendant] to mislead them **_or_** to conceal the [cause of action]" (emphasis added)).

[7] No. 13-MD-2420 YGR, 2014 WL 309192, at *16 (N.D. Cal. Jan. 21, 2014).

[8] 586 F. Supp. 2d 1109, 1119, 1132 (N.D. Cal. 2008).

[9] 738 F. Supp. 2d 1011, 1024–25 (N.D. Cal. 2010).

misleading and pretextual statements along with others makes the case for fraudulent concealment here stronger than in any of those cases.

### a. Defendants Made an Affirmative Effort to Mislead Plaintiffs as to the Existence of their Claims

The SAC alleges "affirmative, public misrepresentations by the defendants that they were not engaging in anticompetitive conduct."[10] *See* SAC ¶¶ 144-82. Defendants repeatedly assured class members that compensation was being set based on a freely competitive market, while—in truth—the market was actually being restrained by defendants' conspiracy. Defendants' misleading assurances included pretextual explanations why compensation levels were depressed and repeated claims that the market for talent was competitive—that is, free from collusive restraint. Defendants then reinforced these misleading statements by proclaiming, falsely, that they were complying with antitrust law. With their anticompetitive conduct cloaked in a veil of secrecy, defendants' misinformation campaign successfully concealed the industry-wide conspiracy for years.

**Pretextual Explanations Concerning Salaries and Offers.** The Ninth Circuit has recognized that claiming the harmful effects of anticompetitive behavior were caused by "competition" is pretext that constitutes fraudulent concealment. In *E.W. French & Sons, Inc. v. General Portland, Inc.*, it held that a reasonable jury could conclude defendants sought to fraudulently conceal their price-fixing agreement by "attribut[ing] the [price] uniformity to competition, not price-fixing."[11] District courts in this Circuit routinely deny motions to dismiss on the same theory.[12]

Here, defendants misled plaintiffs about the existence of their claims by offering pretextual explanations for their depressed compensation. *See, e.g.*, SAC ¶ 147 (salaries are competitively set based on independent market surveys, not collusion); *id.* ¶ 148 (modest raise necessary to avoid pricing themselves out of market, not agreements on salaries with competitors); *id.* ¶ 149 (limitations

---

[10] *Animation Workers*, 2015 WL 1522368 at *16.

[11] 885 F.2d 1392, 1399-1400 (9th Cir. 1989).

[12] *See Animation Workers*, 2015 WL 1522368 at *16 ("*Lithium Ion*, *TFT–LCD*, and *Cathode Ray*, entailed affirmative, public misrepresentations by the defendants that they were not engaging in anticompetitive conduct, which allegedly misled the plaintiffs as to the existence of the plaintiffs' claims.").

set on salaries attributed to expanded benefits programs, not non-solicitation agreements and wage-fixing); *id.* ¶ 165 (lack of counter offer attributed to company's policy "to recognize one's talent from the start," not collusion). These statements affirmatively attributed compensation outcomes to competition and the free market (directly at odds with the concealed conspiracy) and are allegations indistinguishable from those that other courts have credited when denying motions to dismiss.[13]

Defendants' characterization of these allegations as a mere failure to disclose is wrong.  Mot. at 8-9.  Defendants could have remained silent and not sought to mollify employees that compensation was being set by industry competition, but they chose not to and instead offered pretextual explanations to hide their illegal collusion. "Such statements are affirmative acts of concealment, separate from the alleged [wage]-fixing itself."[14]

Pixar's "talking points" memo and email campaign powerfully illustrates defendants' efforts to misrepresent that competition controlled compensation decisions—not defendants' conspiracy. Seeking to mask that the ongoing conspiracy was artificially depressing compensation, Lori McAdams drafted talking points instructing managers to reassure employees that salaries were "competitive" and that modest raises were attributable to "an effort to make room to fund additional

---

[13] *See, e.g.*, *Cathode Ray*, 738 F. Supp. 2d at 1024 (denying motion to dismiss where plaintiffs alleged defendants "gave pretextual reasons for price increases," including by blaming "price increases in 2004 on a shortage of glass shells"); *TFT-LCD*, 586 F. Supp. 2d at 1119, 1132 (denying motion to dismiss direct purchaser complaint where plaintiffs alleged defendants gave "pretextual reasons for the inflated prices of LCDs," including by blaming increases on "undercapitalization," "undersupply," "shortages," and "rapid demand growth"; denying motion to dismiss indirect purchaser complaint where plaintiffs alleged "numerous pretextual and false justifications disseminated to consumers regarding defendants' price increases"); *Rubber Chemicals*, 504 F. Supp. 2d at 788 (denying motion to dismiss where plaintiffs alleged defendants gave "pretextual justifications for the inflated prices of rubber chemicals" by blaming price increases on increases in the cost of energy and raw materials); *accord, e.g.*, *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1234 (D. Kan. 2010) (denying motion to dismiss where plaintiffs alleged "false and pretextual letters and announcements regarding price increases"); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1018 (E.D. Mich. 2010) (denying motion to dismiss where defendants stated prices were "based upon legitimate business purposes, such as increased costs").

[14] *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 WL 520930, at *35 (N.D. Ohio Feb. 9, 2015) (denying summary judgment where defendants offered allegedly pretextual reasons for price increases); *accord Urethane*, 683 F. Supp. 2d at 1235 ("[D]efendants did not simply deny the existence of a conspiracy; rather, plaintiffs have alleged that defendants made affirmative misrepresentations about the true causes of price increases.").

benefits programs."[15] SAC ¶ 149. Ed Catmull then took the additional step of sending a company-wide email reiterating the same. *Id.* Along with other pretextual explanations, defendants mounted a well-orchestrated and successful misinformation campaign to fraudulently conceal their misconduct.

**False Claims that the Labor Market Was Competitive.** Defendants also affirmatively misled plaintiffs by publicly reassuring them that the labor market was competitive when the opposite was true. In *Lithium Ion*, the court denied a motion to dismiss where plaintiffs alleged—almost identical to plaintiffs here—that defendants had falsely proclaimed the existence of "harsh" and "intensifying global competition."[16] *See, e.g.*, SAC ¶ 146 (claiming companies paid "competitive salar[ies]" or "competitive compensation"); *id.* ¶ 148 (instructing managers to tell employees Pixar's goal was to keep salaries "competitive"); *id.* ¶ 169 (newspaper interview describing "stiff competition" for talent and "stepped up recruiting"); ¶ 163 (SEC filing claiming "compet[ition] with other animated film and visual effects studios for artists, animators, directors and producers"); ¶ 161 (10-K stating "[c]ompetition for the caliber of talent required to make our films, particularly our film directors, producers, animators, creative personnel and technical directors, will continue to intensify"). Although defendants again offer their own, self-serving interpretation of these statements—that no jury will believe and with which plaintiffs obviously disagree—the allegations clearly suffice to toll the statute of limitations.

**Falsely Claiming Compliance with Antitrust Laws.** Courts have also recognized as affirmatively misleading, and thus fraudulently concealing, defendants' "public, putatively false

---

[15] These and similar allegations underscore why defendants' reliance on *Thorman v. American Seafoods Company* is misplaced. There, when plaintiff alleged fraudulent concealment evidenced by the fact that "American Seafoods *made no effort to describe how it set posted prices*," the Ninth Circuit correctly responded that "[m]erely keeping someone in the dark is not the same as affirmatively misleading them." 421 F.3d 1090, 1096 (9th Cir. 2005) (emphasis added). But here, plaintiffs allege exactly the opposite: that defendants told their employees, falsely, that salaries were set by "the market" and "outside surveys."

