UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE ANIMATION WORKERS ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | MASTER DOCKET NO.: 14-CV-04062-LHK<br><br>**ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS**<br><br>Re: Dkt. No. 126 |

Defendants DreamWorks Animation SKG, Inc.; The Walt Disney Company; Lucasfilm Ltd., LLC; Pixar; ImageMovers, LLC; Two Pic MC LLC (f/k/a ImageMovers Digital); Sony Pictures Animation Inc.; Sony Pictures Imageworks Inc.; and Blue Sky Studios (collectively, "Defendants") have filed a joint motion to dismiss the second amended complaint. ("Mot."), ECF No. 126. Pursuant to Civil Local Rule 7-1(b), the Court finds this motion suitable for disposition without oral argument and VACATES the hearing set for September 17, 2015. Having considered the parties' submissions, the relevant law, and the record in this case, the Court DENIES Defendants' motion.

## I.  BACKGROUND

This is a consolidated class action brought by former employees alleging antitrust claims

against their former employers, various animation studios with principal places of business in California.[1] Plaintiffs contend that Defendants engaged in a conspiracy to fix and suppress employee compensation and to restrict employee mobility.

**A. Factual Background**

The Court draws the following factual background from the uncontroverted allegations in the Second Amended Complaint ("SAC"), and from judicially noticed documents.[2] Unless otherwise noted, Plaintiffs' allegations are presumed to be true for purposes of ruling on Defendants' motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**1. The Parties**

Defendants include the following animation and visual effects studios: Blue Sky Studios, Inc. ("Blue Sky"), a Delaware corporation with its principal place of business in Greenwich, CT; DreamWorks Animation SKG, Inc. ("DreamWorks"), a Delaware corporation with its principal place of business in Glendale, CA; ImageMovers Digital LLC, a Delaware corporation with its principal place of business in Burbank, CA; Lucasfilm Ltd., LLC ("Lucasfilm"), a California corporation with its principal place of business in San Francisco, CA;[3] Pixar, a California

---

[1] Defendant Blue Sky Studios, Inc. has its principal place of business in Greenwich, CT, but Plaintiffs allege that it is owned by Twentieth Century Fox Film Corporation, which has its principal place of business in Los Angeles, California. SAC ¶ 22.

[2] In its initial order granting Defendant's motion to dismiss, the Court granted Defendants' unopposed request for judicial notice, ECF No. 76, and took notice of the adjudicative facts contained therein. Defendants requested that the Court take judicial notice of the Civil Investigative Demands issued by the Department of Justice; public records from the State of Delaware; the expert report of Edward E. Leamer, as filed in *In re High-Tech Antitrust Litig.*, Case No. 11-CV-2509-LHK, ECF No. 856-8; media articles regarding the DOJ investigation; and an advertisement published by Plaintiffs' counsel. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (holding a court may take notice of proceedings in other courts); *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001) (matters of public record); *MGIC Indem. Co. v. Weisman*, 803 F.2d 500, 505 (9th Cir. 1986) (court records); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002) (media publications); *see also* Fed. R. Evid. 201(d).

Similarly, in its initial order granting Defendants' motion to dismiss, the Court granted Plaintiffs' unopposed request for judicial notice, ECF No. 97 at 37, and took notice of the adjudicative facts contained therein. Plaintiffs requested that the Court take judicial notice of two sealing orders from the *High-Tech* litigation and a media report. *See Lee*, 250 F.3d at 689–90; *Van Saher*, 592 F.3d at 960.

[3] Plaintiffs aver that Industrial Light & Magic ("ILM") is a division of Lucasfilm.

2

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

corporation with its principal place of business in Emeryville, CA;[4] Sony Pictures Animation, Inc. and Sony Pictures Imageworks, Inc. (collectively, "the Sony Defendants"), California corporations with their principal places of business in Culver City, CA; and The Walt Disney Company ("Disney") is a Delaware corporation with its principal place of business in Burbank, CA.[5] SAC ¶¶ 22–29.

Plaintiffs Robert A. Nitsch, Jr., Georgia Cano, and David Wentworth (collectively, "Plaintiffs"), are artists and engineers that were previously employed by four of the named Defendants. *Id.* ¶¶ 19–21. Nitsch worked for Sony Picture Imageworks in 2004 and DreamWorks from 2007 to 2011. *Id.* ¶ 19. Cano worked for Walt Disney Feature Animation from 2004 to 2005, ImageMovers Digital in 2010, and at various other visual effects and animation studios. *Id.* ¶ 20. Wentworth worked at ImageMovers Digital from 2007 to 2010. *Id.* ¶ 21. Nitsch is a resident of Massachusetts, and Cano and Wentworth are residents of California. *Id.* ¶¶ 19–21.

Plaintiffs seek to represent the following class:

> All persons who worked at any time from 2004 to the present for Pixar, Lucasfilm, DreamWorks Animation, Walt Disney Animation Studios, Walt Disney Feature Animation, Blue Sky Studios, Digital Domain, ImageMovers Digital, Sony Pictures Animation or Sony Pictures Imageworks in the United States. Excluded from the Class are officers, directors, senior executives and personnel in the human resources and recruiting departments of the Defendants.

*Id.* ¶ 195.[6]

### 2. *In re High-Tech Employees Litigation* and the Department of Justice investigation

There is significant factual overlap between Plaintiffs' allegations and the related action *In re High-Tech Employees Litigation*, No. 11-CV-02509-LHK, as well as the civil complaints filed by the Department of Justice ("DOJ") against several Silicon Valley technology companies, Pixar, and Lucasfilm. As both the factual and procedural history of the related action, *In re High-Tech*,

---

[4] According to Plaintiffs, ILM, Lucasfilm, and Pixar have been owned by Defendant The Walt Disney Company since 2012. SAC ¶¶ 25–26.
[5] Disney also "oversees the operations of" Walt Disney Animation Studios, formerly known as Walt Disney Feature Animation. SAC ¶ 29.
[6] Plaintiffs also allege that "[t]he relevant Class members do not bring in this complaint any claims against Pixar, Lucasfilm and Disney that were released [in *High-Tech*]." SAC ¶ 196.

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

and the DOJ investigations and complaints are relevant to the substance of Defendants' motion to dismiss, the Court briefly summarizes the background of that litigation below.

From 2009 to 2010, the Antitrust Division of the DOJ investigated the employment and recruitment practices of various Silicon Valley technology companies, including Adobe Systems, Inc., Apple, Inc., Google, Inc., Intel Corp., and Intuit, Inc. *See In re High-Tech Employees Litig.*, 856 F. Supp. 2d 1103, 1109 (N.D. Cal. 2012). In September of 2010, the DOJ then filed civil complaints against the above-mentioned technology companies, in addition to Pixar and Lucasfilm. *Id.* The DOJ filed its complaint against Adobe, Apple, Google, Intel, Intuit, and Pixar on September 24, 2010. *Id.* On December 21, 2010, the DOJ filed another complaint against Lucasfilm and Pixar. *See* No. 11-2509, ECF No. 65. The defendants, including Pixar and Lucasfilm, stipulated to proposed final judgments in which they agreed that the DOJ's complaints had stated claims under federal antitrust law and agreed to be "enjoined from attempting to enter into, maintaining or enforcing any agreement with any other person or in any way refrain from . . . soliciting, cold calling, recruiting, or otherwise competing for employees of the other person. *High-Tech*, 856 F. Supp. 2d at 1109–10 (quoting Adobe Proposed Final Judgment at 5). The D.C. District Court entered the stipulated proposed final judgments in March and June of 2011. *Id.* at 1110.

The *High-Tech* plaintiffs filed five separate state court actions between May and July of 2011. Following removal, transfer to San Jose to the undersigned judge, and consolidation, the *High-Tech* plaintiffs filed a consolidated amended complaint on September 13, 2011. *Id.* at 1112–13. In their complaint, the *High-Tech* plaintiffs alleged antitrust claims against their employers, claiming that the defendants had conspired "to fix and suppress employee compensation and to restrict employee mobility." *Id.* at 1108. More specifically, the *High-Tech* plaintiffs alleged a conspiracy comprised of "an interconnected web of express bilateral agreements." *Id*. at 1110. One agreement, the "Do Not Cold Call" agreement involved one company placing the names of the other company's employees on a "Do Not Cold Call" list and instructing its recruiters not to cold call the employees of the other company. *Id.* In addition to the "Do Not Cold Call" agreements,

United States District Court
Northern District of California

the *High-Tech* plaintiffs also alleged that Pixar and Lucasfilm, defendants in both *High-Tech* and the instant action, entered into express, written agreements to (1) not cold call each other's employees, (2) to notify the other company whenever making an offer to an employee of the other company, and (3) not to engage in "bidding wars." *Id.* at 1111.

### 3. Alleged Conspiracy in the Instant Action

Here, Plaintiffs allege that Defendants conspired to suppress compensation in two ways. First, Defendants allegedly entered into a scheme not to actively solicit each other's employees. SAC ¶ 42. Second, Defendants allegedly engaged in "collusive discussions in which they exchanged competitively sensitive compensation information and agreed upon compensation ranges," which would artificially limit compensation offered to Defendants' current and prospective employees. *Id.*

#### a. Anti-Solicitation Scheme

According to Plaintiffs, "Defendants agreed not to contact their coconspirators' employees to inform them of available positions unless that individual employee had applied for a job opening on his or her own initiative." *Id.* ¶ 43. This solicitation, also known as "cold calling," is "a key competitive tool in a properly functioning labor market, especially for skilled labor." *Id.* ¶ 44. Plaintiffs aver that employees of competitor studios represent "one of the main pools of potential hires," and that employees of competitor studios that are not actively searching for new employment are "more likely to be among the most sought after employees." *Id.* Hiring an employee from a competitor studio "can save costs and avoid risks." *Id.* Absent active solicitation, these employees are also difficult to reach. *Id.* Defendants' anti-solicitation scheme also allegedly included "notifying each other when an employee of one Defendant applied for a position with another Defendant, and agreeing to limit counteroffers in such situations." *Id.* ¶ 45. Moreover, Defendants allegedly "often refrained from hiring other Defendants' employees at all without the permission of the current employer," and would sometimes decline to make offers of employment to an unemployed prospective hire if that individual had an outstanding offer from another Defendant. *Id.* ¶ 46.

5

*Pixar and Lucasfilm*: According to Plaintiffs, "the roots of the conspiracy reach back to the mid-1980s," when George Lucas, the former Lucasfilm Chairman of the Board and CEO, sold Lucasfilm's "computer division" to Steve Jobs, who had recently left Apple. *Id.* ¶ 47. Jobs named his new company Pixar. *Id.* Pixar's President, Ed Catmull, Lucas, and "other senior executives, subsequently reached an agreement to restrain their competition for the skilled labor that worked for the two companies." *Id.* Pixar drafted the terms of the agreement, which both Defendants communicated to their senior executives and "select human resources and recruiting employees." *Id.* Lucas stated in an email that Pixar and Lucasfilm "have agreed that we want to avoid bidding wars," and that the agreement prevented the two companies from "raid[ing] each other's companies." *Id.* Pixar and Lucasfilm allegedly agreed to the following terms: (1) not to cold call each other's employees; (2) to notify each other when making an offer to the other company's employee; and (3) that any offer by the other company would be "final," i.e., neither Pixar nor Lucasfilm would engage in counteroffers. *Id.* ¶¶ 47–51 (citing internal Pixar email sent on January 16, 2006).

Plaintiffs further allege that while the conspiracy originated with Pixar and Lucasfilm, Catmull brought additional studios into the fold. *Id.* ¶ 52. In a 2005 email, then Vice President of Human Resources at Pixar, Lori McAdams, wrote "With regard to ILM, Sony, Blue Sky, etc., we have no contractual obligations, but we have a gentleman's agreement not to directly solicit/poach from their employee pool." *Id.* ¶ 53. Pixar also drafted an internal "competitors list" that "listed anti-solicitation rules for each of the Defendants." *Id.* According to Plaintiffs, Blue Sky, DreamWorks, ImageMovers Digital, Sony Pictures Imageworks, and Walt Disney Animation Studios were "all listed with directions not to 'recruit directly' or 'solicit or poach employees.'" *Id.* Plaintiffs' allegations as to each Defendant's alleged role and participation in the anti-solicitation scheme is detailed below.

*DreamWorks*: Jobs and DreamWorks CEO, Jeffrey Katzenberg, "personally discussed DreamWorks joining into the conspiracy." *Id.* ¶ 55. In a February 18, 2004 email from Catmull to Jobs, Catmull stated that the mutual agreement "worked quite well." *Id.* A January 14, 2007 email

United States District Court
Northern District of California

from Catmull to Disney's Chairman Dick Cook, also provided that "we have an agreement with Dreamworks not to actively pursue each other's employees." *Id.* In further emails between Catmull, McAdams, and DreamWorks's head of human resources, Kathy Mandato, Pixar and DreamWorks reiterated their "non-poaching practices." *Id.* ¶ 56. Mandato explained to McAdams that she "thought that we already had this kind of arrangement in place, based on a conversation between Steven Spielberg and Steve Jobs." *Id.* ¶ 57. When a Pixar recruiting email was sent to a DreamWorks employee, Mandato reached out to McAdams, and McAdams responded that she'd "put a stop to it!" *Id.* ¶ 58.

*Disney*: A 2005 Pixar email "confirmed that Pixar would not recruit workers out of Disney or other studios." *Id.* ¶ 60. In 2006, Disney purchased Pixar, and Catmull assumed responsibility for Walt Disney Animation Studios. *Id.* In communications between Disney Chairman Cook and Catmull, Cook agreed that "avoid[ing] raiding each other" was necessary to avoid "seriously mess[ing] up the pay structure." *Id.* Cook allegedly promised to "reaffirm our position again" with ImageMovers Digital, which Plaintiffs contend is a joint venture Disney launched with ImageMovers.[7] *Id.* In 2006, Disney's Director of Animation Resources apparently asked ILM, a division of Lucasfilm, to "observe 'the Gentlewomen's agreement'" that ILM not recruit Disney digital artists. *Id.* ¶ 61. In 2009, Karen Toliver, the Vice President of Animation at Twentieth Century Fox, the owner of Blue Sky, apparently emailed the Chief Operating Officer of Blue Sky, Briane Keane, regarding a Disney employee who was interested in "explor[ing] opportunities with Blue Sky." *Id.* ¶ 62. According to Plaintiffs, because of Blue Sky and Disney's agreement, however, Blue Sky's Keane responded to Toliver that "we need to be sensitive and not reach out in a way that could get back to Disney." *Id.*

*Sony Defendants*: Beginning in 2002, Sony Pictures Imageworks expanded significantly by

---

[7] Defendants submit that Exhibit F in their request for judicial notice, consisting of Certificates of Corporate Formation and Amendment filed with the Secretary of State of the State of Delaware, Division of Corporations, disproves Plaintiffs' allegation that ImageMovers LLC was a party to the joint venture that created ImageMovers Digital. *See* ECF No. 76. Plaintiffs voluntarily dismissed ImageMovers LLC from this action after Defendants filed their motion to dismiss and request for judicial notice. Consequently, the Court concludes that ImageMovers's involvement in the purported joint venture is not relevant.

