KEKER & VAN NEST LLP
JOHN W. KEKER - # 49092
jkeker@kvn.com
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
CODY S. HARRIS - # 255302
charris@kvn.com
633 Battery Street
San Francisco, CA   94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendants
THE WALT DISNEY COMPANY,
LUCASFILM LTD., LLC, PIXAR and
TWO PIC MC LLC

COVINGTON & BURLING LLP
EMILY JOHNSON HENN - # 269482
ehenn@cov.com
KATHRYN CAHOY - # 298777
kcahoy@cov.com
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA   94061
Telephone:     650 632 4700
Facsimile:     650 632 4800

Attorneys for Defendants
THE WALT DISNEY COMPANY,
LUCASFILM LTD., LLC, PIXAR and
TWO PIC MC LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

Master Docket No.:  14-cv-4062-LHK

IN RE ANIMATION WORKERS
ANTITRUST LITIGATION

**OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DOCUMENTS FROM LUCASFILM AND PIXAR**

Date:          March 22, 2016
Time:          10:00 a.m.
Dept.:         5
Judge:         Hon. Paul S. Grewal

**DISCOVERY MATTER**

THIS DOCUMENT RELATES TO:

ALL ACTIONS

1032348

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   RELEVANT BACKGROUND ...............................................................................1

III.  ARGUMENT ..........................................................................................................4

       A.     Lucasfilm's privilege assertions are proper. .............................................5

              1.     Documents sent to and received from counsel for purposes of obtaining or providing legal advice are privileged. ....................5

              2.     Lucasfilm properly withheld and logged two documents containing legal advice from counsel. ..........................................8

              3.     Privileged communications from Lucasfilm's General Counsel David Anderman do not lose their protected status merely because Mr. Anderman also provided business advice. ...........................................11

              4.     Disclosure of privileged communications or documents to a third-party contractor acting on behalf of the client and at the direction of counsel does not destroy the privilege. ........................................14

       B.     Pixar's privilege assertions over documents involving in-house General Counsel Lois Scali are proper, and the crime-fraud exception has no bearing here.......................................................................................16

              1.     Plaintiffs bear a heavy burden of establishing that the crime-fraud exception applies.......................................................17

               2.     Plaintiffs fail to make a *prima facie* showing of a criminal scheme..........18

               3.     Plaintiffs offer no competent evidence to support their allegation that Pixar endeavored to form a criminal antitrust conspiracy. .................20

               4.     Plaintiffs are using this discovery dispute to seek a premature merits determination about the central disputed issue in this case. ..........21

               5.     *In camera* review would not remedy the deficiencies in Plaintiffs' motion. ..................................................................................22

IV.  CONCLUSION.....................................................................................................23

1032348

**Federal Cases**

*Aplsey v. Boeing Co.*
  No. 05-1368-MLB, 2008 WL 5211001 (D. Kan. Dec. 9, 2008) ............................................ 16

*Barba v. Shire US, Inc.*
  No. 13-civ-21158, 2015 WL 7015324 (S.D. Fla. Nov. 12, 2015) ........................................ 22

*by Mohawk Indus., Inc. v. Carpenter*
  558 U.S. 100 (2009) ..................................................................................... 4

*Clarke v. Am. Commerce Nat'l Bank*
  974 F.2d 127 (9th Cir. 1992) ............................................................................ 4

*Colaco v. Asic Advantage Simplified Empl. Pension Plan*
  No. 5:13-cv-00972-PSG, 2015 WL 4734950 (N.D. Cal. Aug. 10, 2015) ............................... 4

*Coleman v. Schwarzenegger*
  No. CIV S-90-0520 LKK JFM, 2008 WL 4234239 (N.D. Cal. Aug. 29, 2008) ..................... 6

*Elan Microelectronics Corp. v. Apple, Inc.*
  No. C 09-01531 RS (PSG), 2011 WL 3443923 (N.D. Cal. Aug. 8, 2011) ................. 10, 11, 14

*Genentech, Inc. v. Trustees of University of Pennsylvania*
  No. C 10-2037 PSG, 2011 WL 7074211 (N.D. Cal. Oct. 18, 2011) ..................................... 13

*Gucci Am., Inc. v. Guess?, Inc.*
  No. 09 Civ. 4373(SAS), 2011 WL 9375 (S.D.N.Y. Jan. 3, 2011) ....................................... 9

*In re Antitrust Grand Jury*
  805 F.2d 155 (6th Cir. 1986) ...................................................................... 18, 19

*In re Chase Bank USA, N.A. Check Loan Contract Litig.*
  No. 3:09-md-2032 MMC (JSC), 2011 WL 3268091 (N.D. Cal. July 28, 2011) ................... 8

*In re Copper Market Antitrust Litig.*
  200 F.R.D. 213 (S.D.N.Y. 2001) ..................................................................... 15

*In re CV Therapeutics, Inc. Securities Litigation*
  No. C-03-3709SI (EMC), 2006 WL 1699536 (N.D. Cal. June 16, 2006) ......................... 7, 8

*In re Grand Jury Investigation*
  810 F.3d 1110 (9th Cir. 2016) ........................................................... 17, 18, 21, 23

*In re Grand Jury Investigation*
  974 F.2d 1068 (9th Cir. 1992) ..................................................................... 4, 5, 6

*In re Grand Jury Proceedings*
  87 F.3d 377 (9th Cir. 1996) .......................................................................... 19

*In re Napster, Inc. Copyright Litig.*
  479 F.3d 1078 (9th Cir. 2007) ......................................................... 4, 17, 19, 22

1032348

*In re Sulfuric Acid Antitrust Litig.*
   235 F.R.D. 407 (N.D. Ill. 2006) ................................................................. 22

*In re Yahoo Mail Litig.*
   7 F. Supp. 3d 1016 (N.D. Cal. 2014) ........................................................ 20

*Khasin v. Hershey Co.*
   No. 5:12-cv-01862-EJD-PSG, 2014 WL 690278 (N.D. Cal. Feb. 21, 2014) ............ 5, 9, 10, 11

*Laser Industries, Ltd. v. Reliant Technologies, Inc.*
   167 F.R.D. 417 (N.D. Cal. 1996) ............................................................... 19

*McCaugherty v. Siffermann*
   132 F.R.D. 234 (N.D. Cal.1990) ................................................................ 15

*Memry Corp. v. Kentucky Oil Technology, N.V.*
   No. C04-03843 RMW (HRL), 2007 WL 39373 (N.D. Cal. Jan. 4, 2007) ................ 16

*MGA Entm't, Inc. v. Nat'l Prods. Ltd.*
   No. CV 10-07083 JAK SSx, 2012 WL 3150532 (C.D. Cal. Aug. 2, 2012) ................ 7

*Mistretta v. United States*
   488 U.S. 361 (1989) ................................................................................. 20

*Our Children's Earth Foundation v. National Marine Fisheries Service*
   85 F. Supp. 3d 1074 (N.D. Cal. 2015) ......................................................... 8

*Potter v. United States*
   No. 02-CV-0632-H (POR), 2002 WL 31409613 (S.D. Cal. July 26, 2002) ................ 6

*Rembrandt Patent Innovations, LLC v. Apple Inc*
   No. C 14-05093 WHA, 2016 WL 427363 (N.D. Cal. Feb. 4, 2016) ................... 5, 10

*Santrade, Ltd. v. Gen. Elec. Co.*
   150 F.R.D. 539 (E.D.N.C. 1993) ................................................................ 16

*Schaeffer v. Gregory Vill. Partners, L.P.*
   No. 13-cv-04358-JST, 2015 WL 166860 (N.D. Cal. Jan. 12, 2015) ..................... 15

*Skynet Elec. Co., Ltd. v. Flextronics, Int'l, Ltd.*
   No. C 12-06317 WHA, 2013 WL 6623874 (N.D. Cal. Dec. 16, 2013) ................... 6

