1   Daniel A. Small (*pro hac vice*)
    Brent W. Johnson  (*pro hac vice*)
2   Jeffrey B. Dubner (*pro hac vice*)
    COHEN MILSTEIN SELLERS & TOLL PLLC
3   1100 New York Ave. NW, Suite 500
    Washington, DC 20005
4   Telephone:  (202) 408-4600
    Facsimile:  (202) 408-4699
5   dsmall@cohenmilstein.com
    bjohnson@cohenmilstein.com
6   jdubner@cohenmilstein.com

7   Daniel H. Silverman (*pro hac vice*)
    COHEN MILSTEIN SELLERS & TOLL PLLC
8   190 S. LaSalle St., Suite 1705
    Chicago, IL 60603
9   Tel: (312) 357-0370
    dsilverman@cohenmilstein.com
10
    *Co-Lead Plaintiffs' Counsel*
11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                         SAN JOSE DIVISION

15   IN RE ANIMATION WORKERS ANTITRUST          No.  14-CV-4062 LHK
     LITIGATION
16
                                                SUPPLEMENTAL DECLARATION OF
17                                              DANIEL A. SMALL IN SUPPORT OF
                                                PLAINTIFFS' MOTION FOR
18                                              ATTORNEYS' FEES, EXPENSES, AND
                                                SERVICE AWARDS
19

20   THIS DOCUMENT RELATES TO:                  Date:        November 10, 2016
                                                Time:        1:30 p.m.
21   ALL ACTIONS                                Courtroom:   Room 8, 4th Floor
                                                Judge:       The Honorable Lucy H. Koh
22

23

24          I, DANIEL A. SMALL, declare as follows:

25          1.      I am an attorney duly licensed to practice before all of courts of the District of

26   Columbia and the State of Maryland and have been admitted to appear in this case *pro hac vice*.  I

27   am a partner with the law firm of Cohen Milstein Sellers & Toll PLLC, counsel of record for

28

plaintiff Robert A. Nitsch, Jr. and Co-Lead Class Counsel in the above-entitled action.  Based on personal knowledge and review of firm records, if called upon, I could and would competently testify thereto.

2.      I submit this supplemental declaration in response to the Court's November 10, 2016 order requiring certain plaintiffs' counsel to justify their hourly rates submitted with plaintiffs' motion for attorneys' fees.  For Cohen Milstein, the Court requested (1) the job title and hourly rate for each biller, (2) justification for the hourly rates of each biller (other than Daniel Small, Brent Johnson, Jeffrey Dubner, and Daniel Silverman, for whose hourly rates a justification was previously provided), and (3) citations to any cases in which courts have approved the requested hourly rates. Each set of information is provided below.

## I.      CALCULATION OF COHEN MILSTEIN'S LODESTAR WITH JOB TITLES AND HOURLY RATES

3.      Cohen Milstein's lodestar in this case through April 14, 2016 is $3,432,526.25.  This lodestar number is different from the one provided in my original declaration because it only covers the period ending April 14, 2016 (the date class certification briefing was completed) as the Court requested at yesterday's hearing.

4.      The job title and hourly rate for each Cohen Milstein biller is presented in the lodestar chart below. The abbreviations are defined as follows: (P)- Partner, (A)- Associate, (SC)- Special Counsel, (DC)- Discovery Counsel, (SA)- Staff Attorney, (I)- Investigator, (CA)- Contract Attorney, (PL)- Paralegal.

| Name (Job Title) | Timekeeper Initials | Hours | Rate | Lodestar at Current Rates |
|---|---|---|---|---|
| Small, Daniel (P) | DAS | 601.5 | $845 | 508,267.50 |
| Dominguez, Manuel (P) | MJD | 0.50 | $725 | 362.50 |
| Johnson, Brent (P) | BWJ | 1,623.25 | $650 | 1,055,112.50 |
| Farah , George, F. (P) | GFF | 2.00 | $605 | 1,210.00 |
| Ruan, Matthew, W. (SC) | MWR | 0.75 | $575 | 431.25 |

| | | | | |
|---|---|---|---|---|
| Dubner, Jeffrey, B. (A) | JBD | 498.00 | $495 | 246,510.00 |
| Silverman, Daniel (A) | DS | 866 | $475 | 411,350.00 |
| Hafiz, Hiba (A) | HH | 0.50 | $475 | 237.50 |
| Gutierrez, Alicia (DC) | AG | 1,449.75 | $465 | 674,133.75 |
| Clarke, Suzanne (I) | SC | 266.25 | $450 | 119,812.50 |
| Braun, Robert (A) | RB | 21.50 | $450 | 9,675.00 |
| Copenhaver, Carl (CA) | CC | 446.75 | $405 | 180,933.75 |
| Tran, Ngan (SA) | TN | 297.75 | $395 | 117,611.25 |
| Prince, Joshua (SA) | JP | 1.25 | $375 | 468.75 |
| Bracken, John, A. (SA) | JAB | 98.50 | $360 | 35,460.00 |
| Bush, Brenna (SA) | BLB | 22.75 | $320 | 7,280.00 |
| Peterson, Brenda (PL) | BP | 72.25 | $290 | 20,952.50 |
| Abetti, Jonathan (PL) | JA | 107.25 | $280 | 30,030.00 |
| Twigg, Andrew (PL) | AT | 1.25 | $270 | 337.50 |
| Szemanski, Ali (PL) | AS | 14.25 | $270 | 3,847.50 |
| Campbell, Maya (PL) | MC | 9.00 | $270 | 2,430.00 |
| Noronha, Alex (PL) | AN | 15.75 | $270 | 4,252.50 |
| Mogck, Edward (PL) | EM | 7.00 | $260 | 1,820.00 |
| | | **6,423.75** | | **$3,432,526.25** |

5.      After April 14, 2016, Cohen Milstein performed work specifically related to Blue Sky Studios ("Blue Sky") and Sony Pictures Animation and Sony Pictures ImageWorks ("Sony").  These tasks included assisting in drafting the preliminary approval papers, including the class notice, arguing the preliminary approval motion, conferring with the notice administrator, Blue Sky and Sony regarding the notice process and handling questions from class members at Blue Sky.

## II.      JUSTIFICATION FOR HOURLY RATES: EXPERIENCE AND QUALIFICATIONS OF COHEN MILSTEIN ATTORNEYS[1]

6.      **Manuel Dominguez:** Mr. Dominguez has litigated complex antitrust, securities and consumer class actions for over 15 years, serving as lead counsel and handling numerous high-profile cases. He currently represents plaintiffs as lead counsel or in the co-lead counsel team in antitrust litigation involving alleged price-fixing and other anti-competitive conduct in truck transmissions, auto parts, and financial industries. Mr. Dominguez is nationally recognized for his expertise in electronic discovery management, has presented on the impact of the new e-discovery amendments to the Federal Rules of Civil Procedure, and participated in The Sedona Conference Working Group. Mr. Dominguez served as the Chair for the Antitrust, Franchise & Trade Regulation Committee of the Florida Bar's Business Law Section.

7.      **George F. Farah:** George F. Farah joined Cohen Milstein in 2005 and is a member of the Antitrust and Human Rights practice groups. He has represented classes in *In re Hydrogen Peroxide Antitrust Litigation* (E.D. Pa.), *In re OSB Antitrust Litigation* (E.D. Pa.), *In re Publication Paper Antitrust Litigation* (D. Ct.) and *Carlin, et al. v. DairyAmerica, et al.* (E.D. Ca.). Mr. Farah is a graduate of Harvard Law School (J.D., 2005), and Princeton University (B.A., Woodrow Wilson School of Public and International Affairs, 2000).

8.      **Matthew W. Ruan:** Matthew W. Ruan has extensive experience in complex antitrust class litigation. Prior to joining Cohen Milstein in 2013, he practiced at leading firms in San Francisco and Minneapolis, litigating antitrust and securities class actions. He graduated from the

---

[1] The justification for the hourly rates of Daniel Small, Brent Johnson, Jeffrey Dubner and Daniel Silverman was previously provided in the September 15, 2016 Declaration of Daniel A. Small.

University of Chicago in 2000 and the University of Michigan Law School in 2003, where he was an editor of the Michigan Journal of International Law and served as judicial extern to the Honorable Blanche M. Manning, U.S. District Judge, Northern District of Illinois.

9.    **Hiba Hafiz:** Hiba Hafiz worked at Cohen Milstein as an associate and represented plaintiffs in antitrust matters in various industries, including chemical industries. She was a key member of the co-counsel team that brought the first pay-for-delay class action to trial following the Supreme Court's decision in *FTC v. Actavis*, 133 S. Ct. 2223 (2013). She served as lead associate in *Cung Le v. Zuffa, LLC*, Civ. No. 15-1045 (D. Nev.), and worked on *In re Electronic Books Antitrust Litigation*, Civ. No. 11-md-2293 (S.D.N.Y.). Prior to joining Cohen Milstein, she served as law clerk to the Honorable José L. Linares of the United States District Court for the District of New Jersey and to the Honorable Juan R. Torruella of the United States Court of Appeals for the First Circuit.

10.   **Alicia Gutierrez:** Alicia Gutierrez has worked at Cohen Milstein since 2014 and has significant experience in complex antitrust class litigation. Among other cases, she has worked on *Wallach v. Eaton Corporation*, Civ. No. 10-00260 (D. Del.) and *UFCW & Employers Benefit Trust v. Sutter Health*, No. CGC 14-538451 (Ca. Super. Ct., Cty. of San Francisco). Prior to joining Cohen Milstein, she worked at Boies, Schiller & Flexner as an associate, the Boston Consulting Group as a Management Consultant, and Merrill Lynch as a financial analyst. She graduated from Princeton University in 1996 and Stanford Law School and Stanford Graduate School of Business in 2002.

11.   **Suzanne Clarke:** Suzanne Clarke has worked at Cohen Milstein since 2013 and is an accomplished investigator with significant experience in both antitrust and securities litigation. She was previously an investigator with Suzanne Clarke LLC and the James Mintz Group and a reporter with the Natural Resources News Service. She graduated from James Madison University.

12.   **Robert Braun:** Robert A. Braun has significant experience in complex antitrust litigation, including as a lead associate in *In re Cast Iron Soil Pipe and Fittings Antitrust Litigation*, Civ. No. 14-md-2508 (E.D. Tenn.), and *In re Resistors Antitrust Litigation*, Civ. No. 15-3820 (N.D. Ca.). Before joining Cohen Milstein in 2014, Mr. Braun served as a law clerk to the Hon. Carolyn Dineen King of the United States Court of Appeals for the Fifth Circuit and the Hon. Lee H.

Rosenthal of the United States District Court for the Southern District of Texas.  Mr. Braun graduated from Yale Law School in 2011 and from Princeton University *summa cum laude* in 2007.

13.    **Carl Copenhaver:** Carl Copenhaver has worked with Cohen Milstein as a contractor since 2015 and has significant experience in complex antitrust class litigation. Among other cases, he has worked on *Grand Strand Water & Sewer Authority v. Oltrin Solutions, LLC*, No. 14-cv-2800 (D.S.C.) and *Cung Le v. Zuffa,* No. 15-cv-01045 (D. Nev.). He graduated from Carleton College in 1996, magna cum laude, and The George Washington University Law School in 1999.

14.    **Ngan Tran:** Ngan Tran has worked at Cohen Milstein since 2014 and has significant experience in complex antitrust class litigation. Among other cases, she has worked on *In re Cast Iron Soil Pipe Antitrust Litigation*, Civ. No. 14-md-2508 (E.D. Tenn.) and *In re Domestic Drywall Antitrust Litigation*, Civ. No. 13-md-2437 (E.D. Penn.) Prior to joining Cohen Milstein, she worked at Morgan, Lewis & Bockius LLC.  She graduated from St. Mary's College of California in 2003 and The University of Michigan Law School in 2006.

15.    **Joshua Prince:** Joshua Prince has worked at Cohen Milstein since 2009 and has significant experience in complex antitrust class litigation. Among other cases, he has worked on *In re Plasma-Derivative Protein Therapies Antitrust Litigation* Civ. No. 09 C 7666 (N.D. Ill.) and *In re Automotive Parts Antitrust Litigation (Wire Harness)* Civ. No. 12-00101 (E.D. Mich.).  He graduated from the College of William and Mary in 2004 and Villanova University School of Law in 2009.

16.    **John A. Bracken:** John Bracken has worked at Cohen Milstein since 2012 and has significant experience in complex antitrust class litigation. Among other cases, he has worked on *In re Domestic Drywall Antitrust Litigation*, Civ. No. 13-md-2437 (E.D. Penn.), and *Sports Broadcasting Antitrust Litigation,* Civ. No. 97-5184 (E.D. Penn.). Prior to joining Cohen Milstein, he worked at Nixon Peabody LLP as a long term contract attorney. He graduated from Vassar College in 2004 and American University Washington College of Law in 2009.

17.    **Brenna Bush:** Brenna Bush worked at Cohen Milstein from 2012 to 2015, obtaining significant experience in complex antitrust class litigation. Among other cases, she worked on *Shane Group, Inc. et al v. Blue Cross Blue Shield of Michigan*, Civ. No. 10-14360 (E.D. Mich.). She is currently Special Assistant United States Attorney - Felony Major Crimes Trial Section,

1  Misdemeanor Unit at the United States Attorney's Office in Washington DC.  Prior to joining Cohen

2  Milstein, she worked as an Associate Attorney at Morris Schneider Wittstadt, LLC. She graduated

3  from United States International University in 2003 and Rutgers University School of Law - Camden

4  in 2010, and received her LL.M. in Litigation and Dispute Resolution from The George Washington

5  University Law School in 2011.

6       18.  **Brenda Peterson:** Brenda Peterson worked as a paralegal at Cohen Milstein between

7  2013 and 2015. She graduated from the University of Maryland in 1994. In addition to this litigation,

8  she worked on *Allen v. Dairy Farmers of America*, Civ. No. 09-230 (D. Vt.), and *In re Urethane*

9  *Antitrust Litigation*, Civ. No. 04-1616 (D. Kan.).

10       19.  **Jonathan Abetti:** Jonathan Abetti started his tenure as a paralegal at Cohen Milstein

11  in 2009. He graduated from New York University in 2009. In addition to this litigation, he has

12  worked on *In re Auto Parts Antitrust Litigation*, Civ. No. 12-md-2311 (E.D. Mich.), and *In re*

13  *Lidoderm Antitrust Litigation*, Civ. No. 14-md-2521 (N.D. Ca.).