[16] *Compare Lithium Ion*, 2014 WL 309192 at *16 ("Plaintiffs' allegations suffice for purposes of the pleading stage. The complaints allege public, putatively false statements by various defendants affirming . . . the existence of vigorous price competition in the lithium ion battery market (DPP–CAC ¶ 214"), *with* Direct Purchaser Plaintiffs' CAC ¶ 214, *Lithium Ion*, 2014 WL 309192 (Dkt. 257) ("Panasonic stated in its 2005 Annual Report that, '[a]mid intensifying global competition in the rechargeable battery market, the Company focuses management resources on lithium-ion batteries.'" "In 2010, Panasonic stated that '[w]e anticipate the harsh price competition with South Korean makers will continue.'").

statements . . . affirming their compliance with applicable antitrust laws."[17] Here, the SAC alleges that defendants affirmatively misled plaintiffs by falsely proclaiming compliance with applicable antitrust, employment, and privacy laws. *See, e.g.*, SAC ¶ 152 (all officers and employees "must comply with all applicable governmental laws, rules and regulations"); *id.* ¶ 156 ("any decisions related to hiring, evaluating performance, promoting, disciplining or terminating Cast Members and employees are made fairly, with discretion and respect for privacy."); *id.* ¶ 157 ("Don't enter into any agreements or understanding, whether formal or informal, with a competitor, customer or supplier to: set prices or price-related terms"); *id.* ¶ 159-60 (claiming "compliance with all applicable competition laws, including those involving the hiring of Plaintiffs and Class members"). Nearly-identical allegations sufficed to defeat a motion to dismiss in *Lithium Ion*, where the court credited allegations, just like plaintiffs' allegations here, that defendants had falsely affirmed compliance with antitrust laws ***in their public codes of conduct***.[18]

Defendants' arguments downplaying the misleading nature of these statements are easily rejected. Defendants assert that their codes of conduct are not misleading because they "do not say anything . . . about the process by which plaintiffs' salaries were determined"—but this is a straw man: the SAC alleges the codes of conduct were misleading because they falsely stated defendants were complying with antitrust laws. And defendants' reliance on *Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Company*[19] is misplaced because a case holding that misleading codes of conduct do not give rise to a cause of action under the securities laws does not change the fact that such codes ***can*** fraudulently conceal an antitrust violation. Finally, to the extent defendants claim the statements themselves "would not mislead plaintiffs about the alleged conspiracy," the argument simply highlights a disputed question of fact that cannot be resolved on the pleadings.

---

[17] *Lithium Ion*, 2014 WL 309192 at *16.

[18] *Id.* ("The complaints allege public, putatively false statements by various defendants affirming their compliance with applicable antitrust laws (IPP–CAC ¶ 273)."); Indirect Purchaser Plaintiffs' CAC ¶ 273, *Lithium Ion*, 2014 WL 309192 (Dkt. 256) ("In its 'Global Code of Conduct' . . . Samsung publicly stated that it 'will not enter into price fixing, bid collusion, market collusion or reduced production agreements with competitors").

[19] 52 F. Supp. 3d 961, 969 (N.D. Cal. 2014).

**Specious Legal Claims.** In addition to being unpersuasive, defendants' implicit claim that the above disputes of fact should be resolved in their favor on a motion to dismiss is simply wrong as a matter of law. As this Court recognized, on a motion to dismiss it must instead accept the allegations contained in the complaint.[20] In addition to this general legal error, defendants make four other specious legal claims.

First, defendants assert that the complaint must allege that the *purpose* of the misleading or pretextual statements was to mislead plaintiffs not to pursue their claims. Mot. at 8. Nothing in this Court's prior opinion supports this assertion. Nor is it supported by the *Hexcel Corporation v. Ineos Polymers, Inc.* case defendants cite, which is not an active concealment case and which never even uses the word "purpose." All *Hexcel* stated on the cited page was that the fraudulent statements must "keep the plaintiff unaware of his cause of action," not that this must be the purpose of each fraudulent statement.[21] Other cases have expressly held that "[t]he proper focus . . . is not whether the intent was to conceal the information from plaintiffs, but whether the 'concealment . . . prevented plaintiff from being alerted.'"[22] But even if defendants were correct, the allegations detailed above suffice to plausibly infer a purpose to mislead plaintiffs.

Second, defendants assert that the complaint must allege that defendants conspired to produce the misleading and pretextual statements. Mot. at 9-10. Defendants' attempt to convert the fraudulent concealment doctrine into a conspiracy-to-fraudulently-conceal doctrine is wholly unsupported. While this Court and the *Cathode Ray* decision concluded that such evidence would suffice to establish fraudulent concealment, neither held that pleading the existence of a separate conspiracy was necessary. Defendants' argument also ignores the well-settled rule, discussed below, that participation by each conspirator in every detail of the conspiracy is unnecessary, and thus that acts

---

[20] *Animation Workers*, 2015 WL 1522368 at *8.

[21] 681 F.3d 1055, 1060 (9th Cir. 2012) (internal quotation omitted).

[22] *Coordinated Pretrial Proceedings*, 782 F. Supp. at 490 (brackets omitted) (quoting *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 505 (9th Cir. 1988)) (rejecting as meritless the argument "that even if there were affirmative acts, they were not designed to conceal conduct from plaintiffs").

of concealment by one coconspirator are imputed to the other conspirators.[23] In any event, although plaintiffs did not use the talismanic phrase "by agreeing" at the beginning of each of their fraudulent concealment allegations, as the *Cathode Ray* plaintiffs did,[24] a fair reading of the SAC shows just that. *See* SAC ¶¶ 133-82.

Third, defendants repeatedly reject allegations that certain statements were misleading or pretextual on the ground that the allegation did not establish that the statements were literally false. Mot. at 10-13. But there is no legal rule requiring proof of actual falsity on the pleadings. As this Court held, the statement must instead be either "misleading" or "pretextual."[25] The reason need not be literally false as long as it is an incomplete or make-weight reason given to hide the actual or full reason. In any event, here the SAC does allege that defendants made literally false statements, such as the statements that they were complying with antitrust laws, that salaries were being set by competition, and that the reason for the depressed pay was an expansion of employee benefits.

Finally, defendants assert that the SAC must be dismissed because plaintiffs have failed to meet "fraudulent concealment's reliance requirement." Mot. at 13-14. The argument is meritless. As a threshold matter, defendants cite only out-of-circuit, district court authority to support their claim because **there is no such thing as the "fraudulent concealment[] reliance requirement" in the Ninth Circuit**. Instead, "the plaintiff must allege facts showing affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead *a reasonable person* to believe that he did not have a claim for relief."[26] Reliance is only a question when a defendant affirmatively denies wrongdoing, and even then, the question is not whether a plaintiff actually relied on the

---

[23] *See, e.g.*, *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1085 (2d Cir. 1988) ("Given the continuation of the two conspiracies and the fact that secrecy was essential to their continued existence, it was entirely appropriate for the court to allow use of the Amfar defendants' actions against the other coconspirators—*even if the latter did not know of the actions*—since they were acts in furtherance of the conspiracies." (emphasis added)).

[24] *See* Indirect Purchaser Plaintiffs' Consolidated Amended Complaint ¶ 290, *Cathode Ray*, 738 F. Supp. 2d 1011 (Dkt. 437).

[25] *Animation Workers*, 2015 WL 1522368 at *16.

[26] *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978) (emphasis added).

denial, but whether it would be ***reasonable for a plaintiff to have relied on the denial***.[27]

In addition, notwithstanding defendants' suggestion to the contrary, the SAC does allege that plaintiffs "relied on" the foregoing misrepresentations (SAC ¶ 164), and that many of the misrepresentations were made directly to Class Members (*id.* ¶¶ 146-47, 150, 165, 167). As in *Lithium Ion,* "[n]othing in [the] complaint suggests that it would have been unreasonable for Plaintiffs to take these statements at face value prior to the [December 2010] disclosure of the Justice Department's investigation into alleged [wage]-fixing in Defendants' industry."[28] After all, "[t]his is not a situation in which [defendant] simply failed to own up to illegal conduct upon a timid inquiry from the already suspicious plaintiff, but rather a direct public denial of any wrongdoing before sufficient facts existed to make [plaintiffs] suspicious."[29]

### b.   Defendants Took Affirmative Acts to Keep Their Anticompetitive Behavior Secret

Defendants also fraudulently concealed plaintiffs' cause of action by taking affirmative steps "to destroy evidence of the conspiracy or otherwise keep the conspirac[y] secret."[30]

Although the Ninth Circuit has noted that "silence or passive conduct" does not constitute fraudulent concealment, defendants are wrong to equate affirmative acts of secrecy with "silence or passive conduct." *See* Mot. at 4-5. Indeed, the Ninth Circuit has defined "passive conduct" to mean simply the failure to disclose.[31] ***But ensuring that information remains a secret is not the same as failing to disclose that secret***: whereas failing to disclose a meeting passively conceals the contact, ensuring the meeting takes place in-person, with few attendees, who are instructed not to take notes, actively conceals that contact.

While defendants ignore this distinction, it has not been lost on courts, which have found

---

[27] *See Conmar Corp. v. Mitsui & Co. (U.S.A.),* 858 F.2d 499, 505 (9th Cir. 1988) (holding that it was reasonable to rely on denial to the press).

[28] *Lithium Ion,* 2014 WL 309192 at *16. And even this disclosure suggested collusion between just two defendants, Pixar and Lucasfilm.

[29] *Conmar,* 858 F.2d at 505.

[30] *Animation Workers,* 2015 WL 1522368 at *16.