United States District Court
Northern District of California

offering higher salaries to lure workers away from other studios. *Id.* ¶ 63. In response, Catmull allegedly met with Sony executives in person in 2004 or 2005 to "ask[] them to quit calling our employees." *Id.* ¶ 65. Plaintiffs allege that Catmull reached an agreement with Sony at that time that the companies would not directly solicit or poach from each other. *Id.* Following this agreement, McAdams contacted Sony's recruiting team when a Pixar employee left to work at Sony of his own initiative and a Sony recruiter apparently asked "if another employee was 'still employed and if she [could] contact [that employee].'" *Id.* ¶ 67. McAdams spoke to an individual at Sony "in person and over the phone to 'make sure they're still honoring [the agreement] as they may have had turnover in their Recruiting team.'" *Id.* Similarly, when a Sony recruiter contacted a Pixar employee in October 2006, McAdams apparently contacted her counterpart at Sony to "tell them to knock it off." *Id.* By July 2009, "Sony was insistent that the non-solicitation agreement be observed." *Id.* ¶ 68. When a recruiter from a smaller studio, ReelFX, contacted Sony employees, Sony Pictures Digital President Bob Osher emailed ReelFX. *Id.* Osher threatened not only to withhold business from ReelFX but stated that "Dreamworks and others will avoid hiring Reel Effects as well." *Id.*

*Blue Sky Studios*: Plaintiffs aver that Blue Sky "similarly entered the conspiracy," did not recruit from other studios, and requested that other studios not recruit from Blue Sky. *Id.* ¶ 69. In 2005, Blue Sky allegedly declined to pursue a DreamWorks employee that would have been "an amazing addition," because Blue Sky did not "want to be starting anything with [Katzenberg, the DreamWorks CEO] over one story guy." *Id.*

On September 29, 2004, McAdams explained that "[w]ith regard to ILM, Sony, Blue Sky, etc., we have no contractual obligations, but we have a gentleman's agreement not to directly solicit/poach from their employee pool. . . . This agreement is mutual, so if you ever hear that the studios are calling our people, let me know right away and I'll take care of it (as was the case with Sony a few months ago)." *Id.* ¶ 70. Blue Sky's Director of Human Resources, Linda Zazza, also allegedly spoke with Pixar's McAdams to discuss "our sensitive issue of employee retention," and McAdams assured Blue Sky that Pixar was not attempting to poach Blue Sky employees. *Id.* ¶ 71.

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1     When Zazza "noticed a trend of departing employees in 2008," she allegedly "probed to find out if

2     they've been approached by Pixar, etc." *Id.* ¶ 72. According to Plaintiffs, Managers at Twentieth

3     Century Fox Animation, the parent company of Blue Sky, were "careful to honor the agreement,"

4     and Twentieth Century Fox President Vanessa Morrison noted that "[w]e have to be careful not to

5     poach people" from Sony. *Id.* ¶ 73.

6         *ImageMovers*:[8] ImageMovers allegedly also joined the conspiracy. Catmull wrote in a

7     January 2007 email to Disney Chairman Cook that Catmull knew ImageMovers would "not target

8     Pixar." *Id.* ¶ 75. Plaintiffs allege, however, that ImageMovers continued to recruit from other

9     conspiring studios, including DreamWorks, by "offering higher salaries." *Id.* ¶ 76. Catmull then

10    met with one of the founders of ImageMovers, Steve Starkey. Starkey allegedly told Catmull that

11    ImageMovers had informed Lucas that ImageMovers would "not raid ILM." *Id.* ¶ 77. Catmull

12    then contacted Disney Studio's President, Alan Bergman, and Senior Vice President of Human

13    Resources, Marjorie Randolph, requesting that they require the ImageMovers Defendants to

14    comply with the anti-solicitation scheme. *Id.* ¶ 78. According to Plaintiffs, Randolph "responded

15    that Disney had in fact gotten the ImageMovers Defendants to agree to the 'rules' of the anti-

16    solicitation scheme." *Id.*

17        An October 10, 2008, Lucasfilm email confirmed that the "resulting agreement" applied to

18    "any type of position." *Id.* ¶ 77. Similarly, ILM Recruiter Lori Beck confirmed that potential

19    recruits were "not available" when "working at IMdigital [sic]." *Id.* In 2009, Beck stated that ILM

20    should not pursue an employee because "we have the gentlemen's agreement with IMD," and

21    again stated that "we have a gentlemen's agreement with IMD that we cannot recruit people from

22    their studio." *Id.* ¶ 79. Lori McAdams of Pixar also noted in an email that "[w]e can't call our

23    friends or leads who work at IMD, or Disney Animation (or Lucasfilm) and try to entice them to

24    apply." *Id.*

25        *Digital Domain*[9]: Digital Doman allegedly joined the conspiracy and had anti-solicitation

---

[8] Plaintiffs dismissed ImageMovers LLC without prejudice pursuant to a tolling agreement on January 14, 2015. ECF No. 83.

[9] Plaintiffs also dismissed Digital Domain 3.0 without prejudice pursuant to a tolling agreement.

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

agreements with "at least" DreamWorks, Lucasfilm/ILM, and the Sony Defendants. *Id.* ¶ 80. According to Plaintiffs, starting in 2007, Digital Domain hired a new Head of Human Resources Lala Gavgavian. *Id.* ¶ 82. Gavgavian had previously worked at Lucasfilm's ILM division "in senior roles in talent acquisition . . . during which time Pixar President Jim Morris explicitly informed her that Pixar and Lucasfilm" had an anti-solicitation/no-poaching agreement. *Id.* Gavgavian and other senior personnel at Digital Domain allegedly "specifically instructed employees not to cold call or otherwise solicit other Defendants' employees." *Id.* ¶ 83.

As to all Defendants, Plaintiffs contend that Defendants "repeatedly sought to recruit" new studios into the scheme, including a small studio named Lightstream Animation in 2008. *Id.* ¶ 84.

### b. Compensation Ranges

In addition to the anti-solicitation scheme, Plaintiffs further allege that Defendants "directly communicated and met regularly to discuss and agree upon compensation ranges." *Id.* ¶ 86 (citing March 28, 2007 email from McAdams). According to Plaintiffs, Defendants met at least once a year in California at meetings organized by the Croner Company, a third party that apparently collects industry-specific salary information. At the official meetings, Defendants "set the parameters of a compensation survey" that "provides wage and salary ranges for the studios' technical or artistic positions, broken down by position and experience level." *Id.* ¶ 87. The purpose of the meetings was for Defendants to "confirm or adjust [their] salary ranges." *Id.* Senior human resources and recruiting personnel from DreamWorks, Pixar, Lucasfilm/ILM, Disney, ImageMovers, the Sony Defendants, Blue Sky, and Digital Domain attended these survey meetings, in addition to other studios. *Id.* ¶ 88. Defendants also requested "custom cuts" of the survey information collected by the Croner Company, which allegedly involved a "special subset of Croner Survey participants, namely Blue Sky, DreamWorks, Lucasfilm, Sony, and Pixar." *Id.* ¶ 93.

Plaintiffs aver that Defendants used the Croner meetings to "go further than their matching of job positions across companies; they discussed, agreed upon and set wage and salary ranges

---

*See* SAC at 19 n.3.

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

during meals, drinks and other social gatherings that they held outside of the official Croner meetings." *Id.* ¶ 89. It was at one such side meeting in 2007 that Pixar discovered that ImageMovers was recruiting employees away from DreamWorks "at substantial salary increase[s]," which prompted Pixar's president, Catmull, to contact Disney's chairman. Defendants' human resources and recruiting personnel also allegedly held "side" meetings at the Siggraph conference, a major visual effects industry conference, which senior personnel from Blue Sky, Pixar, DreamWorks, Lucasfilm, and Sony Picture ImageWorks attended. *Id.* ¶ 91.

Defendants' Directors of Human Resources also allegedly "frequently sought to create new relationships when one of their counterparts was replaced at a co-conspirator to ensure the efficacy of communications about the conspiracy," and met with each other one-on-one "on many occasions." *Id.* ¶¶ 91–92. Plaintiffs further allege that Defendants regularly emailed each other with specific salary ranges. On May 13, 2005, DreamWorks requested that Disney provide salary information on three positions, and Disney promptly responded. *Id.* ¶ 94. The following spring, DreamWorks also requested similar information from Pixar and Disney, and "made clear it was surveying multiple studios." *Id.* ¶ 95. On September 2, 2009, Blue Sky's Director of Human Resources requested salary range information from Pixar. *Id.* ¶ 96. Plaintiffs contend that Defendants' "collusive compensation setting was not limited to wages and salaries, but extended to other benefits and terms of employment." *Id.* ¶ 97.

In a 2007 email, DreamWorks' Head of Compensation explained that "we do sometimes share general comp information (ranges, practices) in order to maintain the relationships with other studios and to be able to ask for that kind of information ourselves when we need it." *Id.* ¶ 100. For example, a DreamWorks HR officer emailed Pixar's McAdams and Disney HR executives to ask whether Disney matched employee 401K contributions, and Disney HR responded with numbers. *Id.* ¶ 98. McAdams responded within a half an hour with percentage details. *Id.* Similarly, McAdams asked Lucasfilm and DreamWorks executives whether they had policies to reimburse memberships for employees. *Id.* ¶ 99.

According to Plaintiffs, Defendants' communications regarding salary ranges were not

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

limited to bilateral "one off" exchanges, but rather Defendants would "openly email[] each other in large groups with competitively sensitive confidential current and future compensation information." *Id.* ¶ 102. On November 17, 2006, Pixar's McAdams emailed senior human resources personnel at DreamWorks, Sony Pictures Imageworks, Lucasfilm, Walt Disney Animation Studios, and others:

> Quick question from me, for those of you who can share the info.
>
> What is your salary increase budget for FY '07? Ours is [REDACTED] but we may manage it to closer to [REDACTED] on average. Are you doing anything close, more, or less?

*Id.* ¶ 103. In January 2009, DreamWorks's Head of Production Technology emailed the heads of human resources at Pixar, ILM, Sony Pictures Animation, and Disney to "learn how they handled overtime." More specifically, DreamWorks wanted to "see if the other companies were 'as generous.'" *Id.* ¶ 88. On February 14, 2007, McAdams emailed human resources personnel at DreamWorks, Sony, Disney, ILM, and another studio to find out the "base salary range" for a "manager of archives position." *Id.* ¶ 105. McAdams disclosed that Pixar intended to place the position in the "$60K-80K base" range, but wanted to "do a reality check as we head into salary discussions." *Id.* McAdams sent a similar email on May 1, 2007, regarding salary ranges for a supervising animator position. She asked Disney and others to "[s]hare with me your base salary range, perhaps how many of these folks you have (we have 7) and a general idea of actual median base pay? Also knowing any other comp they are eligible for (e.g. bonuses or stock) would be helpful." *Id.* ¶ 107. Similarly, McAdams also apparently directed Pixar's staff in the compensation department to "talk with Disney or other studios & post houses to ensure that our salary ranges for the positions are correct." *Id.* ¶ 106.

These collusive exchanges were also allegedly reflected in internal company documents. For example, a Lucasfilm document in 2006 included a chart for fiscal year 2004 and fiscal year 2005 salary information for competitor studios such as Twentieth Century Fox, Sony, and Disney, and stated that "updates" of these figures were "ongoing," which apparently indicated that conspirators continued to collude on wages through the period. *Id.* ¶ 101.

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

Defendants' human resources and recruiting personnel also allegedly regularly communicated via telephone. *Id.* ¶ 112. Plaintiffs quote emails from Pixar's McAdams to Sony Pictures Imageworks, ILM, DreamWorks, Disney, and Blue Sky "in early 2007" stating that "[c]hatting with all of you each day is really becoming a fun habit," and an email response from Walt Disney Animation Studios Vice President of Human Resources also commenting that "[i]t is fun to hear from you all on a daily basis." *Id.* ¶ 113.

As Plaintiffs describe it, the Croner survey meetings, side meetings, emails, and telephone calls "provided the means and opportunities for Defendants to collude and to implement and enforce the conspiracy to suppress workers' compensation." *Id.* ¶ 114. Plaintiffs note that McAdams also emailed ILM's Senior Director of Human Resources Sharon Coker in June 2008 stating that "[s]ince money can always be a factor, that's the other thing we should consider (e.g. we wouldn't want to offer a lateral move more money than you, and vice versa)." *Id.* ¶ 109. According to Plaintiffs, both McAdams and other executives "knew that such conversations were inappropriate," and expressed concern that it might be "taboo" to discuss compensation. *Id.* ¶ 110. In 2008 and 2009, Sony "laid off hundreds of employees and hired many of them back at lower rates," and Sony apparently informed other studios "that [it] was rehiring folks back at a lower rate than when they left," and to "stand firm in [their] offers to exSony candidates and not worry too much about matching their last Sony rate." *Id.* ¶ 115.

Plaintiffs further allege that while press reports in 2009 noted that the DOJ was investigating anti-solicitation agreements among high-tech companies, including Google and Apple, there was no indication that the DOJ was also investigating Pixar, Lucasfilm, or any other animation company. *Id.* ¶ 119. Plaintiffs aver that September 17, 2010 marked the first news story naming Pixar as a company under investigation, but that there was no public disclosure that any other Defendant in the instant action was part of the conspiracy. *Id.* ¶¶ 119, 184. According to Plaintiffs, Lucasfilm was implicated in the Pixar investigation in December 2010, but until the Court unsealed certain filings in the *High-Tech* case, there was no public information that the other Defendants in this action had engaged in similar conduct. *Id.* Plaintiffs also cite the absence of

13

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

1  news coverage as proof that Plaintiffs had no way of discovering the conspiracy, as even industry

2  journalists were "unable to discover and explore the conspiracy." *Id*. ¶ 186.

3          **c. Fraudulent Concealment**

4       In their SAC, Plaintiffs allege that Defendants fraudulently concealed the conspiracy and

5  therefore prevented the Plaintiffs from filing their claims on time. Plaintiffs allege that Defendants

6  (1) took affirmative steps to keep their conspiracy a secret; (2) affirmatively misled class members

7  by claiming that compensation and recruiting was determined by factors other than the alleged

8  conspiracy; and (4) took affirmative steps to mislead class members about the conspiracy during

9  the *High-Tech* litigation.

10            **1.  Affirmative steps to keep their conspiracy a secret**

11       Plaintiffs aver that Defendants carried out their conspiracy "in a manner specifically

12  designed to avoid detection." *Id*. ¶ 136. Plaintiffs claim that Defendants limited meetings to top

13  executives and HR employees, "avoided discussing the agreements in written documents," and

14  "avoided unnecessarily creating evidence that might alert Plaintiffs . . . to the conspiracy's

15  existence." *Id*. For example, Blue Sky employees allegedly stated that discussions "need[ed] to be

16  a phone conversation" due to the "sensitivity" of the subject.[10] *Id*. ¶ 137. Plaintiffs also allege that

17  Lucasfilm "code-named" the anti-solicitation agreements as "DNR" agreements, and that

18  conversations about the "DNR" agreements needed to be made over the phone. *Id*. ¶ 138. For

19  example, Plaintiffs point to an internal Lucasfilm document that stated: "DNR questions CALL

20  Steve. If you see an email forward to Steve and one of our lawyers." *Id*. Similarly, Plaintiffs cite

21  ILM's Coker's deposition testimony that "the reason the agreement was termed a 'gentleman's

22  agreement' was because it was not written down." *Id*. ¶ 139. A DreamWorks employee explained

23  that the head of recruitment described the no-poach agreement to the employee orally, and that a

24

---

25  [10] The Court notes that Defendants submitted the complete email exchange that Plaintiffs cite in the SAC, and that the relevant quoted portion reads "There is a time sensitive recruiting question
26  that needs to be a phone conversation." *See* ECF No. 127-1, at 3. While Defendants focus on Plaintiffs' selective quotation, the Court does note that the emails also reference whether
27  "everyone is comfortable with . . . efforts made to recruit. This is going to come up a lot and I have been reiterating the sensitivity here." *Id*. at 2.