*Standard Oil Co. of New Jersey v. United States*
   221 U.S. 1 (1911) ................................................................................... 20

*United States v. Adobe Sys., Inc.*
   No. 10-CV-1629, 2011 WL 10883994 (D.D.C. Mar. 18, 2011) ............................ 2

*United States v. Adobe Sys., Inc.*
   No. 1:10-cv-01629, 2010 WL 9525803 (D.D.C. Sept. 24, 2010) ......................... 21

*United States v. Bauer*
   132 F.3d 504 (9th Cir. 1997) .................................................................. 4, 5

*United States v. Chen*
   99 F.3d 1495 (9th Cir. 1996) ................................................................... 19

OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
Master Docket No.: 14-cv-4062-LHK

1032348

*United States v. ChevronTexaco Corp.*
   241 F. Supp. 2d 1065 (N.D. Cal. 2002) ............................................................. 5, 7, 12

*United States v. Lucasfilm, Inc.*
   No. 10-02220 (RBW), 2011 WL 2636850 (D.D.C. June 3, 2011) ............................... 2

*United States v. Ruehle*
   583 F.3d 600 (9th Cir. 2009) ......................................................................... 12

*United States v. U.S. Gypsum Co.*
   438 U.S. 422 (1978) ....................................................................................... 22

*Upjohn Co. v. United States*
   449 U.S. 383 (1981) .................................................................................... 4, 14

*Ward v. Pickett*
   No. C-13-01735 DMR, 2013 WL 5496549 (N.D. Cal. Oct. 3, 2013) ...................... 18

**Federal Rules**

N.D. Cal. Civ. L.R. 37-1 .................................................................................. 10, 17

**State Regulations**

Proposed Final Judgment and Competitive Impact Statement, 75 FR 81651-01 (Dec. 28, 2010) .............................................................................................................. 2

**Other Authorities**

*United States v. Lucasfilm Ltd.*
   75 FR 81651-01(Dec. 28, 2010) ................................................................... 21, 2

## I. INTRODUCTION

Plaintiffs' Motion to Compel is an ill-conceived attempt to resurrect issues that had been previously settled in the *High-Tech* case that forms the basis of their lawsuit, and in some cases even before that. Indeed, all of the documents that are the subject of this motion were withheld as privileged in response to Civil Investigative Demands the Department of Justice served more than six years ago, or during the *High-Tech* litigation nearly four years ago. Neither the government nor the sophisticated plaintiffs' counsel in *High-Tech* ever challenged those determinations in court, and for good reason: the documents are privileged. Nothing has changed between 2009 and today that supports Plaintiffs' demand that this Court disregard Lucasfilm's and Pixar's invocation of attorney-client and work product protections. Plaintiffs' attempt to reopen issues that were resolved long ago wastes the parties' and this Court's time.

In any event, Plaintiffs' arguments fail on their own terms. The hodge-podge of arguments they mount to challenge Lucasfilm's and Pixar's privilege determinations lack legal and factual support. If adopted, Plaintiffs' arguments would severely and inappropriately undermine the attorney-client communication privilege and work product doctrine, and the important policies that underlie those protections. Plaintiffs have also tacked on a claim that the crime-fraud exception applies to certain withheld Pixar documents, despite the fact that Pixar committed no crime and no one—until Plaintiffs in this motion—has ever suggested otherwise. In making this unfounded argument, Plaintiffs ask this Court both to make new law regarding the crime-fraud exception's applicability in the civil antitrust context *and* to resolve the ultimate merits question at issue in this case—all in the context of a discovery dispute. The Court should decline this invitation.

## II. RELEVANT BACKGROUND

This discovery dispute concerns privilege determinations made, in some cases, more than six years ago. The Department of Justice ("DOJ") began issuing Civil Investigative Demands ("CIDs") to Pixar and Lucasfilm in May and November 2009, respectively, regarding certain of their employee recruiting solicitation practices. *See* Decl. of Cody S. Harris ("Harris Decl.") ¶ 3. This investigation was at all times *civil* in nature; criminal charges were never alleged or pursued.

1032348

Pixar and Lucasfilm produced thousands of pages to the DOJ during the pendency of that investigation. Both entities withheld certain documents from that production as privileged, and Lucasfilm also clawed back a handful of privileged documents that had been inadvertently produced. In connection with that clawback request, the DOJ and Lucasfilm ultimately reached agreement on the privilege determinations Lucasfilm made in withholding certain documents in response to the CIDs. *See id.* ¶ 4.

In September 2010, Pixar settled with the DOJ by way of a consent decree, which was entered by the court in March 2011. *See United States v. Adobe Sys., Inc.*, No. 10-CV-1629, 2011 WL 10883994 (D.D.C. Mar. 18, 2011). Lucasfilm likewise settled with the DOJ via a consent decree announced in December 2010 and entered in June 2011. *See United States v. Lucasfilm Ltd.*; Proposed Final Judgment and Competitive Impact Statement, 75 FR 81651-01 (Dec. 28, 2010); *United States v. Lucasfilm, Inc.*, No. 10-02220 (RBW), 2011 WL 2636850, at *3 (D.D.C. June 3, 2011). The Pixar and Lucasfilm consent decrees, which are substantively identical, set forth the DOJ's views regarding those companies' alleged noncompliance with the Sherman Act, but no court or administrative body ever found those allegations to be true. In these decrees, neither Pixar nor Lucasfilm admitted any wrongdoing, but each agreed to take certain steps regarding their employee recruiting and solicitation practices to address the DOJ's concerns. *See, e.g.*, 75 FR at 81657 ("[T]his Final Judgment does not constitute any admission by the Defendant that the law has been violated or of any issue of fact or law, other than that the jurisdictional facts as alleged in the Complaint are true."). The decree also carved out certain areas where Pixar and Lucasfilm were expressly allowed to impose limitations on recruiting and solicitation, in accordance with applicable law. *Id.* at 81655.

In May 2011, a former Lucasfilm employee sued the two companies, along with five others (Google, Apple, Intel, Intuit, and Adobe), in a class action that ultimately bore the caption, *In re High-Tech Employee Litigation*, No. 11-CV-02509-LHK. In response to the *High-Tech* plaintiffs' first document requests, Pixar and Lucasfilm produced all documents the companies had produced to the DOJ, along with the privilege logs associated with that production. Harris Decl. ¶ 5. During discovery in *High-Tech*, both companies withheld certain other documents as

1032348

privileged, and Lucasfilm also "clawed back" certain privileged documents that had been inadvertently produced in discovery. *Id.* ¶ 6. Privilege and redaction logs were produced to the plaintiffs in that action. Counsel for Lucasfilm and plaintiffs' counsel met and conferred extensively over the scope and adequacy of Lucasfilm's privilege logs. *Id.* ¶ 7. In fact, many of those discussions covered the same ground at issue in the instant motion. In the end, the parties resolved all of these issues without judicial intervention. In September 2013, Lucasfilm and Pixar settled with the *High-Tech* plaintiffs and were dismissed from the case. *High-Tech*, No. 11-CV-02509-LHK, 2015 WL 5159441 (N.D. Cal. Sept. 2, 2015).

In September 2014, Plaintiffs filed the first of three complaints that were subsequently consolidated into the instant case, alleging (again) that Lucasfilm and Pixar (collectively herein, "Defendants") had violated the civil antitrust laws by agreeing not to cold-call each other's employees, as well as those of a handful of other animation and visual effects studios. Repeating (often verbatim) allegations and theories advanced in *High-Tech*, Plaintiffs in this action requested all documents produced in that prior lawsuit. Rather than starting from scratch in terms of collecting and reviewing documents for this particular lawsuit, Defendants agreed to produce their *High-Tech* documents to Plaintiffs wholesale, and to provide the privilege logs that had accompanied those productions.