14       20.  **Andrew Twigg:** Andrew Twigg worked as a paralegal at Cohen Milstein from 2012

15  to 2015, and is currently a portfolio analyst at Cohen Milstein. He graduated from Virginia

16  Polytechnic Institute and State University in 2012. In addition to this litigation, he has worked on *In*

17  *re Cast Iron Soil Pipe Antitrust Litigation*, Civ. No. 14-md-2508 (E.D. Tenn.), and *Vera et al v.*

18  *Zuffa, LLC*, Civ. No. 14-5621 (N.D. Ca.).

19       21.  **Ali Szemanski:** Ali Szemanski worked as a paralegal at Cohen Milstein from 2014 to

20  2016. She graduated from Northwestern University in 2014. In addition to this case, she worked on

21  *Shane Group, Inc. et al v. Blue Cross Blue Shield of Michigan*, Civ. No. 10-14360 (E.D. Mich.), and

22  *Garber, et al. v. Office of the Commissioner of Baseball, et al.*, Civ. No. 12-3704 (S.D.N.Y.). She is

23  currently a student at Harvard Law School.

24       22.  **Maya Campbell:** Maya Campbell has worked as a paralegal at Cohen Milstein since

25  2015. She graduated from Reed College in 2015. In addition to this litigation, she has worked on *In*

26  *re Cast Iron Soil Pipe Antitrust Litigation*, Civ. No. 14-md-2508 (E.D. Tenn.), and *In re Resistors*

27  *Antitrust Litigation*, Civ. No. 15-3820 (N.D. Ca.). Prior to joining Cohen Milstein, she interned at the

28  Center for American Progress.

23.    **Alex Noronha:** Alex Noronha has worked as a paralegal at Cohen Milstein since 2015. He graduated summa cum laude from the University of California, San Diego in 2014. In addition to this litigation, he has worked on *In re Dental Supplies Litigation*, Civ. No. 16-696 (E.D.N.Y.), and *Ideker Farms, Inc. v. United States*, Civ. No. 14-183 (Fed. Cl.).

24.    **Edward Mogck:** Edward Mogck worked as a paralegal at Cohen Milstein in 2015. He graduated from the University of California, Berkeley in 2015. In addition to this litigation, he worked on *Allen v. Dairy Farmers of America*, Civ. No. 09-230 (D. Vt.), and *Vera et al v. Zuffa, LLC*, Civ. No. 14-5621 (N.D. Ca.).

## III.    CASES APPROVING REQUESTED HOURLY RATES

25.    Cohen Milstein's lodestar is calculated based on the current hourly rates of the firm. These hourly rates are set annually based on a review of rates prevailing among plaintiffs' counsel in major class action cases for attorneys of comparable skill, experience and qualifications. Courts have awarded fees to Cohen Milstein based on these rates, in some cases with multipliers of these rates. *See* Ex. A, Memorandum and Order,  *In re Urethane Antitrust Litigation*, Civ. No. 04-1616 (D. Kan. July 29, 2016), ECF No. 3273 (awarding fees based on CMST rates); Ex. B, Order Granting Class Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses, *In re Electronic Books Antitrust Litigation*, No. 11-md-2293 (S.D.N.Y. December 9, 2013), ECF No. 474 (same); Ex. C, Order Granting Class Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses Related to Apple Settlement, *In re Electronic Books Antitrust Litigation*, No. 11-md-2293 (S.D.N.Y. November 21, 2014), ECF No. 685 (same); Ex. D, Minute Entry Granting Plaintiff's Unopposed Motion for Final Approval of Class Settlement with Baxter and Motion for Final Award of Attorneys' Fees, Reimbursement of Expenses, and Approval of Incentive Awards for Class Representatives, *In re Plasma-Derivative Protein Therapies Antitrust Litigation*, Civ. No. 09-7666 (N.D. Ill. April 16, 2014), ECF No. 701 (same); and Ex. E, Order and Opinion Regarding Fairness Hearing, Granting Motion for Attorneys' Fees, Reimbursement of Expenses and Payment of Incentive Awards, Denying Motions to Intervene, Granting Motion for Final Approval of Settlement and Plan Allocation, Denying Motion to Strike Sur-Reply, and Denying Motions for Sanctions,

1    *Shane Group, Inc. et al v. Blue Cross Blue Shield of Michigan*, Civ. No. 10-14360 (E.D. Mich.

2    March 31, 2015), ECF No. 213 (same) (vacated on other grounds).

3

4
         I declare under penalty of perjury under the laws of the United States that the foregoing is
5
     true and correct.
6
         Executed this 10th day of November, 2016, at Washington, D.C.
7

8                                                          *s/ Daniel A. Small*
                                                          DANIEL A. SMALL
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE:                                              )
URETHANE ANTITRUST LITIGATION          )          MDL No. 1616
                                                    )          Case No. 04-1616-JWL
This document relates to:                    )
The Polyether Polyol Cases                  )
                                                    )
_____ )

**<u>MEMORANDUM AND ORDER</u>**

This matter came before the Court for hearing on July 27, 2016, on class

plaintiffs' motion for final approval of a settlement with defendant Dow Chemical

Company ("Dow") (Doc. # 3246), plaintiffs' motion for approval of a plan of allocation

and distribution of the settlement fund (Doc. # 3248), and class counsel's petition for

awards of attorney fees, expenses, and incentive payments (Doc. # 3250).  The Court

will enter separate orders granting those motions.  By this Memorandum and Order, upon

consideration of  the written submissions and the arguments at the hearing, the Court

**overrules** the objection by PMC Global, Inc. ("PMC Global") (Doc. # 3263) to

plaintiffs' plan of allocation; and it **overrules** the objections by Johns Manville

Corporation ("Johns Manville") and Whirlpool Corporation ("Whirlpool") (Doc. #3261)

and by FXI, Inc. ("FXI") (Doc. # 3262) to the attorney fee petition .[1]

---

[1]FXI's objection is also asserted on behalf of class members Future Foam,
Johnson Controls, Inc., and Lear Corporation.  INOAC USA, Inc. also purports to join
in the objection, but plaintiffs' counsel states that the class member purchased by that
company previously opted out of this class action, which means that the company has
no standing to assert this objection.

## I.    **Background**

In this multi-district class action, initiated in 2004, the plaintiff class alleged that

Dow and other manufacturers conspired to fix prices for certain urethane chemical

products, in violation of the Sherman Act, 15 U.S.C. § 1.  The Court certified a class

consisting of purchasers of the products from any defendant from January 1, 1999,

through December 31, 2004.  During the course of the litigation, plaintiffs reached

settlements with the other defendants for amounts totaling $139,300,000.  The claim

against Dow, the remaining defendant, was tried to a jury over a period of four weeks,

and on February 20, 2013, the jury awarded plaintiffs damages in the amount of

$400,049,039.00, while finding that such amount did not include any damages for the

period prior to November 24, 2000.  The Court then modified the class to exclude

purchases in 2004, and it eventually entered judgment against Dow in the amount of

$1,060,847,117, an amount that accounted for statutory trebling and a setoff for the prior

settlements.  Dow appealed, but the Tenth Circuit affirmed the judgment.  *See In re*

*Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014).  Dow then filed a petition for

certiorari in the Supreme Court.

While the petition for certiorari was pending, plaintiffs and Dow reached a

settlement in the amount of $835,000,000, which agreement included a release of all

claims by class members based on purchases within the entire class period. On April 27,

2016, the Court issued orders by which it preliminarily approved the settlement and

authorized notice to the class.  Plaintiffs then filed their motions regarding approval of

2

the settlement, a plan of distribution, and attorney fees.  The only objections received by

the Court with respect to those motions are those objections addressed herein.

## II.      Objection to the Plan of Allocation and Distribution

PMC Global objects to plaintiffs' proposed plan of allocation of the proceeds of

the settlement with Dow.[2]  Specifically, PMC Global objects to the fact that the plan

would not provide for any recovery with respect to purchases from January 1, 1999, to

November 23, 2000 (also referred to herein as the "1999-2000 period")—a period within

the class period—even though claims based on such purchases were included within the

release of claims granted to Dow in the settlement agreement.  PMC Global is a holding

company for several class members.  Although it states that it does not know the exact

amount and breakdown of its companies' purchases during the class period, PMC Global

states that those companies' claims based on a total of $117 million in purchases were

approved with respect to the settlements with other defendants, and it believes that the

majority of those purchases within the class period occurred before November 24, 2000.

PMC Global requests either a revised plan of allocation or, preferably, a procedure

whereby plaintiffs would appoint independent counsel to represent the interests of

purchasers from the 1999-2000 period and a mediator would hear arguments and

recommend a revised plan of allocation.  In response, plaintiffs argue that the proposed

---

[2]PMC Global states explicitly that it favors approval of the settlement.

3

allocation is reasonable in light of the jury's finding of no damages during the 1999-2000 period.

The Court has previously stated the standard for approval of a plan of allocation of class action settlement proceeds as follows:

> In evaluating a plan of allocation, the court must ensure that the distribution of funds is fair and reasonable.  When formulated by competent and experienced class counsel, . . . an allocation plan need only have a reasonable, rational basis.  A reasonable plan may consider the relative strength and values of different categories of claims.

See *In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1262 (D. Kan. 2006) (Lungstrum, J.) (citations omitted); *see also Law v. NCAA*, 108 F. Supp. 2d 1193, 1196 (D. Kan. 2000) ("Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.") (citations and internal quotations omitted).

PMC Global argues that the allocation cannot be presumed fair because no class representative had a majority of its purchases during the 1999-2000 period.  PMC Global further argues that the 1999-2000 period claims could have value, based on the facts that Dow evidently sought a release for those claims and that Dow sought judgment post-trial on those claims based on the verdict.  PMC Global further argues that if the claims did have value, an allocation that includes no recovery for such claims is not reasonable.  PMC Global contends that the jury's finding should not be dispositive on the issue but should merely be one factor, and that there is at least an argument that should be had

4

concerning the value of those claims.   PMC Global cites various cases for the

proposition that a reasonable allocation may include a recovery for claims that seem to

have no value on the merits.

        The Court rejects these arguments, and it remains unpersuaded that these claims

may have value for purposes of an allocation of the settlement funds.   The present case

is distinguishable from the cases cited by PMC Global (as that party concedes), as in this

case the jury's finding and the lack of a subsequent appeal of that finding foreclose any

possible future recovery on such claims.[3]   These claims are simply dead, with no further

_____

        [3]Addressing the cases on which PMC Global most heavily relies: In *In re
BankAmerica Corp. Securities Litigation*, 210 F.R.D. 694 (E.D. Mo. 2002), the proposed
allocation was not fair because the plaintiffs receiving no portion of the settlement did
have valuable claims remaining under state law.  *See id.* at 712.  In the present case, the
claims have no value.  In *Law v. NCAA*, 108 F. Supp. 2d 1193 (D. Kan. 2000), which
involved a settlement after a jury verdict for the plaintiff class, the plaintiffs had
seemingly abandoned claims of some members at trial; nevertheless, the court approved
an allocation under which those members would receive a small recovery.  *See id.* at
1197.  In that case, however, there does not appear to have been any objection to
recovery by those members, and the court did not consider whether a no-recovery
allocation would have been reasonable.  *See id.*  The fact that that court approved as
reasonable an unopposed allocation that included a recovery for abandoned claims
certainly does not mean that a court should reject a proposed allocation that does not
include an award for worthless claims.  In *Better v. YRC Worldwide, Inc.*, 2013 WL
6060952 (D. Kan. Nov. 18, 2013), the court refused to approve a plan of allocation with
no recovery for a subset of plaintiffs where no class representatives were only members
of that subset; thus, the Court could not determine whether plaintiffs were correct in
arguing that the subset's claims had no merit.  *See id.* at *4-5.  In that case, there had
been no ruling on the merits of the claims, *see id.*, as there has been in this case.
Moreover, as discussed below, the class representatives in this case could ably represent
the interests of PMC Global.  In *Freebird, Inc. v. Merit Energy Co.*, 2013 WL 1151264
(D. Kan. Mar. 19, 2013), the court approved an allocation under which a discounted
recovery was allowed for certain claims that had been ruled time-barred.  *See id.* at *3.
(continued...)

recourse available.  A reasonable defendant in Dow's position would naturally desire to

obtain a release from all class members, whether or not some of those members still have

viable claims; thus, the fact that the 1999-2000 period claims were included in the

release does *not* provide evidence that those claims have value.  *See In re CRT Antitrust

Litig.*, 2016 WL 3648478, at *14 (N.D. Cal. July 7, 2016) ("That Defendants insisted on

a global release does not change this analysis, since defendants typically insist on a

global release in *every* case.").  Nor does the fact that Dow sought judgment on these

claims post-trial provide evidence that the claims have value, as Dow most likely sought

such a judgment for its possible preclusive effect with non-parties, i.e., opt-outs from the

class.[4]  There is no basis to assign any value to the claims; thus, the proposed allocation

---

[3](...continued)
Again, the fact that one court approved a proposed allocation allowing for some recovery
for seemingly worthless claims does not mean that such an allocation is required.
Moreover, in *Freebird*, the case was still pending before the district court at the time of
settlement, and thus the possibility existed that the limitations ruling could have been
reversed on appeal—which means that those claims may have retained some value.  In
the present case, no possibility of appeal remained on the relevant claims.  Finally, in *In
re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242 (2d Cir.
2011), the court reversed the certification of a settlement class for lack of adequacy of
representation under Rule 23; the court ruled that a subclass was required because no
named plaintiff had claims only within the subset of the worst claims (which subset
included 99 percent of the claims overall), and thus the court could not determine the
amount by which those claims were inferior to the other claims.  *See id.* at 254-55.
Again, the case (which did not involve approval of a plan of allocation) does not stand
for the proposition that worthless claims must be allocated a portion of a settlement fund.
Moreover, as discussed below, the named plaintiffs in this case could adequately
represent PMC Global's interest.

[4]In denying the motion, the Court noted that the requested amendment would
essentially have affected only non-parties, and thus it independently considered the issue
(continued...)

precluding recovery for such claims is reasonable.