[31] *See, e.g., Volk,* 816 F.2d at 1416 ("[A]ppellees passively concealed the reports by not disclosing them to the investors.").

active concealment where defendants "took steps to keep their meetings secret,"[32] attended "secret meetings to set prices,"[33] and "concealed their price-fixing conspiracy through secret discussions about price and output."[34] The SAC's allegations that defendants kept their conspiracy secret by carrying it out through secret meetings, away from their places of business, with few, high-level attendees are indistinguishable from the allegations in those cases that found fraudulent concealment. *See, e.g.*, SAC ¶ 89 ("they discussed, agreed upon, and set wages and salary ranges during meals, drinks and other social gatherings that they held outside of the official Croner meeting"; "the survey meeting 'presents an opportunity for an intimate group of us to get together'"; "These meetings provided the officials an opportunity to discussion compensation ranges in a private setting."); *id.* ¶ 143 ("In lieu of emails, McAdams opted for in-person meetings, including a dinner she held with Lucasfilm's Jan Van der Voort on June 24, 2008, wherein she planned "to ask her about their merit increase budget for 2009.").

Similar considerations have led this Court, and others, to recognize that "allegations that Defendants attempted to avoid memorializing the anti-solicitation scheme in order to keep the conspiracy secret may be relevant to Plaintiffs' fraudulent concealment claim."[35] As another court held, "Defendants' suggestion that the failure to make written records is not an affirmative act is nothing more than semantic quibbling."[36] Here, the SAC alleges defendants did just that. *See, e.g.*, SAC ¶ 139 ("the agreement was termed a 'gentleman's agreement' . . . because it was not written down"); *id.* ¶ 141 ("he never saw anything in writing to document it;" "head recruiter[] told him it was unsaid and certainly not in writing"). Plaintiffs' allegations are again indistinguishable from those that have been credited elsewhere: agreeing not to write down the terms of an anti-solicitation

[32] *Cathode Ray*, 738 F. Supp. 2d at 1024 (active concealment where plaintiffs alleged defendants had "organized Glass Meetings to avoid detection" and had agreed "to limit the number of representatives from each Defendant attending the meetings as to avoid detection").

[33] *Rubber Chemicals*, 504 F. Supp. 2d at 788 (active concealment where plaintiffs alleged defendants sought to conspire in a "secluded location, either in a Hotel or at a hired meeting room").

[34] *TFT-LCD*, 586 F. Supp. 2d at 1132 (active concealment where plaintiffs alleged "defendants had secret discussion about price and output").

[35] *Animation Workers*, 2015 WL 1522368 at *16); *see also, e.g.*, *Lithium Ion*, 2014 WL 309192 at *16 (active concealment based on allegations that defendants "instruct[ed] personnel to refrain from memorializing conversations").

[36] *Coordinated Pretrial Proceedings*, 782 F. Supp. at 491.

agreement is directly analogous to passing price information through "plain white envelopes,"[37] and telling a coconspirator the agreement is "unsaid and certainly not in writing" is no different than saying "never leave any written [] evidence."[38]

Relatedly, courts have also found active concealment based on allegations that defendants attempted to avoid discussing their anticompetitive conduct in discoverable materials.[39] Such allegations demonstrate fraudulent concealment because they show defendants sought to "minimize[] the risk that a grand jury subpoena or private litigant using discovery would uncover the communications or that a 'whistleblower' employee might see the records and report the matter."[40] Plaintiffs have adequately pleaded such concealment here. *See, e.g.*, SAC ¶ 137 ("Blue Sky employees stated that the issue 'needs to be a phone conversation' due to the 'sensitivity' of the subject."); *id.* ¶ 138 ("'DNR questions CALL Steve. If you see an email forward to Steve and one of our lawyers.'"); *id.* ¶ 140 ("Defendants also communicated about the conspiracy using their personal email accounts instead of their official employer accounts").

Defendants' attack on these allegations all amount to disputed claims that these facts should be interpreted in some other way, which is irrelevant on a motion to dismiss. Those disputed claims are also unpersuasive. The fact that the "needs to be a phone conversation" email itself created a paper trail is beside the point: even though that particular conversation ended up in email, the statement still plausibly demonstrates that Blue Sky sought to keep even more incriminating discussions about its anticompetitive conduct from occurring over email. Indeed, an email stating this "needs to be a phone conversation" is indistinguishable from an email stating "this is not something we can discuss via-email," which was credited as active concealment in *Rubber Chemicals*.[41] If defendants were right that a plan to eliminate a paper trail cannot be proven using

---

[37] *E.W. French & Sons*, 885 F.2d at 1399.

[38] *Lithium Ion*, 2014 WL 309192 at *16 (citing Direct Purchaser Plaintiffs' Complaint ¶ 217).

[39] *See, e.g.*, *Rubber Chemicals*, 504 F. Supp. 2d at 778 (allegations showing "agreement not to publicly discuss the nature of the conspiracy" demonstrated active concealment, where plaintiffs pointed to **inter-company** email stating "this is not something we can discuss via E mail").

[40] *Coordinated Pretrial Proceedings*, 782 F. Supp. at 490 (denying summary judgment where defendants used "leased WATS lines" so "no telephone company record of the call would be made").

[41] *See*, *supra*, note 39.

documents, then the only proof would be oral conversations that ordinarily are unavailable to plaintiffs before deposition discovery and are very difficult to obtain even then. It is also eminently plausible that the sender heeded her own warning and reserved unspoken topics for a later phone conversation, when the recipient was not "in a car full of people"—after all, she never received an answer to her question via email, as the recipient replied, "Hold a beat on your question until I get back."[42]

Defendants' characterization of the "DNR" document is similarly unpersuasive. Even though the face of that document says, "DNR questions CALL Steve," defendants inexplicably proclaim that the document "does *not* suggest that Lucasfilm . . . was instructing employees to call Steve *instead* of writing him." Mot. at 6 (first emphasis added). But that is exactly what it says, with "CALL" in capital letters. And although defendants again claim that forwarding "DNR" emails would expand the paper trail, it is just as plausible, if not more plausible, that the instruction to forward such emails to **counsel** would help ensure that the emails ended up never produced due to assertions of the attorney-client privilege. Finally, claiming that the use of personal email somehow "contradicts" plaintiffs' allegation that email was to be avoided simply misapprehends the allegation: the point is precisely that personal email, unlike work email, is not easily discoverable.[43] These are all disputed fact issues for a jury to decide.

Courts have also held that using code to refer to an unlawful conspiracy shows an affirmative effort to fraudulently conceal it.[44] The SAC specifically alleges that defendants used code to speak about the conspiracy alleged in this case. *See, e.g.*, SAC ¶ 61 ("Walt Disney Animation Studios'

---

[42] Defendants' characterization of the email asks the Court to reject plaintiffs' plausible inferences. The request for a phone conversation was not motivated by time—email is instantaneous—but by a desire to avoid discussing by email "efforts to recruit" a Sony employee. The author seeks to "make sure everyone is comfortable" with the efforts to recruit a competitor's employee and notes that she has been "reiterating the sensitivity" of the issue. The inference is that the "sensitivity" of the efforts is due to the existence of the illegal agreement not to solicit.

[43] *See Polyurethane Foam*, 2015 WL 520930 at *33 (denying summary judgment where "active-concealment evidence" showed "Defendants would occasionally send or receive PIAs using personal email accounts").

[44] *See, e.g.*, *Capacitors*, 2015 WL 3398199 at *15 (denying motion to dismiss where defendant "used 'Company N' as code name to refer to NEC TOKIN"); *Lithium Ion*, 2014 WL 309192 at *16 (denying motion to dismiss where defendants used "code to refer to particular entities or topics" such as "P Company" for Panasonic and "D Company" for Samsung).

Director of Animation Resources asked ILM to observe "the Gentlewomen's agreement" concerning the recruiting of digital artists at Disney in 2006."); *id.* ¶ 138 ("DNR questions CALL Steve"). Referring to the antisolicitation agreement as simply "the Gentlewomen's agreement" (or "Gentlemen's agreement") enabled defendants to communicate about the conspiracy without needing to continually rehash its terms in written communications. Coding it the relatively-innocuous "Gentlewomen's agreement" also served to deflect any suspicions of illegality.[45]

The same is true of defendants' use of the "DNR" code: whereas documents discussing a "do not recruit" agreement might be considered transparent, using the code term "DNR" is not. Indeed, although defendants contend that it "strain[s] credulity" to characterize "DNR" as a code name, rather than as an acronym, Mot. at 6 n. 6, using "DNR" as short-hand for "Do Not Recruit" is much more concealing than using "P Company" as a short-hand for "Panasonic" or "N Company" as a short-hand for NEC—which were said to be fraudulently concealing code in *Lithium Ion* and *Capacitors*. In any event, defendants' acronym versus code name argument is for the jury, not for a motion on the pleadings.