28

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

head recruiter informed the employee that "it was unsaid and certainly not in writing." *Id.* ¶ 141.

Plaintiffs also point out that Defendants sometimes communicated about the conspiracy over personal email accounts instead of employer accounts, which Plaintiffs characterize as a "sharp deviation from standard business practices." *Id.* ¶ 140. Plaintiffs aver that "[t]he most logical inference of such atypical business contacts is to avoid detection." *Id.*

In addition to using personal emails, Defendants also allegedly "opted for in-person meetings" when possible, instead of communication via email. *Id.* ¶ 143. For example, Pixar's McAdams had dinner with Lucasfilm's Jan Van der Voort on June 24, 2008, wherein McAdams planned "to ask her about their merit increase budget for 2009." *Id.*

### 2. Pretextual statements regarding compensation and recruiting

Plaintiffs further allege that Defendants "routinely provided pretextual, incomplete or materially false and misleading explanations for compensation decisions and recruiting and retention practices." *Id.* ¶ 145. For example, Defendants' recruiting websites and brochures state that they provide "fair" and "competitive salar[ies]" and "competitive compensation," which, according to Plaintiffs, "hid[es] . . . the fact that compensation that normally exists among rival employers had been restrained by collusion." *Id.* ¶ 146.

Plaintiffs allege that Pixar's HR department drafted annual "talking points" for its managers "in an effort to help prepare [the managers] for [the managers'] conversations with [the managers'] employees" about salaries. *Id.* ¶ 147. Pixar, in these talking points, noted that salaries were set by outside surveys. *Id.* There was no mention of the effects of non-solicitation agreements or agreed-upon collusive salary ranges. *Id.* Similarly, Plaintiffs allege that "[i]n response to questions from employees about salary determinations" Pixar instructed its managers to inform employees that their salaries were set based on performance, skills, and proficiency, without mention of collusion. *Id.* ¶ 148. This allegedly provided "untrue assurances to employees that they were receiving compensation based on what the competitive market would bear—in direct contrast to Pixar's covert conspiracy to suppress the compensation that employees could command in an unrestrained labor market." *Id.*

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

Moreover, Pixar's McAdams and ILM recruiter Lori Beck explained to putative class members Eben Ostby and Frankie Rodriguez that compensation was competitive without disclosing collusion. *Id.* ¶ 150. On October 24, 2006, McAdams emailed Ostby stating that McAdams was "confident that our actual total comp is quite competitive on the average." *Id.* Beck also emailed putative class member Matthew Bouchard, noting that ILM "consider[s] employee equity and the skillset and experience of the entire [Technical Director] group at ILM when determining ILM's rate," rather than admitting to the conspiracy. *Id.* Plaintiffs also allege that Pixar Senior Recruiter Dawn Haagstad told putative class member Philip Metschan that Pixar's initial salary offer to Metschan was the "best offer" Pixar could put out there, noting that "it's important to recognize one's talent from the start—so that artists don't feel the need to go back and forth regarding money." *Id.* ¶ 165. Plaintiffs contend that the real reason Pixar opened with its best offer was because it had agreed with co-conspirators to avoid bidding wars.

With regard to employee questions about modest salary increases, Pixar, in one of its "talking point" memos, explained that "one of the main reasons" for the modest 3.5% salary increase in 2007 was because Pixar sought to fund additional benefit programs for employees, for example, a daycare. *Id.* ¶ 149. Similarly, Ed Catmull, in a company-wide email, defended the modest increases as a result of the company's construction of a new child-care center. *Id.*

Plaintiffs also allege that Defendants' own codes of conduct contained statements that "misrepresented the truth about the conspiracy." *Id.* ¶ 151. Pixar's code, for example, directed its employees and executives to "comply with all applicable governmental laws, rules and regulations" and emphasized the importance of "preserving and protecting its proprietary information." *Id.* ¶¶ 151–52. Plaintiffs contend that this was misleading because Pixar itself was in violation of antitrust laws and exchanged proprietary information regarding wages and benefits with competitors. *Id.* Plaintiffs make similar allegations against Disney. *Id.* ¶¶ 155–58. More specifically, Disney's code provided that "[a]ny decisions related to hiring, evaluating performance, promoting, disciplining or terminating Cast Members and employees are made fairly, with discretion and respect for privacy." *Id.* ¶ 156. Plaintiffs allege that this statement is

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

1  misleading and false, as "Disney's hiring decisions were not made fairly." *Id.*

2      Plaintiffs also point to the Defendants' public filings with the Securities and Exchange

3  Commission ("SEC"), as misleading. *Id.* ¶ 159. DreamWorks, for example, states in its SEC

4  filings that it "attract[ed] and retain[ed] [its] animators with competitive compensation packages

5  and an artist friendly environment." *Id.* ¶ 163. Moreover, in Pixar's merger agreement with

6  Disney, Pixar stated that "[t]o the Company's Knowledge, the Company and its Subsidiaries are in

7  compliance in all material respects with all Laws and Orders . . .  relating to the employment of

8  labor." *Id.* ¶ 160. Pixar's 2005 10-K form also allegedly contained "affirmative

9  misrepresentations," as Pixar stated that "[w]e believe that the primary competitive factors in the

10  market for animated feature films include creative content and talent" and that Pixar "presently

11  compete favorably with respect to each of these factors." *Id.* ¶ 161. Pixar also represented that

12  "[c]ompetition for the caliber of talent required to make our films, particularly our film directors,

13  producers, animators, creative personnel and technical directors, will continue to intensify as more

14  studios build their in-house CGI-animation or special effects capabilities." *Id.* ¶ 162. Plaintiffs

15  characterize these statements as misleading because Pixar knew that such competition would not

16  intensify as a result of the conspiracy's efforts to suppress competition. Similarly, DreamWorks

17  also publicly assured employees and prospective employees in its SEC filings that it "compete[d]

18  with other animated film and visual effect studios for artists, animators, directors and producers,"

19  and "attract[ed] and retain[ed] our animators with competitive compensation packages and an

20  artist friendly environment." *Id.* ¶ 163.

21      Defendants also allegedly made pretextual and misleading statements regarding recruiting

22  and retention. *Id.* ¶ 166. According to Plaintiffs, Defendants "misrepresented the steps they took to

23  retain or attract" employees, including Lucasfilm's statements on its recruiting website that it was

24  "continually on the lookout for talent," despite having agreed not to solicit or cold call employees

25  of its competitors. *Id.* ¶ 166. Lucasfilm's President and CEO, in a town hall with employees, also

26  described the "key reasons why people stay" without mentioning the anti-solicitation agreement.

27  *Id.* ¶ 167. Similarly, ILM's Lori Beck told a recruit that "[o]nce we find strong people, we do our

28

17

United States District Court
Northern District of California

absolute best to keep them with us at ILM," without mentioning the conspiracy. *Id.* One of

DreamWorks's executives was quoted in San Francisco Business Times stating that the market for

talent was "stiff" and that DreamWork had "stepped up recruiting." *Id.* ¶ 169. Plaintiffs contend

that DreamWorks, at the time, did not face "stiff competition" because of the conspiracy and that

DreamWorks was not actually "stepp[ing] up" its recruiting.

### 3. Misleading statements during the *High-Tech* litigation

Plaintiffs also allege that Defendants Pixar and Lucasfilm made affirmative

misrepresentations to Plaintiffs and putative class members at the outset of the *High-Tech*

litigation. *Id.* ¶ 171. According to Plaintiffs, Pixar and Lucasfilm denied that the anti-solicitation

agreement "was created with the intent and effect of eliminating bidding wars," whereby a

prospective employee could increase her total compensation by leveraging offers from either

Defendant. *Id.* ¶ 172. Plaintiffs contend that this denial "affirmatively deceive[d]" Plaintiffs and

putative class members "as to the purpose of the agreement." *Id.* Moreover, Plaintiffs point to

Pixar's and Lucasfilm's apparently misleading statements regarding the scope of their agreement.

*Id.* ¶ 173.

In addition to these representations, Plaintiffs also contend that Defendants Pixar and

Lucasfilm denied under oath that Pixar or Lucasfilm had "conspired with any entities beyond

those named by the DOJ." *Id.* ¶ 174. Specifically, Plaintiffs cite Pixar's McAdams's deposition

testimony that Pixar did not "have gentleman's agreements or understandings of that kind with

any other companies besides Lucasfilm." *Id.* ¶ 175. McAdams also apparently described an

agreement with Defendant Disney as part of a "co-production agreement," rather than disclosing

the full breadth of the non-solicitation agreement. *Id.* Similarly, Lucasfilm's senior manager of

compensation, Michelle Maupin, in a sworn declaration filed in *High-Tech*, described sources of

information and factors that Lucasfilm used to determine "market compensation levels." *Id.* ¶ 177.

Maupin's declaration does not mention the communications among Defendants, but instead

"falsely suggested that compensation was measured against market surveys and self-reporting

from candidates." *Id.*

18

Finally, Plaintiffs allege that Defendants "took steps to conceal documents revealing the true scope of their conspiracy by designating all depositions, declarations and most documents in *High-Tech* 'attorneys' eyes only,'" thus preventing putative class members from examining these documents until the Court unsealed the documents in 2013. *Id.* ¶ 179. According to Plaintiffs, Defendants "made the affirmative decision" to file such documents under seal or seek sealing "even when such requests were unjustified," and that the true purpose of Defendants' actions was to "conceal the documents." *Id.* ¶ 180. For example, in support of their sealing requests, Defendants argued that the documents contained internal decisionmaking regarding business strategies and internal assessments of their competitive position in the labor market. Plaintiffs contend that these descriptions were misleading as "many of the documents were not internal at all: they covered inter-company communications regarding the conspiracy." *Id.* ¶ 181. Plaintiffs also put forth Defendants' public statements that the claims in the *High-Tech* litigation were "meritless" as evidence of Defendants' attempts to conceal the conspiracy. *Id.* ¶ 182.

### 4.  Claims

Plaintiffs' SAC contains three claims for relief under the following statutes: (1) Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) California's Cartwright Act, Cal. Bus. & Prof. Code § 16720; and (3) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq*. Plaintiffs seek damages, pre- and post-judgment interest, attorney's fees and expenses, and a permanent injunction. *Id.* ¶ 147.

### B.  Procedural Background

In light of the relationship between the instant case and the *High-Tech* case, the Court briefly summarizes the relevant procedural history in *High-Tech* in addition to the instant case.

### 1.  *High-Tech* Procedural Background

The *High-Tech* defendants removed the first state-court action on May 23, 2011. No. 11-2509, ECF No. 1. On April 18, 2012, the Court granted in part and denied in part the *High-Tech* defendants' joint motion to dismiss and denied Lucasfilm's motion to dismiss. No. 11-2509, ECF No. 119. On April 5, 2013, the Court granted in part and denied in part the *High-Tech* plaintiffs'

19

United States District Court
Northern District of California

motion for class certification with leave to amend. No. 11-2509, ECF No. 382. The Court granted the *High-Tech* plaintiffs' supplemental motion for class certification on October 24, 2013. No. 11-2509, ECF No. 531.  On November 13, 2013, the *High-Tech* defendants filed a Rule 23(f) petition before the Ninth Circuit, requesting permission to appeal this Court's October 24, 2013 class certification order. No. 13-80223, ECF No. 1. The Ninth Circuit denied the defendants' petition on January 14, 2014. No. 13-80223, ECF No. 18.

In the interim, three of the *High-Tech* defendants, Intuit, Lucasfilm, and Pixar, reached an early settlement with the plaintiffs. On September 21, 2013, the *High-Tech* plaintiffs filed a motion for preliminary approval of a proposed class action settlement as to defendants Intuit, Lucasfilm, and Pixar. No. 11-2509, ECF No. 501. On October 30, 2013, the Court preliminarily approved the proposed settlement with Intuit, Lucasfilm, and Pixar. No. 11-2509, ECF No. 540. The Court granted final approval as to that settlement on May 16, 2014. No. 11-2509, ECF No. 915. The Court entered a final judgment with regards to Lucasfilm, Pixar, and Intuit on June 9, 2014. No. 11-2509, ECF No. 936. At the request of Intuit, the Court entered an amended final judgment on June 20, 2014. No. 11-2509, ECF No. 947.

The remaining *High-Tech* defendants, Adobe, Apple, Google, and Intel, filed individual motions for summary judgment, and joint motions for summary judgment and to strike certain expert testimony on January 9, 2014. No. 11-2509, ECF Nos. 554 (Intel), 556–57 (joint motions), 560 (Adobe), 561 (Apple), 564 (Google). The Court denied the *High-Tech* defendants' individual motions for summary judgment on March 28, 2014. No. 11-2509, ECF No. 771. On April 4, 2014, the Court granted in part and denied in part the *High-Tech* defendants' motion to strike, and denied the defendants' joint motion for summary judgment. No. 11-2509, ECF No. 778.

On May 22, 2014, the *High-Tech* plaintiffs filed a motion for preliminary approval of class action settlement as to the remaining defendants. No. 11-2509, ECF No. 920. On August 8, 2014, the Court denied the *High-Tech* plaintiffs' motion for preliminary approval, concluding that the proposed settlement did not fall "within the range of reasonableness." No. 11-2509, ECF No. 974, at 30. On September 4, 2014, the *High-Tech* defendants filed a petition for a writ of mandamus

20

United States District Court
Northern District of California

with the Ninth Circuit. No. 14-72745, ECF No. 1. On September 22, 2014, the Ninth Circuit found that the petition "raises issues that warrant a response," and ordered briefing. No. 14-72745, ECF No. 2. On January 13, 2015, the *High-Tech* defendants filed correspondence with the Ninth Circuit referring to a new proposed settlement agreement. No. 14-72745, ECF No. 21. On January 30, 2015, the defendants filed an unopposed motion to dismiss the petition, which the Ninth Circuit granted on February 2, 2015. No. 14-72745, ECF Nos. 23, 24.

On January 15, 2015, the *High-Tech* plaintiffs filed a motion for preliminary approval of class action settlement as to the remaining defendants. No. 11-2509, ECF No. 1032. In this second proposed class action settlement, the parties had reached a settlement amount exceeding the previously rejected settlement by approximately $90.5 million dollars. *Id.* at 1. Following a fairness hearing on March 2, 2015, the Court granted preliminary approval to the January 2015 settlement agreement on March 3, 2015. No. 11-2509, ECF Nos. 1051, 1054. A final approval hearing was held on July 9, 2015. Plaintiffs' counsel completed filing supplemental briefing on attorney's fees on July 24, 2015. No. 11-2509, ECF No. 1108.