In accordance with the Court's December 12, 2015 Case Management Order, *see* ECF # 173, on December 16, 2015, Defendants served Plaintiffs with the privilege logs that had been completed, served, and negotiated in the *High-Tech* case. The logs included entries dating back to the Defendants' original CID responses to the DOJ in 2009 and 2010. On December 23, 2015, Defendants served additional privilege logs that were specific to this action.

On December 22, 2015, Plaintiffs sent Defendants a 43-page email challenging certain entries and categories of entries on the old privilege logs from *High-Tech*. Defendants promptly responded to Plaintiffs' inquiries, both in writing and telephonically over the holiday period. The parties continued meeting and conferring over the ensuing weeks. In many instances, each time Defendants clarified their position, demonstrated the weaknesses of Plaintiffs' arguments, or even withdrew a privilege claim in order to resolve a dispute, Plaintiffs responded by raising new or

1032348

different arguments, or simply refusing to explain what information Defendants could possibly provide that would satisfy their concerns. When it became clear that Plaintiffs were intent on seeking judicial intervention no matter what, Defendants asked Plaintiffs to provide notice regarding which issues, if any, they would bring to this Court's attention, and which privilege log entries they intended to challenge. *See* Schiltz Dec. ¶ 3, Ex. 3. Plaintiffs ignored that request and filed the instant motion.

## III.    ARGUMENT

The attorney-client privilege shields from disclosure "confidential communications made by a client to an attorney to obtain legal services." *Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992). The privilege likewise safeguards "an attorney's advice in response to such disclosures." *In re Grand Jury Investigation*, 974 F.2d 1068, 1070 (9th Cir. 1992).

"In the Ninth Circuit, the privilege is jealously guarded." *Colaco v. Asic Advantage Simplified Empl. Pension Plan*, No. 5:13-cv-00972-PSG, 2015 WL 4734950, at *1 (N.D. Cal. Aug. 10, 2015) (quoting *Fischel v. Equitable Life Assurance*, 191 F.R.D. 606, 607 (N.D. Cal. 2000)). And for good reason: it is "the oldest and arguably most fundamental of the common law privileges" known in American law. *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, (2009); *see also United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997) (describing the attorney-client privilege as "perhaps . . . the most sacred of all legally recognized privileges"). The privilege advances the salutary purpose of "encourag[ing] full and frank communication between attorneys and their clients and thereby promot[ing] broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Because the rule "assure[s] confidentiality" of this sort, attorneys are "better able to provide candid advice and effective representation." *Carpenter*, 558 U.S. at 108. The privilege accordingly "protects fundamental liberty interests by allowing individuals to seek the legal advice they need to guide them through the thickets of complex laws." *In re Napster*, 479 F.3d at 1090 (internal quotation marks and brackets omitted).

The party asserting the attorney-client privilege has the initial burden of proving that the

privilege applies. *Bauer*, 132 F.3d at 507. There are "a number" of ways the party may satisfy

that burden, including by preparing a privilege log. *In re Grand Jury Investigation*, 974 F.2d at

1071. "A party may make a *prima facie* showing of privilege by submitting a privilege log that

identifies: (1) the attorney and client involved, (2) the nature of the document, (3) all persons or

entities shown on the document to have received or sent the document, (4) all persons or entities

known to have been furnished the document or informed of its substance, and (5) the date the

document was generated, prepared, or dated." *Rembrandt Patent Innovations, LLC v. Apple Inc*,

No. C 14-05093 WHA, 2016 WL 427363, at *3 (N.D. Cal. Feb. 4, 2016). A party "goes beyond

these standards if it also provides information on the subject matter of each document," as

Lucasfilm and Pixar have done here. *Khasin v. Hershey Co.*, No. 5:12-cv-01862-EJD-PSG, 2014

WL 690278, at *2 (N.D. Cal. Feb. 21, 2014). As this Court has noted, the "loss of the attorney-

client privilege in adversarial litigation is a severe sanction." *Id.* (internal quotation marks

omitted). For the reasons that follow, it is unwarranted here.

### A. Lucasfilm's privilege assertions are proper.

#### 1. Documents sent to and received from counsel for purposes of obtaining or providing legal advice are privileged.

Plaintiffs' first challenge concerns ten documents, each of which was sent to or received

from legal counsel for purposes of soliciting or receiving legal advice.[1] These documents fall

squarely within the attorney-client communication privilege. Indeed, it is well-settled "that

communications between corporate personnel and their in-house counsel made for the purpose of

securing legal advice are protected by the privilege." *United States v. ChevronTexaco Corp.*, 241

F. Supp. 2d 1065, 1076 (N.D. Cal. 2002). Plaintiffs nowhere dispute that Douglas Reilly,

Jennifer Seibly, and David Anderman were all functioning as in-house counsel for Lucasfilm at

the time each of these documents was sent to them. Furthermore, contrary to Plaintiffs'

assertions, the privilege does not disappear merely because the legal inquiry may touch on or

---

[1] Defendants have determined that a substantially similar version of one of the challenged documents, the entry labeled 44, was produced in this litigation in redacted form. *See* Harris Decl. ¶ 8, Ex. A. Defendants will produce the exact version of the document to Plaintiffs with the same privilege redaction and update its logs accordingly.

1032348

involve "business" issues, as inquiries brought to in-house counsel in the corporate context so often do. Rather, the privilege applies in full "where business advice is incorporated into legal advice." *Potter v. United States*, No. 02-CV-0632-H (POR), 2002 WL 31409613, at *5 (S.D. Cal. July 26, 2002).[2]

Here, Lucasfilm's log makes clear that each document withheld falls within the privilege. The documents were developed by lawyers, included their "legal advice" or "legal edits," or were sent to them expressly for their review. Furthermore, in making their challenges, Plaintiffs have inappropriately separated parent emails from their attachments, sometimes challenging the email and other times the attachment. For example, the entry labeled LUCAS00006706 is an attachment, but the parent email (LCUAS00006705)—which Plaintiffs have omitted here and are ***not*** challenging—was listed on the log as an email from Steve Mair to Douglas Reilly, Esq., and described as an "Email requesting that legal department update employee recruitment policies." Harris Decl. ¶ 9, Ex. B. The same is true for entries labeled LUCAS00007656 and LUCAS0007658—in both instances, Plaintiffs have ignored (and declined to challenge) the parent email, even though those entries make clear that their attachments, which were logged

---

[2] Plaintiffs also argue that Lucasfilm waived its work product assertions with respect to certain of these documents because Lucasfilm did not identify the "anticipated litigation or trial" for which each document was created. *See* Mot. at 4 n.2. This argument is baseless. To begin with, Lucasfilm's privilege logs contain sufficient information to substantiate its assertions of the work product doctrine, and Plaintiffs' demand for more granular information was both unfounded and unsupported by precedent. *See In re Grand Jury Investigation*, 974 F.2d at 1071. In addition, Plaintiffs have failed to identify with specificity which documents, if any, they are challenging on the basis of a purported work-product waiver. Indeed, they now appear to be raising a different issue than the one the parties discussed during the meet-and-confer process. Then, Plaintiffs requested additional information about work-product assertions made for documents that were subject to a separate and *uncontested* claim of attorney client privilege. As Lucasfilm explained in a meet-and-confer letter—in a sentence Plaintiffs' motion quotes only *in part*— Lucasfilm was not bound to undertake the burdensome process of reconstructing the grounds for work-product protection "if those documents are subject to a separate assertion of attorney-client privilege, *which plaintiffs have offered no basis for challenging*." Schiltz Ex. 5 (emphasis added); *see also Coleman v. Schwarzenegger*, No. CIV S-90-0520 LKK JFM, 2008 WL 4234239, at *3 (N.D. Cal. Aug. 29, 2008). For the documents disputed in this motion, Plaintiffs' challenges are limited to the applicability of the attorney-client communication privilege and Defendants have responded on those grounds. Accordingly, the Court need not address work-product protection. *See Skynet Elec. Co., Ltd. v. Flextronics, Int'l, Ltd.*, No. C 12-06317 WHA, 2013 WL 6623874, at *1 (N.D. Cal. Dec. 16, 2013).