Nor is there any basis to delay the approval of plaintiffs' plan of allocation by requiring additional procedures to allow for further argument. The Court rejects PMC Global's argument that none of the named plaintiffs could represent its interests with respect to this issue. One named plaintiff made 41 percent of its class-period purchases during the 1999-2000 period, and that fraction for another named plaintiff was 32 percent. Those plaintiffs would have had an incentive to make any reasonable argument to compensate 1999-2000 period claims in the plan of allocation, and thus appointment of separate counsel to make that argument is unwarranted. Moreover, the arguments that PMC Global seeks to make before a mediator about the value of the 1999-2000 claims can just as easily be made—and have been made—before this Court in considering this motion, and the Court nevertheless remains unconvinced that these claims have value.

PMC Global concedes that a plan of allocation may reflect the relative strengths of the class members' various claims. *See In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d at 1262. PMC Global also concedes that a plan may reasonably allocate no recovery for certain claims. The court's reasoning in the *CRT* case in recently approving a plan of allocation applies here as well:

> As the Court noted earlier, no Ninth Circuit case holds that the release of a class action claim must be compensated in all instances, and

---

[4](...continued)
despite the lack of opposition from plaintiffs. *See* Memorandum and Order of July 26, 2013, at 4 n.2.

7

this Court will not break new ground by announcing one. Class counsel here were within their rights to allocate the settlement proceeds according to the degree of injury suffered by the class. Certain class members were not injured in any manner recognized by law, and accordingly did not receive compensation. That Defendants insisted on a global release does not change this analysis, since defendants typically insist on a global release in *every* case. Were the Court to place any weight on this latter fact, it would essentially be adopting a *per se* compensation rule—which, as just explained, the Court is unwilling to do. Nor is the Court persuaded by the argument that plaintiffs with meritless claims should always be able to extract nuisance value for them whenever those claims are part of a global settlement. If such claims actually have value, the affected plaintiffs can demonstrate that fact during the objection process (or timely opt out). If they fail in that effort, the Court will not have worked any injustice in allowing claims with no value to go uncompensated.

*See In re CRT Antitrust Litig.*, 2016 WL 3648478, at *14 (citations and footnote omitted). In the present case—unlike in any case cited by PMC Global—the uncompensated claims were rejected by the jury, and no appeal was taken. Thus, more so than in any other case, the Court can conclude with certainty that these particular claims have no value. Therefore, the proposed plan of allocation reasonably apportions no recovery for those claims, and the Court overrules PMC's objection.

No other class member asserted an objection to the proposed plan of allocation, which plan experience class counsel recommends. The Court thus finds in its discretion that the proposed plan of allocation, which is based on calculations of actual damages as found by the jury, is fair and reasonable. The Court further finds that the other terms in the proposed plan relating to administration and distribution of the settlement fund are reasonable. Accordingly, the Court will approve the proposed plan of allocation by separate order.

8

### III.    Objections to the Attorney Fee Petition

Plaintiffs' counsel have moved for an award of attorney fees in the amount of one-third of the Dow settlement fund.  Objections were filed by only two sets of objectors out of some 2,200 class members, although their purchases comprise a significant percentage of the class purchases to be compensated from the fund. Objectors argue that a one-third fee would be excessive.

Attorney fees are appropriately awarded from a class action settlement fund, "on the theory 'that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.'" *See Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).  The Tenth Circuit has expressed a preference for the percentage-of-the-fund method of awarding attorney fees in common fund cases.  *See Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995) (citing *Gottlieb*, 43 F.3d at 483). Objectors do not take issue with the use of the percentage-of-the-fund method in this case, and the Court finds it appropriate to use that method here.

The Tenth Circuit has endorsed the use of the following factors—the so-called *Johnson* factors—in setting percentage fee awards in common fund cases:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee—this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability

9

of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*See Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-55 (10th Cir. 1988) (citing

*Johnson v. Georgia Hwy. Expr., Inc.*, 488 F.2d 714 (5th Cir. 1974)). "[R]arely are all

of the *Johnson* factors applicable; this is particularly so in a common fund situation."

*See id.* In this case, the sixth, seventh, and eleventh factors are not applicable; the other

factors, however, all weigh in favor of plaintiffs' counsel's request for a substantial

award of attorney fees in the amount of one-third of the settlement fund.

The most important factor in this case is undoubtedly the amount involved and

the results obtained. "In a common fund case, . . . although time and labor required are

appropriate considerations, the [eighth] *Johnson* factor—the amount involved and the

results obtained—may be given greater weight when, as in this case, the trial judge

determines that the recovery was highly contingent and that the efforts of counsel were

instrumental in realizing recovery on behalf of the class." *See Brown*, 838 F.2d at 456.

Hundreds of millions were at stake here, and counsel achieved incredible success on the

merits of the claims, earning a verdict of over $400 million that would be trebled and

eventually obtaining settlements totaling over $974 million (much more than double the

amount of damages). Liability on these claims was far from certain, and thus the case

presented a great deal of risk, as counsel was required to advance all expenses and

attorney time to litigate a hard-fought case against highly experienced opposing counsel

hired by a defendant with ample resources. The case was not settled pretrial for a

percentage of the damages, nor was it settled on appeal for a steep discount from the judgment amount; instead counsel litigated the case to a verdict and an appellate affirmance. Counsel achieved this verdict and judgment without the benefit of a government investigation or prosecution of members of the alleged antitrust conspiracy. The subject matter was complex and not easily digestible by a lay jury, and there were no personal injuries to heighten sympathy. In almost 25 years of service on the bench, this Court has not experienced a more remarkable result. This enormous success in a highly contingent case favors an award of a substantial percentage of the Dow settlement fund to the counsel who achieved that success for the class members.

The other applicable *Johnson* factors favor a significant fee award as well. Counsel and staff were required to expend an enormous amount of time and labor, totaling over 193,000 hours, over a period of more than 11 years (first factor). This was an extremely difficult and complex case (second factor). The case was contested quite vigorously on both sides, with significant disputed issues arising at the pleading and summary judgment stages, in class certification proceedings, in conducting fact and expert discovery, in pretrial motion practice, during a long jury trial, and on appeal. Litigation of this case required great skill in a highly specialized field (third factor), against highly skilled opposing counsel, and plaintiffs' attorneys, who had great experience and superior national reputations, demonstrated great skill throughout (ninth factor). The amount of time expended over a protracted period leaves little doubt that these attorneys were forced to forego other work during this case (as confirmed by the

11

attorneys' declarations) (fourth factor). The Court agrees with counsel that a one-third fee is customary in contingent-fee cases, and indeed that figure is often higher for complex cases or cases that proceed to trial (fifth factor).[5] The undesirability of this case (tenth factor) is shown by the fact that plaintiffs' counsel in the companion polyester cases, which were aided by a government investigation, declined to litigate these polyether cases as well.

The Court then turns to the only factor truly disputed by objectors—awards in similar cases (twelfth factor). Objectors argue that fees are typically awarded at a much lower percentage in so-called "megafund" cases that involve extremely large settlements (for instance, over $100 million), and they cite a number of cases and two surveys of cases with class-action settlements. They further argue that lower-percentage awards are especially common in the largest megafund cases, and FXI repeatedly cites the

---

[5]That figure is supported by counsel's expert and a 2004 survey. *See* Theodore Eisenberg and Geoffrey Miller, "Attorney Fees in Class Action Settlements: An Empirical Study," 1 J. Empirical L. Stud. 27, 35 (2004); *see also, e.g.*, *Flournoy v. Honeywell Int'l, Inc.*, 2007 WL 1087279, at *2 (S.D. Ga. Apr. 6, 2007) ("The most common contingent fee is one third of the recovery. Forty percent fee contracts are common for complex and difficult litigation . . . ."). Johns Manville and Whirlpool argue in a footnote that the Court should not find one-third to be a customary fee in considering this factor, but they cite no authority for that argument. These objectors concede that a one-third fee is common in "ordinary contingent-fee cases," but they argue that the present case is not ordinary by virtue of the large settlement amount. This argument, however, is better made in the context of the factor considering awards in similar cases (the twelfth factor), which the Court addresses below. Moreover, the Court is persuaded that any experienced counsel would have insisted on a contingent fee of at least one third for this case, given the great amount of risk involved, as discussed above. Thus, the Court finds that a one-third fee would be customary in a case of this type.

12

"principle" in the Tenth Circuit that fee award percentages decrease as settlement funds increase.

Objectors do not dispute, however, that the fee percentage must be determined on a case-by-case basis, based on a weighing of the applicable *Johnson* factors. Moreover, there is no Tenth Circuit principle as argued by FXI. The Tenth Circuit itself has not suggested such a principle; rather, FXI cites only two cases from district courts within the circuit. In *Ramah Navajo Chapter v. Jewell*, __ F. Supp. 3d __, 2016 WL 825710 (D.N.M. Mar. 2, 2016), the court stated that "[t]o avoid windfalls, Courts generally modify their analysis by awarding a lower percentage in mega fund cases," and that "courts in other districts have awarded between 10% and 15% of a mega fund." *See id.* at *19 (citing cases). The court also noted contrary authority, however. *See id.* (citing *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006)). Moreover, in *Ramah*, the court was not asked to award a higher percentage fee; rather, it made these statements about other megafund cases in concluding that the 8.5 percent fee requested in that case was conservative. *See id.* In *In re Copley Pharmaceutical, Inc.*, 1 F. Supp. 2d 1407 (D. Wyo. 1998), the court noted that, according to studies, courts had reduced percentage fee awards as the size of recovery increases, in sensitivity to the concern that if a common fund is extraordinarily large, the application of a benchmark or standard percentage could result in a fee that is unreasonably large for the benefit conferred. *See id.* at 1413. The court then proceeded to consider the *Johnson* factors in determining an appropriate percentage-fee in that case. *See id.*

This Court appreciates that some courts have awarded lower percentages to avoid granting an excessive windfall to counsel under the unique circumstances of those cases. On the other hand, the court agrees with those courts who have noted that such a diminishing scale can fail to provide the proper incentive for counsel. For example, the court in *Allapattah* (cited in *Ramah*) reasoned as follows:

> While such an approach may have validity when there is a large settlement short of a full trial, I conclude that the rationale has no reasonable application in this unique case for the reasons I have already discussed. Likewise, the court in *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) rejected this "declining percentage method:
>
>> Such an approach also fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is great risk of no recovery. Nor does it give significant weight to the fact that large attorneys' fees serve to motivate capable counsel to undertake these actions.
>
> While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method adopted by the Eleventh Circuit . . ., the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained. By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for the Class Counsel to settle too early for too little.

*See Allpattah*, 454 F. Supp. 2d at 1212-13 (citations and internal quotation omitted). Similarly, in the present case, as discussed above, class counsel achieved extraordinary success in a very long litigation. Thus, use of a declining-scale approach is not appropriate here, and the Court will award fees based on the unique circumstances of the

case.

Moreover, although objectors have cited a number of lower-percentage awards in megafund settlement cases, plaintiffs' counsel have cited many such cases in which courts did award higher percentages, up to and exceeding one-third of the fund. Counsel's expert has identified 34 megafund cases with settlements of at least $100 million in which the court awarded fees of 30 percent or higher. Thus, although a one-third fee would be at the top of the range of awards in megafund cases, that figure does still fall within that range, especially in more recent cases. Moreover, the consideration of awards in similar cases is but one factor among the many applicable *Johnson* factors to be considered here.

The Court concludes, based on a consideration of those applicable factors, that a percentage award at the top end of the range is warranted and reasonable here. All cases present unique circumstances, but it is difficult to imagine a case in which an award at the highest percentage would be more appropriate than in this case. As already discussed, counsel achieved an incredible result for the class, in a case with an extreme amount of risk at all stages of the litigation, and they obtained that result because they won what is reported to be one of the largest verdicts of its kind in United States history. Counsel had to build this case on their own, without the help of a governmental investigation or prosecution, after other counsel had declined to pursue it, and they toiled for many years, at great expense to themselves, with a very real risk that they would not recover anything from this defendant.

15

Thus, this case is easily distinguished from cases in which a lower-percentage fee was awarded.[6]  The case most resembles *Allapattah*, in which the court awarded fees of 31-and-one-third percent of a $1 billion settlement after a jury verdict.  Indeed, counsel's expert, Brian Fitzpatrick, who authored one of the empirical studies on which objectors rely, opines that of the 688 settlements in his study, *Allapattah* is the case most similar to the present case and supports the fee percentage requested here.  Thus, the Court considers the facts that courts have awarded fees as high as one-third in megafund cases and that the most similar case included an award in excess of 31 percent.

In percentage-of-the-fund cases, courts often engage in a "cross-check" of the fee award against the lodestar figure accounting for counsel's hours and hourly rates.  *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305-06 (3d Cir. 2005).  According to billing records provided *in camera* to the Court, counsel expended over 193,000 hours in this litigation, which, at current rates, yields a total lodestar amount of approximately $100 million.[7]  Thus, an award of one-third of the Dow settlement fund would yield a total multiplier (including settlements with all defendants) of approximately 3.2.

---

[6]For instance, although the litigation in *Ramah* lasted 18 years, counsel worked on the case only for a total 19,213.48 hours, which yielded a multiplier of over 7.  *See Ramah*, 2016 WL 825710.  The present case involved ten times more hours, and even a one-third percentage award would yield a significantly lower multiplier here.

[7]Because of the long delay in receiving payment for past work, the Court concludes that use of current billing rates is appropriate in conducting this lodestar cross-check.  *See Smith v. Village of Maywood*, 17 F.3d 219, 221 (7th Cir. 1994) (courts should use either current rates or past rates with interest).