Set against these myriad acts of concealment is defendants' suggestion that the conspiracy was not, in fact, a secret because Pixar's General Manager apparently provided deposition testimony in *High-Tech* in which he stated that he had discussed "Pixar's 'gentleman's agreement' with Lucasfilm . . . in a 2008 presentation to an auditorium of Pixar interns that was videotaped and thereafter 'ma[d]e available to employees for training purposes.'" Mot. at 5 n. 4. But this new evidence, which is not alleged in the SAC, and cannot be considered on a motion to dismiss without converting it into a motion for summary judgment, supports—not undercuts—denying the motion. That same deposition also reveals that the portion of the recording in which Mr. Morris claims that he referenced the "gentleman's agreement" was later ***deleted*** from that recording. And Mr. Morris was unable to explain in that deposition when or why it was deleted. Accordingly, even without plaintiffs having had an opportunity to depose Mr. Morris, or any other Pixar witnesses in this case,

---

[45] *Accord Polyurethane Foam*, 2015 WL 520930 at *33 (denying summary judgment where "Defendants used shorthand or code to refer to competitor employees and price discussions": "When [they] talked about '[o]ur favorite issue,' they talked about prices").

this evidence outside the four corners of the SAC (even if improperly considered on a motion to dismiss) renders it plausible that Pixar's doctored video fraudulently concealed the existence of plaintiffs' claims.[46] This disputed issue of fact alone warrants the dismissal of defendants' motion.

Finally, defendants dismiss the allegations of affirmative efforts to keep the conspiracy secret on two grounds. First, defendants claim that alleging affirmative efforts to keep a conspiracy secret requires alleging the destruction of evidence. Mot. at 7. In reality, as this Court recognized, the cases hold that this prong requires alleging "affirmative efforts taken to destroy evidence of the conspiracy *or otherwise keep the conspiracies secret*."[47] Moreover, apparently there is evidence available in discovery from which a jury can reasonably infer that Pixar did destroy evidence of their conspiracy by deleting portions of the Morris video. Second, defendants argue against a straw man by falsely claiming that plaintiffs argue that affirmative efforts to keep the conspiracy secret suffice to show fraudulent concealment. Mot. at 7. In fact, plaintiffs couple such allegations with detailed allegations of misleading and pretextual statements, as detailed in the previous section.

### c.   Plaintiffs' Allegations Toll the Statute of Limitations as to All Defendants

The foregoing sections show that the SAC adequately alleges defendants took affirmative acts to prevent plaintiffs from having notice of their claims, both by making misleading representations to plaintiffs and by concealing their anticompetitive conduct. Nevertheless, Sony, Blue Sky, and Two Pic argue that the SAC's allegations are insufficient to toll the statute of limitations as to them specifically. *See* Mot. at 22-23. Not so.

***Every appellate court to decide the issue has held that the fraudulent concealment of a conspiracy "may be established through the acts of co-conspirators."***[48] As a result, every act of

---

[46] *See Rubber Chemicals*, 504 F. Supp. 2d at 778 (active concealment based on allegations that defendants destroyed "documents that might evidence their actions"); *Coordinated Pretrial Proceedings*, 782 F. Supp. at 491 (active concealment based on "evidence that, if a document reflected information which could later be damaging in an antitrust suit, defendants' common practice was either to redraft the document . . . or to destroy it.").

[47] *Animation Workers*, 2015 WL 1522368 at *16 (emphasis added).

[48] *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008); *see also Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989) ("[A]ffirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators for purposes of tolling the statute of limitations"); *Hendrickson Bros.*, 840 F.2d at 1085 ("Given the continuation of the two conspiracies and the fact that secrecy was essential to their continued existence, it was entirely

concealment by one of the defendants is attributable to each of the other defendants. This follows from the joint and several liability that applies to antitrust conspiracies.

Defendants rely on the Ninth Circuit's opinion in *Barker v. American Mobil Power Corporation* to suggest that Plaintiffs need to plead affirmative acts by each individual defendant. Mot. at 22. But *Barker* is distinguishable. At issue in *Barker* was the proper interpretation of the statutorily-defined "fraud or concealment" exception to the Employee Retirement Income Security Act ("ERISA") statute of limitations.[49] And unlike antitrust conspiracies, ERISA does not allow for joint and several liability and does not hold a defendant "liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of the appellees' own actions."[50] For this very reason—that "'[p]articipation by each conspirator in every detail of the conspiracy is unnecessary'"—Judge Breyer rejected the same argument in *In re Transpacific Passenger Air Transportation Antitrust Litigation.*[51]

Regardless, it is simply not true that plaintiffs failed to allege acts of fraudulent concealment by Sony, Blue Sky, or Two Pic: among other things, the SAC alleges that they agreed not to put the terms of their anticompetitive agreements in writing; used short-hand or code to refer to those agreements; conspired at in-person, offsite meetings, which they limited to principals only; used phone calls and personal email accounts to avoid a paper trail; falsely represented to plaintiffs that compensation was "fair" and "competitive"; and publicly affirmed their compliance with competition laws.[52]

---

appropriate for the court to allow use of the Amfar defendants' actions against the other coconspirators—***even if the latter did not know of the actions***—since they were acts in furtherance of the conspiracies." (emphasis added)); *see also In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2011 WL 1753738, at *21 (N.D. Cal. May 9, 2011) ("[T]he Court is not swayed by [the] argument, that the fraudulent concealment claims fail because they make no specific allegations of fraudulent concealment by Air New Zealand and Malaysian Airlines.").

[49] 64 F.3d 1397, 1400-01 (9th Cir. 1995). In the twenty years since *Barker* was decided, the Ninth Circuit has never mentioned it, let alone applied it, outside of the ERISA context.

[50] *Beltz Travel Service, Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980).

[51] *Transpacific Passenger Air*, 2011 WL 1753738 at 75 n. 22 (N.D. Cal. May 9, 2011) (quoting *Beltz*, 620 F.2d at 1367).

[52] *See, e.g.*, SAC¶ 5 (Sony, Blue Sky enter "gentleman's agreement"); ¶ 65-67 (Sony and Pixar reach "gentleman's agreement" during in-person meeting; Pixar and Sony discuss agreement "in person and over the phone"); ¶ 76 (Two Pic and Pixar executives have one-on-one meeting to form

### d. Affirmative Acts of Concealment Need Not be "Above and Beyond" the Underlying Conspiracy to Toll the Statute of Limitations

Finally, while it is unnecessary to do so to uphold the SAC, plaintiffs invite the Court to reconsider its prior holding that plaintiffs must "show affirmatively misleading conduct 'above and beyond' the alleged conspiracy itself" and thus that allegations showing defendants engaged in a secret conspiracy "do[] not show that Defendants took 'affirmative steps to mislead.'"[53] There are four independently dispositive reasons to reject the "above and beyond" standard in an antitrust conspiracy case and credit as fraudulently concealing a defendant's affirmative acts to keep its underlying anticompetitive conduct a secret.

*First*, the Ninth Circuit has routinely found fraudulent concealment in the antitrust context where acts of concealment were intertwined with a defendant's underlying anticompetitive behavior.[54] *Second*, the Ninth Circuit is not alone in rejecting the "above and beyond" standard, as the Second, Fourth, Fifth, Sixth, Seventh, Eleventh, and District of Columbia Circuits have all explicitly rejected the argument that an antitrust plaintiff must show acts of concealment above and

---

no-raid agreement); ¶ 79 (Lucas and Two Pic "gentlemen's agreement"); ¶ 88-89 (Senior employees at Sony, Blue Sky, Two Pic attended "intimate" offsite meetings to set wages "in a private setting"); ¶ 135 (Defendants "engaged in a secret conspiracy"; they "intentionally kept the meetings 'to principals' only"); ¶ 136 (Defendants "avoided discussing the agreements in written documents"); ¶ 137 (Sony executive tells colleague that discussion of recruiting restrictions with Sony "needs to be a phone conversation"); ¶ 139 (Two Pic Director of HR, Sharon Coker, said "the agreement was termed a 'gentleman's agreement' . . . because it was not written down."); ¶ 140 (Sharon Coker testified that she contacted co-conspirator using personal email); ¶ 146 (Defendants "consistently represented to Class members that their compensation was 'fair' and 'competitive'"); ¶ 159 (Defendants "misled their employees in public filings . . . wherein Defendants claimed to be in compliance with all applicable competition laws").

[53] *Animation Workers*, 2015 WL 1522368 at *15. "*All rulings of a trial court are subject to revision at any time before the entry of judgment*." *United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) (emphasis in original, internal quotation omitted).