### 2.  Procedural Background in the Instant Action

Plaintiff Nitsch filed the first complaint against all Defendants but Blue Sky on September 8, 2014. ECF No. 1. The Court related Nitsch's action to *In re High-Tech Employee Antitrust Litigation*, No. 11-2509, on September 23, 2014. Plaintiff Cano filed the second complaint against all Defendants on September 17, 2014, which the Court related to *High-Tech* on October 7, 2014. *See* Case No. 14-4203, ECF Nos. 1, 9. Plaintiff Wentworth filed the third complaint against all Defendants but Blue Sky on October 2, 2014, which the Court related to *High-Tech* on October 28, 2014. *See* Case No. 14-4422, ECF Nos. 1, 26. On November 5, 2014, the Court granted Plaintiffs' motion to consolidate the above-mentioned three cases into a single action, *In re Animation Workers Antitrust Litigation*. *See* Case No. 14-4062, ECF No. 38.

Pursuant to the Court's case management order, Plaintiffs filed their first consolidated amended complaint ("CAC") on December 2, 2014. ECF No. 63. On January 9, 2015, Defendants filed a joint motion to dismiss, and a request for judicial notice. ECF Nos. 75, 76. Defendants also

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

filed an administrative motion to seal exhibits in support of their motion to dismiss. ECF No. 79.

Plaintiffs filed a timely opposition, ECF No. 97, and Defendants replied, ECF No. 100. On April

3, 2015, the Court granted Defendants' motion to dismiss. *In re Animation Workers Antitrust*

*Litig.*, --- F. Supp. 3d. ---, No. 14-4062, 2015 WL 1522368 (N.D. Cal. Apr. 3, 2015). The Court

found that Plaintiffs' claims were time barred under the statute of limitations, and that Plaintiffs

had failed to adequately plead a "continuing violations" theory or a "fraudulent concealment"

theory. *See id.* at \*17. The dismissal was without prejudice, as the Court determined that Plaintiffs

might be able to allege sufficient facts to support their continuing violations or fraudulent

concealment theories. *Id.*

On May 15, 2015, Plaintiffs filed their SAC. ECF No. 121. Six days later, Defendants filed

the instant joint motion to dismiss the SAC. ECF No. 126. Defendants also filed a request for

judicial notice. ECF No. 127.[11] Plaintiffs filed a timely opposition, ECF No. 132, and Defendants

replied, ECF No. 137. Defendant Blue Sky filed a motion to seal, ECF No. 124, as did the Sony

Defendants, ECF No. 130. The Court addresses those sealing motions in a separate order.

## II.  LEGAL STANDARD

### A.  Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint

for failure to state a claim upon which relief can be granted. Such a motion tests the legal

sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In considering

whether the complaint is sufficient, the Court must accept as true all of the factual allegations

contained in the complaint. *Iqbal*, 556 U.S. at 678. However, the Court need not accept as true

"allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations

---

[11] Defendants' unopposed request for judicial notice is GRANTED, and the Court takes notice of the adjudicative facts contained therein. *See* ECF No. 127. Defendants request that the Court take judicial notice of documents incorporated by reference into the SAC (emails and deposition testimony quoted in SAC ¶¶ 137, 140), matters of public record (SEC filings, quoted in SAC ¶¶ 161, 163), and newspaper articles (quoted in SAC ¶ 169). These documents are appropriate for judicial notice. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (documents referenced in complaint but not physically attached); *Lee*, 250 F.3d at 689–90 (matters of public record); *Von Saher*, 592 F.3d at 960 (media publications); *see also* Fed. R. Evid. 201(d).

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1    that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re*

2    *Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). While a

3    complaint need not allege detailed factual allegations, it "must contain sufficient factual matter,

4    accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678

5    (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility

6    when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

7    the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a

8    'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

9    unlawfully." *Iqbal*, 556 U.S. at 678 (internal citation omitted).

10         **B.  Rule 9(b)**

11         Claims sounding in fraud or mistake are subject to the heightened pleading requirements of

12   Federal Rule of Civil Procedure 9(b), which require that a plaintiff alleging fraud "must state with

13   particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see *Kearns v. Ford Motor*

14   *Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). To satisfy the heightened standard under Rule 9(b), the

15   allegations must be "specific enough to give defendants notice of the particular misconduct which

16   is alleged to constitute the fraud charged so that they can defend against the charge and not just

17   deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.

18   1985). Thus, claims sounding in fraud must allege "an account of the time, place, and specific

19   content of the false representations as well as the identities of the parties to the

20   misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam)

21   (internal quotation marks and citation omitted). A plaintiff must set forth what is false or

22   misleading about a statement, and why it is false." *In re GlenFed, Inc. Secs. Litig.*, 42 F.3d 1541,

23   1548 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as stated in Marksman*

24   *Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1309 (C.D. Cal. 1996). However,

25   "intent, knowledge, and other conditions of a person's mind" need not be stated with particularity,

26   and "may be alleged generally." Fed. R. Civ. P. 9(b).

27

28
     Case No. 14-CV-04062-LHK
     ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## III. DISCUSSION

Defendants move to dismiss Plaintiffs' SAC on the following grounds: that (1) Plaintiffs' claims are barred under the relevant statutes of limitations; (2) Plaintiffs fail to state plausible claims against Defendants Blue Sky or Sony Pictures; and (3) Plaintiffs fail to sufficiently allege a *per se* antitrust claim based on wage-fixing agreements. The Court begins by addressing whether Plaintiffs' claims are time barred.

### A. Fraudulent Concealment

The Court previously concluded that Plaintiffs' claims are time barred under the relevant statutes of limitations unless Plaintiffs adequately allege either a continuing violations theory or a fraudulent concealment theory. *In re Animation Workers Antitrust Litig.*, 2015 WL 1522368, at *17. In their SAC, Plaintiffs have abandoned their continuing violations theory, and the parties agree that absent a showing of fraudulent concealment, Plaintiffs' claims are time-barred. For the reasons discussed below, the Court finds that Plaintiffs have adequately pled fraudulent concealment and the statute of limitations may be tolled.

The purpose of the fraudulent concealment doctrine is to prevent a defendant from "concealing a fraud . . . until such a time as the party committing the fraud could plead the statute of limitations to protect it." *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349 (1874). Thus, "[a] statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel Corp. v. Ienos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). The plaintiff bears the burden of pleading and proving fraudulent concealment. *Id.*; *see also Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988). To plead fraudulent concealment, the plaintiff must allege that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have "actual or constructive knowledge of the facts giving rise to its claim"; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to its claim. *Hexcel*, 681 F.3d at 1060; *see also Conmar*, 858 F.2d at 502; *Beneficial Standard Life Insurance Co. v. Madariaga*, 851 F.2d 271, 276 (9th Cir. 1988).

24

Moreover, allegations of fraudulent concealment must be pled with particularity. *Conmar*, 858 F.2d at 502. However, "it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators." *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007).

### 1. Affirmative acts to mislead

#### a. The Court's April 3, 2015 order

Before turning to the substance of Defendants' motion to dismiss for failure to sufficiently plead fraudulent concealment, the Court briefly summarizes its April 3, 2015 order granting Defendants' motion to dismiss Plaintiffs' CAC. *See In re Animation Workers Antitrust Litig.*, No. 14-CV-04062-LHK, 2015 WL 1522368, at *15 (N.D. Cal. Apr. 3, 2015). The Court granted Defendants' motion to dismiss, finding that Plaintiffs failed to plead any facts showing affirmative acts of concealment. *Id.* More specifically, the Court found that Plaintiffs' conclusory allegations that Defendants engaged in a "secret conspiracy" and that "Defendants' conspiracy was concealed" were insufficient as a matter of law. *Id.* at *16.

In addition to their allegations with respect to Defendants' alleged secret conspiracy, Plaintiffs also argued that Defendants took affirmative steps to mislead Plaintiffs as to the existence of Plaintiffs' claims through the Croner survey. The Court rejected Plaintiffs' argument and found that there were no allegations in the CAC "that the compensation information in the Croner survey was publicly accessible, that Defendants were responsible for publishing the Croner survey, or that Defendants publicized the Croner survey as 'affirming their compliance with applicable antitrust laws . . . .'" *Id.* (citing *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2014 WL 309192, at *16 (N.D. Cal. Jan. 21, 2014)). The Court also found that the bare allegation that Defendants provided "pretextual, incomplete or materially false and misleading explanations for hiring, recruiting and compensation decisions" was conclusory and insufficient to state a claim under Rule 9(b), as Plaintiffs failed to offer "specific facts showing the 'who, what, where, when' of [the] alleged incomplete or materially false statements." *In re Animation Workers*

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

1   *Antitrust Litig.*, 2015 WL 1522368, at *16 (citing *Swartz*, 476 F.3d at 764).

2         The Court noted, however, that "the combination of . . . misleading, pretextual statements

3   *and* . . . affirmative efforts taken to . . . otherwise keep the conspirac[y] secret" could support a

4   fraudulent concealment claim if such pretextual statements were pled with particularity and if the

5   alleged affirmative acts to conceal went beyond mere "passive concealment." *In re Animation*

6   *Workers Antitrust Litig.*, 2015 WL 1522368, at *16 (citing *Lithium Ion*, 2014 WL 309192 at *16;

7   *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1119 (N.D. Cal. 2008) (finding

8   sufficient allegations of pretextual explanations for price increase and affirmative efforts to ensure

9   secrecy of conspiracy); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1101,

10  1024–25 (N.D. Cal. 2010) (same)). However, as initially pled in the CAC, Plaintiffs' allegations

11  were either insufficient to meet the particularity requirement or merely constituted "passive

12  concealment." *In re Animation Workers Antitrust Litig.*, 2015 WL 1522368, at *16. The Court

13  further concluded that amendment would not necessarily be futile, and granted Plaintiffs leave to

14  amend their complaint.

15        The Court now turns to whether Plaintiffs' amended allegations with respect to

16  Defendants' alleged fraudulent concealment are sufficient to state a plausible claim.

17        **b. Plaintiffs' claims in the SAC**

18        Defendants contend that even if the new factual allegations in the SAC are taken as true,

19  Plaintiffs have not established a plausible claim for fraudulent concealment because (1) Plaintiffs'

20  allegations that the alleged conspiracy was secret do not establish affirmatively misleading

21  conduct; (2) Plaintiffs fail to identify any instance where Defendants made specific and

22  affirmatively false or misleading statements to conceal the conspiracy; (3) Pixar's and Lucasfilm's

23  conduct in defense of the *High-Tech* litigation does not constitute affirmative acts of concealment;

24  and (4) Plaintiffs have failed to allege that they diligently investigated their claims after Plaintiffs

25  were put on notice of their claims. Mot. 4–17. The Court turns to these arguments below.

26        **c. Legal standard for "affirmative acts"**

27        Before the Court evaluates the legal sufficiency of Plaintiffs' factual allegations, the Court

28        26

*United States District Court*
*Northern District of California*

begins by addressing the parties' dispute with respect to what standard for "affirmatively misleading conduct" Plaintiffs' allegations must meet. In the Court's April 3, 2015 order granting Defendants' motion to dismiss, the Court concluded that Plaintiffs "faile[d] to show affirmatively misleading conduct 'above and beyond' the alleged conspiracy itself." *In re Animation Workers Antitrust Litig.*, 2015 WL 1522368, at *15 (quoting *Guerrero v. Gates*, 442 F.3d 697, 706–07 (9th Cir. 2003)). Relying on the Ninth Circuit's decisions in *Guerrero* and *Conmar*, the Court explained that "the fact that a defendant's acts are 'by nature self-concealing' is insufficient to show that the defendant has affirmatively misled the plaintiff as to the existence of the plaintiff's claim.'" *In re Animation Workers Antitrust Litig.*, 2015 WL 1522368, at *15 (quoting *Conmar*, 858 F.2d at 505). The Court found that Plaintiffs must allege that "Defendants took affirmative steps to mislead Plaintiffs" and concluded that "Plaintiffs fail[ed] to allege facts showing that Defendants did more than passively conceal information." *Id.*

The Court begins by addressing the parties' apparent confusion and disagreement with respect to the relationship between the "above and beyond" language used in *Guerrero* and what type of fraudulent conduct is necessary for a fraudulent concealment claim in the Ninth Circuit. More specifically, the parties dispute whether Plaintiffs must allege acts of concealment that are "separate and apart" from the wrongful conspiracy itself. As the Fourth Circuit explained in *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995), the circuits have adopted three standards for what acts satisfy the requirement that a defendant has "fraudulently concealed the facts that are the basis of the plaintiff's claim": the (1) "self-concealing" standard; (2) the "separate and apart" standard; and (3) the "affirmative acts" standard.

Under the most lenient standard, the "affirmatively misleading conduct" element is satisfied so long as the plaintiff pleads a "self-concealing" antitrust violation. Thus, the mere existence of a secret conspiracy is enough to prove fraudulent concealment. *Id.* at 122 (citing *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir. 1988), *cert. denied*, 488 U.S. 848 (1988)). In contrast, under the "separate and apart" standard, the most demanding standard, a plaintiff must

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1  plead affirmative acts of concealment separate from acts of concealment inherent in the conspiracy

2  itself. *Id.* (citing *Colorado v. W. Paving Constr. Co.*, 630 F. Supp. 206, 210 (D. Colo. 1986)

3  (noting that the affirmative acts alleged by the plaintiffs "are the acts taken in carrying out the

4  conspiracy itself" and that "[f]raudulent concealment occurs when a defendant takes affirmative

5  steps in addition to the original wrongdoing"), *aff'd en banc by an equally divided court*, 841 F.2d

6  1025 (10th Cir.), *cert. denied*, 488 U.S. 870 (1988)). Finally, under the intermediate "affirmative

7  acts" standard, a plaintiff must show that the defendant affirmatively acted to conceal the

8  conspiracy, but the proof may include acts of concealment that were in furtherance of the

9  conspiracy itself. *Id.* (citing *Texas v. Allan Construction Co.*, 851 F.2d 1526, 1532 (5th Cir.

10  1988)).

11      There is no dispute that the "self-concealing" standard is not the law of this circuit. In

12  *Conmar*, the Ninth Circuit explicitly held that fraudulent concealment "require[s] more" than acts

13  that "by nature [are] self-concealing." *Conmar*, 858 F.2d at 505; *see also Volk*, 816 F.2d at 1416

14  ("[S]ilence or passive conduct does not constitute fraudulent concealment."). As evidenced by the

15  parties' dispute, however, it is less evident whether the Ninth Circuit requires a plaintiff to allege

16  acts of concealment that are wholly separate and independent from the underlying conspiracy

17  itself. Adding to the complexity is the fact that, as the leading treatise on antitrust law concludes,

18  "the line between active and passive concealment is very fine indeed." P. Areeda and H.

19  Hovencamp, Antitrust Law ¶ 320e. The Court further acknowledges that the "above and beyond"

20  language in *Guerrero* has engendered some confusion between the parties. However, as discussed

21  below, the Ninth Circuit's application of the fraudulent concealment doctrine supports the

22  conclusion that a plaintiff in this circuit must allege "affirmative" acts or "affirmatively

23  misleading conduct" to conceal, but those acts do not need to be "separate and apart" from the

24  underlying conspiracy itself.