1032348

separately, are also privileged: they were the substance of the requests for legal advice. *Id.*[3]

Plaintiffs also contend that the documents' distribution to employees outside the legal department destroys the privilege. Pls.' Mot. to Compel ("Mot.") at 5 (ECF # 213). But the fact that these documents were then forwarded among a select group of employees (no more than five in any given instance) does nothing to strip the documents of their privileged character. On the contrary, a privileged document does not lose its privileged character merely because corporate employees have forwarded it to others in the organization with a need to know that information. *See ChevronTexaco*, 241 F. Supp. 2d at 1077 (noting that the privilege attaches to "communication[s] between nonlegal employees in which the employees discuss or transmit legal advice given by counsel"); *MGA Entm't, Inc. v. Nat'l Prods. Ltd.*, No. CV 10-07083 JAK SSx, 2012 WL 3150532, at *4 (C.D. Cal. Aug. 2, 2012) ("'[D]ocuments subject to the privilege may be transmitted between non-attorneys . . . so that the corporation may be properly informed of legal advice and act appropriately.'" (quoting *Santrade, Ltd. v. Gen. Elec. Co.*, 150 F.R.D. 539, 545 (E.D.N.C. 1993))). Legal advice provided by in-house counsel with respect to recruiting issues can be distributed to corporate employees in the recruiting department without breaking privilege; indeed, the attorney-client communication privilege would be of little use if corporate counsel had to keep his or her advice within the four walls of the legal department.

Moreover, Lucasfilm has never taken the position that an attachment or document becomes privileged merely by being attached to—or, as Plaintiffs more colorfully put it, "funneled" through—counsel. Mot. at 4. In fact, when that same information was otherwise sent or received in the course of regular business absent a request for legal advice, ***it was produced in this litigation***. Harris Decl. ¶ 10.

As Defendants explained to Plaintiffs during the meet and confer process, their reliance on *In re CV Therapeutics, Inc. Securities Litigation*, No. C-03-3709SI (EMC), 2006 WL 1699536 (N.D. Cal. June 16, 2006), misses the mark. That case concerned so-called dual-purpose

---

[3] That is also the case for the entry labeled LUCAS00007653. Its parent email (LUCAS00007652)—not challenged here—was listed as an email from Steve Mair to David Anderman, Esq., described as "Email seeking legal review of employee recruitment document." Harris Decl. ¶ 9, Ex. B.

1032348

documents that were arguably created for both a business purpose and in anticipation of litigation.
Investigating that question, the court determined that the vast majority of documents at issue in
that case *were* in fact privileged, in light of the "implied request[s] for legal advice" that the
communications entailed. *See id.*, at *4-5. As that case makes clear:

> The attorney-client privilege protects documents which "involve either client communications intended to keep the attorney apprised of continuing business developments, with an implied request for legal advice based thereon, or self-initiated attorney communications intended to keep the client posted on legal developments and implications, including implications of client activity noticed by the attorney but with regard to which no written request for advice from the client has been found."

*Id.* at *4 (quoting *Jack Winter, Inc. v. Koratron Co.*, 54 F.R.D. 44, 46 (N.D. Cal. 1971)).

*Our Children's Earth Foundation v. National Marine Fisheries Service*, 85 F. Supp. 3d
1074 (N.D. Cal. 2015) (Conti, J.), is likewise inapposite. That was a case analyzing a *Vaughn*
index submitted in response to a Freedom of Information Act request. There, the court
questioned whether "a record of a telephone conversation" between two non-lawyers could be
withheld as privileged when it was forwarded to an attorney "for legal advice." *Id.* at 1088. That
is a far cry from documents drafted, reviewed, and/or revised by in-house counsel. And in any
event, the court declined in that case to order the documents produced, or even to review the
documents *in camera*; the court merely asked for a more detailed explanation regarding the
telephone record. *Id.*[4]

### 2. Lucasfilm properly withheld and logged two documents containing legal advice from counsel.

Plaintiffs next seek production of two documents that have been withheld pursuant to the
attorney-client privilege and work-product doctrine, and for which Lucasfilm served a
supplemental log on February 5, 2016. *See* Schiltz Decl. Ex. 1. They mount this challenge
despite nowhere disputing that the lawyer referenced in the log, Christina Cordoza, was serving in
her legal capacity as Lucasfilm's in-house counsel. Plaintiffs' sole complaint appears to be that,

---

[4] Plaintiffs also cite *In re Chase Bank USA, N.A. Check Loan Contract Litig.*, No. 3:09-md-2032 MMC (JSC), 2011 WL 3268091 (N.D. Cal. July 28, 2011), for the proposition that Defendants must show that the communication in question "provides primarily legal and not business advice," and that "numerous recipients" outside of the legal department may argue against the privilege. *Id.* at *2. But that case is interpreting and applying Delaware privilege law, which does not govern here. *See id.* at *1.

in response to Plaintiffs' inquiries during the meet-and-confer process, Lucasfilm decided to withdraw its privilege assertion over two documents referenced in the original log, and to revise its log with respect to two others. Plaintiffs now characterize those good-faith attempts to resolve this dispute short of litigation as an improper attempt to shield non-privileged documents. Those assertions fall flat.

When Lucasfilm first withheld these documents in the *High-Tech* litigation, it did so on the grounds that Howard Roffman—an attorney with a long and distinguished history at Lucasfilm—had provided legal advice in those communications. This was absolutely correct. Plaintiffs in this action, however, asserted for the first time that starting in 1993, Mr. Roffman had been listed as an inactive member of the California bar, rendering him ineligible to practice. Lucasfilm does not dispute the accuracy of the California Bar's records. When made aware of the issue, Lucasfilm re-reviewed the four documents in question and determined that, with respect to two of the documents, Ms. Cordoza was *also* providing legal advice on the topics listed. Lucasfilm therefore supplemented its log to address Plaintiffs' concerns with respect to those two documents. Because Mr. Roffman was the only lawyer involved in the other two documents, Lucasfilm decided to produce those to Plaintiffs to moot the dispute.[5] Unable to take "yes" for an answer, however, Plaintiffs moved to compel production of the other two privileged documents.

Piercing the attorney-client privilege is not a game of "gotcha." Courts will find that a party has waived a privilege claim only after conducting a "holistic, case-by-case analysis" of the particular situation presented. *Khasin*, 2014 WL 690278, at *2 (citing *Burlington N. & Santa Fe*

---

[5] In doing so, Lucasfilm in no way conceded that its assertion of privilege was improper. Indeed, it is unclear whether an attorney's failure to pay his bar fees destroys *his client's* ability to invoke the attorney-client privilege. The privilege belongs to the client, not the lawyer. Accordingly, some courts have recognized that a lawyer's failure to maintain active status does not, standing alone, destroy the privilege. *See Gucci Am., Inc. v. Guess?, Inc.*, No. 09 Civ. 4373(SAS), 2011 WL 9375, at *5 (S.D.N.Y. Jan. 3, 2011) ("A number of courts have sustained invocation of the privilege even when the communications were not made with a member of the bar, if the client reasonably believed that it was communicating with an attorney.") (citing cases). Here, during the relevant time, Mr. Roffman sat atop Lucasfilm's legal department, with the general counsel reporting to him. Indeed, one of Plaintiffs' own exhibits makes this point. *See* Schiltz Decl. ¶ 8, Ex. 8. Although Lucasfilm need not rely on the "reasonable belief" exception here (since a different, active lawyer provided the privileged information withheld)—and the Court need not decide this question to resolve this dispute—the company is willing to present additional evidence on this question if it is deemed necessary.

1032348

*Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005)). When the purported deficiency can be cured through the production of a supplemental log, the Court will decline to impose the "severe sanction" of finding the privilege waived. *Id.* at *2.