Objectors note that they have not been allowed to examine the billing records, but because the records are used only for a cross-check and not to determine the actual amount of the award, it is less important for objectors to be able to dispute particular hours.  Moreover, the Court has had the opportunity to review the records.  If it were awarding damages based on the lodestar, the Court might very well reduce some of the hourly rates slightly and might very well be able to find some places in which the hours expended were excessive.  This was an exceedingly complex case, however, and the Court cannot say that the hours needed to litigate the case reasonably would not be in the range of the hours actually expended.  Moreover, the amounts at issue justified use of the best counsel charging the highest rates (just as Dow used similarly high-priced counsel in the litigation).  Thus, even if the Court were to reduce the lodestar a small amount, such that the multiplier here increased to 4 or 5, that multiplier would fall within the range of multipliers accepted by a number courts in megafund cases, as demonstrated in plaintiffs' counsel's reply brief.  Moreover, as the Court has discussed, the circumstances of this case justify the highest award, and in light of the great risk assumed by counsel, the requested one-third award would not provide an excessive or improper windfall to counsel in this case.[8]  That is especially true given the fact that,

---

[8]Although objectors expressed concern about double-counting in this calculation of the lodestar and the multiplier, the Court is persuaded that no such double-counting has taken place here, as plaintiffs' counsel has calculated the multiplier based on the total amount of the settlements with all defendants and their total hours worked on the entire litigation.

even after a one-third award of fees, class members would still receive approximately 1.4 times the amount of their actual damages as determined at trial.

Accordingly, the Court concludes, based on a consideration of the *Johnson* factors as applied to the unique circumstances of this case, that the requested fee award of one-third of the Dow settlement fund is reasonable and appropriate in this case, and it will award such fees by separate order.[9]

No class member has objected to counsel's request for reimbursement of expenses from the settlement fund. The Court finds such an award to be reasonable and appropriate, and it will therefore award expenses in the requested amount of $1,545,872.58. Nor has any class member objected to the requested incentive awards for the named plaintiffs, and the Court will also grant such awards as reasonable in this case. Finally, the Court approves the proposed language giving co-lead-counsel the authority to distribute the awarded attorney fees in a fair manner. The Court will enter a separate written order granting the motion for fees, expenses, and incentive payments.

IT IS THEREFORE ORDERED BY THE COURT THAT the objection by class member PMC Global (Doc. # 3263) to class plaintiffs' plan of allocation and distribution

---

[9]It appears from the proposed order submitted by plaintiffs' counsel that they assumed that the one-third award would be calculated before awarded expenses were deducted. The Court concludes, however, that the one-third share is more appropriately calculated *after* the deduction of expenses awarded to counsel (but before deductions for incentive payments for the named plaintiffs).

of the Dow settlement fund is hereby **overruled**.


IT IS FURTHER ORDERED BY THE COURT THAT the objections by class

members Johns Manville and Whirlpool (Doc. # 3261) and by class member FXI (Doc.

# 3262) to plaintiffs' counsel's attorney fee petition are hereby **overruled**.

IT IS SO ORDERED.

Dated this 29th day of July, 2016, in Kansas City, Kansas.


*s/ John W. Lungstrum*
John W. Lungstrum
United States District Judge

# EXHIBIT B

USDC SDNY
DOCUMENT
ELECTRONICALLY
DATE FILED: 12|9|2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ELECTRONIC BOOKS ANTITRUST LITIGATION | No. 11-md-02293 (DLC)<br>ECF Case |
| This Document Relates to:<br><br>ALL ACTIONS | CLASS ACTION |

## [PROPOSED] ORDER GRANTING CLASS PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

This matter came before the Court for hearing on December 6, 2013, pursuant to Class

Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Participation

Awards for Named Plaintiffs. Having considered all papers filed and proceedings held herein,

including the objections to the proposed fee application, and otherwise being fully informed in

the premises, it is HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1. The Court hereby awards to Class Counsel attorneys' fees in the amount of

$10,455,534.56 and reimbursement of expenses in the amount of $750,465.44 for a total of

$11,206,000.

2. These amounts reflect the total that the five settling defendants (Macmillan,

Penguin, HarperCollins, Hachette and Simon & Schuster) have agreed to pay Class Counsel

under the three settlement agreements.[1]

3. In making this award of attorneys' fees and reimbursement of expenses in the

amounts described, the Court has considered and finds as follows:

     a) The settlements provide significant monetary relief to the Settlement

Classes.[2]

---

[1]   *See* Settlement Agreement by and Among Holtzbrinck Publishers, LLC, d/b/a Macmillan
and Plaintiff States and Settlement Class ("Macmillan Settlement Agreement") at 9, June 21,
2013, ECF No. 360-1 (providing for attorneys' fees and expenses for Class Counsel up to
$2,475,000); Settlement Agreement by and Among Penguin Group (USA), Inc. and Plaintiff
States and Settlement Class ("Penguin Settlement Agreement") at 9, June 21, 2013, ECF No.
360-2 (providing for attorneys' fees and expenses for Class Counsel up to $8 million);
HarperCollins, *et al.* Settlement Agreement (between Class Plaintiffs and HarperCollins,
Hachette and Simon & Schuster) ("HarperCollins, *et al.* Settlement Agreement") at 9, June 21,
2013, ECF No. 362-1 (providing for attorneys' fees and expenses for Class Counsel up to
$731,000).

[2]   "Settlement Classes" refers, collectively, to the "Settlement Class" as defined in the
HarperCollins, *et al.* Settlement Agreement (natural persons who purchased E-books published
by the named publishers from April 1, 2010 until May 21, 2012, and who resided in Minnesota at
the time of their E-book purchase) and the Settlement Class as defined in the Macmillan and
Penguin Settlement Agreements (all natural persons who have purchased E-books published by

b)      Notice of the settlements was sent to over 23 million consumers nationwide identified by retailers as eligible consumers. Only 72 consumers requested exclusion from the settlements, not all of whom were members of the Settlement Classes.

c)      Class Counsel have conducted the action and achieved the settlements with skill, perseverance and diligent advocacy on behalf of the Plaintiffs and the Settlement Classes as a whole.

d)      The action involves complex factual and legal issues and, in the absence of settlement, would involve further lengthy proceedings and uncertain resolution of such issues.

e)      Had settlement not been achieved, there would remain a significant risk that the Settlement Classes may have recovered less or nothing from defendants, and that any recovery would have been significantly delayed.

f)      The amount of attorneys' fees and reimbursable expenses awarded to Class Counsel is fair and reasonable given the number of attorney hours expended to achieve the settlements on behalf of Plaintiffs and the Settlement Classes as a whole, and the estimated value of the settlement benefits obtained for the Settlement Classes, and the amount awarded is consistent with awards for similar work in similar cases.

4.      In making this award of attorneys' fees and reimbursement of expenses in the amounts described, the Court finds that the requested fees of $10,455,534.56 are reasonable under the circumstances and justified.

---

the Named Publishers during the period from April 1, 2010 until May 21, 2012, who resided in one of the following states, territories or commonwealths at the time of their E-books purchase: American Samoa, California, Florida, Georgia, Guam, Hawaii, Kentucky, Maine, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Jersey, North Carolina, Northern Mariana Islands, Oklahoma, Oregon, Rhode Island, South Carolina, U.S. Virgin Islands, Washington, or Wyoming).

- 2 -

5.  Class Counsel also requests reimbursement of $750,465.44 in expenses. The Court has examined the breakdown of costs and finds them to be reasonable and appropriate for litigation of this size and complexity.

6.  One objector, Christopher Batman, has objected to the proposed award of attorneys' fees. Mr. Batman resides in Texas and is represented by the Attorney General for the State of Texas in this action, not Class Counsel. He thus lacks standing to object to Class Counsel's attorneys' fees. The Court has nevertheless considered his objections and finds them to be without merit.

SO ORDERED.

DATED: _December,_ 2013

_____
HON. DENISE L. COTE
UNITED STATES DISTRICT COURT JUDGE

010260-11  657063 V1

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RONICALI

11/21/2014

IN RE ELECTRONIC BOOKS ANTITRUST
LITIGATION

No.  11-md-02293 (DLC)
ECF Case

This Document Relates to:

ALL ACTIONS

CLASS ACTION

[PROPOSED] ORDER GRANTING CLASS COUNSEL'S MOTION
FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES
RELATED TO APPLE SETTLEMENT

This matter came before the Court for hearing on November 21, 2014, pursuant to Class Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses Related to Apple Settlement. Having considered all papers filed and proceedings held herein, including the objections to the proposed fee application, and otherwise being fully informed in the premises, it is HEREBY ORDERED, ADJUDGED AND DECREED as follows:

A. The Court hereby awards to Counsel for the Settlement Class attorneys' fees, as provided for in Section III of the Settlement Agreement by and Among Apple Inc., Plaintiff States and Class Plaintiffs ("Settlement Agreement").[1]

B. In making this award of attorneys' fees and reimbursement of expenses in the amounts described, the Court has considered and finds as follows:

a) Notice of the settlement was sent to over 23 million consumers nationwide identified by retailers as eligible consumers. Only 76 consumers requested exclusion from the settlement, not all of whom were members of the Settlement Class.

b) The time and labor expended by Class Counsel supports the requested fee. Counsel for the Settlement Class have submitted declarations supporting a cumulative lodestar of 20,254 hours and $9,532,321.75, as well as $607,091.56 in expenses unreimbursed by the prior settlements with the Publisher Defendants. This lodestar reflects the significant time and attention undertaken to get the results in this case.

c) The magnitude and complexity of this litigation is evident, particularly in the result. As outlined in Counsel for the Settlement Class's motion for attorney's fees and in the accompanying declarations, the volume of the pleadings filed in this case, the number of

---

[1] All capitalized terms in this Order shall have the same meaning as defined in the Apple Settlement Agreement, July 16, 2014, ECF No. 642-1.

depositions, the breadth of document productions, and the complexity of the transactional database all confirm that this was extraordinarily complex litigation.

      d)    ~~Counsel for the Settlement Class undertook significant risk when they filed this litigation, more than an ordinary piece of litigation.~~ The risks Class Counsel undertook in this case are consistent with the litigation's scope and complexity, and justify a substantial award.

      e)    Counsel for the Settlement Class have conducted the action and achieved the settlement with skill, perseverance and diligent advocacy on behalf of the Class Plaintiffs and the Settlement Class as a whole.

      f)    The total amount to be paid, collectively, to Counsel for the Settlement Class and Plaintiff States for attorneys' fees, costs relating to the investigation, litigation and appeal of the litigation and for release of civil penalties claims, as a percentage of the total payments by all defendants to consumers nationwide, would equal 0, 7 or 17 percent, depending on the outcome of the Final Liability decision. This Court finds such an award of fees to be consistent with the settlement's size and scope.

      g)    Public policy considerations also support the requested fee, as only a small number of firms have the expertise, resources, and inclination to lead the prosecution of cases such as this one.

      h)    The amount of attorneys' fees and reimbursable expenses awarded to Class Counsel is fair and reasonable given the number of attorney hours expended to achieve the settlement on behalf of plaintiffs and the Settlement Class as a whole, and the estimated value of the settlement benefits obtained for the Settlement Class, and the amount awarded is consistent with awards for similar work in similar cases.

- 2 -

C.       This Court has considered the five objections filed in this case, only three of
which relate to Class Counsel's application for fees and expenses and finds the following:

a)       Mr. Ritchie Lipson (ECF No. 674), as resident of Arizona, is not a
member of the Settlement Class and does not have standing to object to the award of fees and
expenses to Class Counsel. Regardless, his objections regarding attorneys' fees and expenses are
duplicative of those made by other objectors and are addressed below.

b)       Ms. Dianne Erwin (ECF No. 670) and John Bradley (ECF No. 671)
challenge the parties' decision to negotiate class members' recovery separately from fees and
costs. This court finds that, particularly given the involvement of multiple parties here (the
litigating Plaintiffs States, Class Counsel and Apple), this separate negotiation of fees and costs
was protective of consumers' interests. Moreover, the settlement process was overseen by an
experienced mediator (Mr. Antonia Piazza), which gives the Court added confidence in the
integrity of the settlement process. The Court finds the negotiation of attorneys' fees and
expenses separate from consumer recovery does not render the settlement or the request for
attorneys' fees unfair or unreasonable.

c)       Ms. Erwin and Mr. Bradley also suggest that Apple's agreement to pay a
certain amount in attorneys' fees and expenses renders the settlement *per se* unreasonable. The
Second Circuit, however, has explained, "an agreement 'not to oppose' an application for fees up
to a point is essential to [the] completion of the settlement, because the defendants want to know
their total maximum exposure and the plaintiffs do not want to be sandbagged." *Malchman v.
Davis*, 761 F.2d 893, 905 n.5 (2d Cir. 1985). Indeed, even the courts to whom the objectors cite
do not hold clear-sailing provisions to be sufficient in and of themselves to undermine a
settlement; rather, the question is whether the settlement is fair and reasonable on the whole, not

- 3 -

whether it has one specific form. *See, e.g., Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 426 (6th Cir. 2012) ("[N]ot every 'clear sailing' provision demonstrates collusion."); *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 520 (1st Cir. 1991) (where settlement includes a clear-sailing provision, "the court should scrutinize it to ensure that the fees awarded are fair and reasonable"). The Court finds that the provision requiring Apple to pay attorneys' fees and expenses separate from consumer compensation does not render the fees unfair or unreasonable. Moreover, the Court finds that the range of fees requested by Class Counsel falls within or below the ranges approved by courts in previous cases with recoveries of similar size.

        d)      Both Ms. Erwin and Mr. Bradley argue that the Court cannot award fees without detailed billing records. Steve Berman, the managing partner of Hagens Berman Sobol Shapiro LLP and Kit Pierson, the co-chair of the Antitrust Practice Group at Cohen Milstein Sellers & Toll PLLC, have both attested to the detailed work undertaken by Class Counsel in this case, as well as that the requested lodestar reflects detailed and contemporaneously prepared time. And the Second Circuit has stated that "where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court," that "the practice of requiring documentation of hours as a 'cross-check'" is only "encourage[d]," and that "the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case (as well as encouraged by the strictures of Rule 11)." *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); *accord, e.g., Cassese v. Williams*, 503 Fed. App'x 55, 59 (2d Cir. 2012), *cert. denied, Komar v. Cassese*, 133 S. Ct. 2013 (2013) (describing identical argument by Mr. Bradley's counsel as "meritless"). The Court finds, given its familiarity with the record and the detail submitted by Class Counsel, that the fees requested by Class Counsel are reasonable, *entirely* ~~the~~ *in line with what the Court anticipated,* and the submission of detailed time records is not necessary.

So ordered.

*Lucie Koh*

Nov. 21, 2014

SO ORDERED.

DATED: _____

_____
HON. DENISE L. COTE
UNITED STATES DISTRICT COURT JUDGE

010260-11 712851 V1

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6,1
### Eastern Division

In Re: Plasma−Derivative Protein Therapies
Antitrust Litigation, et al.