[54] *See, e.g., Conmar*, 858 F.2d at 505 (holding "the filing of false custom forms was affirmative conduct sufficient for a finding of fraudulent concealment," where defendant violated the Clayton Act by dumping steel products in the United States "using false customs reports"); *E.W. French & Sons*, 885 F.2d at 1399 (holding a reasonable jury could conclude that "alleged use of 'plain white envelopes' to mail pricing information to [] competitors" constituted fraudulent concealment, where defendant conspired to fix prices by "mailing discount and price information to its competitors in 'plain white envelopes'"); *accord Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 125–26 (4th Cir. 1995) (*Conmar* "implicitly rejected the separate and apart standard and held instead that affirmative acts in furtherance of a conspiracy provide sufficient evidence of fraudulent concealment to establish the first element of the fraudulent concealment test."); Areeda and Hovencamp, Antitrust Law § 320(e) (citing *E.W. French & Sons* for the proposition that "If the efforts to disguise illegal activity are elaborate, fraudulent concealment is readily found").

PLS.' OPP'N TO MOT. TO DISMISS
No: 14-cv-4062-LHK

beyond the acts underlying the conspiracy itself.[55] _Third_, defendants do not cite a single antitrust case applying an "above and beyond" standard to fraudulent concealment allegations because the standard was never intended to apply in this context. Indeed, two of the antitrust cases on which defendants rely explicitly reject the application of that standard.[56] The other eleven never mention it. Defendants rely on cases that quote language from _Santa Maria v. Pacific Bell_, but none of those cases is an antitrust case, and a close reading of _Santa Maria_ reveals why neither it nor its progeny can, or should, inform the interpretation of what constitutes an affirmative act of concealment in an antitrust conspiracy case. Although _Santa Maria_ asserted, without support, that "[f]raudulent concealment necessarily requires active conduct by a defendant, above and beyond the wrongdoing upon which the plaintiff's claim is filed," actually at issue in _Santa Maria_ was the application of the "equitable estoppel" doctrine in the ADA discrimination context, and **not** the interpretation of the fraudulent concealment elements that apply here.[57] _Fourth_, requiring an antitrust plaintiff to plead active concealment "above and beyond the alleged conspiracy" is both unworkable and inequitable. Its application would lead to inconsistent results as courts attempt to parse acts of concealment taken

---

[55] _See Hendrickson Bros._, 840 F.2d at 1084 ("[T]he plaintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing."); _Supermarket of Marlinton_, 71 F.3d at 126 ("Those acts, however, need not be separate and apart from the acts of concealment involved in the antitrust violation; rather, Marlinton's proof may include acts of concealment involved in the alleged antitrust violation itself."); _State of Tex. v. Allan Const. Co._, 851 F.2d 1526, 1531 (5th Cir. 1988) ("[W]e never have held that the acts that demonstrate fraudulent concealment must be wholly separate from the acts underlying the wrong itself."); _Pinney Dock and Transport Co. v. Penn Central Corp._, 838 F.2d 1445, 1472 (6th Cir. 1988) (affirming that "'affirmative acts may be found by the trier of fact to constitute both wrongful concealment of the alleged conspiracy in violation of the antitrust laws and acts in furtherance of the conspiracy"); _Baker v. F & F Inv._, 420 F.2d 1191, 1199 (7th Cir. 1970) ("Where, as in the case of many conspiracies in violation of federal antitrust laws, the wrong is self-concealing, little need by added in order to justify tolling the statute."); _Hill v. Texaco, Inc._, 825 F.2d 333, 336 n. 2 (11th Cir. 1987) (recognizing "self-concealing" exception to rule requiring plaintiffs to "show affirmative actions by the defendant constituting concealment"); _Riddell_, 866 F.2d at 1492 (applying "self-concealing" standard to fraudulent concealment of RICO conspiracy).

[56] _See In re Magnesium Oxide Antitrust Litig._, No. CIV. 10-5943 DRD, 2011 WL 5008090, at *21 (D.N.J. Oct. 20, 2011); _In re Aspartame Antitrust Litig._, No. CIV.A.2:06-CV-1732, 2007 WL 5215231, at *5 (E.D. Pa. Jan. 18, 2007).

[57] _Compare Santa Maria_, 202 F.3d 1170, 1176-77 (9th Cir. 2000) ("A finding of equitable estoppel rests on the consideration of a non-exhaustive list of factors, including . . . ."), _with Hexcel_, 681 F.3d at 1060-62 (interpreting "equitable tolling doctrine in fraudulent concealment case[]"; listing elements of the same); _see generally Cervantes v. Countrywide Home Loans, Inc._, 656 F.3d 1034, 1045 (9th Cir. 2011) (distinguishing equitable estoppel from equitable tolling; "above and beyond" only applies to equitable estoppel).

in furtherance of the conspiracy, from those that are "above and beyond" the conspiracy.[58] And the "above and beyond" standard would serve only to protect those "who were cunning enough to commit their crimes initially in such a manner that there was no need for further concealment."[59] Such a standard would wrongly convert the fraudulent concealment doctrine into a shield for the benefit of wrongdoers.[60]

### 2.    Plaintiffs Had No Actual or Constructive Knowledge of the Conspiracy

In addition to adequately alleging that defendants took affirmative acts to mislead plaintiffs, the SAC sufficiently pleads that plaintiffs "had neither actual nor constructive knowledge of the facts giving rise [their] claims" more than four year prior to filing this suit.[61] *See* SAC ¶ 184-88. Plaintiffs did not begin to discover the facts underlying their claims until 2013, "when incriminating documents were unsealed and filed publicly in the *High-Tech* docket." *Id.* ¶ 184.

Defendants all but concede this element. They never argue plaintiffs had actual knowledge of the conspiracy more than four years prior to filing the SAC, and they point to no evidence of actual knowledge. Instead, defendants oddly argue that even though some details about a DOJ investigation did not emerge until September 17, 2010, that does not matter because plaintiffs have not alleged they diligently investigated such details. But because plaintiffs filed by September 17, 2014, any alleged lack of diligence after that date is "***irrelevant***" because it was within limitations period.[62]

Moreover, defendants' only discussion of plaintiffs' constructive knowledge (or lack thereof) comes in footnote 16, where they assert, without authority from this Circuit, that plaintiffs "were on notice by *early* 2010, if not sooner" because that is when "many widely read publications" reported on DOJ's investigation "into employment practices at high tech companies." Mot. at 17 n. 16.

---

[58] *See Supermarket of Marlinton*, 71 F.3d at 125 (rejecting standard because "no valid reason to differentiate between those conspiracies in which the conspirators document their antitrust violations and subsequently shred those documents, from those in which the conspirators are careful not to write down evidence of their antitrust violations in the first place").

[59] *Id.*

[60] *See Bailey v. Glover*, 88 U.S. 342, 349, 22 L. Ed. 636 (1874) ("To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which is designed to prevent fraud the means by which it is made successful and secure.").

[61] *Conmar*, 858 F.2d at 502.

[62] *Id.* at 505 (emphasis added) ("[N]o due diligence is required within the limitations period.").

Putting aside the fact that constructive knowledge "presents a question for the trier of fact,"[63] footnote 16 falls well short of what is needed to show constructive knowledge in the Ninth Circuit. As plaintiffs previously explained, ***not a single publication suggested that any of the defendants were remotely connected to any antitrust investigation***, until "September 17, 2010, when a news story first reported that Pixar was being investigated." SAC ¶ 185. Even if that article were sufficient to trigger constructive knowledge (it was not, because it did not reveal the conspiracy alleged here, *see infra* note 67), it would not affect the timeliness of plaintiffs' claims because the first complaint was filed on September 8, 2014, and all of defendants were named by September 17, 2014, both of which are within four years of that report.

Defendants are thus left to take the position that "early 2010" articles triggered plaintiffs' constructive knowledge by virtue of the fact that they reported on an investigation of "firms in Northern California, where Pixar and Lucasfilm are located and where DreamWorks has a production facility." Mot. at 17 n. 16. But defendants' mere physical proximity to companies reportedly being investigated by DOJ was not sufficient to put plaintiffs on notice of their claims.[64] After all, in the Ninth Circuit, a handful of newspaper articles does not trigger constructive knowledge, ***even when those articles specifically link defendants by name to anticompetitive conduct***.[65] The Court should reject the suggestion that defendants have established as a matter of law constructive knowledge outside of the limitations period.

Defendants' failure to show constructive knowledge is significant for an additional reason: it relieves plaintiffs of the need to allege "due diligence."[66] That is because the Ninth Circuit has held

---

[63] *Volk*, 816 F.2d at 1417; *see also Conmar*, 858 F.2d at 502 (**Summary judgment** is only appropriate "if uncontroverted evidence irrefutably demonstrates that a plaintiff discovered or should have discovered the cause of action but failed to file a timely complaint." (quotation omitted)).