25      In *Conmar*, for example, the Ninth Circuit held that "affirmative conduct" which was

26  integral to the underlying conspiracy itself could support a fraudulent concealment claim. *See*

27  *Conmar*, 858 F.2d 499–501. More specifically, the plaintiff, Conmar, brought an antitrust action

28

United States District Court
Northern District of California

28

against Mitsui, a foreign supplier of PC-strand steel, alleging that Mitsui imported PC-strand steel at below-market prices, (i.e., "dumping"), in conspiracy with Conmar's competitors. "Dumping" steel products allowed Conmar's competitors to obtain PC-strand steel from Mitsui at illegally low prices, suppressing competition. *Id.* Mitsui was able to import PC-strand steel at below-market prices "in part by using false customs reports" that "split[] . . . the difference between nominal and actual exchange rates." *Id.* at 500. In support of its fraudulent concealment claim, Conmar alleged that "Mitsui affirmatively acted to conceal its anticompetitive behavior by creating customs and other documents false reporting prices for PC-strand." *Id.* at 505. The Ninth Circuit held that a jury could conclude that the "the filing of false customs forms was affirmative conduct sufficient for a finding of fraudulent concealment." *Id.*

Indeed, the Fourth Circuit in *Meadow Gold Dairies* cited *Conmar* for the proposition that "affirmative acts in furtherance of a conspiracy provide sufficient evidence of fraudulent concealment to establish the first element of the fraudulent concealment test." *Meadow Gold Dairies*, 71 F.3d at 125–26. Similarly, in *E.W. French & Sons, Inc. v. General Portland Inc.*, 885 F.2d 1392 (9th Cir. 1989), the Ninth Circuit found that acts part and parcel of the underlying conspiracy could support a finding of fraudulent concealment. In *E.W. French*, the plaintiff alleged antitrust violations in the form of an illegal price fixing conspiracy, in which the defendant allegedly provided secret discounts and lower prices to certain co-conspirators. *E.W. French*, 885 F.2d at 1394–95. In addition to alleging that the defendant had flatly denied any wrongdoing, the plaintiff also alleged that the defendant's use of "plain white envelopes" to mail discount and price information to co-conspirators was an affirmative act of fraudulent concealment. *Id.* at 1399. The Ninth Circuit agreed, and held that a reasonable jury could conclude that the use of "plain white envelopes" to communicate anti-competitive prices and discounts, in combination with the defendant's denial of wrongful conduct, could establish fraudulent concealment. *Id.* at 1399.

In both *Conmar* and *E.W. French*, the Ninth Circuit held that a defendant's acts which were in furtherance of the underlying conspiracy could be sufficient to show fraudulent concealment. These cases cannot be reconciled with the "separate and apart" standard, which

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

1    requires that a plaintiff allege fraudulent conduct that is extrinsic of the underlying conspiracy

2    itself. *See Meadow Gold Dairies*, 71 F.3d at 125–26. The Ninth Circuit and other courts in this

3    District have consistently required only that a plaintiff allege "affirmative acts" of concealment.

4    These acts must be "affirmative steps to mislead" that are more than mere "passive[]

5    conceal[ment]." *Volk*, 816 F.2d at 1415–16. That does not, however, impose the heightened

6    requirement that a plaintiff allege fraudulent conduct that is independent of the underlying

7    conspiracy, or that the affirmative conduct be "separate and apart" from acts in furtherance of the

8    underlying conspiracy. *See, e.g.*, *Lithium Ion*, 2014 WL 309192, at *16 (efforts by the defendants

9    to keep conspiracy secret, such as instructing destruction of emails after reading, instructing

10   personnel to refrain from memorializing conversations, and using code names were relevant to the

11   fraudulent concealment question); *TFT-LCD*, 586 F. Supp. 2d at 1119, 1132 (defendants' use of

12   pretextual explanations for price increases and agreement not to publicly disclose the nature of the

13   conspiracy could establish fraudulent concealment).

14       Moreover, the Court notes that such an interpretation of existing Ninth Circuit case law is

15   in accord with the majority of the circuits, which have adopted either the "self-concealing"

16   standard, or the intermediate "affirmative acts" standard. *See New York v. Hendrickson Bros., Inc.*,

17   840 F.2d 1065, 1084–85 (2d Cir. 1988) ("[T]he State sufficiently proved the concealment by the

18   defendants of the conspiracies . . . both because the bid-rigging was self-concealing and because

19   the . . . defendants' affirmative acts of concealment were properly admissible against all of the

20   defendants."); *Marlington*, 71 F.3d at 126 ("Those acts, however, need not be separate and apart

21   from the acts of concealment involved in the antitrust violation; rather, [plaintiff's] proof may

22   include acts of concealment involved in the alleged antitrust violation itself."); *Texas v. Allan

23   Const. Co.*, 851 F.2d 1526, 1541 (5th Cir. 1988) ("Refusing to allow affirmative acts that further a

24   conspiracy to support a finding of fraudulent concealment rests upon a view . . . that we find

25   unacceptable."); *Pinney Dock and Transport Co. v. Penn Central Corp.*, 838 F.2d 1445, 1472 (6th

26   Cir. 1988) ("[A]ffirmative acts may be found by the trier of fact to constitute both wrongful

27   concealment of the alleged conspiracy in violation of the antitrust laws and acts in furtherance of

28

30

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

the conspiracy."); *Baker v. F & F Inv.*, 420 F.2d 1191, 1199 (7th Cir. 1970) ("Where, as in the case of many conspiracies in violation of federal antitrust laws, the wrong is self-concealing, little need be added in order to justify tolling the statute."); *Hill v. Texaco, Inc.*, 825 F.2d 333, 335 n.2 (11th Cir. 1987) (holding that fraudulent concealment may be shown if "the wrong is of such a character as to be self-concealing.").

Defendants rely on the "above and beyond" language in *Guerrero*, which this Court cited in its April 3, 2015 order, in support of their argument that fraudulent concealment requires conduct that is "separate and apart" from the underlying conspiracy. In *Guerrero*, the Ninth Circuit held that fraudulent concealment "halts the statute of limitations when there is 'active conduct by a defendant, above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time.'" *Guerrero*, 442 F.3d at 706 (quoting *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000)). As discussed above, the Court concludes that the Ninth Circuit has consistently held in antitrust actions that allegations of affirmative acts of concealment, even if in furtherance of the conspiracy, may be sufficient to support a fraudulent concealment claim. To the extent there may be any ambiguity as to whether the "above and beyond" language in *Guerrero* requires a plaintiff to allege fraudulent acts that are "separate and apart" from the underlying conspiracy itself, the Court finds that the Ninth Circuit, at least in antitrust actions,[12] has required only "affirmative acts" of concealment. Reading *Guerrero* against the Ninth Circuit's decisions in *Conmar*, *E.W. French*, and *Volk*, the Court concludes that these cases stand for the proposition that a plaintiff must allege active, affirmative acts of fraudulent concealment that entail more than passive silence, but those affirmative acts may be intertwined with the underlying antitrust conspiracy.[13]

---

[12] Defendants contend that the Ninth Circuit has not explicitly held that the standard for fraudulent concealment differs in antitrust actions. While that may be the case, the Court is not persuaded that *Guerrero* abrogated the long line of Ninth Circuit authority finding that affirmatively misleading acts that were also in furtherance of the conspiracy could establish fraudulent concealment.

[13] While not relevant here, the Court does note that silence may be sufficient to show fraudulent concealment where there is an affirmative duty to disclose, e.g., a fiduciary duty. *Conmar*, 858 F.2d at 505 ("Passive concealment of information is not enough to toll the statute of limitations, unless the defendant had a fiduciary duty to disclose information to the plaintiff.") (internal citation omitted).

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

1   Accordingly, the Court rejects Plaintiffs' "invitation" to reconsider the Court's previous

2   finding that Plaintiffs failed to sufficiently plead "affirmative acts" of misconduct. In its April 3,

3   2015 order, the Court relied on *Guerrero*, *Conmar*, and *Volk* to conclude that Plaintiffs'

4   conclusory allegations with respect to Defendants' "secret conspiracy," were insufficient to show

5   more than mere passive concealment. *See In re Animation Workers Litig.*, 2015 WL 1522368, at

6   *15–16. Plaintiffs' bare allegations in their CAC consisted of claims that Defendants engaged in a

7   "secret conspiracy" or that "Defendants' conspiracy was concealed." As the Court previously

8   concluded, under Ninth Circuit precedent, allegations that a "secret conspiracy" existed are

9   insufficient to show "affirmative acts" of concealment. *Id.* (citing *Conmar*, 858 F.2d at 505). The

10   Court therefore denies Plaintiffs' request to "reconsider" its April 3, 2015 order.

11   The Court therefore turns to whether Plaintiffs have now sufficiently alleged facts in their

12   SAC showing "affirmative acts" of concealment.

13   **d. Plaintiffs have pled sufficient facts to satisfy the "affirmative acts" requirement**

14   With the above principles in mind, the Court finds that Plaintiffs' allegations, taken as a

15   whole, have stated a plausible claim that Defendants took "affirmative acts" to mislead the

16   Plaintiffs. The Court notes that Defendants Sony and Blue Sky have raised specific challenges to

17   the sufficiency of Plaintiffs' allegations of fraudulent concealment as to those Defendants, and the

18   Court addresses those arguments in Part B. Setting aside Defendants Sony and Blue Sky's separate

19   arguments for the moment, the Court concludes that Plaintiffs have adequately pled the first

20   element of a fraudulent concealment claim for the reasons discussed below.

21   Here, the Court finds that Plaintiffs' allegations of pretextual statements regarding

22   compensation, in combination with Plaintiffs' allegations that Defendants actively concealed and

23   ensured the secrecy of the conspiracy, are sufficient to allege "affirmative acts." *See In re*

24   *Animation Workers Litig.*, 2015 WL 1522368, at *16 (citing *In re Lithium Ion Batteries Antitrust*

25   *Litigation*, No. 13-MD-2420, 2014 WL 309192, at *16 (N.D. Cal. Jan. 21, 2014); *In re TFT-LCD*

26   *(Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1119 (N.D. Cal. 2008) (pretextual explanations

27   for the inflated prices of LCDs and efforts to ensure secrecy were affirmative acts of

28

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1    concealment); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024–25

2    (N.D. Cal. 2010) (same ). In *Lithium Ion*, for example, the plaintiffs alleged both that the

3    defendants had made "public, putatively false statements . . . affirming their compliance with

4    applicable antitrust laws, as well as the existence of vigorous price competition in the . . . market,"

5    on which plaintiffs could have reasonably relied, and that the defendants had taken affirmative

6    steps to destroy evidence of the conspirators' secret meetings, avoided memorializing

7    conversations, and used secret codes to refer to coconspirators and topics.  *Lithium Ion*, 2014 WL

8    309192, at *16. As this Court previously noted, "[i]t was the combination of those misleading,

9    pretextual statements and the affirmative efforts taken to destroy evidence of the conspiracy or

10   otherwise keep the conspiracies secret that supported the respective plaintiffs' fraudulent

11   concealment allegations." *In re Animation Workers Litig.*, 2015 WL 1522368, at *16

12          In the instant case, the Court finds that Plaintiffs have sufficiently alleged that Defendants

13   both made misleading, pretextual statements and took affirmative steps to keep the alleged

14   conspiracy a secret. Plaintiffs allege that Defendants both made general statements regarding the

15   reasons for certain salary raises and ranges that belied the true reason for compensation decisions,

16   i.e., the alleged conspiracy, and that Defendants made specific misleading statements to individual

17   putative class members. For instance, Pixar's Ed Catmull sent an email to Pixar employees

18   suggesting that "one of the main reasons" for the modest 3.5% raise in 2007 was to "fund

19   additional benefit programs." SAC ¶ 149. According to Plaintiffs, such a statement could be

20   misleading, because Plaintiffs contend that the actual reason salary increases were modest was the

21   illegal conspiracy. Similarly, Pixar allegedly instructed its managers to inform employees that

22   salaries were set based on performance, skills, and proficiency, without any mention of collusive

23   salary range setting. *Id.* ¶ 148. In addition to these more generalized statements, Plaintiffs identify

24   specific communications from Defendants to putative class members describing compensation as

25   "competitive," and explaining that compensation was determined on "employee equity . . . skill

26   set[,] and experience," without any mention of the alleged conspiracy. *Id.* ¶ 150 (quoting emails

27   from Pixar's McAdams and ILM's Beck).

28

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1       Taking these allegations as true, which the Court must on a motion to dismiss, the Court

2   concludes that Plaintiffs have adequately alleged that Defendants provided pretextual explanations

3   for Plaintiffs' allegedly suppressed compensation. Attributing the anti-competitive effects of a

4   conspiracy to some cause other than the collusive conduct can be an affirmative act of fraudulent

5   concealment. *See E.W. French*, 885 F.2d at 1399 (finding affirmative acts where defendant

6   attributed price uniformity to competition, rather than collusion). Moreover, as this Court

7   explained in its April 3, 2015 order, other courts in this District have consistently found that

8   pretextual explanations for how or why certain anti-competitive effects are occurring can satisfy

9   the "affirmative acts" requirement.

10       For instance, in *Cathode Ray*, the court found that the defendant acted affirmatively when

11   it attributed "stubbornly" high prices to a shortage of critical input components. 738 F. Supp. 2d at

12   1024. Similarly, in *TFT-LCD*, the court found that the defendants' pretextual explanations for the

13   inflated prices of LCDs, such as undercapitalization and undersupply, were affirmative acts of

14   concealment under the first element of the fraudulent concealment standard. 586 F. Supp. 2d at

15   1119. Likewise, in *Lithium Ion*, the court found that the defendants' "public, putatively false

16   statements . . . affirming their compliance with applicable antitrust laws, as well as the existence of

17   vigorous price competition in the . . . market," in combination with efforts to maintain the secrecy

18   of the conspiracy, could support a fraudulent concealment claim. *Lithium Ion*, 2014 WL 309192,

19   at *16. Here, as in *Cathode Ray*, *TFT-LCD*, and *Lithium Ion*, Plaintiffs have identified instances

20   where Defendants allegedly provided explanations for why compensation levels were set at certain

21   levels that belied the actual reason for suppressed compensation, i.e., Defendants' alleged

22   conspiracy.

23       In addition to these new specific factual allegations with respect to Defendants' allegedly

24   misleading, pretextual explanations for compensation levels, the Court further notes that Plaintiffs

25   have made more detailed allegations with respect to Defendants' affirmative attempts to maintain

26   the secrecy of the conspiracy. Unlike Plaintiffs' bare allegations of the existence of a "secret

27   conspiracy" in Plaintiffs' CAC, *see* CAC ¶ 126, Plaintiffs have now put forth specific factual

28

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1    allegations concerning Defendants' affirmative efforts to keep the conspiracy secret. Plaintiffs

2    allege, and support with specific factual allegations, that Defendants actively attempted to conceal

3    the existence of the conspiracy. *See generally* SAC ¶¶ 135–182. For example, "[i]n lieu of emails,

4    [Pixar's] McAdams opted for in-person meetings," including a dinner she held with a Lucasfilm

5    executive where she planned to "ask her about her merit increase budget for 2009." SAC ¶ 143.

6    Similarly, Plaintiffs cite the deposition testimony of Sharon Coker, the former ILM Senior

7    Director Human Resources and Director of Human Resources at the Walt Disney Company and

8    ImageMovers, where Coker explained that the non-solicitation agreement "was termed a

9    'gentleman's agreement' . . . because it was not written down." *Id.* ¶ 139. Plaintiffs also contend

10   that Lucasfilm made "affirmative efforts to eliminate a paper trail regarding its code-named

11   'DNR' agreements," including a requirement that "all discussions of 'DNR' needed to be

12   conducted over the phone . . . [i]f you see an email forward to Steve and one of our lawyers." *Id.* ¶

13   138.