This Court's decision in *Khasin* is instructive. There, a party produced a privilege log that failed to satisfy even the "basic requirement" that attorneys be identified by name. *Id.* at *4. Indeed, the log "provide[d] no means of determining which individuals could properly be categorized as 'clients' on each entry." *Id.* This Court nonetheless refused to find a waiver. Instead, it ordered the party claiming privilege to produce a supplemental log, which would identify the attorneys and clients on each entry. *Id.* at *6.

Here, Lucasfilm provided a log that listed attorneys and clients. In response to Plaintiffs' inquiries regarding Howard Roffman, Lucasfilm supplemented its log voluntarily, adding additional information supporting the assertion of privilege. This is the precise remedy this Court ordered in *Khasin* when confronted with a far more problematic log than the one at issue here. If Plaintiffs' view were correct, the Court's ruling in *Khasin* would make no sense: the supplemental log the Court ordered would be rejected as a "moving target" and the documents would have to be produced. Mot. at 8.

None of Plaintiffs' cited cases support a contrary conclusion. In *S.E.C. v. Yorkville Advisors, LLC*, the Southern District of New York considered a supplemental privilege log that abandoned previously-asserted privileges "in favor of claims of privilege that were never previously asserted." 300 F.R.D. 152, 165 (S.D.N.Y. 2014). Here, Lucasfilm has consistently asserted attorney-client and work product protection over the two documents at issue. The supplemental log merely added additional information in response to Plaintiffs' specific inquiries—which is the entire point of the meet-and-confer process. *See* N.D. Cal. Civ. L.R. 37-1. Plaintiffs' citation to this Court's opinion in *Elan Microelectronics Corp. v. Apple, Inc.*, No. C 09-01531 RS (PSG), 2011 WL 3443923 (N.D. Cal. Aug. 8, 2011), likewise misses the mark. There, unlike here, Elan's supplemental log "fail[ed] to identify by name even a single attorney who was involved in or that requested any of the disputed communications that Elan continue[d] to withhold." *Id.* at *5. It was for that reason that the Court found the supplemental log

1032348

insufficient and ordered the documents' production.  *Id.* ("Without that information, there is no basis for which to determine whether assertion of the privilege is proper.").  Here, by contrast, the original log referenced one lawyer, and when Plaintiffs raised a question about that lawyer's bar status, Defendants provided a supplemental log that referenced additional legal counsel.  Because Plaintiffs cannot and do not contest the supplemental log's adequacy with respect to these two entries, their motion should be denied.

> **3.** **Privileged communications from Lucasfilm's General Counsel David Anderman do not lose their protected status merely because Mr. Anderman also provided business advice.**

Plaintiffs' next challenge concerns documents containing legal advice or solicitations for such advice sent to or received from Lucasfilm's most senior in-house counsel, David Anderman. The Court should reject this blunt-force attack on the core of the attorney-client privilege—legal communications between corporate clients and their chief in-house lawyer.

Plaintiffs' argument is premised on a fundamental mischaracterization of the facts at issue. Plaintiffs initially based this challenge on the assertion that Mr. Anderman was "COO during the conduct period," making his documents subject to disclosure.  *See* Schiltz Decl. ¶ 2, Ex. 2.  In light of "Mr. Anderman's role as COO," Plaintiffs demanded that Lucasfilm make a "clear showing" that he had made the withheld communications "for the purpose of obtaining or providing legal advice."  *Id.*  It turned out Plaintiffs were wrong: Mr. Anderman did not serve as COO of Lucasfilm during the relevant discovery period.[6]  *See* Harris Decl. ¶ 11.

Refusing to let facts get in the way of an argument, Plaintiffs cited a job description, a press release about Mr. Anderman's appointment, and his own LinkedIn profile, for the unremarkable proposition that Mr. Anderman sometimes provided "business advice" while at the company.  *See* Schiltz Decl. ¶¶7-9, Exs. 7-9.  But these documents provide no aid to Plaintiffs. The 2008 press release makes clear that "Anderman has been a key member of Lucasfilm's legal

---

[6] Lucasfilm also repeatedly asked Plaintiffs what kind of "clear showing" would satisfy them, short of providing them the documents themselves.  They provided no answer whatsoever to that question, making the meet and confer on this issue unproductive.  *See* Schiltz Decl. ¶ 2, Ex. 2. Lucasfilm believes its privilege log descriptions are more than "boilerplate," Mot. at 11, and in fact go beyond what is required by Ninth Circuit law.  *See Khasin*, 2014 WL 690278, at *2.  If the Court, however, would like Lucasfilm to supplement its log with more fulsome document descriptions, Lucasfilm would provide that information.

team since joining the company in 1998" and was being promoted to be "the company's senior legal officer." *Id.* ¶ 8, Ex. 8. Although Mr. Anderman's role as General Counsel involved a broad array of business affairs, the release confirms that he managed those issues primarily through a legal perspective. *See id.* ("[H]e has overseen legal matters related to production and distribution of films and television, as well as negotiated worldwide merchandising and promotional licenses, technology transactions, online ventures and real estate development deals."). Furthermore, the job description Plaintiffs reference demonstrates that Mr. Anderman's business affairs function was primarily legal in nature. The job functions included, for example, partnering with other departments "to accomplish a full range of transactional, operational, litigation and policy matters," "draft[ing], review[ing], and negotiat[ing] legal agreements," "establish[ing] strong relationships with studio attorneys," and "anticipat[ing] and identify[ing] issues and risks, recommending potential solutions, and identifying trends in the areas of law relating to technology and entertainment." *Id.* ¶ 7, Ex. 7. What Mr. Anderman chooses to highlight on his own LinkedIn profile should hardly guide the legal analysis here. Plaintiffs have plucked out a few sentences from these documents referencing the General Counsel's ability to provide "sound business advice" and the like. Those are thin reeds on which to rest a wholesale attack on privileged documents sent to and from a company's General Counsel.

Plaintiffs are wrong to suggest that in-house counsel's communications are subject to disclosure if they address business affairs. "Where *legal advice of any kind*, is sought from a professional legal advisor in his capacity as such, the communications *relating to that purpose*, made in confidence, by the client, are at his instance permanently protected from disclosure by himself or by the legal advisor, unless the protection be waived." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (emphasis added). In-house lawyers will often provide legal advice regarding business affairs—that's part of the job.

Lucasfilm agrees with the uncontroversial statement that communications with corporate counsel made for purely business purposes as opposed to legal ones are not privileged. *See ChevronTexaco*, 241 F. Supp. 2d at 1076. Accordingly, Lucasfilm produced seventy documents to, from, or copying Mr. Anderman when such communications were ***not*** made for the purpose of

1032348

obtaining or providing legal advice. Harris Decl. ¶ 12. The documents at issue here were withheld precisely because they involved legal advice. Indeed, the general timeframe of these documents makes clear that many of them concern an active legal dispute that was brewing between Lucasfilm and ImageMovers Digital (a Disney entity) regarding recruiting and intellectual property issues. Lucasfilm produced several letters between Lucasfilm's outside counsel and Disney's lawyers on this topic during the relevant time frame. One was dated March 15, 2007 ("Employee Raiding and Misappropriation of Trade Secrets and Confidential Information by IM Digital"), another April 13, 2007 (same), and a third May 4, 2007 (same). *See* Harris Decl. ¶¶13-15, Ex. C-E.[7] Many of the log entries before and after these letters reference Mr. Anderman's "draft letter," "legal memo," and "legal advice re employee solicitation." *See* Schiltz Decl. ¶ 1, Ex. 1. It should not have been difficult for Plaintiffs to connect the dots.