                                        Plaintiff,

v.                                    Case No.:
                                    1:09−cv−07666
                                    Honorable Joan B.
                                    Gottschall

CSL Limited, et al.

                                          Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, April 16, 2014:

       MINUTE entry before the Honorable Joan B. Gottschall: Motion hearing held. Plaintiff's Unopposed Motion for Final Approval of Class Settlement with Baxter [696] and Motion for Final Award of Attorneys' Fees, Reimbursement of Expenses, and Approval of Incentive Awards for Class Representatives [697] are granted. Judgment is entered dismissing with prejudice from this action Defendants Baxter International, Inc. and Baxter Healthcare Corporation. Enter Order and Judgment. Civil case terminated. This order relates to all member cases associated with MDL 2109. MDL 2109 terminated. Mailed notice(ef, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

THE SHANE GROUP, INC., et al.,

     Plaintiffs,

                                   Case No. 10-CV-14360

v.                                (Class Action Matter)

                                HON. DENISE PAGE HOOD

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

     Defendant.

_____/

### OPINION AND ORDER REGARDING FAIRNESS HEARING, GRANTING MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND PAYMENT OF INCENTIVE AWARDS, DENYING MOTIONS TO INTERVENE, GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN ALLOCATION, DENYING MOTION TO STRIKE SUR-REPLY, AND DENYING MOTIONS FOR SANCTIONS

## I.    BACKGROUND

On June 22, 2012, a Consolidated Class Action Amended Complaint was filed against Defendant Blue Cross Blue Shield of Michigan ("Blue Cross") alleging: Unlawful Agreement in Violation of § 1 of the Sherman Act under the Rule of Reason (Count I); Unlawful Agreements in Violation of Section 2 of the Michigan Antitrust

Reform Act, M.C.L. § 445.772 (Count II). (Doc. No. 78) The class action seeks to recover overcharges paid by purchasers of Hospital Healthcare Services directly to hospitals in Michigan. These overcharges resulted from the anticompetitive acts of Blue Cross. (Am. Comp., ¶ 1) Blue Cross is a Michigan nonprofit healthcare corporation headquartered in Detroit, Michigan. (Am. Comp., ¶ 18) Blue Cross provides, directly and through its subsidiaries, health insurance and administrative services, including preferred provider organization ("PPO") health insurance products and health maintenance organization ("HMO") health insurance products. (Am. Comp., ¶ 18)

A Discovery Plan was jointly submitted by the parties on August 3, 2012. (Doc. No. 82) Several Scheduling Orders were thereafter entered by the Court and discovery was conducted by the parties. Various motions were filed by the parties as well. After the parties informed the Court the parties had resolved the issues before the Court and after a hearing was held on the matter, the Court entered an Order Granting Preliminary Approval to Proposed Class Settlement on June 26, 2014. (Doc. No. 151) The Court set a date for the Fairness Hearing on November 12, 2014, 2:00 p.m. Objections were ordered to be filed no later than 90 days from the Preliminary Approval Order. The Court approved Epiq Class Action & Mass Tort Solutions, Inc. to administer the Settlement Agreement under the supervision of Class Counsel.

Eagle Bank, a Maryland State Chartered Bank, was approved by the Court to maintain the Escrow Account in which the Settlement Fund shall be held and to disburse the funds after the Court's approval. To be excluded from the Settlement Class, a Class Member was required to request in writing postmarked no later than 90 days after the Preliminary Approval. If the request for exclusion from any class member was not timely filed, this would result in the Class Member being deemed included in the Settlement Class. The Claim Form was to be completed and sent to the Settlement Administrator by first-class mail, post-marked no later than November 16, 2014.

The Preliminary Order provided that Class Counsel serve an application for attorneys' fees, reimbursement of expenses and incentive awards no later than 30 days after entry of the Preliminary Approval Order, which was filed on July 24, 2014. (Doc. No. 155) Blue Cross filed with the Court a certificate stating compliance with the requirements of the Class Action Fairness Act, 28 U.S.C. § 1715, on July 1, 2014. (Doc. No. 152) Class Counsel were required to serve, no later than 75 days after entry of the Preliminary Approval Order, a Notice regarding dissemination of the Notice Plan, which was filed on October 2, 2014. (Doc. No. 162)

Timely objections to (90 days from the June 26, 2014 Preliminary Approval Order) or letters regarding the proposed class action settlement were filed by: John Kunitzer (Doc. No. 158, filed September 19, 2014); Christopher Andrews (Doc. No.

3

159, filed September 24, 2014); Scott Mancinelli (Doc. No. 160, filed September 24, 2014) and, ADAC Automotive and Others (Doc. No. 161, filed September 24, 2014). Untimely letters regarding the proposed class action settlement were filed by Darrell Thompson (Doc. No. 165, October 20, 2014) and Marguerite M. Schubert (Doc. No. 176, October 31, 2014).

This matter is now before the Court to determine whether the proposed class action settlement is fair.  If the Court so finds, Plaintiffs seek final approval of the settlement and plan allocation.  Also before the Court is Class Counsel's Motion for Attorneys' Fees, Reimbursement of Expenses and Payment of Incentive Awards to Class Representatives, Certain Movants' Motion to Unseal Certain Records and to Adjourn the Fairness Hearing.  A hearing was held on the various motions on November 12, 2014.  The motions are each addressed below.

## II.    MOTIONS TO INTERVENE

### A.    Background

Twenty-Six Class Members, represented by the Varnum law firm, seek to intervene for the limited purpose of unsealing records and adjourning the fairness hearing.  (Doc. No. 166)  Specifically, they seek to unseal the following four documents which were filed sealed: Opposition to Motion to Add and Drop Named Plaintiffs for the Proposed Class (Doc. No. 127); the Motion for Class Certification

4

and Appointment of Class Counsel and Response thereto (Doc. Nos. 133, 139); and the Motion to Exclude Expert Testimony of Dr. Jeffrey Leitzinger (Doc. No. 140). The Twenty-Six Class Members seek to access the Sealed Documents to gather information that will help them assess the likelihood of success of the case, assess their potential damages recovery, and gather information relevant to their assessment of the proposed settlement and their objections to the proposed settlement.  They claim that they are entitled to intervene as of right, or in the alternative, with permission of the Court, and that this motion is timely.

Blue Cross and Plaintiffs oppose the motion asserting that the motion to intervene is untimely and that the Twenty-Six Class Members have not shown they are entitled or require to review the sealed documents to evaluate whether the proposed settlement is fair.  Certain Third-Party Hospitals and other organizations seek to intervene in order to respond in opposition to the Twenty-Six Class Members' Motion to Unseal certain records.  (Doc. Nos. 183, 184, 185, 186, 189, 192)  The Third-Party Hospitals and other organizations produced highly sensitive information during the discovery phase and oppose any records unsealed.

**B.      Intervention as of Rights, Fed. R. Civ. P. 24(a)**

Intervention as of right is governed by Rule 24(a) of the Federal Rules of Civil Procedure which allows a party to intervene who "claims an interest relating to the

property or transaction that is the subject of the action, and is so situated that disposition of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). An applicant must show: 1) the application was timely filed; 2) the applicant possesses a substantial legal interest in the case; 3) the applicant's ability to protect its interest will be impaired without intervention; and 4) the existing parties will not adequately represent the applicant's interest. *Blount-Hill v. Zelman*, 636 F.3d 278, 283 (6th Cir. 2011). Each of these elements is mandatory, and therefore failure to satisfy any one of the elements will defeat intervention under the Rule. *Id.* The court must consider timeliness in the first instance. *Id.* at 284 (The "court where the action is pending must *first* be satisfied as to timeliness" under Rule 24.) (quoting *NAACP v. New York*, 413 U.S. 345, 365 (1973)).

In determining timeliness, five factors must be considered: 1) the point to which the suit has progressed; 2) the purpose for which intervention is sought; 3) the length of time the proposed intervenors knew or should have known of their interest in the case; 4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and 5) the existence of unusual circumstances militating against or in favor of intervention. *Blount-Hill*, 636 F.3d at 284 (quoting *Jansen v.*

6

*Cincinnati,* 904 F.2d 336, 340 (6th Cir. 1990)).

Applying the first factor–the point to which the suit has progressed–the instant action was filed on October 29, 2010, four years ago. The related case filed by the United States against Blue Cross was filed on October 18, 2010 and jointly dismissed on March 28, 2013. The Twenty-Six Class Action Members filed the instant motion on October 20, 2014. Over the four years this case and other related cases were before the Court, the cases have been vigorously litigated and extensive discovery have been conducted. In this class action lawsuit, motions to dismiss and other motions were filed. During the litigation, the parties in this case entered into settlement negotiations. On June 23, 2014, the parties filed a Motion for Order for Preliminary Approval of Settlement. The parties held a hearing on the matter, granting the motion in a June 26, 2014 Order. (Doc. No. 151) When the Twenty-Six Class action Members filed the instant Motion to Intervene in October 2014, the suit had progressed to resolution, only awaiting a hearing on the fairness of the settlement and the motion for final approval of the settlement scheduled on November 12, 2014, about three weeks from when the Motion to Intervene was filed. Notices have been filed to class action members and the Twenty-Six Class Action Members themselves had filed their Objections to the settlement. This factor does not weigh in favor of the Twenty-Six Class Action Members since the motion was filed four years after the

7

instant case was filed and when a resolution between the parties has been reached.

The second factor–the purpose of the intervention–is to review motions and documents filed under seal in this case. The Twenty-Six Class action Members claim they require these documents in order to value their claims and to determine whether the settlement is fair. While objectors are entitled to meaningful participation in the settlement process, they are not automatically entitled to discovery or to question and debate every provision of the proposed settlement. *In re Gen. Tire & Rubber Co. Sec. Litig.,* 726 F.2d 1075, 1084 (6th Cir. 1984); *Bailey v. White,* 320 F. App'x 364, 366 (6th Cir. 2009). These objectors should have knowledge of their own interests, as opposed to the interest of others and so evaluating their interests need not require the review of documents submitted by others to the Court and amongst the parties of the instant suit. The Sixth Circuit has noted that the purpose for intervening in order to investigate and evaluate the proposed settlement, was satisfied by the opportunity to participate in the fairness hearing. *Bailey*, 320 F. App'x at 366. This factor does not weigh in favor of the Twenty-Six Class Action Members since the Sixth Circuit has held that the members are not entitled automatically to discovery because they are able to participate in the fairness hearing.

As to the third factor, the length of time the proposed intervenors knew of their interest in the case, the Court finds they should have known of their interest when the

United States filed its lawsuit against Blue Cross back in 2010, and when the instant suit and the related suits were filed in this District in 2010 and 2011. The related lawsuits were well-publicized at that time and since the filing of the suits in the general media and the insurance and medical communities. This Court notes that many of the moving parties have lawsuits in this District against Blue Cross regarding its handling of their insurance contracts on other issues. The length of time the proposed intervenors should have known their interest in the case factor does not weigh in their favor.

Regarding the fourth factor–the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case–also weighs against the Twenty-Six Class Action Members. As addressed in the third factor above, the proposed intervenors should have known of their interests back in 2010. Their failure to promptly intervene back then and only after the parties in the instant suit have reached a resolution, clearly prejudices those parties. The parties have conducted extensive discovery and have vigorously litigated this case. The proposed intervenors now seek documents which are filed under seal but contain sensitive information regarding the parties' interests and private information regarding the parties' insurance and medical information. In addition, many hospitals participated in this litigation and medical

9

information regarding patients may be contained in these documents.  This factor weighs against the Twenty-Six Class Action Members and heavily weighs in favor of the original parties who have vigorously litigated this action.

The fifth factor–the existence of unusual circumstances militating against or in favor of intervention–the proposed intervenors, other than noting there are no unusual circumstances militating against intervention, do not identify any unusual circumstances why the Court should allow intervention.  The settling parties argue there are unusual circumstances militate against intervention.  They claim that the Settlement involves millions of Settlement Class Members, many of which are large and sophisticated entities.  This factor weighs against the Twenty-Six Class Action Members since there are unusual circumstances where millions of class members are involved and where documents the proposed intervenors seek to review may contain highly sensitive business, personal, medical and insurance information which may not be present in other class action lawsuits.

Weighing the factors required for the Court to determine whether the Motion to Intervene is timely, the Court finds that the various motions to intervene were not timely filed.  Having considered the timeliness issue in the first instance and since this element is mandatory, the Motion to Intervene, even for the limited purpose of unsealing and reviewing documents filed by the parties, is denied.  *Blount-Hill,* 636

F.3d at 283.

### C. Permissive Intervention, Fed. R. Civ. P. 24(b)

Rule 24(b) provides that, "[o]n timely motion, the court may permit anyone to intervene who ... has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). The Sixth Circuit in *Blount-Hill* held that because the proposed intervenors' motion was untimely in its analysis under mandatory intervention, the motion for permissive intervention was also untimely. *Id.* at 287. For the same reasons above, since the motion for mandatory intervention is untimely, the motion under the permissive intervention rule is also untimely. As in *Bailey*, the Twenty-Six Class Action Members have participated in this case by filing their Objections to the class action settlement. They have a voice as objectors in this case. The Motion to Intervene under the permissive intervention rule is denied.

Since the Motions to Intervene are denied, there is no basis to adjourn the Fairness Hearing. The request to adjourn the Fairness Hearing is denied.

## III. FAIRNESS OF SETTLEMENT

### A. Rule 23

Rule 23 of the Rules of Civil Procedure governs the Court's determination of whether the settlement is fair. Pursuant to Fed. R. Civ. P. 23(e)(2), "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or

compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise: If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." The factors to be determined at the fairness hearing are: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Int'l Union, UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (2007).

### B.    Objections Filed

#### 1.    Pro Se Letters/Objections

##### a.    John Kunitzer

John Kunitzer filed a timely Objection on September 15, 2014. (#158) Kunitzer asserts that during the time period at issue, he has had four major surgeries, but has been unable to obtain copies of his bills and therefore cannot support his claim. He states that this is another case where the lawyers involved will reap the substantial benefits instead of those that actually suffered the loss.

##### b.    Christopher Andrews

Christopher Andrews also filed timely Objections on September 24, 2014.