[64] Not only were no defendants named, neither was the animation or visual effects industry; the articles merely referenced a "preliminary" investigation "in the technology and biotech industries."

[65] *See Conmar*, 858 F.2d at 503–04 (holding that San Francisco Chronicle and Wall Street Journal articles naming defendants were insufficient to constitute constructive knowledge as a matter of law); *Coordinated Pretrial Proceedings*, 782 F. Supp. at 497 (holding that articles describing attorney general investigation into similar illegal conduct did not constitute constructive notice); *accord E.W. French & Sons*, 885 F.2d at 1400 (holding that plaintiff's knowledge of a similar price-fixing lawsuit, naming some of the same defendants, did not constitute constructive knowledge).

[66] *See Conmar*, 858 F.2d at 504-05 ("[B]ecause we find that there is a genuine issue of material fact whether the facts publicly available were sufficient to excite Conmar's inquiry, then no due

that "[t]he requirement of diligence is only meaningful . . . when facts exist that would excite the inquiry of a reasonable person."[67] "Plaintiffs are not under a duty continually to scout around to uncover claims which they have no reason to suspect they might have."[68] Accordingly, "[i]t is impossible to declare at this motion to dismiss stage that plaintiffs failed to exercise due diligence to follow up on that which may or may not have been sufficient to excite their suspicions."[69]

Defendants' contrary suggestion is premised entirely on cases from outside this Circuit. It also ignores the fact that plaintiffs tried to obtain information that might have given rise to their claims, but such inquiries were met with misrepresentations. *See, e.g.*, SAC ¶¶ 147-48, 150, 165, 183. Further, journalists who were diligently investigating the issue failed to discover the conspiracy alleged here until July 2014, negating any claim that diligent investigation by plaintiffs would have uncovered the conspiracy sooner. *Id.* ¶¶ 186-88.[70]

## B. Plaintiffs Allege a Single Conspiracy to Suppress the Compensation of Class Members Which is Subject to a *Per Se* Analysis Under the Sherman Act

Plaintiffs allege the existence of one conspiracy, the object of which was to suppress compensation to class members. The conspiracy was effectuated through a scheme not to actively solicit each other's employees and collusion over sensitive compensation information. SAC ¶ 42. Defendants choose to re-characterize the complaint as two conspiracies—one "no-poaching" conspiracy and one wage-fixing conspiracy. Mot. at 18 n. 17. Defendants ask this Court to either dismiss or strike the paragraphs in the SAC relating to the "wage-fixing" conspiracy for failure to state a *per se* claim. Mot. at 18-22.

Defendants' argument fails in the first instance for attempting to usurp the role of the jury by seeking a factual determination of the contours of the conspiracy. Defendants essentially request the

---

diligence need be demonstrated for Conmar to survive **summary judgment**." (emphasis added)); *accord, e.g.*, *Cathode Ray*, 2014 WL 1091589 at *8 n. 7 (no requirement to plead due diligence where plaintiff "had no notice of the existence of an alleged price-fixing conspiracy").

[67] *Conmar*, 858 F.2d. at 504.

[68] *Coordinated Pretrial Proceedings*, 782 F. Supp. at 498 (citing *Conmar*, 858 F.2d at 504).

[69] *Rubber Chemicals*, 504 F. Supp. 2d at 788 (internal brackets and quotation omitted).

[70] Plaintiffs recognize this Court's departure from  the reasoning in *Fenerjian v. Nongshim Co., Ltd.*, --- F. Supp. 3d ---, 2014 WL 5685562, at *13 (N.D. Cal. Nov. 4, 2014), but reassert the discovery rule arguments from their opposition to defendants original motion to dismiss (Dkt. # 97) to preserve them for appeal, if necessary.

factual determination at the pleadings stage that there were two separate conspiracies, and then the application of two separate standards. But "[w]hether a single conspiracy or multiple conspiracies have been shown is a question of fact resolved by the jury."[71]

Whether a single conspiracy or multiple conspiracies exist is inherently factual.[72] For example, to find multiple conspiracies, this Court would need to find the existence of "separate networks operating independently of each other,"[73] despite plaintiffs' allegations that each of the defendants participated in both non-solicitation and in collusive discussions regarding the setting of compensation to class members. SAC ¶¶ 1-2. Such a request is improper.

Courts overseeing civil litigation (as opposed to criminal litigation, where double jeopardy issues are involved) have consistently rejected defendants' attempts to recast a plaintiff's allegations.[74] As one court concluded, "the mere fact that the defendants have a different case theory should not deprive the plaintiffs of the opportunity to prove theirs."[75] Recently, in the *In re Capacitors Antitrust Litigation*, Judge Donato rejected this exact argument—whether a complaint can be held as implausible on its face over the parties' varying interpretations of single versus multiple conspiracies.[76] Judge Donato had two complaints—one from the direct purchasers pleading a single conspiracy concerning three types of capacitors, and one from the indirect purchasers pleading two (albeit related) conspiracies concerning the separate types of capacitors. The Court

---

[71] *United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990). *See also Polyurethane Foam*, 2015 WL 766193 at *64–65 (same).

[72] *See United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003); *Polyurethane Foam*, 2015 WL 766193 at *64–65 (same).

[73] *See, e.g., United States v. Edwards*, No. 10-cr-145-02, 2011 U.S. Dist. LEXIS 23078, at *5-6 (E.D. Pa. Mar. 8, 2011) (internal citation omitted).

[74] *See, e.g., In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, at *38 (E.D.N.Y. Oct. 15, 2014) ("The plaintiffs have supplied compelling common evidence of a global conspiracy. Whether the plaintiffs' proof of such a conspiracy is more or less compelling than the defendants' alternative theory is a question of fact for the jury."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 607 (N.D. Cal. 2010) ("[D]efendants may not recast plaintiffs' allegations, and plaintiffs have consistently alleged a single, overriding conspiracy spanning the entire class period."); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 265 (D.D.C. 2002) ("[Defendants] claim there were multiple conspiracies, if any existed at all. [They] improperly recharacterize the plaintiffs' allegations. The plaintiffs have not alleged multiple conspiracies—they have alleged a single price fixing conspiracy.").

[75] *Air Cargo*, 2014 WL 7882100 at *38.

[76] *Capacitors*, 2015 WL 3398199.

upheld both complaints, reasoning that the factual allegations underlying the complaints were similar and that "there simply is no requirement that an antitrust plaintiff draw the boundaries of the alleged conspiracy (or conspiracies) in a complaint with the precision of a diamond cutter."[77] Although defendants asked for a ruling that the allegations regarding a single conspiracy were "implausible on their face," Judge Donato rejected the argument and held that the complaint gave defendants "'an idea of where to begin,' and defendants cannot with a straight face claim otherwise."[78]

Because the existence of one or more conspiracies cannot be determined on the face of the complaint, defendants' request to have this Court determine whether to apply the *per se* or rule of reason standard is simply misplaced. As this Court recognized in the *High-Tech* litigation, whether a *per se* or rule of reason standard applies is not appropriately determined at the motion to dismiss stage.[79] Although defendants try to distinguish this Court's prior ruling, suggesting that the agreement not to solicit in *High-Tech* was alone sufficient as an antitrust violation under either a *per se* or rule of reason theory, this distinction is nonsensical. Here, plaintiffs too allege that each defendant agreed not to solicit the other's employees, and ***in addition***, engaged in collusive discussions regarding compensation levels. These additional anticompetitive acts cannot, logically, act to increase the legal standard to be applied to these antitrust claims.

Defendants also attack plaintiffs' claim for failing to allege an "express agreement" or facts which support the reasonable existence of such an agreement. Mot. at 19. But direct proof of an agreement is not required and, indeed, is rarely found.[80] Rather, the scheme and its object may be inferred from the circumstances, including the nature, context, and continuing course of Defendants'

---

[77] *Id.* at *5.

[78] *Id.* at *6.

[79] *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1115 n. 9 (N.D. Cal. 2012) (stating that considerations under a possible rule of reason analysis were "properly decided in later stages of litigation"); *id.* at 1109 (recognizing that "DOJ concluded that Defendants entered into agreements that were restraints of trade that were *per se* unlawful under the antitrust laws").