14          These factual allegations raise the reasonable inference that Defendants took affirmative

15   steps to conceal the details of their conspiracy by intentionally choosing to meet in-person or over

16   the telephone, rather than risk memorializing details about the alleged conspiracy. [14] *See, e.g.*, *In re*

17   *Capacitors Antitrust Litig.*, No. 14-cv-03264-JD, 2015 WL 3398199, at *7 (N.D. Cal., May 26,

18   2015) (finding allegations that the defendants "generally agreed not to discuss public nature of the

19   scheme," "did not take or distribute official minutes or record the meetings," and instructed

---

[14] The Court further notes that Plaintiffs have alleged a variety of other actions that Plaintiffs
contend evince affirmative acts to conceal on the part of Defendants. As discussed in the factual
background, Plaintiffs aver that Defendants would use personal emails instead of company emails
to communicate about the conspiracy, published codes of conduct or documents that
"misrepresented the truth about the conspiracy," filed misleading SEC documents, and took active
steps to conceal the breadth and scope of the conspiracy during the *High-Tech* litigation. *See* SAC
¶¶ 140, 151–163, 171–182. Defendants contest the truth of some of these allegations, and also
dispute whether any alleged action or conduct could individually and independently be considered
misleading or fraudulent. *See* Mot. at 8–16.
        However, on a motion to dismiss the Court accepts as true Plaintiffs' factual allegations
and makes all reasonable inferences in favor of Plaintiffs. *See Knevelbaard Dairies v. Kraft
Foods, Inc.*, 232 F.3d 979, 984 (9th Cir. 2000) (In ruling on a motion to dismiss, "the court must
presume all factual allegations of the complaint to be true and draw all reasonable inferences in
favor of the nonmoving party.") (citation omitted).

35

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

1   employees to delete emails were sufficient to support the allegation of fraudulent concealment).

2   These allegations also support Plaintiffs' claim that Defendants actively took measures to ensure

3   the secrecy of the conspiracy. While Defendants dispute Plaintiffs' characterizations and

4   interpretations of these factual allegations, and while Plaintiffs may not ultimately prevail in

5   proving that their allegations are true, the Court accepts as true Plaintiffs' factual allegations at the

6   motion to dismiss stage. *See Knevelbaard*, 232 F.3d at 984. At this stage of the proceedings,

7   Plaintiffs need only allege sufficient facts to state a plausible claim, not prove the veracity of their

8   allegations. *See id.*

9        Defendants argue that Plaintiffs have not shown that these alleged pretextual statements

10   were made "for the purpose of misleading plaintiffs 'or to keep the plaintiff unaware.'" Mot. 8

11   (citing *Hexcel*, 681 F.3d at 1060). However, Defendants cite no Ninth Circuit authority, or any

12   authority for that matter, that requires Plaintiffs to show that Defendants' affirmative acts were for

13   the purpose of misleading Plaintiffs. To the contrary, one court in this circuit has specifically held

14   that "[t]he proper focus . . . is not whether the *intent* was to conceal the information from

15   plaintiffs, but whether the 'concealment . . . prevented [plaintiff] from being alerted." *In re*

16   *Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 782 F. Supp. 487, 490

17   (C.D. Cal. 1991) (citing *Conmar*, 858 F.2d at 502). While it may be the case that Plaintiffs will

18   ultimately have to prove the fact that Defendants' alleged affirmative conduct "prevented

19   [Plaintiffs] from being alerted to the" suppression of Plaintiffs' compensation, that does not

20   require that Plaintiffs prove that Defendants had the subjective intent of concealing the alleged

21   conspiracy. *Conmar*, 858 F.2d at 505.

22        Indeed, Defendants rely on this "purpose" argument in support of their contention that

23   Plaintiffs have failed to allege more than mere passive concealment. However, for the reasons

24   discussed above, the Court concludes that Plaintiffs have alleged more than a mere failure to

25   disclose the existence of a conspiracy. As Plaintiffs argue, taking steps to ensure that a conspiracy

26   remains secret is qualitatively different from failing to disclose a secret conspiracy. *See, e.g.*, *In re*

27   *Capacitors Antitrust Litig.*, 2015 WL 3398199, at *7. At bottom, while Defendants characterize

28

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

their arguments as concerning the sufficiency of Plaintiffs' allegations, the Court finds that Defendants' arguments go to the truth of Plaintiffs' claims. As discussed above, the Court previously granted Defendants' motion to dismiss because Plaintiffs' "factual" allegations were comprised of conclusory allegations that "Defendants provided pretextual, incomplete or materially false and misleading explanations for hiring, recruiting and compensation decisions made pursuant to the conspiracy," and that "Defendants engaged in a secret conspiracy." *See* CAC ¶¶ 126, 130. In Plaintiffs' SAC, however, Plaintiffs have made specific factual allegations with "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz*, 476 F.3d at 764. These factual allegations, taken as true, are sufficient to support a plausible claim of fraudulent concealment.

Defendants also contend that Plaintiffs cannot show that any of Plaintiffs' alleged pretextual statements were "putatively false." Mot. at 11. For instance, according to Defendants, Plaintiffs "do not and cannot allege that Pixar was being deceptive" by explaining that the child care center was "one of the main reasons" for the modest salary raises. Reply at 9. Instead, "what [P]laintiffs are *really* arguing is that Pixar should have disclosed, *in addition* to the child care center, the purported conspiracy." *Id*. Mere failure to disclose the alleged conspiracy, Defendants contend, cannot constitute "affirmative" conduct. *Id.* Defendants are correct that silence or mere passive concealment cannot constitute affirmatively misleading conduct. However, Plaintiffs assert that Pixar's identification of the child-care center as "one of the main reasons" for modest salary increases in 2007 without disclosing that the conspiracy was allegedly the real reason for the modest increases constitutes more than mere silence and passive concealment. For the purposes of deciding a motion to dismiss, the Court finds this allegation sufficient. The alleged pretextual explanation for the modest salary increases could plausibly be interpreted as a misleading partial disclosure designed to evade the suspicions of the Plaintiffs. *See ,e.g.*, *Cathode Ray.*, 738 F. Supp. 2d at 1024–25 (allegation that defendants provided pretextual explanations for price increases sufficient). Such evasion or attempt to mislead is neither silence nor passive concealment.

37

United States District Court
Northern District of California

Furthermore, a statement need not be "putatively false" to mislead. Defendants, unsurprisingly, cite no authority for this proposition as Rule 9(b) merely requires that Plaintiffs plead "false *or* misleading" statements. *GlenFed*, 42 F.3d at 1548 (emphasis added). For instance, in *Lithium Ion*, the defendants "used the cobalt price increase as a pretext for an unwarranted price increase on their own products." *Lithium Ion*, 2014 WL 309192, at *4. While there was, in fact, an increase in cobalt prices at that time, the defendants' pretextual excuse for increasing prices prevented plaintiffs from discovering the true reason for the unwarranted price increases: defendants' alleged illegal conspiracy. *Id.* at *4, 16. As in *Lithium Ion*, it may be the case that Defendant Pixar's explanation for its "modest" salary increases was not "putatively" false, but Plaintiffs have plausibly pled that Pixar's explanation was misleading because it deflected attention from the allegedly anticompetitive conspiracy.

Defendants also contend that Plaintiffs have failed to allege that any pretextual statements "were the product of any concerted activity between or among defendants for the purpose of concealing the alleged conspiracy." Mot. at 9 (citing *Cathode Ray*, 738 F. Supp. 2d at 1025). As Plaintiffs note, however, "Defendants' attempt to convert the fraudulent concealment doctrine into a conspiracy-to-fraudulently-conceal doctrine is wholly unsupported." Opp. at 8. It is true that the *Cathode Ray* court found that the plaintiffs' allegations that the defendants agreed, as part of price-fixing conspiracy, "'not to discuss publicly, or otherwise reveal, the nature and substance' of their dealings . . . . and to give 'false and pretextual reasons for . . . price increases," were sufficient to plead fraudulent concealment. *In re Cathode Ray*, 738 F. Supp. 2d at 1025. The *Cathode Ray* court did not, however, hold that such agreement was a necessary predicate to finding that the defendants had taken affirmative acts to fraudulently conceal their conspiracy. *See id.* Defendants' identification of a case where certain factual allegations were found sufficient to plead fraudulent concealment does not support Defendants' assertion that such allegations are *necessary* to plead fraudulent concealment. Here, for the reasons discussed above, Plaintiffs have sufficiently alleged that Defendants conspired to suppress compensation through their anti-solicitation and compensation setting agreements, and that Defendants took affirmative steps to fraudulently

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

conceal the alleged conspiracy. The Court declines to impose the novel requirement that any fraudulent concealment also have been an explicit, separate, and agreed-to term of the conspiracy.

In sum, the Court finds that Plaintiffs have sufficiently alleged, with particularity, "affirmative acts" of concealment. While Plaintiffs may not ultimately prevail on these claims, and while Defendants vigorously contest Plaintiffs' inferences and characterizations of certain factual allegations, the Court concludes that Plaintiffs have "ple[d] factual content that allows the court to draw the reasonable inference that the defendant[s are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. At the motion to dismiss stage, Plaintiffs are not required to do more.

### 2. Actual or constructive knowledge and due diligence

In addition to pleading affirmative conduct, the first element of the fraudulent concealment claim, Plaintiffs must also allege the second and third elements of a fraudulent concealment claim: that Plaintiffs did not have "actual or constructive knowledge of the facts giving rise to its claim"; and that Plaintiffs acted diligently in trying to uncover the facts giving rise to their claims. *Hexcel*, 681 F.3d at 1060; *see also Conmar*, 858 F.2d at 502; *Beneficial Life*, 851 F.2d at 276. "Where a plaintiff's suspicions have been or should have been excited, there can be no fraudulent concealment where he [or she] 'could have then confirmed his [or her] earlier suspicion by a diligent pursuit' of further information." *Conmar*, 858 F.2d at 504 (quoting *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978)). "The requirement of diligence is only meaningful, however, when facts exist that would excite the inquiry of a reasonable person." *Conmar*, 858 F.2d at 504.

Here, Defendants focus primarily on whether Plaintiffs have sufficiently alleged that Plaintiffs diligently investigated their claims. *See* Mot. at 17. More specifically, Defendants contend that "[r]egardless of *when* plaintiffs had notice of their claims, they offer no allegations whatsoever as to what they did to investigate them." *Id.* Defendants' argument puts the cart before the horse, however, as Plaintiffs were not obligated to investigate their claims *until* Plaintiffs had reason to suspect the existence of their claims. *See Conmar*, 858 F.2d at 504–05; *see also In re Coordinated Pretrial Proceedings*, 782 F. Supp. at 498 ("Due diligence is not required in the

39

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

abstract. Plaintiffs are not under a duty continually to scout around to uncover claims which they have no reason to suspect they might have."). In other words, as the parties appear to agree, Plaintiffs' duty to diligently investigate their claims would only have been triggered by inquiry notice.

Plaintiffs allege that Plaintiffs "had no reason to know Defendants had conspired to suppress compensation . . . until 2013, when incriminating documents were unsealed and filed publicly in the *High-Tech* docket." SAC ¶ 184. Plaintiffs further allege that Plaintiffs diligently pursued and investigated their claims shortly after the "documents disclosing the conspiracy were first released, and just two months after the first news article suggesting that the conspiracy might go beyond the one in the high-tech industry." *Id.* ¶ 189. Moreover, Plaintiffs also argue that "plaintiffs tried to obtain information that might have given rise to their claims, but such inquiries were met with misrepresentations." Opp. at 21 (citing SAC ¶¶ 147–48, 150, 165, 183). Defendants contend, in a footnote, that Plaintiffs "were on notice by *early* 2010, if not sooner" based on "many widely read publications" reporting the DOJ's investigation "into employment practices at high tech companies - specifically including firms in Northern California, where Pixar and Lucasfilm are located and where DreamWorks has a production facility." Mot. at 17, n.16.

As a threshold matter, the Court agrees with Plaintiffs that the question of constructive knowledge and inquiry notice generally "presents a question for the trier of fact." *Volk*, 816 F.2d at 1417. Moreover, the fact that "widely read publications" reported a DOJ investigation of "high tech firms" that were in physical proximity to some Defendants is insufficient to show that Plaintiffs, as a matter of law, should have been on inquiry notice of their claims. *See, e.g.*, *Conmar*, 858 F.2d at 503–04 (holding that issue of whether newspaper articles and public record of the defendant's indictment triggered inquiry notice could not be resolved at summary judgment); *In re Coordinated Pretrial Proceedings*, 782 F. Supp. at 497 (finding genuine issue of material fact existed as to inquiry notice based on newspaper articles describing government investigation); *E.W. French*, 885 F.2d at 1400 (reversing directed verdict and holding that plaintiff's knowledge of a similar lawsuit against the named defendants did not necessarily

United States District Court
Northern District of California

constitute actual or constructive knowledge as a matter of law). The Court further notes that courts have "been hesitant to dismiss an otherwise fraudulently concealed antitrust claim for failure to sufficiently allege due diligence," because questions of inquiry notice are "necessarily bound up with the facts of the case." *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090, at *24 (D.N.J. Oct. 20, 2011).

At this stage, the Court is not persuaded that Plaintiffs' were on inquiry notice of their claims as a matter of law. It may be the case that Defendants can later prove that Plaintiffs were on inquiry notice of their claims before 2013 when Plaintiffs allege that they first had access to the public documents on the *High-Tech* docket. However, Defendants' bare assertion that Plaintiffs should have been on notice of their claims based on "widely read publications" describing the DOJ's investigation of companies in the same geographic area is insufficient to warrant dismissal of Plaintiffs' fraudulent concealment claim. Even assuming this allegation were facially sufficient, "[i]t is impossible to declare at this . . . stage that plaintiffs failed to exercise due diligence to follow up on that which may or may not have been sufficient to excite their suspicions." *Rubber Chemicals*, 504 F. Supp. 2d at 788 (internal quotation marks omitted). Accordingly, the Court finds that Plaintiffs have sufficiently alleged both that Plaintiffs lacked actual or constructive knowledge of the facts giving rise to their claims, and that Plaintiffs acted diligently under the circumstances.

In sum, the Court finds that Plaintiffs have adequately alleged the elements of a fraudulent concealment claim. Plaintiffs have pled specific facts showing that certain Defendants took affirmative steps to conceal the existence of Plaintiffs' claims. *See Hexcel*, 681 F.3d at 1060. Moreover, the Court finds that Plaintiffs have adequately alleged that Plaintiffs did not have actual or constructive knowledge of their claims, and that Plaintiffs acted diligently once Plaintiffs discovered their claims.

Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiffs' claims as time barred, as the Court finds that Plaintiffs' allegations of fraudulent concealment are sufficient to toll the statute of limitations.