Plaintiffs have complemented their factual mischaracterizations with legal ones. They rely heavily on *Genentech, Inc. v. Trustees of University of Pennsylvania*, No. C 10-2037 PSG, 2011 WL 7074211 (N.D. Cal. Oct. 18, 2011), arguing that this case is "nearly identical" to that one. Hardly. There, the in-house lawyer in question was also the company's President and CEO. *Id.* at *1. Here, Plaintiffs erroneously contended that Mr. Anderman was the COO, when in fact he never held that title during the time period relevant to the log entries in question. *See* Harris Decl. ¶ 11. Notably, in *Genentech*, this Court ultimately decided that the documents at issue were not privileged, in part because in one of the disputed email threads, the lawyer in question went "so far as to announce that he [wa]s 'speaking as the CEO'" about the events at issue. *Genentech*, 2011 WL 5079531, at *3 (N.D. Cal. Oct. 24, 2011). Mr. Anderman could have made no such proclamation. Plaintiffs' citation to *Apple Inc. v. Samsung Electronics Co., Ltd.* is also puzzling. That case concerned waiver of privilege in light of the widespread distribution of purportedly privileged material "to many individuals with no apparent connection to th[e] litigation." 306 F.R.D. 234, 244 (N.D. Cal. 2015). The case had nothing to do with the situation presented here—

---

[7] All three letters were produced in *High-Tech*, and two were subsequently produced to Plaintiffs in this litigation. In preparing this opposition, Defendants realized that one of these letters was inadvertently not produced to Plaintiffs. Upon discovering this omission, Defendants immediately served the third letter on Plaintiffs. *See* Harris Decl. ¶ 15.

a company's General Counsel receiving and dispensing legal advice about issues core to his legal function.

As a fallback, Plaintiffs assert that *in camera* review of these documents is warranted in light of Mr. Anderman's role. But taken to its logical conclusion, Plaintiffs' position would require a court to perform *in camera* review—or eviscerate the privilege outright—whenever in-house counsel also provides business advice as part of his or her job generally, and whether or not there is a basis to assert that the specific documents at issue related to business rather than legal advice. Such a rule would place an unwarranted burden on the attorney-client privilege, and could well make an in-house lawyer think twice before providing the unvarnished advice to which the client is entitled. *See Upjohn*, 449 U.S. at 389. It would also lead to a dramatic rise in discovery motion practice, as nearly every in-house lawyer communication would trigger *in camera* review, at a minimum.[8] The Court should reject this broadside attack on the attorney-client privilege.

> **4.    Disclosure of privileged communications or documents to a third-party contractor acting on behalf of the client and at the direction of counsel does not destroy the privilege.**

Plaintiffs' final challenge regarding Lucasfilm's documents concerns fifty privileged documents that were sent to or received from a third-party consultant (the Palmer Advantage), who was performing legal analysis at the direction of counsel. Plaintiffs' counsel in *High-Tech* raised this same concern during the pendency of that litigation, and the parties resolved the issue during the meet-and-confer process in November 2012. Harris Decl. ¶ 16. Plaintiffs' attempt to resurrect this stale dispute fails.

Plaintiffs argue that Lucasfilm waived any attorney-client or work product privilege that may have attached to these documents by disseminating them to this third-party consultant. That is wrong. It is well-settled that "where a consultant performs work that is substantially

---

[8] Plaintiffs go so far as to argue that even *in camera* review would be too much of a concession here, and that the documents must be produced outright. Mot. at 12. This extreme demand is without precedent. Plaintiffs rely on *Elan* for this request, but again that citation is off-base. There, the Court declined to perform an *in camera* review "in the twilight of fact discovery." *Elan*, 2011 WL 3443923, at *5. Here, fact discovery closes eight months from now, in October 2016. *See* ECF # 198.

1   intertwined with the subject matter of a corporation's legal concerns, and the consultant provides

2   information to the corporation's attorney to aid the attorney in advising the corporate client, the

3   privilege extends to the consultant as the corporation's functional employee." *Schaeffer v.*

4   *Gregory Vill. Partners, L.P.*, No. 13-cv-04358-JST, 2015 WL 166860, at *4 (N.D. Cal. Jan. 12,

5   2015).  This holds true even when the consultant at issue is performing a discrete task "for a

6   limited time and purpose" to address "regulatory action and potential litigation" facing the

7   company, as opposed to having a more extensive role regarding every phase of the company's

8   legal department.  *Id.*; *see also McCaugherty v. Siffermann*, 132 F.R.D. 234, 239 (N.D. Cal.1990)

9   (concluding that the privilege applied to communications with consultants who performed work

10  within "an environment dense in regulations," and the consultants "knew that whatever deals they

11  considered had to be analyzed within that regulatory framework," and "also knew that there

12  would be consequential legal implications of" their actions); *In re Copper Market Antitrust Litig.*,

13  200 F.R.D. 213, 218-19 (S.D.N.Y. 2001) ("RLM's independent contractor status provides no

14  basis for excluding RLM's communications with Sumimoto's counsel from the protection of the

15  attorney-client privilege").

16       As Lucasfilm explained to Plaintiffs during the meet-and-confer discussions about this

17  issue, the company retained the Palmer Advantage firm to assist the legal department in assessing

18  and evaluating legal issues, including compliance with wage and hour laws.  Schiltz Decl. ¶ 2,

19  Ex. 2.  The consultant's work in this "environment dense in regulations" falls within the ambit of

20  the attorney-client privilege and work product doctrine.  *Siffermann*, 132 F.R.D. at 239.

21  Lucasfilm further explained that the Palmer Advantage prepared these documents at the request

22  and under the supervision of counsel, namely in-house counsel Christina Cordoza and outside

23  counsel Judith Keyes.  Schiltz Decl. ¶ 2, Ex. 2.  Plaintiffs now complain that this is not reflected

24  on the privilege logs themselves, Mot. at 13, but when Lucasfilm offered to supplement those

25  logs, Plaintiffs ignored the request and responded with this motion.  Schiltz Decl. ¶ 3, Ex. 3.

26       Plaintiffs also erroneously state that "neither Cardoza, Keyes, nor any other lawyer was

27  included on **any** of the withheld documents."  Mot. at 14.  Ms. Cordoza is in fact listed on entries

28  25, 26, 27, 28, 29, 30, 31, 32, 35, 36, 37, and 38.  *See* Schiltz Dec. ¶ 1, Ex. 1.  The fact that not

1032348

every document involves a lawyer is of no moment: "A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds. . . . [D]ocuments subject to the privilege may be transmitted between non-attorneys . . . so that the corporation may be properly informed of legal advice and act appropriately." *Santrade, Ltd. v. Gen. Elec. Co.*, 150 F.R.D. 539, 545 (E.D.N.C. 1993); *see also Aplsey v. Boeing Co.*, No. 05-1368-MLB, 2008 WL 5211001, at *1 (D. Kan. Dec. 9, 2008) ("[T]he attorney-client privilege is not lost merely because an employee conveys the legal communication for another employee for action.").

*Memry Corp. v. Kentucky Oil Technology, N.V.*, No. C04-03843 RMW (HRL), 2007 WL 39373 (N.D. Cal. Jan. 4, 2007), is not to the contrary. There, the court concluded that the company did not waive privilege by sharing documents with a third party who was not "even a traditional consultant." *Id.* at *3. The inquiry turned on whether "the corporate client's agents possessed the relevant information the attorney needed to render sound legal advice." *Id.* at *2. Here, as the log indicates, the Palmer Advantage performed confidential work relating to categorizing employee status, in connection with actual or potential litigation. Such work was relevant to the legal department's needs and is therefore protected by the attorney-client privilege. Plaintiffs' request should be denied.