12

(Doc. No. 159) He also filed supplemental documents to support his Objections, to seek sanctions and to respond to other motions. (Doc. Nos. 163, 172, 179, 202, 204, 205, 207, 209, 210) Andrews asserts that he is a non-attorney and is also acting as a representative under a Power of Attorney for Cathy Waltz as executor of the estate of Eileen Greenia and Emily Byrne, and for Ron Waltz and Michael Andrews. (Doc. Nos. 193, 195) Andrews lists several issues including: the $30 million amount for damages is too low; incentive awards are too high; postcard and long notices are flawed and defective; claim forms are flawed; claim packets are defective; hourly rates are too high as are the number of hours claimed for attorneys' fees; $3.5 million in expenses is too high; and, Blue Cross should have paid for the notice. Andrews presented his arguments at the hearing.

### c. Scott Mancinelli

Scott Mancinelli filed a timely Objection on September 24, 2014. (Doc. No. 160) He asserts he directly purchased healthcare services form Michigan General Acute Care Hospitals for himself and for his minor children between January 2006 and June 2014 in the form of co-pay, co-insurance and insurance deductibles. Mancinelli argues the settlement is not reasonable, fair or adequate. He claims the settlement fails to address Blue Cross' "Most Favored Nation" contracts with the hospitals, which was the primary issue in the case. He argues the MFN issue is not

addressed in the settlement because there is no declaratory or injunctive relief prohibiting unfair trade practices in the future. The release in the settlement addressing the MFN issue applies to almost every consumer of acute care hospital services in Michigan. Mancinelli claims that in exchange for the paltry $15 to $40, consumers are "dooming" themselves to a "rigged" hospital pricing system that perpetuates a "quasi-monopoly" for Blue Cross, which is not the best interest of the settlement class, the citizens of Michigan, or other insurance carriers. Mancinelli argues that the *cy pres* recipients and the present *cy pres* distribution is a carve out of funds from the overall settlement and is not necessitated by or the result of the economic unavailability of a distribution to class members. He claims that the *cy pres* distribution is a direct result of a cap placed on distributions to class members and that the cap should be removed. As to notice, Mancinelli asserts he received no direct notice of the class action or its settlement, but that his eight-year old daughter received a post card notice. He agrees with Kunitzer's objection that the claim forms require a claimant to put the date of service, the amount paid and hospital provider, which very few class members are unable to obtain back to 2006.

### d.    Darrell Thompson

Darrell Thompson filed untimely letters regarding the settlement, the first filed October 15, 2014 (Doc. No. 165), and two others received by the Court on November

14

7 and 11, 2014. Thompson's letter dated October 13, 2014 states that he was a patient at Michigan hospitals from January 1, 2006 to June 23, 2014. He emailed the settlement administrator on September 17, 2014 asking how to determine if he is part of the settlement. The settlement administrator responded on September 19, 2014 indicating it was investigating the issue and then responded on September 24, 2014 directing Thompson to contact Class Counsel. Thompson then emailed Class Counsel the evening of September 24th. He received a telephone call the following week indicating he could file for the class action settlement, but by then, the time to file objections had passed. Thompson presented his arguments at the hearing.

### e.    Marguerite Schubert/Dale J. Schubert

Marguerite Schubert filed an untimely letter to the Court on October 30, 2014 submitted by her son, Dale J. Schubert. (Doc. No. 176) Her son indicates he had been attempting to complete the claim form, but has been unable to obtain information from certain insurance companies. He states that he has called the claims administrator, but has not been able to obtain assistance with his questions. He asked to speak to one of the staff attorneys handling the matter, but has not received a response to the request. He seeks an adjournment of the filing deadline until all the issues have been addressed.

The Named-Plaintiffs submitted a supplemental brief indicating that they

investigated Mr. Schubert's inquiries to Epiq. Charles Marr, Epiq's Project Manager, submitted a declaration indicating he called Mr. Schubert regarding his letter to the Court and further explained to him the details of the Plan of Allocation. Mr. Marr indicated that by the end of the call, Mr. Schubert stated he had the necessary information to file a claim, which was received by Epiq timely.

### 2. ADAC Automotive and Others (Represented by Varnum)

Twenty-Six self-insured Objectors, made up of over 5,000 health plan participants filed a timely joint objection asserting: 1) the proposed settlement fund is woefully inadequate; 2) the proposed settlement gives preferential treatment to the named plaintiffs; 3) the proposed settlement gives preferential treatment to class counsel; and, 4) the claims process is unnecessarily burdensome. (#161, 9/24/14) They argue that under the "preferential treatment" standard, although not included in the seven UAW factors in evaluating the fairness of a settlement, the Sixth Circuit also looked to whether the settlement gives preferential treatment to the named plaintiffs and class counsel, citing *Greenberg v. Procter & Gamble Co.* (*In re Dry Max Pampers Litig.)*, 724 F.3d 713, 719 (6th Cir. 2013) and *Vasalle v. Midland Funding LLC,* 708 F.3d 747, 755 (6th Cir. 2013). The Objectors' arguments are addressed in the analysis below.

### C. Factors

16

## 1.    Substantial Risk of Fraud or Collusion

The Twenty-Six Objectors argue that class members over the eight-and-a-half-year period covered under the proposed settlement spent over $86 billion in Michigan hospitals.  They claim that only 1 percent of the class member payments will be refunded under the settlement plan and for a small number of specific hospitals, class members will be refunded 3.5 percent of their payments to those particular hospitals. The Twenty-Six Objectors claim that "simple math" dictates that in order to refund class members 1 percent of their hospital expenditures, the settlement fund should be at least $850 million, based on the $85 billion figure.  They argue that the proposed settlement of a gross amount of $29,990,000 is "woefully inadequate."  The nearly $30 million gross settlement amount is allocated as follows: 1) $3.5 million to reimburse class counsel for expenses; 2) up to $10 million attorneys' fees for class counsel; 3) over $200,000 in potential incentive awards to the named-Plaintiffs; and, 4) expenses incurred in administering the proposed settlement, pre-authorized up to $1 million.  The Twenty-Six Objectors claim that closer to $15 million would then be available to reimburse class members, which they argue is "wholly inadequate" to reimburse the class members.  The 1 percent refund set forth in the proposed settlement they argue is completely misleading and illusory.  The proposed net settlement amount represents 0.000176 percent of the hospital expenditures by the

class members during the class period or $1 for every $5,681 spent by class members. If Plaintiffs are successful at trial, they claim that the case is a "billion-dollar" case. The Twenty-Six Objectors also argue that Blue Cross, despite being a non-profit corporation, holds massive reserves at almost $12.8 billion at the end of 2013, including $696 million in cash. They claim that any judgment against Blue Cross could be collected.

The Twenty-Six Objectors claim that this "grossly inadequate" amount suggests a "serious risk of fraud and collusion" between the Named-Class Plaintiffs and Blue Cross. The proposed four organization Named-Plaintiffs are entitled to an incentive payment of up to $50,000 and the four individual Named-Plaintiffs are entitled to $10,000 incentive payment. With the net settlement fund of $15 million, they argue that it this was solely distributed to individual class members (and not to insurers or self-insured entities), each class member would receive an average recovery of $3.00.

The Twenty-Six Objectors argue that the excessive attorneys' fees award of up to $10 million to Plaintiffs' counsel is unreasonable and points to a substantial risk of fraud and collusion. They claim that the substantial amount to be paid to class counsel, when compared to the "meager" net amount to be paid to class members, creates a substantial conflict of interest between class counsel and class members that raises a serious risk of fraud and collusion.

18

They next argue that the burdensomeness of the claims process will be a substantial deterrent to claims being filed and further suggests possible fraud or collusion. The claim form requires insurers and self-insured plans to itemize in a claims table: 1) the amount of healthcare services paid for; on 2) each date of service over the class period; for 3) each of approximately 130 hospitals in Michigan. They argue that the claims tables from insurers and self-insured are likely to be thousands of pages long. The individuals are also required to itemize their claim by amount, date and hospital during the class period. The requirement that insurers and self-insureds submit copies of supporting bills would result in submission of perhaps millions of pages of supporting documents. They claim that individuals are not required to submit supporting documents. The Twenty-Six Objectors argue that the insurers and self-insured plans should be treated the same way as individuals and not require supporting documents, unless the claim is suspect. The claimants are required to certify under penalty of perjury that their claim form is true and accurate, which should be sufficient to minimize the risk of false or inflated claims submitted. They also claim that millions of class members are either directly insured by Blue Cross or are self-insured plans administered by Blue Cross, which means that Blue Cross has superior access to the hospital payment information concerning its insureds and the self-insured plans it manages. The Twenty-Six Objectors claim that the claims

19

process can only be seen as a "cynical" attempt to discourage most class members from submitting claims in order to justify the extremely low settlement fund amount.

The Named-Class Plaintiffs respond that the Settlement creates a common fund of approximately $30,000,000, which they claim is an excellent recovery for the class since it recovers more than 25 percent of the $118 million damages estimated. They argue that this amount of recovery and much less, have been approved in countless antitrust class actions. *See, e.g., Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,* No. 03-cv-4578, 2005 WL 1213926, at *9 (E.D. Pa. May 19, 2005)(11.4% of damages); *In re Linerboard Antitrust Litig.,* No. MDL 1261, 2004 WL 1221350, at *4 (E.D. Pa. June 2, 2004)(collecting cases approving anywhere from 5.35% to 28% of damages). Named-Class Plaintiffs assert that this settlement was reached after three and a half years of hard-fought litigation, production of millions of pages of documents, depositions of 169 witnesses, analysis of many terabytes of data, expert reports submitted by the parities, and, briefing of several motions. They claim there are no indicia of unfairness to class members and that Class Counsel's request for attorneys' fees and expenses is authorized by abundant case law.

The Named-Class Plaintiffs assert that the history of this litigation is hard-fought with extensive negotiations between the parties. They claim the Court had ample opportunity to observe the intensely adversarial nature of this litigation during

the past few years.  They note that Blue Cross fought the class action at every turn, and Class Counsel fought back vigorously.  The Named-Class Plaintiffs submitted declarations detailing the drawn-out settlement negotiations which demonstrate the arm's-length, adversarial nature of the parties' relations.

The Named-Class Plaintiffs assert that the Settlement Agreement itself refutes the idea that there was fraud or collusion.  The Settlement Agreement provides that all awards are placed in the sole discretion of the district court.  They claim that Class Counsel's interests are fully aligned with the Settlement Class' interest, therefore, there was no self-dealing or fraud or collusion in the settlement negotiations.  The Named-Plaintiffs claim that Class Counsel include highly competent antitrust class action experts, whose records of zealous and successful representation belies any claim that they would "sell out their clients for a quick deal."  (Doc. No. 169, Pg ID 5328)  Class Counsel invested $3.5 million of their own money and over $15 million of their time, despite facing substantial risks and a formidable opponent.

Applying the first factor, the Court finds there is no indication of fraud or collusion in this case.  It is "presumed that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands" absent "evidence of improper incentives." *UAW,* 497 F.3d at 628.  Each party vigorously advanced and defended their arguments and positions before the

21

Court.  There were initially three cases filed relating to the instant Settlement which were later consolidated by the Court after the parties' agreed to do so.  (Doc. No. 65) Various motions were filed by the parties, including a Motion to Dismiss filed by Blue Cross, which was denied by the Court.  (Doc. No. 102) The parties engaged in extensive motion practice and discovery relating to the class certification issue and expert-related issues.  It was only after these motions were filed that the Court was informed that the parties resolved the matter after extensive negotiations.  Each time a status conference or a hearing was held before the Court, there were numerous attorneys in attendance representing each party.  The duration and complexity of the litigation and the number of parties involved undermines the Objectors' claims that fraud or collusion resulted in the Settlement Agreement.  The Court did not observe any signs that the parties were engaged in pretense and posturing during the years in litigation before the Court to mask collusion in reaching a Settlement Agreement with Blue Cross.  It is this Court's observation as to cases before this Court involving the antitrust cases filed against Blue Cross that Blue Cross defends these cases most vigorously.  Class Counsel in these consolidated cases also vigorously argued each of their positions before the Court.  All the Objectors have failed to show that the Named-Plaintiffs and Class Counsel engaged in acts of fraud or collusion in negotiating the Settlement Agreement before the Court.

22

## 2. Complexity, Expense, and Likely Duration of Litigation

The Twenty-Six Objectors argue that the bulk of the work necessary to prepare the case for trial has been done. They claim that although antitrust litigation is complex, expensive and takes time, those are largely "sunk costs" at this point. They also claim that if Plaintiffs prevail at trial, they are entitled to treble damages and recovery of attorneys' fees and costs, which means there is substantially less risk to the Plaintiffs in continuing to litigate rather than settle. The Twenty-Six Objectors claim it is Blue Cross who bears far greater litigation risk because of the treble damages and attorneys' fees and costs recovery it faces.

The Named-Plaintiffs respond that they have yet to complete the class certification litigation, there is expert discovery to be conducted, and summary judgment motions have not been filed. The antitrust claims at issue involving MFNs are difficult and complicated. Class Counsel have put millions of dollars in this case already, but more litigation is required to move the case forward. Appeals would follow, however the case is resolved by trial. Given the sizable hurdles in front of the Plaintiffs, any recovery outside of this Settlement would likely take years to recover and would highly be uncertain.

As to the second factor in this case, the Court finds that the antitrust MFN issues raised by the Plaintiffs are complex, very expensive to litigate and the litigation

23

would continue for years, including any appeals. The MFN issue is not a common issue involving antitrust cases in the healthcare arena. The Named-Plaintiffs have submitted the expenses and fees they have expended related to the consolidated cases. The litigation, contrary to the Objectors' arguments, is far from complete. The parties have yet to complete class certification motions, expert discovery, and any dispositive motion practice, even though the parties have engaged in extensive fact discovery to date. The complexity, expense and likely duration factor weighs in favor of class settlement.

### 3. Amount of Discovery

The Twenty-Six Objectors indicate that Plaintiffs engaged in a very significant amount of discovery in this case, but because the documents have been filed under seal, it is impossible to assess the extent to which discovery has confirmed the allegations in the Complaint, enhanced or developed additional information to support the allegations in the Complaint or identified weaknesses in the allegations which might motivate settlement.