[80] *See In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 441 (9th Cir. 1990) (explaining agreement may be shown by circumstantial or direct evidence); *In re Citric Acid Litig.*, 191 F.3d 1090, 1093 (9th Cir. 1999) (same); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1009 (N.D. Cal. 2013) ("Circumstantial evidence can establish an antitrust conspiracy at trial or at summary judgment. Certainly more is not required at the pleading stage." (citation omitted)).

conduct.[81] Here, plaintiffs allege that each defendant entered into the agreement to suppress compensation of class members, including (i) entering the non-solicitation scheme; and (ii) engaging in direct communications regarding compensation ranges and other sensitive compensation information. SAC ¶¶ 1-2, 9. Plaintiffs allege that industry meetings, such as SIGGRAPH, were not just "opportunities" to conspire, but were in fact places where conspiratorial acts occurred. Defendants met regularly to set the parameters of compensation surveys, including Croner and Dunlap surveys, where the competitors could "each confirm or adjust [their] salary ranges." *Id.* ¶ 87. Plaintiffs allege specific instances where these meetings were used to set compensation levels— including in January 2007 when after the survey meeting and the discovery that ImageMovers was recruiting employees from other studios at a high salary, high-level executives intervened to rein in ImageMovers' hiring. *Id.* ¶ 90. Defendants used these surveys to request "custom cuts" limited to just defendants themselves to ensure the collusion was effective. *Id.* ¶ 93. The SAC is replete with other examples of defendants exchanging specific and detailed sensitive compensation information regarding class members, including information on salary (*id.* ¶¶ 94-96, 103, 105, 107-108), insurance (*id.* ¶ 97), retirement (*id.* ¶ 98), reimbursements (*id.* ¶ 99), and overtime (*id.* ¶ 111).

These allegations must be considered in the entirety, and not with the slate wiped clean after each incremental allegation.[82] And although defendants suggest that none of these allegations support a reasonable inference that defendants reached an agreement to conspire, as plaintiffs explain, "[a]bsent an agreement not to compete on compensation, any studio sharing such information would be handing its competitors specific information how to best compete with them for employees and candidates." SAC ¶ 112.[83] Indeed, defendants acknowledge that they provided sensitive compensation information to their competitors to ensure that they received the same

---

[81] *See United States v. Consol Packaging Corp.*, 575 F.2d 117, 126 (7th Cir. 1978) (holding that direct evidence is not needed to prove a conspiracy, rather "a common purpose and plan may be inferred from a 'development and collocation of circumstances'").

[82] *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962).

[83] That is, given the sensitive nature of such individuated information, it makes sense that it would not be exchanged without an agreement that the other part would return the favor. In any event, in *United States v. Container Corp.*, 393 U.S. 333 (1969), the agreement to exchange price information was inferred based on nothing other than the actual practice of reciprocally exchanging individuated pricing information.

information in exchange. *Id.* ¶ 100 (DreamWorks stating in regards to conversations with Sony: "We do sometimes share general comp information (ranges, practices) in order to maintain the relationships with other studios and to be able to ask for that kind of information ourselves when we need it."). Taken in their entirety, these allegations are certainly sufficient to infer the existence of a conspiracy to suppress compensation to class members.

**C.      Plaintiffs Adequately and Timely Allege Claims Against Blue Sky and Sony Pictures**

As they did in their initial motion to dismiss, Blue Sky and Sony again suggest that the SAC does not contain sufficient allegations to satisfy *Twombly*.[84] Again, they are wrong. As Judge Donato recently remarked in *Capacitors*, *Twombly* does not act "as a license to resolve a Rule 12(b)(6) challenge on an impressionistic assessment of a complaint's merits . . . or . . . based on whether the Court feels [the complaint] is a winner or has curb appeal." [85] Instead, plaintiffs must plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[86] And at the motion to dismiss stage, plaintiffs need only "make allegations that plausibly suggest that each [d]efendant participated in the alleged conspiracy."[87] Plaintiffs have done so here.

**1.      Blue Sky**

Blue Sky castigates plaintiffs for "creative parsing," "selective quotation" and "outright mischaracterization." Mot. at 24. But in truth, what Blue Sky offers to this Court is its own interpretations of numerous pieces of evidence—evidence plaintiffs say supports their claims; evidence which Blue Sky strongly disputes. At the pleadings stage, however, plaintiffs must only

---

[84] In addition, Blue Sky and Sony suggest that plaintiffs must allege fraudulent concealment by each defendant separately. This is not the law, as plaintiffs explain in section A.1.c., *supra*.

[85] *Capacitors*, 2015 WL 3398199 at *5.

[86] *Animation Workers*, 2015 WL 1522368 at *8 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[87] *In re Cathode Ray (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (quotation omitted); *see also Lithium Ion*, 2014 WL 309192 at *9 ("'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" (quoting *Iqbal*, 556 U.S. at 679)); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (finding plaintiffs "plead[ed] sufficient facts plausibly to suggest a § 1 price-fixing conspiracy" when the complaint alleged "Defendants had an ongoing agreement to exchange price information and intended that this exchange would lead to price stabilization or increases").

show the existence of the conspiracy is "plausible."[88] As the Second Circuit explained in *Anderson News*, "[b]ecause plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible."[89] But the "choice between or among plausible inferences or scenarios is one for the factfinder."[90]

For example, Blue Sky quotes a portion of the deposition of George Lucas where he states that Lucasfilm did not have "an understanding or agreement" with Blue Sky. Mot. at 24. As an initial matter, the self-serving statement of an executive with an interest in downplaying conspiratorial conduct is hardly a trump card on a motion to dismiss. Moreover, in the same colloquy with *High-Tech* counsel, Mr. Lucas acknowledges that Blue Sky stood in the same position as companies like DreamWorks and Sony— that while there was no "understanding" as Mr. Lucas used the word, there was a policy "not [to] actively go out and recruit from [these] other companies."[91] Whether this was in fact a unilateral policy, or whether— as the documentary evidence strongly suggests—the studios' human resources and recruiting departments actively cooperated with each other to carry it out, is a question of inferences that cannot be decided in Blue Sky's favor at this stage. The question properly before the Court is whether plaintiffs' allegations plausibly support a conspiracy, and they clearly do.

Plaintiffs quote from an email where Pixar's Vice President of Human Resources, Lori McAdams, wrote: "With regard to ILM, Sony, Blue Sky, etc. . . . we have a gentleman's agreement not to directly solicit/poach from their employee pool." SAC ¶ 5. Blue Sky points to Ms. McAdams deposition where she says she was "mistaken" in what she wrote. But during her deposition, Ms. McAdams had every reason to minimize her role in the conspiracy and limit the liability of her employer. And her 2005 email confirming the existence of an agreement is supported by other,

---

[88] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[89] *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012); *see also Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) ("two or more witnesses" may tell mutually inconsistent but "coherent and facially plausible stor[ies]").

[90] *Anderson News*, 680 F.3d at 184; *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 766 & n.11 (1984) (the meaning of documents that are "subject to" divergent "reasonable . . . interpret[ations]" either as "referring to an agreement or understanding that distributors and retailers would maintain prices" or instead as referring to unilateral and independent actions, is "properly . . . left to the jury").

[91] *See* Declaration of Jonathan B. Pitt in Support of Motion to Dismiss the Second Consolidated Amended Class Action Complaint, ECF No. 129, Ex. 1 at 74-75.

contemporaneous records, including: (i) an internal Pixar "Competitors List" with directions regarding Blue Sky that Pixar was not to "recruit directly" or "solicit or poach employees" (*id.* ¶ 53), (ii) a Pixar email reflecting a conversation between McAdams and Linda Zazza (Blue Sky's Director of HR) where Pixar assured Blue Sky that they were "not making calls to their people or trying to poach them in any way" (*id.* ¶ 71); and (iii) a 2008 email from Ms. Zazza probing employees "to find out if they've been approached by Pixar" (*id.* ¶ 72). Each of these contemporaneous statements supports plaintiffs' framing of the conspiracy—that the defendants agreed to engage in conduct that suppressed the compensation of class members.

Blue Sky similarly offers counter-explanations for other pieces of evidence, consistently requesting that the Court adopt exculpatory inferences over plausible conspiratorial inferences. In paragraph 72, where plaintiffs believe that Ms. Zazza's statements probing employees regarding recruitment by Pixar evidences an agreement and an effort to enforce the conspiracy, Blue Sky suggests an alternative explanation—that this was a "routine effort to ascertain why Blue Sky lost employees to its competitors." Mot. at 25. In paragraph 73, where plaintiffs cite an email that clearly states "We have to be careful not to poach people [from Sony]," Blue Sky says this email is merely the author's efforts to avoid liability for tortious interference with contract. Mot. at 26. In paragraph 62, plaintiffs quote an email where Blue Sky employees state that "because [a potential candidate] is currently at Disney," Blue Sky needs to "not reach out in a way that could get back to Disney," Blue Sky says this was merely to avoid "the taint" associated with one's employer knowing one is looking for other work. Mot. at 26.