41

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

### B. Plaintiffs' claims against Defendants Blue Sky, Sony Pictures, and Two Pic MC LLC

Defendants Blue Sky and Sony Pictures separately move to dismiss Plaintiffs' claims against them on two grounds. First, Blue Sky and Sony claim that Plaintiffs have failed to specifically allege fraudulent concealment against Blue Sky, Sony, and Two Pic MC LLC (f/k/a ImageMovers Digital). Second, Defendants Blue Sky and Sony contend that the SAC fails to state viable antitrust claims against Blue Sky and Sony as a matter of law. Mot. at 24. The Court considers each argument in turn.

### 1. Fraudulent Concealment as to Defendants Blue Sky and Sony Pictures

Defendants contend that Plaintiffs have failed to make any specific allegations regarding fraudulent concealment with respect to Defendants Blue Sky, Sony, and Two Pic MC LLC (f/k/a ImageMovers Digital). Mot. at 22. The parties dispute whether all Defendants may be held liable for fraudulent concealment based on the actions of alleged co-conspirators, which were presumably in furtherance of the conspiracy. The Court begins by addressing whether Plaintiffs are obligated to allege fraudulent concealment as to each Defendant, before addressing the sufficiency of Plaintiffs' allegations.

Here, Plaintiffs contend that "[e]very appellate court to decide the issue has held that the fraudulent concealment of a conspiracy 'may be established through the acts of co-conspirators.'" Opp. at 15 (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008), and citing *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989) ("[A]ffirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators for purposes of tolling the statute of limitations."); *Hendrickson Bros.*, 840 F.2d at 1085 (same); *see also In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 07-05634 CRB, 2011 WL 1753738, at *21 (N.D. Cal. May 9, 2011) (rejecting argument that plaintiffs must make specific allegations of fraudulent concealment by particular defendants). Defendants argue, however, that the Ninth Circuit has held otherwise.

In *Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1402 (9th Cir. 1995), the Ninth Circuit held that "'Plaintiffs may not generally use the fraudulent concealment by one defendant as

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

a means to toll the statute of limitations against other defendants.'" (quoting *Griffin v. McNiff*, 744 F. Supp. 1237, 1256 n.20 (S.D.N.Y. 1990), *aff'd*, 996 F.2d 303 (2d Cir. 1993)). The *Barker* court held that the "common law doctrine of 'fraudulent concealment'" may toll the statute of limitations "only if the plaintiff 'establishes affirmative conduct upon the part of *the defendant* which would, under the circumstances of the case, lead a reasonable person to believe that he [or she] did not have a claim for relief.'" *Barker*, 64 F.3d at 1402 (quoting *Volk*, 816 F.2d at 1415).

Defendants rely on *Barker* for the proposition that Plaintiffs may not hold Defendants Blue Sky, Sony, or Two Pic MC LLC liable for any alleged fraudulent concealment committed by the other coconspirator Defendants, regardless of whether or not that fraudulent concealment was committed in furtherance of the conspiracy. While such an interpretation is superficially appealing, the Court concludes that *Barker* cannot stand for such a broad proposition when read with Ninth Circuit conspiracy and antitrust cases.[15]

In *Barker*, the Ninth Circuit was careful to note that the requirement that a plaintiff allege fraudulent concealment as to each defendant was the "general[]" rule. *Id.* As Plaintiffs note, the Ninth Circuit has not specifically addressed whether in a case alleging a conspiracy, whether a plaintiff must specifically allege fraudulent concealment on the part of each and every conspirator. *Barker* did not involve an alleged conspiracy, but instead addressed whether the alleged fraud or concealment by the defendants' "successor fiduciaries" could be used to toll the statute of limitations against the defendants. *Barker*, 64 F.3d at 1401–02. The *Barker* court therefore had no occasion to opine on whether conspiracy law would pose an exception to the "general[]" rule that a plaintiff must allege fraudulent concealment against each defendant.

Similarly, none of the district court cases that the *Barker* court quoted and relied upon for

---

[15] The Court notes that Plaintiffs are incorrect in attempting to limit *Barker* solely to Employee Retirement Income Security Act ("ERISA") cases. It is true that the *Barker* court was interpreting the "fraud or concealment" exception in the ERISA statute. *Barker* 64 F.3d at 1401–02. However, the Ninth Circuit held that the "'fraud or concealment' exception in the statute incorporates the common law doctrine of 'fraudulent concealment.'" *Id.* at 1402. The *Barker* court then cited its prior decision in *Volk* and other persuasive authority for the proposition that *under the common law doctrine* of fraudulent concealment, a plaintiff must "generally" allege fraudulent concealment as to each defendant. *Id.*

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

the proposition that "the doctrine of fraudulent concealment tolls the statute of limitations only as to those defendants who committed the concealment," *id.* (quoting *Greenwald v. Manko*, 840 F. Supp. 198, 203 (E.D.N.Y. 1993)), addressed alleged acts of fraudulent concealment by a coconspirator in furtherance of the conspiracy. *See Greenwald*, 840 F. Supp. at 198–202 (individual defendants with no conspiracy allegation); *Griffin*, 744 F. Supp. at 1255–56 (dismissing conspiracy claim and finding plaintiffs were on inquiry notice); *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 232 (S.D.N.Y. 1989) (finding that the "bare conspiracy allegation" was insufficient under Rule 9(b) and that the alleged RICO conspiracy had no relationship to the alleged fraudulent concealment by non-conspirators). Instead, those cases either involved no conspiracy allegations at all, insufficient allegations that were dismissed, or allegations of a conspiracy that bore no relationship with the alleged fraudulent concealment. *O'Brien*, 719 F. Supp. at 232. Nor did any of those cases involve alleged antitrust violations or discuss joint and several liability under either antitrust or conspiracy law.

As Defendants concede, the antitrust laws "impose joint and several liability." Reply at 16, n.15. Moreover, the Ninth Circuit has made clear that the "action of any of the conspirators to restrain or monopolize trade is, in law, the action of all," and "[a]ll conspirators are jointly liable for the acts of their co-conspirators." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1366–67 (9th Cir. 1980). In *Beltz*, the Ninth Circuit explained that:

> If [a plaintiff] can establish the existence of a conspiracy in violation of the antitrust laws and that [defendants] were a part of such a conspiracy, [defendants] will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of [defendants'] own actions. Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result.

*Id.* at 1367. Notwithstanding this well-established body of antitrust and conspiracy law, Defendants contend that under *Barker*, a coconspirator may not be held liable for the fraudulent concealment of another member of the conspiracy even if that fraudulent concealment was in furtherance of the conspiracy.

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

1    The Court is not persuaded. Defendants' proposed application of *Barker* is incompatible

2    with *Beltz*'s holding that, as a fundamental principle of conspiracy law, coconspirators are "liable

3    for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the

4    nature of [the coconspirators'] own actions." *Id.* As the Ninth Circuit recognized in *Beltz*, it may

5    be the case that certain members of the conspiracy are "performing different tasks to bring about

6    the desired result." *Id.* Under Defendants' overly broad interpretation of *Barker*, if two members

7    of a conspiracy are responsible for misleading potential plaintiffs from the existence, scope, or

8    effects of an anticompetitive conspiracy, and other members are responsible for implementing

9    other integral functions of the conspiracy, a plaintiff seeking to toll the statute of limitations may

10   only bring claims against the first two members of the conspiracy. Such an outcome cannot be

11   reconciled with the Ninth Circuit's explicit holding in *Beltz*, that "[p]articipation by each

12   conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability,

13   for each conspirator may be performing different tasks to bring about the desired result." *Id.*

14       Defendants also rely on Rule 9(b)'s heightened pleading requirement in support of their

15   argument that Plaintiffs must allege specific acts of fraudulent concealment by each conspirator.

16   Defendants quote language from the Ninth Circuit's decision in *Swartz* that under Rule 9(b), a

17   plaintiff must "identify the role of each defendant in the alleged fraudulent scheme" and

18   "differentiate their allegations and inform each defendant separately of the allegations surrounding

19   his [or her] alleged participation in the fraud." *Swartz*, 476 F.3d at 765. Defendants fail to note

20   however, that the *Swartz* court began that same paragraph with the rule that "there is no absolute

21   requirement that where several defendants are sued in connection with an alleged fraudulent

22   scheme, the complaint must identify false statements made by each and every defendant." *Id.* at

23   764. The *Swartz* court then proceeded to quote *Beltz*'s holding that "[p]articipation by each

24   conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability . .

25   . ." *Id.* (quoting *Beltz*, 620 F.2d at 1367).

26       Here, the Court finds that Plaintiffs have not "merely lump[ed] multiple defendants

27   together," but made specific factual allegations as to each Defendant and its participation in the

28

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1   alleged conspiracy. *See Swartz*, 476 F.3d at 765 (citing *Haskin v. R.J. Reynolds Tobacco Co.*, 995

2   F. Supp. 1437, 1439 (M.D. Fla. 1998)). *Swartz* does not stand for the proposition that Plaintiffs

3   must allege specific acts of fraudulent concealment as to each Defendant. To the contrary, the

4   *Swartz* court specifically disavowed any such requirement and cited *Beltz*. Instead, *Swartz* requires

5   only that Plaintiffs must make specific factual allegations with respect to each Defendant's alleged

6   participation in the scheme as a whole. *See Swartz*, 476 F.3d at 764–65. As discussed in further

7   depth below, the Court finds that Plaintiffs have satisfied this requirement.

8        Accordingly, the Court denies Defendants Blue Sky's and Sony's motion to dismiss

9   Plaintiffs' claims against them and Two Pic MC LLC as time barred.

10       **2. Plaintiffs' claims against Defendants Blue Sky and Sony**

11        In addition to Defendants' arguments with respect to fraudulent concealment, Defendants

12   Blue Sky and Sony further contend that Plaintiffs have failed to plead plausible claims for relief

13   against either Defendant. The Court begins by laying out the relevant legal standard before

14   addressing the adequacy of Plaintiffs' allegations against Defendants Blue Sky and Sony.

15        The Court notes from the outset that Defendants' disagreements with Plaintiffs'

16   characterizations or interpretations of certain factual allegations do not go to the sufficiency of

17   Plaintiffs' allegations on a motion to dismiss. *See Moss v. United States Secret Serv.*, 572 F.3d

18   962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory

19   factual content, and reasonable inferences from that content, must be plausibly suggestive of a

20   claim entitling the plaintiff to relief.") (internal quotation marks omitted). At the pleading stage, a

21   complaint claiming conspiracy, to be plausible, must plead "enough factual matter (taken as true)

22   to suggest that an agreement was made," i.e., it must provide "some factual context suggesting

23   [that the parties reached an] agreement," not facts that would be "merely consistent" with an

24   agreement. *Twombly*, 550 U.S. at 556, 549, 557. However, the plausibility requirement does not

25   require that a plaintiff show that "its allegations suggesting an agreement are more likely than not

26   true or that they rule out the possibility of independent action, as would be required at later

27   litigation stages such as a defense motion for summary judgment, or a trial." *Anderson News,*

28
Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

1   *L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (citing *Twombly*, 50 U.S. at 556;

2   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597–98 (1986)) (internal

3   citations omitted).

4           **a. Defendant Blue Sky**

5         Defendant Blue Sky claims that Plaintiffs fail to provide "even the most basic facts of Blue

6   Sky's supposed participation in a non-solicitation conspiracy." Mot. at 24. However, the Court

7   finds that Plaintiffs' factual allegations and the "reasonable inferences" from Plaintiffs' factual

8   allegations are sufficient to allege that Blue Sky agreed to and participated in the alleged

9   conspiracy. For example, Plaintiffs specifically aver that Defendant Pixar's internal "Competitors

10   List" instructed Pixar not to recruit or poach employees from Blue Sky, DreamWorks,

11   ImageMovers, Sony Pictures Imageworks, and Walt Disney. SAC ¶ 53. Similarly, Pixar's

12   McAdams explained that Pixar had "gentleman's agreements" with ILM, Sony, and Blue Sky,

13   among others. *Id.* ¶ 54. Blue Sky characterizes the "Competitor List" as nothing but "a statement

14   of Pixar's policy," and argues that the list does not indicate that there was some sort of agreement

15   involving Blue Sky. Reply at 18. In opposition, Plaintiffs contend that the only plausible inference

16   from these allegations is a conspiracy. Indeed, as Plaintiffs argue, it is not evident why Pixar, Blue

17   Sky's competitor, would refuse to recruit or poach from Blue Sky absent some sort of mutual

18   agreement. At a minimum, the inclusion of Blue Sky on Pixar's anti-solicitation list renders it

19   plausible that Blue Sky was an active participant in the conspiracy.

20         Similarly, Plaintiffs point to an alleged conversation between Pixar's McAdams and Blue

21   Sky's Director of Human Resources, Linda Zazza, where McAdams assured Zazza "that [Pixar]

22   [was] not making calls to their people or trying to poach them in any way." SAC ¶ 71. Absent an

23   agreement not to poach, it is not clear why Pixar would call to reassure a competitor that it was *not*

24   poaching the competitors' employees. In addition, Plaintiffs allege that when Zazza "noticed a

25   trend of departing employees," she quickly "'probed to find out if they've been approached by

26   Pixar, etc.' to see if a violation of the no-poach agreement caused the employees to leave Blue

27   Sky." SAC ¶ 72. Defendants contend that Zazza's actions were merely "a routine effort to

28    

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

ascertain why Blue Sky lost employees to its competitors." Mot. at 25. However, Plaintiffs have alleged that Zazza's probe was *"*to see if a violation of the no-poach agreement caused the employees to leave." SAC ¶ 72. While the parties obviously differ in their interpretations of these events, these allegations support the plausible theory that Blue Sky was a member of the conspiracy. Moreover, at the motion to dismiss stage, the Court must draw all reasonable inferences in favor of Plaintiffs. *See Knevelbaard*, 232 F.3d at 984.

Defendants contend that Plaintiffs' allegations are merely "not inconsistent with" Blue Sky's participation in the alleged conspiracy based on Defendants' contrary interpretations and inferences from Plaintiffs' factual allegations. *See* Reply at 18–19. As discussed above, however, the Court finds that Plaintiffs have put forth specific factual allegations that allow the Court to "draw the reasonable inference that" Blue Sky participated in the alleged conspiracy. *Iqbal*, 556 U.S. at 678. Blue Sky may well be able to prove, as a factual matter, that it was not a member of the alleged conspiracy.[16] At this stage of the proceedings, however, the Court evaluates not the probability of Plaintiffs' success on the merits, but whether Plaintiffs have alleged "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* Here, drawing all reasonable inferences in favor of Plaintiffs, the Court finds that Plaintiffs have done so. *See Knevelbaard*, 232 F.3d at 984.

Accordingly, the Court DENIES Defendant Blue Sky's motion to dismiss Plaintiffs' claims against it.

**b. Defendant Sony**

Defendant Sony also contends that Plaintiffs' allegations that Sony participated in the alleged conspiracy are "implausible." Reply at 19. For the reasons stated below, however, the Court finds that Plaintiffs have adequately alleged that Sony participated in the conspiracy.

---

[16] Indeed, to the extent Blue Sky relies on its own apparent "repeated efforts" to recruit from competitors, or George Lucas's deposition testimony that Lucasfilm did not have an agreement with Blue Sky, the Court notes that these are factual disputes as to the truth of Plaintiffs' claims, not the sufficiency of Plaintiffs' allegations. As the Court is required to accept as true Plaintiff's factual allegations and draw all reasonable inferences in favor of Plaintiffs on a motion to dismiss, the Court finds that Plaintiffs have sufficiently alleged a plausible claim for relief. *See Knevelbaard*, 232 F.3d at 984.