**B.  Pixar's privilege assertions over documents involving in-house General Counsel Lois Scali are proper, and the crime-fraud exception has no bearing here.**

Plaintiffs' motion seeks to cripple the attorney-client privilege in civil antitrust cases by advancing a sweeping, novel, and unsupported view of the crime-fraud exception. At bottom, Plaintiffs are attempting to shoehorn *the* critical and contested merits of this entire lawsuit— whether a preponderance of the evidence demonstrates the defendants civilly violated antitrust law as alleged in the complaint—into an early-stage discovery dispute. They do so by proceeding on an expansive view of the crime-fraud exception that finds no precedent in Ninth Circuit or Supreme Court case law. Moreover, Plaintiffs fail to explain with any specificity how Pixar's conduct might have amounted to a "crime" or "fraud" in the first place. And they fail to marshal competent evidence to prove—as they must—that the exception applies by a preponderance of

1032348

the evidence.  Pixar is entitled to protection of the attorney-client privilege, just as is any client who seeks legal advice to address complex problems.  Plaintiffs' request to compel production of privileged attorney-client communications is baseless and should be denied. [9]

### 1. Plaintiffs bear a heavy burden of establishing that the crime-fraud exception applies.

A party invoking the crime-fraud exception to the attorney-client privilege must clear two hurdles.

> First, the party must show that the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme. Second, it must demonstrate that the attorney-client communications for which production is sought are sufficiently related to and were made in furtherance of the intended, or present, continuing illegality.

*In re Grand Jury Investigation*, 810 F.3d 1110, 113 (9th Cir. 2016) (internal quotation marks and brackets omitted).  In a civil case, the party seeking to invoke the crime-fraud exception must prove by a preponderance of the evidence that the exception applies.  *In re Napster*, 479 F.3d at 1094-95.  Plaintiffs' cursory and imprecise arguments, which fail to take seriously the moving party's burden to overcome this "oldest and arguably most fundamental" common law privilege, fall far short of meeting these requirements.  *Id.* at 1090.

It is also worth noting that the crime-fraud exception naturally requires some showing that either a "criminal" or "fraudulent" scheme was underway or in the works when the attorney-client communication occurred.  *Id.*  Here, Plaintiffs have only—and barely—argued without factual or legal basis that Pixar planned to engage in *criminal* conduct when it sought legal advice from attorney Lois Scali.  While Plaintiffs' motion makes one passing reference to the notion that Pixar's alleged scheme was "criminal *or fraudulent*," nowhere do Plaintiffs set out a distinct fraud-based theory for their attempt to vitiate the attorney-client privilege.  Mot. at 18 (emphasis added).  Accordingly, Plaintiffs have waived any argument premised on allegedly fraudulent

---

[9] During the lengthy meet-and-confer process, Plaintiffs never once contended that any of Lois Scali's documents were subject to disclosure because of her alleged "dual business-legal role"; that argument appears for the first time in this motion.  *See* Mot. at 16.  Because Plaintiffs failed to satisfy their meet-and-confer obligations on this issue, the Court should disregard it.  *See* N.D. Cal. Civ. L.R. 37-1(a) (requiring an "attempt[] to resolve all disputed issues").  Moreover, Plaintiffs' chart setting forth the disputed Scali documents draws no distinction between which documents they challenge based on this dual-role theory, and which on the crime-fraud theory, making analysis on this point impossible.

1032348

conduct. *See Ward v. Pickett*, No. C-13-01735 DMR, 2013 WL 5496549, at *5 (N.D. Cal. Oct. 3, 2013) ("[I]ssues raised in a brief that are not supported by argument are deemed abandoned.").[10]

### 2.  Plaintiffs fail to make a *prima facie* showing of a criminal scheme.

Given that Plaintiffs make no allegation of fraud, Pixar's claim of privilege must stand unless they can show by a preponderance of the evidence that Pixar "was engaged in or planning a **criminal** . . . **scheme** when it sought the advice of counsel to further the scheme." *In re Grand Jury Investigation*, 810 F.3d at 1113 (emphasis added). But Plaintiffs' motion glosses over this fundamental requirement of privilege law and instead jumps to the second step of the crime-fraud analysis, all on the apparent assumption that the Court will simply *infer* the existence of a criminal scheme from the defendants' alleged conduct. It is not until the second-to-last page of their motion that Plaintiffs finally (if briefly) reveal the core starting premise of their crime-fraud argument: a belief that Pixar's alleged conduct amounted to a federal felony in violation of the Sherman Act. *See* Mot. at 24. For two reasons, this blithe reference to the statute is utterly insufficient as a foundation for Plaintiffs' crime-fraud argument.

First, Plaintiffs' theory lacks support in Ninth Circuit or Supreme Court precedent. Neither court has sanctioned an application of the crime-fraud exception in a civil antitrust case based on a claim that the same *civil* wrongs alleged in the plaintiffs' complaint would—if prosecuted by the United States in a criminal action—amount to a *criminal* antitrust violation sufficient to support the exception. Of course, in this very case, the DOJ investigated and sued solely on a civil violation, which was settled without admission or adjudication of any violation of law, even civilly. Indeed, Plaintiffs fail to point to *any* authority authorizing the crime-fraud exception on those grounds in a civil case between private parties. They rely only on *In re Antitrust Grand Jury*, 805 F.2d 155 (6th Cir. 1986), which arose from a federal grand jury investigation into "possible *criminal* antitrust violations." *Id.* at 159 (emphasis added). There the

---

[10] Similarly, to the extent Plaintiffs' motion suggests—by way of a single parenthetical citation to an unpublished order from another court, with no accompanying explanation or analysis, *see* Mot. at 24 (citing *Lewis v. Delta Air Lines, Inc.*, No. 2:14-cv-01683-RFB-GWF, 2015 WL 9460124, at *3 (D. Nev. Dec. 23, 2015))—that the crime-fraud exception might somehow still apply absent an attempted crime *or* fraud, the Plaintiffs have failed to develop any argument along those lines. *See Ward*, 2013 WL 5496549, at *5.

1032348

Sixth Circuit approved an application of the crime-fraud exception upon finding a "reasonable basis to suspect" that certain parties undertook a criminal conspiracy to restrain trade in violation of the Sherman Act. *Id.* at 166. But the Ninth Circuit has made clear that the crime-fraud exception applies quite differently in a civil case than in the grand jury context. *See In re Napster*, 479 F.3d at 1094-95 (rejecting an argument that the "reasonable cause to believe" standard applied in grand jury cases is adequate to safeguard the attorney-client privilege in "ordinary" civil cases); *see also id.* at 1094 (summarizing Judge Brazil's "thorough and thoughtful" discussion in *Laser Industries, Ltd. v. Reliant Technologies, Inc.*, 167 F.R.D. 417 (N.D. Cal. 1996), of the differences between civil and grand jury cases when it comes to establishing the crime-fraud exception). Plaintiffs are therefore asking this Court to enter uncharted legal waters and make new law regarding the attorney-client privilege, with no binding legal precedent as a guide. This Court should decline that invitation.

Second, Plaintiffs have utterly failed to substantiate their accusation that Pixar was in the midst of perpetrating a federal crime. Beyond a cursory citation to the Sherman Act itself, they make no attempt to explain what is required in order to prove a criminal antitrust violation. This half-hearted attempt to override the attorney-client privilege—a privilege "deserving of unique protection in the courts"—falls far short of what the Ninth Circuit requires. *In re Napster*, 479 F.3d at 1095 (internal quotation marks omitted). Even in a *criminal* case—where the weaker "reasonable cause" standard applies—a party seeking to invoke the crime-fraud exception must still "submit evidence that if believed by the jury would *establish the elements* of an ongoing violation." *United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir. 1996) (internal quotation marks omitted) (emphasis added); *see also In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996) (explaining that the moving party must do much more than "merely . . . allege that it has a sneaking suspicion the client was engaging in or intending to engage in a crime or fraud when it consulted the attorney"). Yet Plaintiffs fail to explain even the most basic requirements for establishing a criminal violation of the Sherman Act. Nor—despite the fact that this famously open-ended statute has required more than a century of exposition by the courts, *see, e.g.*, *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911)—do Plaintiffs offer any case

19

1032348

law to support their theory that an agreement of the sort alleged here might qualify as a criminally illegal "restraint of trade." *Cf. Mistretta v. United States*, 488 U.S. 361, 417 (1989) (Scalia, J., dissenting) (observing that "a certain degree of discretion, and thus lawmaking, *inheres*" in construing what constitutes a "restraint of trade" under the Sherman Act). As noted, the DOJ certainly never took that view when conducting its own investigation.