The Named-Plaintiffs agree that they have engaged in discovery of millions of pages of documents, multiple terabytes of data, 169 depositions and preparation of competing expert reports. They argue that based on all of this discovery taken, the Named-Plaintiffs and Blue Cross are well-aware of the strengths and weaknesses of

24

the case. They argue that based on the significant discovery taken, this factor weighs heavily in favor of approval of the settlement.

There is no dispute that extensive discovery has been taken in this case, and the Objectors so concede. In light of this extensive discovery, the Court finds that the Named-Plaintiffs and Blue Cross have been able to evaluate the propriety and fair value of the settlement. The amount of discovery taken and considered by the parties in this case weighs in favor of approving the settlement.

### 4. Likelihood of Success on the Merits

The Twenty-Six Objectors argue that they are unable to determine the likelihood of success on the merits since the documents are sealed in this matter. They claim the information that is publicly available strongly suggests Plaintiffs have a substantial likelihood of success since the Department of Justice brought a federal complaint against Blue Cross. In addition, the Michigan legislature banned the MFN Agreements by legislation passed in March 2013. They also claim that the Court has not granted a dispositive motion in favor of Blue Cross in this suit or the related Aetna lawsuit or the original Department of Justice lawsuit. The Objectors argue that it is obvious that the proposed settlement is grossly unreasonable, which means class members have nothing to lose, and everything to gain, by going forward with trial.

The Named-Plaintiffs argue that in this case, an expert has analyzed the

damages in this case, which was labor-intensive. The analysis could reliably and manageably be measured for purchasers covered by 23 provider agreements, out of hundreds of provider agreements with MFN hospitals at 13 hospitals, out of 70 MFN hospitals. According to the Named-Plaintiffs, this analysis projects damages that is far less than the multi-billion dollar case argued by the Objectors. They argue that the many risks of continued litigation cast significant doubt on whether class members would receive any recovery. The Named-Plaintiffs further argue that even though the United States and the State of Michigan obtained success, they did not have to obtain class certification or prove that the class members paid an overcharge for hospitals services, or measure the amount of the overcharge. While the Named-Plaintiffs argue they would have succeeded at trial in this case, given the complex economic issues, a jury may not credit Plaintiffs' evidence or a jury may award less than the damages that would be sought at trial. The Named-Plaintiffs claim they face significant risk that class members would receive nothing without a settlement, therefore the recovery of nearly $30 million reflects a substantial victory for Settlement Class members.

The main question in approving a class settlement is whether the settlement is fair in light of "plaintiff's likelihood of success on the merits." *UAW*, 497 F.3d at 631. As noted above, extensive discovery has been held in this case. The Court has denied Blue Cross' initial Motion to Dismiss, finding at that point in the litigation that

26

Plaintiffs had stated a claim against Blue Cross.  However, in light of Plaintiffs'

expert's analysis as to damages,  the Court finds that the settlement amount reached

by the parties is fair in light of any success the Plaintiffs may obtain on the merits of

the case.  As noted above, although significant discovery has been performed in this

case, the litigation is far from over.  The Named-Plaintiffs face significant risk that the

class members could receive nothing or some negligible amount in damages at trial

or on appeal.  The Court finds that the likelihood of success on the merits weighs in

favor of approving the settlement.

### 5.  Opinions of Class Counsel and Class Representatives

The Twenty-Six Objectors argue that in circumstances where class counsel and

class representatives receive preferential treatment under the terms of the settlement,

the Court should not give any weight to their opinions.  They claim Class Counsel and

the Class Representatives have a conflict of interest due to their heavy financial

incentive to push for the proposed settlement.

The Named-Plaintiffs and their counsel argue that as noted previously, counsel

include leaders in complex class action litigation, particularly in the field of antitrust.

They have considered voluminous discovery, expert analysis and engaged in motion

practice before reaching the settlement.   The Named-Plaintiffs claim they have

participated in the case for years and they include all segments of the Settlement

27

Class, including individual purchasers, institutional payors, purchasers in each of the Categories 1, 2 and 3.

"The judgment of the parties' counsel that the settlement is in the best interest of the settling parties is entitled to significant weight." *IUE-CWA v. Gen. Motors Corp.,* 238 F.R.D. 583, 597 (E.D. Mich. 2006). Courts should defer to the judgment of experienced counsel who have evaluated the strength of the proofs. *Williams v. Vukovich,* 720 F.2d 909, 922-23 (6th Cir. 1983).

Class Counsel and the Named-Plaintiffs in this action all support the settlement in this case. Deference is given to their opinions because they have had the opportunity to review discovery and an opinion by an expert in the evaluation of the case. Although the Objectors argue that Class Counsel and the Class Representatives have a conflict of interest due to their heavy financial incentive to push for the proposed settlement, the Court must weigh this factor significantly in their favor. The Objectors have not overcome this burden in light of the discovery taken in this case and the expert analysis reviewed by Class Counsel and Named-Plaintiffs.

### 6. Reaction of Absent Class Members

The Twenty-Six Objectors argue that Aetna's parallel lawsuit against Blue Cross provides significant evidence of the inadequacy of the proposed settlement. Aetna alleges it suffered over $600 million in damages, and with the trebled damages,

28

Aetna claims damages over $2 billion. The Twenty-Six Objectors argue that the aggregate damages in this class action exceed the individual damages sought by Aetna.

The Named-Plaintiffs argue that as to Aetna's estimate of damages, such estimate is based on lost profits for Aetna's sales in the market for commercial group health insurance and diminution of business value, not overcharges for purchases of hospital services attributable to Blue Cross' conduct. In this case, Named-Plaintiffs only sought *overcharges* in the sale of hospital services, *not total payments* for hospital services paid by class members.

The Named-Plaintiffs and Counsel assert that more than 26,000 class members had filed claims as of October 17, 2014, including the largest purchasers of hospital services in Michigan. They claim that only 1,518 potential class members opted out, 0.02% of the class and 0.05% of those directly notified. Out of this number, 179 requests were filed by Aetna entities, who have filed a separate lawsuit in this District. They cite cases where courts approved class action settlements with a far higher opt rate such as 0.55% in *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) and 0.4% in *Garner v. State Farm Mut. Auto. Ins.*, No. 08-cv-1365, 2010 WL 1687832, at *15 (N.D. Cal. Apr. 22, 2010). They also argue that there were only four objections filed, representing 32 class members, one of which was later withdrawn.

29

They claim that the low number of objections favors approval of the settlement. *See,
D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001)(The small number of
objections weighed in favor of settlement where 27,883 notices were sent and 18
objections received.).

Based on the opt out rate at 0.02% of the class and 0.05% of those directly
notified, and the few objections filed against the settlement, the Named-Plaintiffs have
shown that the opt-out rate the factor as to the reaction of absent class members
weighs in favor of settlement.

### 7.    The Public Interest

The Twenty-Six Objectors assert that nearly every member of the public is a
class member, therefore the interests of the public are best analyzed as part of
assessing the reasonableness of the settlement to the class.

The Named-Plaintiffs argue that the public interest in this case is to settle a
complex litigation and class action and to conserve judicial resources. They claim that
in this case, 169 depositions have been taken, including depositions of over 100 third
parties (employees from dozens of hospitals), and that having a trial in this case would
burden the court and place a burden on Michigan healthcare providers.

There is a strong public interest in encouraging settlement of complex litigation
and class action suits because such suits are "notoriously difficult and unpredictable

and settlement conserves judicial resources." *In re Cardizem CD Antitrust Litig.,* 218 F.R.D. 508, 530 (E.D. Mich. 2003)(quoting *Granada Inv., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)).  The public interest the Objectors raise is essentially a numerosity issue, which weighs in favor of a class action settlement.  The public interest is strong to settle complex class action cases, such as this case.  If the matter was to move forward to class action litigation, dispositive motion practice and trial, given the number of members in the class, the time to resolve this matter would be lengthy.  The number of witnesses, including those in the Michigan healthcare system involved, would burden those systems.  There is no guarantee at trial that the matter would be resolved in favor of class members.  The public interest in settling complex class action litigation weighs in favor of settlement.

### 8.    Preferential Treatment

The Twenty-Six Objectors argue that based on the Sixth Circuit decision in *Greenberg*, incentive payments to the named-Plaintiffs and Class Counsel are a disincentive for the class members to care about the adequacy of relief afforded by unnamed class members and instead encourages the class representatives to compromise the interest of the class for their personal gain.  Such inequities in treatment, they argue, make a settlement unfair.

The Named-Plaintiffs assert that the incentive payments to the Named-Plaintiffs

are allowed and encouraged to reward their efforts in litigating the case on behalf of the class. The incentives are proportional to the time and resources each Named-Plaintiff devoted to the case. They argue that the attorneys' fees are not dependent on any award, but are subject to the Court's approval. As to absent class members, the Named-Plaintiffs argue that the settlement on their behalf is not "perfunctory." The settlement calls for a recovery of over 25 percent of the $118 million they claimed are the estimated damages in this case, which, they argue is not "perfunctory" in light of the risks, burdens and delay of continued litigation. They claim that there is no preferential treatment in favor of the Named-Plaintiffs and Class Counsel.

Courts have stressed that incentive awards are the efficient ways of encouraging members of a class to become class representatives and rewarding individual efforts taken on behalf of the class. *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003). Depending on the circumstances, incentive awards are appropriate. *Id.* at 897-98. The Named-Plaintiffs in this case have been involved since the filing of all three consolidated cases. They have been involved in extensive discovery and any award to class representatives is proportioned to the time and effort each representative performed in this action. As to absent class members, their awards are not "perfunctory" in that the settlement is over 25 percent of the $118 million in estimated damages. The attorneys' fees requested are not contingent upon any award, but are

subject to the court's approval.  The Court finds that the settlement before the Court does not give preferential treatment to the Named-Plaintiffs, other than the incentives which are reasonable in light of their involvement in the case.  The Court also finds that the relief to unnamed class members is not illusory or perfunctory.  Because the settlement does not give preferential treatment to Named-Plaintiffs or perfunctory relief to unnamed class members, the Court approves the settlement in this case.

### 9.    Plan of Allocation

In addition to the above-stated factors, the Court must also determine whether the method of distributing the settlement fund is "fair and reasonable." *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 534 (E.D. Ky. 2010).

The Named-Plaintiffs in this case have shown that an expert has analyzed the damages in this case and the effect of the MFNs on the damages.  The Plan of Allocation categorizes different claims by placing them in three categories: 23 provider agreements for which damages were able to be measured (Category 1); purchases at hospitals with an MFN agreement, but for which the plaintiff has no reliable evidence of harm or evidence of only de minimus damages (Category 2); and purchases were made when no MFN agreement was in effect (Category 3).  Category 1 is allocated to receive 78 percent of the Net Settlement Fund, Category 2 will receive 20 percent of the Net Settlement Fund, and Category 3 will receive 2 percent

of the Net Settlement Fund. The Plan of Allocation is structured where the stronger claims receive more than the other claims where damages are less. Any payments in Category 3 which are too small to distribute will instead be made to the non-profit organization Free Clinics of Michigan, a charity providing free health services throughout Michigan. This non-profit was agreed to by the parties.

### 10. Conclusion/Summary

Having reviewed and heard the Objections and arguments by the parties and having weighed the factors set forth above, the Court finds that the Settlement submitted to the Court is fair, reasonable and adequate and that the Plan of Allocation is also fair, reasonable and adequate. The Court approves the Settlement and the Plan of Allocation. The Objections are overruled for the reasons set forth above.

## IV. ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARDS

### A. Attorneys' Fees and Expenses Standard of Review

District courts may award reasonable attorneys' fees and expenses from the settlement of a class action upon motion under Fed. R. Civ. P. 54(d)(2) and 23(h). The court engages in a two-part analysis when assessing the reasonableness of a fee petition. *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 760 (S.D. Ohio 2007). First, the court determines the method of calculating the attorneys' fees–either the percentage of the fund approach or the lodestar method. *Id.*; *Van Horn v.*

*Nationwide Prop. and Cas. Inc. Co.*, 436 F. App'x 496, 498 (6th Cir. 2011). The court has the discretion to select the appropriate method for calculating attorneys fees "in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them." *Rawlings v. Prudential-Bache Props., Inc.,* 9 F.3d 513, 516 (6th Cir. 1993). In common fund cases, the award of attorneys' fees need only "be reasonable under the circumstances." *Id.* Second, the court must then analyze and weigh the six factors described in *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188 (6th Cir. 1974). *Id.*

## B. Percentage of the Fund Approach

Class Counsel asserts that the Court should award attorneys' fees using the percentage of the fund approach at one-third of the fund amount. Class Counsel argues that this Circuit approves and prefers the percentage of the fund approach in awarding attorneys' fees because it eliminates disputes about the reasonableness of rates and hours, conserves judicial resources, and fully aligns the interests of Class Counsel and the Class. *See, e.g., Rawlings,* 9 F.3d at 515. Class Counsel notes that the requested fee is $5.5 million less than their actual fees based on the lodestar approach. Courts in this District have approved attorneys' fees in antitrust class actions anywhere from a 30% to one-third ratio of the common fund. *See, In re Packaged Ice Antitrust Litig.*, 08-MDL-01952, 2011 WL 6209188, at *19 (E.D. Mich.

35

Dec. 13, 2011); *Kogan v. AIMCO Fox Chase, L.P.,* 193 F.R.D. 496, 503 (E.D. Mich. 2000). Courts have noted that the range of reasonableness in common fund cases is from 20 to 50 percent of the common fund. *See, In re Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig.,* 137 F. Supp. 2d 1029, 1046 (S.D. Ohio 2001); *In re Cincinnati Gas & Elec. Co. Sec. Litig.*, 643 F. Supp. 148, 150 (S.D. Ohio 1986).

Class Counsel claims that Co-Lead Counsel coordinated the efforts of all Plaintiffs' Counsel to maximize efficiency, minimize duplication of effort, and minimize any unnecessary or duplicative billing. Class Counsel asserts the time submissions were reviewed to ensure that no person submitted time for unauthorized work.