At the pleadings stage, the Court should not choose between two competing plausible inferences.[92] Plaintiffs need only allege enough facts to support the inference that a conspiracy existed, and enough allegations to "plausibly suggest that each Defendant participated in the alleged conspiracy."[93] Plaintiffs have done so here, and more is not required.[94] Particularly because there is

---

[92] *Anderson News*, 680 F.3d at 184–85.

[93] *Cathode Ray,* 738 F. Supp. 2d at 1019.

[94] Blue Sky relies on *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), a case addressing the standard at summary judgment. Not only is the standard cited in *Matsushita* not relevant to the pleadings stage, it is also worth noting that the conspiracy alleged in *Matsushita* was

1  no dispute that the conspiracy occurred, it is reasonable to interpret Blue Sky's statements as

2  evidencing its participation in the conspiracy.

### 2.  Sony

4  Sony also protests that plaintiffs have not alleged sufficient facts to demonstrate its

5  participation in the conspiracy. The SAC's allegations include, however: Ed Catmull's testimony that

6  he met with Sony in 2004 and believed there was an agreement not to poach employees (SAC

7  ¶ 65);[95]  Lori McAdams' 2005 email, where Sony is identified as a party to the "gentleman's

8  agreement not to directly solicit/poach from their employee pool" (*id.* ¶ 5); Sony's participation in

9  the "fun habit" of regular meetings with other HR representatives (*id.* ¶ 13); Sony's inclusion on

10  Pixar's "Competitors List" which instructed Pixar personnel not to "recruit directly" or "solicit or

11  poach employees" from the listed companies (*id.* ¶ 53); in 2006, Pixar calling Sony to "tell them to

12  knock it off" – the "it" being poaching of Pixar employees (*id.* ¶ 66); and emails reflecting Pixar's

13  conversations with Sony to "make sure they're still honoring it [the agreement] as they may have had

14  turnover in their Recruiting team" (*id.* ¶ 63).

15  Other allegations demonstrate that in 2009, when Sony laid off a number of employees and

16  then rehired them at lower rates, it advised its co-conspirator, Pixar, to "stand firm in [its] offers to

17  exSony candidates and not worry too much about matching their last Sony rate." *Id.* ¶ 12.

18  DreamWorks noted that it had collusive discussions with Sony, and that DreamWorks did

19  "sometimes share general comp information (ranges, practices) in order to maintain the relationships

---

21  one of predatory pricing to achieve monopoly power in the US market for televisions. After two
22  decades, the companies had yet to achieve success. *Matsushita*, 475 U.S. at 591. It was against this
   backdrop that the Supreme Court remarked "if the factual context renders respondents' claim
   implausible—if the claim is one that simply makes no economic sense—respondents must come
23  forward with more persuasive evidence to support their claim than would otherwise be necessary."
   *Id.* at 587. Such is hardly the case here, where the object of defendants' conspiracy—to restrain
   competition over wages—was wildly successful.

24  Blue Sky also relies on *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp.
25  2d 1347, 1355 (N.D. Cal. 2013), where the plaintiffs alleged no evidence of direct communications
   between two of the defendants (plaintiffs alleged a hub with spokes, but no rim to the conspiracy), an
26  entirely different set of circumstances than the direct discussions alleged in this complaint.

[95]  Sony objects to this portion of Mr. Catmull's testimony and submits further testimony that
27  Sony's behavior did not change. This piece of evidence is not submitted in isolation, however, and
   must be considered in the context of the other allegations—all of which support the inference of
28  Sony's participation in the conspiracy.

1   with other studios and to be able to ask for that kind of information ourselves when we need it." *Id.*

2   ¶ 100. And plaintiffs allege specific instances where Sony exchanged sensitive compensation

3   information with its competitors, including future salary information (*id.* ¶ 101), salary budgets (*id.*

4   ¶ 103), base salary ranges (*id.* ¶ 105), and overtime (*id.* ¶ 111).

5          Sony ignores the substance of virtually all these allegations, objecting only that although

6   Pixar's Ed Catmull testified that Sony entered into the agreement not to poach employees in January

7   2004, he also testified that Sony later violated that agreement. Mot. at 28. But the existence of a

8   cartel agreement is not disproven by evidence that a member of the cartel sometimes cheated on that

9   cartel; virtually every cartel involves some cheating because anticompetitive agreements make

10  individual deviations profitable. Sony argues that Pixar calling Sony to "tell them to knock it off

11  (again!)" disproves an agreement, but the fact that Pixar felt entitled to tell Sony to knock it off

12  shows that they had an agreement. No one calls a competitive rival who is undercutting on price to

13  say knock it off unless they have an agreement on price because undercutting them on price is just

14  what a rival is supposed to do. Sony also argues the fact that "Mr. Catmull eventually got so fed up

15  that in December 2007 he authorized a counterattack" disproves an agreement. Mot. at 28-29. But in

16  fact it prove the opposite: that for the four years from January 2004 to December 2007, Pixar was not

17  even trying to compete with Sony on recruiting because it believed it had a non-poaching agreement

18  with Sony, and that Pixar only authorized the counterattack to enforce that agreement. It is common

19  cartel behavior to target cheating members with price cuts as a disciplining device.

20         Sony objects that none of this evidence comes from Sony's files. But Sony does not, and

21  cannot, cite any law that requires allegations against a particular defendant be based on that

22  defendant's documents. There is no justification for such a pleading standard, and nothing in

23  *Twombly* or any other case requires it. And Sony discounts a string of documents relied on by

24  plaintiffs that did come from Sony's files. Plaintiffs say that a threat to non-defendant ReelFX

25  regarding the solicitation of Sony employees was retaliation not only by Sony, but also its co-

26  conspirator DreamWorks. SAC ¶ 68. Sony says that this string related only to the improper use of

27  Sony contact information. Mot. at 29 n. 30. Again, arguing competing inferences is not appropriate

28  on a motion to dismiss.

1   Sony also asks this Court to ignore allegations which relate to its involvement in collusive

2   discussions over compensation information, as Sony believes that plaintiffs fails to allege a "*per se*

3   wage fixing claim*.*" Mot. at 30. As argued above, however, the existence of a single conspiracy (as

4   alleged by plaintiffs) or multiple conspiracies (as proposed by Sony) is one for the jury to decide.

5   Finally, Sony suggests that plaintiffs do not allege it was aware of a multi-faceted conspiracy.

6   But a single conspiracy does not "fragment into multiple conspiracies because a member does not

7   'know every other member' or 'know of or become involved in all of the activities in furtherance of

8   the conspiracy.'"[96] Similarly, Sony suggests that its participation in the conspiracy is on its face

9   implausible because it was seeking to expand its workforce. But there is nothing implausible about a

10  company seeking to expand while simultaneously seeking to reduce the cost of expansion. Sony's

11  participation in the conspiracy, as with all the defendants, is more than plausible.

12  **III.     CONCLUSION**

13  For all the reasons above, plaintiffs respectfully request that this Court deny defendants'

14  motion to dismiss the SAC. If this Court does grant the motion, however, plaintiffs request leave to

15  amend, which should be "freely given."[97]

16

17

18  DATED: June 4, 2015              By ___*/s/ Steven G. Sklaver*_____
                                            STEVEN G. SKLAVER
19

20                                   Daniel A. Small (pro hac vice)
                                     Brent W. Johnson  (pro hac vice)
21                                   Jeffrey B. Dubner (pro hac vice)
                                     COHEN MILSTEIN SELLERS & TOLL PLLC
22                                   1100 New York Ave. NW, Suite 500
                                     Washington, DC 20005
23                                   Telephone: (202) 408-4600
                                     Facsimile: (202) 408-4699
24                                   dsmall@cohenmilstein.com
                                     bjohnson@cohenmilstein.com
25                                   jdubner@cohenmilstein.com

26

27  ───────────────
        [96] *Polyurethane Foam*, 2015 WL 520930, at *5
28      [97] *See Lopez v. Smith*, 203 F.3d 1122, 1140 (9th Cir. 2000).

PLS.' OPP'N TO MOT. TO DISMISS
No: 14-cv-4062-LHK                           - 30 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Steve W. Berman (pro hac vice)
Ashley A. Bede (pro hac vice)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
ashleyb@hbsslaw.com

Marc M. Seltzer (54534)
Steven G. Sklaver (237612)
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Matthew R. Berry (pro hac vice)
Jordan Talge (pro hac vice)
John E. Schiltz (pro hac vice)
1201 Third Avenue, Suite 3800
Seattle, WA, 98101-3000
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
mberry@susmangodfrey.com
jtalge@susmangodfrey.com
jschiltz@susmangodfrey.com

***Interim Co-Lead Plaintiffs' Counsel***