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiffs point to myriad examples of Sony's alleged involvement in the conspiracy. For example, the SAC specifically alleges that Pixar's Catmull met with Sony executives in order to stop Sony from poaching Pixar's employees and to "reach an agreement where neither [Pixar nor Sony] let recruiters approach the other." SAC ¶ 64–66. Catmull thought it was important for Sony to "quit calling [Pixar's] employees." *Id. ¶* 65. Plaintiffs allege that Catmull reached a "gentleman's agreement" with Sony not to directly solicit or poach each other's employees. *Id.* ¶ 67. Furthermore, Pixar's McAdams spoke with Sony recruiters multiple times to "make sure they're still honoring [the agreement]." *Id.* Indeed, when one Sony recruiter reached out to a Pixar employee, a Pixar recruiter suggested that Pixar "slap her on the wrist." *Id.* As a result, McAdams apparently called her counterpart at Sony and told them to "knock it off." *Id.*

Similarly, the SAC includes allegations that Pixar included Sony on its "do not poach" list, *id.* ¶ 53, and that Sony human resources representatives exchanged sensitive compensation information with competitors, including salary information, *id.* ¶ 101, salary budgets, *id.* ¶ 103, salary ranges, *id.* ¶ 105, and overtime, *id.* ¶ 111. Moreover, when Sony laid off a number of employees and rehired them at lower rates, Sony allegedly advised Pixar to "stand firm in [its] offers to exSony candidates and not worry too much about matching [the exSony candidates'] last Sony rate." *Id.* ¶ 12. As Plaintiffs note, these factual allegations support the plausible theory that Sony both participated in the anti-solicitation scheme and also colluded with the other Defendants on salary ranges.

Sony contends that it never entered into the "gentleman's agreement" to begin with and that Plaintiffs' factual allegations actually support the conclusion that Sony was actively poaching the employees of its competitors. However, as Plaintiffs note, that Sony may have violated the alleged agreement does not disprove Sony's involvement in the conspiracy as a matter of law. Opp. at 29. Indeed, if Sony were not part of the conspiracy to begin with, there would be no need for Pixar to tell Sony to "knock it off (again!)." *Id.* Plaintiffs argue that "[n]o one calls a competitive rival who is undercutting on price to say knock it off unless they have an agreement on price because undercutting them on price is just what a rival is supposed to do." *Id.* Based on

49

1     the specific factual allegations Plaintiffs make, this is not an unreasonable inference.

2          Sony also argues that absence of any Sony documents evincing its participation in the

3     conspiracy renders Plaintiffs' claims implausible. While this may ultimately weigh against the

4     probability that Plaintiffs will prevail on their claims against Sony, the Court sees no reason why

5     Plaintiffs' inability to identify Sony documents at the motion to dismiss stage would render

6     Plaintiffs' claims insufficient as a matter of law. Indeed, the standard for surviving a motion to

7     dismiss asks whether Plaintiffs have pled "enough fact[s] to raise a reasonable expectation that

8     discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. It does not require

9     that Plaintiffs have evidence of the alleged illegal agreement in hand.

10         In addition, Sony argues that Plaintiffs' claims do not "comport with 'basic economic

11    principles." Reply at 20 (quoting *William O. Gilley Enters., Inc. v. Alt. Richfield Co.*, 588 F.3d

12    659, 662 (9th Cir. 2009)). Sony asserts that it is "economically implausible that a firm seeking

13    more workers . . . would voluntarily hamstring its ability to do so by forgoing a readily available

14    pool of workers from other film studios." *Id.* However, Plaintiffs contend that Sony could have

15    rationally concluded that agreeing to the conspiracy in order to reduce the overall costs of

16    expansion would be beneficial. Moreover, as an alleged "cheater" to the conspiracy, Sony could,

17    theoretically, "have its cake and eat it too," by reaping the benefits of overall lower costs while

18    poaching those employees that Sony found most desirable while attempting to avoid retaliation by

19    other members of the conspiracy. As Plaintiffs have put forth an alternative plausible explanation,

20    the Court is not persuaded by Sony's bare assertion that Plaintiffs' claim is "economically

21    implausible" as a matter of law.

22          As with Defendant Blue Sky, it may be the case that Sony can, as a factual matter,

23    disprove its participation in the alleged conspiracy. However, the question at the motion to dismiss

24    stage is not whether Plaintiffs have shown a probable claim, but instead a plausible one. *See Iqbal*,

25    556 U.S. at 678. Here, the Court finds that Plaintiffs have alleged a plausible claim against

26    Defendant Sony. Accordingly, the Court DENIES Defendant Sony's motion to dismiss Plaintiffs'

27    claims against it.

28

50

United States District Court
Northern District of California

1     **C.   *Per se* wage-fixing claim**

2            Finally, Defendants contend that Plaintiffs have failed to adequately plead a *per se* wage-

3     fixing claim. Here, the parties dispute whether Plaintiffs' conspiracy claims should be analyzed as

4     a single conspiracy to suppress the compensation of putative class members, or two separate

5     conspiracies: a no-poaching conspiracy and a wage-suppression conspiracy. Opp. at 21; Reply at

6     12. Defendants argue that because Plaintiffs' conspiracy claims are based on two distinct

7     agreements, Plaintiffs must plead sufficient facts to independently support each claim. While

8     Defendants do not contend that Plaintiffs have failed to plead a *per se* violation of the Sherman

9     Act with respect to the non-solicitation agreements, Defendants allege that Plaintiffs have failed to

10    plead a *per se* wage-fixing claim.

11           The Court begins by noting that Defendants cite no authority for the proposition that

12    Plaintiffs may not allege the existence of a single overarching conspiracy to suppress employees'

13    compensation or that Defendants' recharacterization requires dismissal of Plaintiffs' claims. To

14    the contrary, courts have generally rejected attempts by defendants to recharacterize a plaintiff's

15    theory of an overarching conspiracy. For example, in *TFT-LCD*, the defendants argued that the

16    plaintiffs' "specific allegations . . .  contradict[ed] the notion of a single overarching conspiracy"

17    and instead supported the defendants' alternative theory that plaintiffs had been "harmed by

18    different, unconnected alleged agreements" and conspiracies. 267 F.R.D. at 606–07. The *TFT-*

19    *LCD* court rejected the defendants' argument, finding that the "defendants may not recast

20    plaintiffs' allegations, and plaintiffs have consistently alleged a single, overriding conspiracy

21    spanning the entire class period." *Id.*; *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 265

22    (D.D.C. 2002) ("The plaintiffs have not alleged multiple conspiracies—they have alleged a single

23    price fixing conspiracy . . . . '[T]he character and effect of a conspiracy are not to be judged by

24    dismembering it and viewing its separate parts but only by looking at it as a whole.'" (quoting

25    *Cont'l Ore Co. v. union Carbide & Carbon Co.*, 370 U.S. 690, 699 (1962)).

26           Similarly, in *In re Air Cargo Shipping Services Antitrust Litigation*, No. 06–MD–1175,

27    2014 WL 7882100, at *28 (E.D.N.Y. Oct. 15, 2014), the defendants offered a competing

28
Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

interpretation of the plaintiffs' conspiracy allegations. Rather than the global conspiracy that the plaintiffs alleged, the defendants contended that the plaintiffs had only alleged a "collection of route-specific conspiracies." *Id.* As in *TFT-LCD* and *In re Vitamins*, the *Air Cargo* court concluded that "the mere fact that the defendants have a different case theory should not deprive the plaintiffs of the opportunity to prove theirs." *Id.* Moreover, "[w]hether the plaintiffs' proof of such a conspiracy is more or less compelling than the defendants' alternative theory is a question of fact for the jury." *Id.*

Defendants cite this Court's decision in *Steshenko v. Gayrard*, 70 F. Supp. 3d 979, 999 (N.D. Cal. 2014), in support of its argument that the Court should parse Plaintiffs' claims as two separate conspiracies. *See* Reply at 12. However, in *Steshenko*, the plaintiff alleged the existence of three separate conspiracies and did not contend that there was a single, overarching conspiracy. *See id.* Here, it is not evident to the Court why it should disregard Plaintiffs' allegation that Defendants engaged in a single overarching conspiracy to suppress employee compensation by refraining from poaching each other's employees and also setting compensation ranges. That Defendants choose to re-cast Plaintiffs' allegations as supporting the existence of two separate conspiracies does not change the fact that Plaintiffs have alleged the existence of a single conspiracy, involving a single group of conspirators, that allegedly engaged in the same anti-competitive behavior.

Moreover, while Defendants contend that Plaintiffs should not be able to "evade *Twombly* by combining two self-evidently distinct alleged agreements into a single claim for relief," the Court is not persuaded that Plaintiffs have, in fact, alleged two "self-evidently distinct" agreements. Reply at 12. Plaintiffs have alleged that each Defendant "entered into the agreement to suppress compensation of class members, including (i) entering the non-solicitation scheme; and (ii) engaging in direct communications regarding compensation ranges." Opp. at 24 (citing SAC ¶¶ 1–2, 9). Though Defendants may disagree with Plaintiffs' theory of the case, Defendants have failed to put forth any authority for the proposition that the Court should, at this stage of the proceeding, determine whether Plaintiffs have really alleged one conspiracy or two. *Cf. United*

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   *States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003) ("Whether single or multiple conspiracies have

2   been shown is usually a question of fact to be resolved by the jury . . . .").

3              Furthermore, the Court concludes that Plaintiffs have alleged sufficient facts to support a

4   plausible *per se* claim that Defendants allegedly conspired to suppress the compensation of the

5   putative class. As discussed above, Defendants do not contest the sufficiency of Plaintiffs'

6   allegations with respect to Defendants' participation in the anti-solicitation or no-poach scheme. In

7   addition, Plaintiffs allege that Defendants participated in comprehensive and sustained information

8   sharing, both through in-person meetings and through email. According to Plaintiffs, Defendants

9   participated in industry-wide meetings organized by the Croner Company, which were allegedly

10  organized "so [Defendants could] each confirm or adjust [their] salary ranges." *Id.* ¶ 87. Such

11  meetings allegedly "provided the officials an opportunity to discuss compensation ranges in a

12  private setting." *Id.* ¶ 89. For example, at one meeting, Pixar apparently learned that ImageMovers

13  was recruiting employees at a higher salary, leading Catmull to ask Disney's chairman to step in:

14  "The HR folks from the CG studios had their annual get together in the bay area (sic) last week. At

15  that time, we learned that the company that Zemeckis is setting up in San Rafael has hired several

16  people away from Dreamworks at a substantial salary increase." *Id.* ¶ 90. As a result, Catmull and

17  Disney apparently told the founder of ImageMovers that it was "important . . . that we not have a

18  hiring war." *Id.* In addition, Plaintiffs allege that Defendants requested "custom cuts" of Croner

19  Survey data limited to conspiracy participants—namely, Blue Sky, DreamWorks, Lucasfilm,

20  Sony, and Pixar. *Id.* ¶ 93. According to Plaintiffs, this was to ensure that the collusion was

21  effective. *Id.*

22             Furthermore, Plaintiffs allege that these exchanges of information were not "isolated," but

23  rather, systematic and constant. The complaint is replete with allegations that Defendants

24  frequently exchanged information about salary ranges, benefits, and other HR matters. Pixar's

25  McAdams notes that the Defendants talked with each other "to ensure that our salary ranges for

26  the positions are correct." *Id.* ¶ 86. Blue Sky's human resources director allegedly emailed Pixar

27  asking for salary information for specific positions in order "to find out if we're paying a

United States District Court
Northern District of California

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

competitive rate." *Id.* ¶ 96 ("I was wondering if I could get some salary information from you . . . Please see the titles below and if possible, could you give me a range of what you pay them?"). Pixar also sought salary information for specific positions from Disney. *Id.* ¶ 106 ("[W]ork . . . on getting the MCC position descriptions updated, and from there we can talk with Disney or other studios & post houses to ensure that our salary ranges for the positions are correct."). Plaintiffs contend that information sharing was not just limited to salary information, but included benefits as well. *Id.* ¶ 97 (health insurance); *id.* ¶ 98 (401k); *id.* ¶ 99 ("memberships"); *id.* ¶ 100.

While the mere "exchange of price data and other information among competitors does not invariably have anticompetitive effects" and does not constitute a *per se* violation of the Sherman Act, *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978), taken in context, the factual allegations here plausibly suggest that the purpose of information sharing and the anti-solicitation scheme was to suppress wages. Plaintiffs contend that Defendants' emails "[make] it clear that the purpose of the conspirators' collusion on compensation was to keep compensation low." *Id.* ¶ 109. As Pixar's McAdams wrote to ILM's Coker, "[s]ince money can always be a factor, that's the other thing we should consider (e.g., *we wouldn't want to offer a lateral move more money than you, and vice versa*)." *Id.* (emphasis added). Similarly, Plaintiffs contend that the Defendants' actual hiring practices demonstrate that the purpose of the information sharing and the anti-solicitation scheme was to suppress wages. For example, Plaintiffs aver that in 2008 and 2009, Sony laid off hundreds of employees and hired them back at lower rates—rates squarely in the range the conspirators had discussed in previous meetings. *Id.* ¶ 115. Sony allegedly made sure that its co-conspirators knew not to match its previous, higher rates by telling other studios that Sony was "rehiring folks back at a lower rate than when they left" and encouraging the co-conspirators to "stand firm in [their] offers to exSony candidates and not worry too much about matching their last Sony rate." *Id.*

In sum, the Court finds that Plaintiffs have sufficiently alleged facts showing that Defendants reached an agreement to conspire. Here, Plaintiffs have alleged that Defendants systematically shared information, agreed not to solicit each other's employees, and that the

Case No. 14-CV-04062-LHK
ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

United States District Court
Northern District of California

purpose of the information sharing and no-poach scheme was to suppress wages. Taking these allegations as true, and drawing all reasonable inferences in favor of Plaintiffs, the Court finds that these allegations raise a plausible inference that Defendants entered into an express agreement to suppress compensation. *See Knevelbaard*, 232 F.3d at 984.

For the foregoing reasons, the Court finds that Plaintiffs have successfully alleged a single conspiracy to suppress the compensation of Defendants' employees. Accordingly the Court denies Defendants' motion to dismiss Plaintiffs' *per se* antitrust claim.[17]

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss.

**IT IS SO ORDERED.**

Dated: August 20, 2015

_____
LUCY H. KOH
United States District Judge

---

[17] Defendants request, in passing, that the Court "dismiss or strike" Plaintiffs' wage-fixing claim. Federal Rule of Civil Procedure 8(b)(3) requires a party to state "a demand for the relief sought, which may include relief in the alternative or different types of relief." Rule 12(f) permits a court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A matter is immaterial if it "has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), rev'd on other grounds, 510 U.S. 517 (1994). A matter is impertinent if it consists of statements that do not pertain to and are not necessary to the issues in question. *Id.* Redundant allegations are those that are wholly foreign to the issues involved or the needless repetition of allegations. *Sliger v. Prospect Mortg., LLC*, 789 F. Supp. 2d 1212, 1216 (E.D. Cal. 2011). As the Court finds that Plaintiffs have sufficiently pled a *per se* antitrust claim based on Defendants' alleged conspiracy to suppress employee compensation, the Court DENIES Defendants' request to strike.