Plaintiffs' failure even to adequately allege a crime, much less demonstrate one occurred, dooms their argument. Any further attempts to flesh out Plaintiffs' crime-fraud theory would at this point be untimely. *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1035 (N.D. Cal. 2014) ("[A]rguments raised for the first time in Reply briefs are waived.").

### 3. Plaintiffs offer no competent evidence to support their allegation that Pixar endeavored to form a criminal antitrust conspiracy.

Even if Plaintiffs had made out a *prima facie* case in support of the crime-fraud exception's applicability, they have still failed to present any competent evidence that Pixar was, in fact, engaged in any criminal activity. Indeed, ignoring that the defendants have vigorously litigated this case for 17 months (and the *High-Tech* case before that) without once admitting liability, Plaintiffs remarkably and wrongly contend that the existence of an illegal conspiracy "cannot be disputed." Mot. at 18. To the contrary, one can—and the defendants vehemently *do*—dispute that an unlawful conspiracy occurred in this case. And not once in the more than seven years since the DOJ investigation began has anyone, until Plaintiffs in this motion, had the temerity even to suggest that any conduct was criminal.

What's more, Plaintiffs offer only two types of "evidence" to "prove" the allegedly criminal conspiracy, neither of which is probative. Plaintiffs rely primarily on legal conclusions from the DOJ's 2010 Competitive Impact Statements. According to those Statements, the DOJ believed that two of the defendants in this case—Pixar and Lucasfilm—once violated the Sherman Act by entering into an agreement to restrict employee recruiting. The DOJ's conclusions are irrelevant to this motion.

First, those Statements were the product of a *civil*—and not criminal—antitrust probe. *See United States v. Adobe Sys., Inc.*, No. 1:10-cv-01629, 2010 WL 9525803 (D.D.C. Sept. 24, 2010) (Competitive Impact Statement the DOJ "submitted for entry in this *civil* antitrust proceeding"

(emphasis added)); *United States v. Lucasfilm Ltd.*, 75 FR 81651-01(Dec. 28, 2010) ("The United States of America . . . brings this *civil* antitrust action . . . ." (emphasis added)).  Indeed, the absence of criminal allegations from the required Tunney Act statements suggests that the DOJ did not regard the alleged conduct to be criminal in nature.  Second, Pixar and Lucasfilm settled that civil litigation without admitting any civil liability, let along any criminal culpability.  The Court should therefore disregard Plaintiffs' attempt to invoke the crime-fraud exception by relying on legal conclusions written—and never proved to judge or jury—by DOJ civil attorneys.

Plaintiffs' next argument is a pure form of question begging: Plaintiffs suggest they can establish the existence of a criminal antitrust conspiracy simply by pointing to *their own unproven allegations* in this case.  *See* Mot. at 19 (summarizing the Court's ruling on defendants' motion to dismiss).  Plaintiffs seem to conflate their burden to state a claim under Federal Rules of Civil Procedure 8 and 9—a purely legal issue that turns on the sufficiency of the allegations in their civil complaint—with their qualitatively different burden here to *prove*, by a preponderance of the evidence, that Pixar sought Lois Scali's advice in furtherance of a criminal scheme.  *See In re Grand Jury Investigation*, 810 F.3d at 1113 (explaining the moving party's obligation to "show that the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme" (internal quotation marks omitted)).  Given the Court's obligation to "accept[] as true Plaintiffs' factual allegations" and "make[] all reasonable inferences in favor of Plaintiffs" when deciding a motion to dismiss, ECF #147 at 35 n.14, it is completely and utterly irrelevant for purposes of establishing the crime-fraud exception that the Court last year denied the defendants' Rule 12 motion.

Plaintiffs rely on these two classes of evidence—and nothing else—to prove the first prong of the crime-fraud test.  *See* Mot. at 18-19.  Their failure to marshal any competent evidence marks yet another reason to deny their attempt to vitiate the attorney-client privilege.

### 4. Plaintiffs are using this discovery dispute to seek a premature merits determination about the central disputed issue in this case.

The Court should reject Plaintiffs' gambit for an even more fundamental reason.  At bottom, Plaintiffs' motion seeks a back-door ruling on a central merits issue that ultimately must be decided by the trier of fact: whether a preponderance of the evidence suggests that Pixar

21

1032348

endeavored illegally to restrain trade in violation of the Sherman Act. Especially given that "the behavior proscribed by the [Sherman] Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct," *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 440-41 (1978), courts have repeatedly refused to apply the crime-fraud exception in cases like this where the moving party's basis for the motion simply mirrors the antitrust allegations in the complaint. *See, e.g., Barba v. Shire US, Inc.*, No. 13-civ-21158, 2015 WL 7015324, at *2 (S.D. Fla. Nov. 12, 2015) (denying a motion to compel privileged attorney-client communications where "the parties' efforts to persuade the Court to adopt their view of the crime-fraud exception . . . have essentially caused this discovery dispute to morph into what amounts to a 'trial on the papers'"); *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 423 (N.D. Ill. 2006) (declining to apply the crime-fraud exception when the question of whether an antitrust violation occurred was "fact-intensive" and disputed and "given the limited analysis of these complex issues that can be performed in the context of a discovery dispute, with its necessarily constricted evidentiary record").

Where, as here, an attempt to invoke the crime-fraud exception is premised on alleged practices that a jury can, and Defendants believe will, find to have legitimate business purposes, applying the crime-fraud exception "would defeat a primary purpose of the attorney-client privilege, which is to encourage individuals to seek legal counsel to guide them through the thickets of complex laws." *In re Napster*, 479 F.3d at 1097 (internal quotation marks and brackets omitted). Plaintiffs' position, taken to its logical conclusion, would mean that the privilege could be vitiated by the mere act of asking an attorney for legal advice about business practices that are later challenged in a civil antitrust suit. The Court should reject this unfounded attempt to vitiate the attorney-client privilege.

### 5. *In camera* review would not remedy the deficiencies in Plaintiffs' motion.

Given Plaintiffs' failure to meet even the most basic requirements of proving the applicability of the crime-fraud exception—i.e., offering adequate proof of an underlying attempt to carry out a crime or fraud—the Court should not bless their disregard for the attorney-client privilege by nonetheless conducting *in camera* review of more than 100 documents

memorializing Pixar's attorney-client communications.  There is no point in undertaking *in camera* review—which is only required before a court can decide whether a *particular document* "should be produced under the crime-fraud exception"—where Plaintiffs have failed to make even an arguable threshold showing "that the client was engaged in or planning a criminal or fraudulent scheme" in the first place.[11]  *In re Grand Jury Investigation*, 810 F.3d at 1113. Plaintiffs' request to compel Pixar's privileged attorney-client communications should be denied in its entirety.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion to Compel.


DATED:   February 24, 2016                    KEKER & VAN NEST LLP


By:  */s/ Robert A. Van Nest*

John W. Keker
Robert A. Van Nest
Cody S. Harris

COVINGTON & BURLING LLP

Emily Johnson Henn
Kathryn Cahoy
Cortlin Lannin

*Attorneys for Defendants*
The Walt Disney Company
Lucasfilm Ltd., LLC
Pixar
Two Pic MC LLC

---

[11] Because the crime/fraud exception has no application here given the absence of any cognizable crime or fraud, the Court need not consider whether each privileged communication was (i) "related to" or (ii) "made in furtherance of" the non-existing criminal scheme.  *See In re Grand Jury Investigation*, 810 F.3d at 1113.  But even if the Court were to reach the issue, Defendants in no way concede the point.  The privileged documents at issue were routine business communications lacking any indicia of criminal or fraudulent intent.