As noted previously, this action is a complex antitrust class action. Class Counsel submitted declarations of the various attorneys who participated in this case setting forth their attorneys' fees and expenses incurred. Based on the submission of Class Counsel and after review of the Objections submitted, the Court finds that the percentage of the fund method is the proper measure to award attorneys' fees in this case rather than the lodestar method. The percentage of the fund method eliminates arguments regarding the reasonableness of rates and hours incurred by the numerous counsel involved in this case and fully aligns with the interest of the Class. *Rawlings,*

9 F.3d at 515.

The Court further finds that the requested one-third of the fund percentage at $9,996,667.00 is reasonable in light of the time and resources expended by Class Counsel in this case. Taking Class Counsel's submissions regarding the fees incurred at $15,497,960.25 under the lodestar method, the one-third ratio awards Class Counsel more than $5 million *less* if the lodestar method was instead used in this case. Even if 10% of the lodestar amount was decreased, Class Counsel's fees under the lodestar method would still be higher than the one-third amount requested by Class Counsel. The Court finds that Class Counsel properly supported the request to award one-third of the common fund as attorneys' fees.

### C.    *Ramey* Factors

The Court must also review the requested fees and weigh the factors set forth in *Ramey*: (1) the value of the benefits rendered to the class; (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (3) whether the services were undertaken on a contingent fee basis; (4) the value of the services on an hourly basis [the lodestar cross-check]; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel on both sides. *Ramey*, 508 F.2d at 1194-97. Based on the Class Counsel submissions and reviewing the Objections to the requested fees, the Court finds that each of these factors weighs

in favor of awarding the requested attorneys' fees.

The first factor, the value of the benefit to the Class, is that the Settlement provides cash payment of $29.99 million to the Class Members. As previously noted, this amount represents 25% of the overcharges the Class Members paid as estimated by Plaintiffs' expert. Courts have approved settlements in class action antitrust settlements anywhere between 5.35% to 28% of estimated damages in a complex antitrust class actions. *See, In re Linerboard,* 2004 WL 1221350, at *4. This amount weights in favor of approving the fee award in light of the risks of the litigation as previously addressed.

Regarding the second factor, the society's stake in rewarding attorneys as an incentive, the Court finds this weighs in favor of approving the fee request. A court is tasked with ensuring that counsel are fairly compensated for the work performed and the result achieved. *Rawlings,* 9 F.3d at 516. "Encouraging qualified counsel to bring inherently difficult and risky but beneficial class actions ... benefits society." *In re Cardizem*, 218 F.R.D. at 534. In this case, Class Counsel's work resulted in a settlement for the Class, which in light of the risk of the litigation the attorneys' fees requested are reasonable. As noted above, courts have held that the public interest is strong in encouraging settlement of complex litigation and class action suits because they are difficult and unpredictable. The settlement conserves judicial resources and

38

compensates class members.

The third factor, whether the services were undertaken on a contingent fee basis, weighs in favor of awarding the attorneys' fees requested. Contingency fee arrangements indicate that there is a certain degree of risk in obtaining a recovery. *In re Telectronics,* 137 F. Supp. 2d at 1043. Plaintiff's Counsel prosecuted the cases on a contingent basis. They are aware that for a variety of reasons, including information revealed during discovery, court rulings on motions, and findings by a jury, Plaintiff's Counsel could recover no fee for prosecuting the cases. The nature of the contingent fee arrangement between Plaintiffs and their Counsel weighs in favor of the fees requested by Class Counsel.

As to the fourth factor, the value of the services on an hourly basis [the lodestar cross-check], as noted above, if the Court were to award the attorneys' fees based on the lodestar method, the fees would exceed by more than $5 million the requested one-third ratio. The Court finds that the requested one-third attorneys' fees amount is reasonable.

The Court has noted, and there is no real dispute that this antitrust litigation is complex. This fifth factor, the complexity of the litigation, weighs in favor of awarding the requested attorneys' fees.

The sixth factor, the professional skill and standing of counsel on both sides,

weigh in favor of awarding the attorneys' fees requested. "The ability of Co-Lead Counsel to negotiate a favorable settlement in the face of formidable legal opposition further evidences the reasonableness of the fee award requested." *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.,* 248 F.R.D. 483, 504 (E.D. Mich. 2008). The Court has observed counsel on all sides of this litigation. There is no doubt that Blue Cross is a formidable opponent. Blue Cross' counsel have zealously defended Blue Cross' position in this litigation and the related litigation before the Court. Class Counsel and the other Plaintiffs' Counsel in this case have also vigorously prosecuted the case on behalf of the Class. Class Counsel have submitted the lead counsels' backgrounds which indicate that each counsel have excellent standing amongst their peers and all are well-experienced in this area of litigation.

Weighing the *Ramey* factors set forth by the Sixth Circuit, for the reasons set forth above, they requested attorneys' fees of one-third of the Settlement Fund is fair and reasonable and is so awarded.

### D. Expenses

Class Counsel asserts that they have incurred litigation expenses in the aggregate amount of $3,499,893.02 for the benefit of the Settlement Class. They claim that a significant component of the expenses is the cost of the expert work performed on behalf of the Settlement Class. They retained highly qualified economic

experts to analyze the impact of Blue Cross' MFN clauses on prices of acute care hospital healthcare services in Michigan, and to address other issues such as market definition and market power. Class Counsel claims the experts' work required complex statistical analysis of extraordinarily large amounts of data. They assert that the notice sent to the Class indicated Class Counsel would seek up to $3,500,000 in attorneys' fees. The costs incurred by Class Counsel is in line with the notice sent to the Class. Class Counsel indicated they will not seek reimbursement of certain expenses, including approximately $146,000 in expenses related to sending notice to an additional 500,000 names. Class Counsel asserts that they incurred the millions of dollars of expenses in this case, without any guarantee of recovery. Class Counsel claims the out of pocket expenses support their commitment to this case, even with the substantial risks inherent in this complex class action litigation.

Class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document productions, consulting with experts and consultants, travel and other litigation-related expenses. *In re Cardizem,* 218 F.R.D. at 535. The type of expenses compensable are the type typically billed by attorneys to paying clients in the marketplace. *Id.* Courts have recognized that the assistance of qualified experts is necessary and a costly expense

41

in antitrust litigation. *See, B&H Med., L.L.C. v. ABP Admin., Inc.,* No. 02-73615, 2006 WL 123785, at *3 (E.D. Mich. Jan. 13, 2006).

Reviewing the expenses incurred by Class Counsel set forth in their declarations and after considering the Objections, the Court finds that the requested amount incurred by counsel out-of-pocket is reasonable, in light of the time, resources, expert analysis and complexity of this class action case. The amount requested is substantial at $3,499,893.02. However, this amount includes complicated analysis by experts as to how the MFN clauses impacted healthcare services in Michigan using extraordinarily large amount of data. Class Counsel have shown that the experts provided significant services on behalf of the Settlement Class resulting in the settlement between the parties.

### E.    Incentive Awards

Class Counsel request $165,000 in incentive awards for each Plaintiff organization and individual Plaintiffs as follows:

- Michigan Regional Council of Carpenters Employee benefits Fund - $45,000;
- Abatement Workers National Health and Welfare Fund - $35,000;
- Monroe Plumbers & Pipefitter Local 671 Welfare Fund - $35,000
- The Shane Group, Inc. - $20,000
- Susan Baynard - $10,000
- Anne Patrice Noah - $10,000

- Bradley Veneberg - $5,000
- Scott Steele - $5,000

The Notice to the Settlement Class provided incentive awards for the class representatives at $240,000, which is .8% of the Settlement Fund. However, Class Counsel is only seeking a total of $165,000 in incentive awards, which is at 0.55% of the Settlement Fund, lower than the amount in the Notice.

The Sixth Circuit has noted that incentive awards are typically awarded to class representatives for their extensive involvement with a lawsuit. *Hadix*, 322 F.3d at 897. Awards encourage members of a class to become class representatives and reward their efforts taken on behalf of the class. *Id.* Payment of incentive awards to class representatives is a reasonable use of settlement funds. *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 351 (6th Cir. 2009). Courts have approved incentive awards of up to $15,000 for individual plaintiff class representatives for providing information to class counsel, receiving and approving pleadings, assisting in discovery and participating in settlement discussions. *See, In re CMS Energy ERISA Litig.*, No. 02-72834, 2006 WL 2109499, at *3 (E.D. Mich. June 27, 2006). Larger incentive awards than those to individual plaintiffs have been approved for organizational class representatives because of the greater burden in the course of litigation by producing greater numbers of documents and participating in Rule 30(b)(6) depositions. *See, In*

43

*re Vitamin C Antitrust Litig.*, No. 06-MD-1738, 2012 WL 5289514, at *11 (E.D. N.Y. Oct. 23, 2012).

After reviewing the request for incentive awards and the Objections thereto, the Court finds that awards requested are reasonable. The three Union self-funded organizations produced thousands of documents during discovery. The organizations shared their knowledge of the industry with Class Counsel and assisted in drafting and responding to discovery requests. The organizations' staff and agents spent time and resources during the litigation resulting in the settlement on behalf of the Class. The Shane Group was an initial filer of the lawsuit in October 2010. Its representatives worked with Class Counsel throughout the litigation locating and producing documents, responding to discovery requests and reviewing filings in the case. Based on these four groups' participation in the litigation resulting in the settlement on behalf of the Class, the incentive awards requested for each are reasonable.

As to the individual awards for Baynard and Noah, according to Class Counsel, they provided important and indispensable service to the Settlement Class. They searched their personal records multiple times to locate documents responsive to Blue Cross' discovery requests and obtained documents in the custody of third parties. Both testified via depositions, which required them to travel to Detroit from northern Michigan. The Court finds that the requested incentive awards for Noah and Baynard

44

are reasonable in light of their participation during the discovery phase of the litigation. Their participation benefitted the Class.

The individuals Veneberg and Steele filed their complaints in October 2010 and January 2011, respectively. They both participated in discovery by locating and producing documents. The Court finds that their participation in the litigation supports the requested incentive awards.

## V. SANCTIONS

Objector Christopher Andrews field a Motion for Sanctions against Class Counsel for their filings related to their requested fees and approval of the settlement. Class Counsel responds that Andrews has not provided any basis for sanctioning Class Counsel. In turn, Class Counsel filed a Motion for Show Cause relating to sanctionable conduct by Andrews. Andrews responds that Class Counsel are the ones engaging in sanctionable conduct. Since the Fairness Hearing in this matter, Andrews has filed supplemental documents with the Court. Class Counsel has also filed supplemental documents with the Court.

Rule 11 permits sanctions if "a reasonable inquiry discloses the pleading, motion, or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay." *Merritt v. Int'l*

*Ass'n of Mach. and Aerospace Workers,* 613 F.3d 609, 626 (6th Cir. 2010). Rule 11

sanctions are warranted if the attorney's conduct was unreasonable under the

circumstances. *Andretti v. Borla Performance Indus., Inc.,* 426 F.3d 824, 833 (6th

Cir. 2005). The grant of sanctions must be reviewed in the context of the litigation

history of the action. *Merritt,* 613 F.3d at 627. The central purpose of Rule 11 is to

deter baseless filings in the district court. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S.

384, 393 (1990).

As to Class Counsel's actions relating to this case and the responses filed to

Andrews' submissions, the Court finds that their submissions have been well

grounded in fact and the circumstances, made in good faith and were not filed for any

improper purpose, harassment, or delay. Class Counsel's filings have been in

accordance with the rules and the Court's orders regarding filings of documents

related to the Class Action Settlement and Fairness Hearing.

Regarding Andrews' *pro se* submissions, the Court finds that many of the

submissions are not warranted by the law and facts of the case, were not filed in good

faith and were filed to harass Class Counsel. Class Counsel claims Andrews'

demands for payment of a "ransom," is extortion. Rule 11 requires a *pro se* plaintiff

to sign any document filed with the court as certification that the document is not

being submitted for an improper purpose and that the documents' legal claims and

46

factual allegations are warranted. Fed. R. Civ. P. 11(c); *Garrison v. Mich. Dep't of Corr.,* 333 F. App'x 914, 920 (6th Cir. 2009). The court may impose an appropriate sanction on a party who violates the rule. *Garrison,* 333 F. App'x at 920. Sanctions imposed by the court require a finding of fraud or willful disobedience of a court order. *Id.* Here, although Andrews has submitted various documents to the Court, the Court finds he has not disobeyed any court order, nor has Class Counsel alleged Andrews has committed fraud. Class Counsel only argues that Andrews' communications to Class Counsel amount to "criminal extortion" in that Andrews is attempting to interfere with the Court's authority and proceedings by demanding that filed pleadings be withdrawn and that he be paid an undisclosed sum of money. The demands by Andrews are just that, demands which the Court need not consider.

The Court is aware that other courts have noted that Andrews is known to be a "professional objector who has extorted additional fees from counsel in other cases," but this Court will not at this time sanction his conduct of filing documents with the Court. *See, In re Nutella Marketing and Sales Practices Litig.,* No. 11-cv-01086 (D.N.J.)(7/9/12 Fairness Hearing Tr., Ex. C to Doc. No. 201). As to Class Counsel's claim that Andrews has engaged in criminal extortion, Class Counsel is free to pursue that claim with the appropriate authorities.

## VI.   CONCLUSION

For the reasons set forth above, the Court finds that the Settlement and the Plan of Allocation is fair, reasonable and adequate to the interest of the Class Members.

Accordingly,

IT IS ORDERED that the Motion for Attorneys' Fees, Reimbursement of Expenses and Payment of Incentive Awards to Class Representatives **(Doc. No. 155)** is GRANTED.

IT IS FURTHER ORDERED that the Motions to Intervene for the Limited Purpose of Unsealing Records and Adjourning Fairness Hearing **(Doc. Nos. 166, 183, 185, 186, and 192**) are DENIED.

IT IS FURTHER ORDERED that the Motion for Final Approval of Settlement and Plan of Allocation **(Doc. No. 169)** is GRANTED.

IT IS FURTHER ORDERED that the Motion to Strike Sur-Reply of Objector Christopher Andrews **(Doc. No. 177)** is DENIED.

IT IS FURTHER ORDERED that the Motion for Sanctions filed by Christopher Andrews **(Doc. No. 205)** is DENIED.

IT IS FURTHER ORDERED that Class Counsels' Emergency Motion for Show Cause Order Relating to Sanctionable Conduct by Objector Christopher Andrews **(Doc. No. 206)** is DENIED.

48

s/Denise Page Hood
DENISE PAGE HOOD
United States District Judge

DATED: March 31, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 31, 2015, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager

49